## UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA

```
UNITED STATES OF AMERICA      :
                              :
             Plaintiff,       :   Criminal Action
                              :   No. 1:17-cr-00222-LO
v.                            :
                              :
WILLIAM S. WILSON and         :
                              :
MATTHEW KEKOA LUMHO,          :   June 22, 2021
                              :   9:30 a.m.
                              :
             Defendants.      :
                              :
.............................. :
```

### DAY 10 - MORNING and AFTERNOON SESSION
### TRANSCRIPT OF JURY TRIAL PROCEEDINGS
### BEFORE THE HONORABLE LIAM O'GRADY, and a JURY
### UNITED STATES DISTRICT COURT JUDGE

APPEARANCES:

For the United States:        **Matthew Burke, Assistant U.S.**
                              **Attorney**
                              United States Attorney's Office
                              (Alexandria)
                              2100 Jamieson Avenue
                              Alexandria, VA 22314
                              703-299-3700
                              Email: Matthew.Burke@usdoj.gov

                              **Russell L. Carlberg, Assistant U.S.**
                              **Attorney**
                              United States Attorney's Office
                              (Alexandria)
                              2100 Jamieson Avenue
                              Alexandria, VA 22314
                              703-299-3700
                              Email: Russell.L.Carlberg@usdoj.gov

```
APPEARANCES:   (Cont.)



For Defendant Wilson:        Andrew Michael Stewart, Esq.
                             Dennis Stewart & Krischer PLLC
                             2007 15th Street N
                             Suite 201
                             Arlington, VA 22201
                             703-248-0626
                             Email:
                             Andrew.m.stewart.esq@gmail.com

                             Stuart Alexander Sears, Esq.
                             Schertler Onorato Mead & Sears,
                             LLP
                             901 New York Avenue, NW
                             Suite 500 West
                             Washington, DC 20001-4432
                             202-628-4199
                             Fax: 202-628-4177
                             Email: Ssears@schertlerlaw.com


For Defendant Lumho:         Christopher Bryan Amolsch, Esq.
                             Law Office of Christopher Amolsch
                             12005 Sunrise Valley Drive
                             Suite 200
                             Reston, VA 20191
                             703-969-2214
                             Fax: 703-774-1201
                             Email: Chrisamolsch@yahoo.com

                             Frank Salvato, Esq.
                             1203 Duke Street
                             Alexandria, VA 22314
                             703- 548-5000
                             Email: Frank@salvatolaw.com


Court Reporter:              Scott L. Wallace, RDR, RMR, CRR
                             Official Court Reporter
                             United States District Court
                             401 Courthouse Square
                             Alexandria, VA  2231-5798
                             Office: 703-549-4626
                             Cell: 202-277-3739
                             Email: Scottwallace.edva@gmail.com


Proceedings reported by machine shorthand, transcript produced
by computer-aided transcription.
```

# **C O N T E N T S**

### **EXAMINATIONS**                                        **Page**

DIRECT EXAMINATION OF MATTHEW KEKOA LUMHO          13
BY MR. AMOLSCH

CROSS-EXAMINATION OF MATTHEW KEKOA LUMHO          195
BY MR. CARLBERG

REDIRECT EXAMINATION OF MATTHEW KEKOA LUMHO       282
BY MR. AMOLSCH

### **EXHIBITS**

**DESCRIPTION**

Defendant's Exhibit 41 admitted                   124

Government's Exhibit 1564 marked                  226

Government's Exhibit 1564 admitted               226

Government's Exhibit 1550 admitted               255

Government's Exhibit 1551 admitted               259

Government's Exhibit 1552 admitted               260

Government's Exhibit 1553 admitted               278

Defendant's Exhibit 15 admitted                   47

Defendant's Exhibit 37 admitted                   59

Defendant's Exhibit 38 admitted                   63

Defendant's Exhibit 39 admitted                   99

Defendant's Exhibit 40 admitted                  121

Defendant's Exhibit 42 admitted                  134

Defendant's Exhibit 43 admitted                  146

Defendant's Exhibit 44 admitted                  149

Defendant's Exhibit 45 admitted                  **157**

## **EXHIBITS**

| **DESCRIPTION** | **Page** |
|---|---|
| Defendant's Exhibit 46 admitted | 159 |
| Defendant's Exhibit 47 admitted | 166 |
| Defendant's Exhibit 28 admitted | 194 |

1       <u>**MORNING SESSION, JUNE 22, 2021**</u>

2   (9:35 a.m.)

3       THE COURT:  All right.  Good morning.  I see all counsel

4   and Mr. Lumho and Mr. Wilson are here.  Good morning to everyone.

5   Thank you again for the jury instructions.  I've gotten them and

6   looked them over and we've made some changes, and we'll see where

7   we are at the end of the case for purposes of any modifications

8   we need to make.  Mr. Burke.

9       MR. BURKE:  Your Honor, I did have one housekeeping

10  matter.  So we have been excluding all of our agents with the

11  exception of Ms. Russo.  I guess the housekeeping matter I had is

12  that at this point we do not see any likelihood that we would

13  call Special Agent Brian Futagaki or Special Agent Julian Donuwa

14  in any rebuttal case.  I'm not sure we're going to have a

15  rebuttal case, but if we do I can't imagine we'll call either

16  agent.

17      THE COURT:  Okay.

18      MR. BURKE:  I don't expect the defense to call either of

19  those agents to complete impeachments or for anything else.  And

20  so if the defense can tell me whether they still need to exclude

21  them, then we'll exclude them, but if there's no need.

22      MR. AMOLSCH:  No need.

23      MR. STEWART:  No need.

24      MR. BURKE:  Then Your Honor, I guess I would ask that

25  Special Agent Futagaki and Special Agent Donuwa be allowed to sit

1    in the courtroom.  But, in an abundance of caution, I would ask

2    that Special Agent Giardina and Ms. Rachel Bingham, who I do not

3    see, not enter the courtroom until we figure out if there's

4    anything further from either of those witnesses.

5          THE COURT:  All right.  That's fine.

6          MR. SEARS:  Your Honor, I have -- I hate to do this to the

7    Court but there is an issue that came to my mind this morning

8    with regard to the jury instructions.  And all I can say in my

9    defense is that I was so hyper focus on honest services fraud

10   that I may not have paid as close attention to some of the other

11   instructions.

12         And the conversation I had with Mr. Burke last night about

13   the good faith instruction and then this morning going through,

14   you know, more carefully, the instructions that were sent to the

15   Court last night, I realize that from our perspective there's a

16   missing element in the false claims instruction.  I believe it's

17   on page 86 of the government's submission last night.  And what's

18   missing, from our perspective, Your Honor, is a requirement that

19   the government prove that the defendants acted willfully.  There

20   is a split in the circuits on that issue.

21         My reading of the 4th Circuit case that addresses this

22   issue, which is United States versus Maher, M-A-H-E-R, it is 582

23   F.2nd 842.  I will tell the Court it is an old case, it is 1978.

24   It was before Judge Bryan.  Plato Cacheris was the defense

25   attorney in the case.  Bill Cummings was the U.S. Attorney, so

1    it's kind of the who's who of EDVA back in the day.

2         And Judge Bryan gave an instruction in a false claims case

3    trial that required, you know, the government to show -- prove

4    that the defendant acted willfully with the intent to violate the

5    law.  And as far as I can tell, that is good law, still, even

6    though it's a 1978 case.  It doesn't even have a yellow flag on

7    it in Westlaw so it's about as good as it gets.

8         And I sent to the government this morning -- I didn't come

9    across this issue until this morning, and so I sent the case to

10   the government.

11        I also sent them links via e-mail to two Department of

12   Justice guidelines on false claims acts cases.  One was a tax

13   division one was a criminal division, and both of those documents

14   or Web sites seem to recognize that the 4th Circuit does require

15   that element.

16        I think that if the government agrees that it's a quick

17   fix, just adding that word to -- willfully, adding "willfully" to

18   the element -- to one of the elements of the offense that's

19   already in there, and we already have the willfully instruction

20   as relates to the false statements counts.  So it just needs to

21   be referenced to that or move that one up further up to the false

22   claims.

23        So I think it can be a quick fix, but I also, in addition

24   to that, Your Honor, I wanted to preserve an argument that we

25   believe that there should -- that the law should require a

1    specific intent to defraud with regard to false claims.  I can

2    tell the Court in the 4th Circuit and many other circuits it is

3    not a requirement with regard to false or fictitious claims.  The

4    false claims statute charges false fictitious or fraudulent

5    claims.

6         As far as I can tell, and according to the instruction

7    that will be provided in this case, false and fictitious claims

8    do not require an intent to defraud.  It's just a fact that it

9    was false, you knew it was false, and you submitted it.

10         Fraudulent claims appear to require an intent to defraud.

11   I am not smart enough despite my efforts to figure out the

12   difference between a false fictitious and fraudulent claim, but

13   that's what the law appears to be.  And I just wanted it to be

14   clear on the record because this is an issue that we may take up

15   given the facts of this case, that we believe the government

16   should have to show -- prove a specific intent to defraud.  And I

17   recognize it's not the case law as it exists right now, at least

18   with regard to false and fictitious claims, but I wanted to

19   reserve the argument, Your Honor, and I should have done that

20   yesterday, and I apologize for not doing so.

21         THE COURT:  That's quite all right.  There was a lot going

22   on with the instructions.  Mr. Burke.

23         MR. BURKE:  So, Your Honor, I agree with Mr. Sears as to

24   the second point.  I think the law is, at least the state of the

25   law currently, as to Section 287, it does not require -- phrased

1    in the disjunctive and the courts I believe have ruled that.  As

2    a result the government can prove it any of those ways and,

3    therefore, you don't necessarily need to show intent to defraud

4    on a false claims count.

5          The issue about willfully, Your Honor, it was only brought

6    to my attention this morning.  I had a chance to glance at the

7    case that Mr. Sears brought to my attention, but I haven't had a

8    chance to really digest the issue.

9          I will note that the text of Section 287 does not say

10   anything about willfully.  It says, "Knowing such claim to be

11   false, fictitious or fraudulent."  And so I would simply ask the

12   Court's indulgence for a little bit of time, perhaps over the

13   lunch hour or early this afternoon to look at it, to look at the

14   *Hidell* case and to make a judgment about what we think the

15   correct language should be.

16         THE COURT:  Yeah, that's fine.  We'll all look at it when

17   we have an opportunity and then be able to or substantively

18   engage in discussion.

19         MR. BURKE:  And, Your Honor, just one other thing I wanted

20   to flag, and I don't know that it needs to be decided right at

21   this moment, but I want to make sure that it's flagged for the

22   Court and for Council's consideration.

23         We've not yet had any discussions about potential

24   forfeiture jury instructions, or whether there will even be a

25   forfeiture jury trial.  My understanding of the law is that the

1    defense -- so, so the forfeit -- if there is a forfeiture phase

2    it would apply only to Mr. Wilson because there are no specific

3    assets sought to be forfeited from Mr. Lumho.

4         And my understanding of the law is that the defense needs

5    to make an election prior to your charging the jury about guilt

6    or innocence about whether they would request a forfeiture jury

7    trial.

8         So I don't know that we need to decide that right now, but

9    I just wanted to make sure we had all thought about it and if

10   they want a jury trial, then we need to address the potential

11   forfeiture jury instructions.

12        THE COURT:  All right.  We also haven't discussed the

13   verdict form for the criminal phase, and you had proposed one.

14        MR. BURKE:  Yes, Your Honor, and I will say that since the

15   one we proposed for the first trial, we've taken another look at

16   it.  We've made some revisions.  I have not had a chance to

17   finalize that or share with the defense but again I would expect

18   over the lunch hour, perhaps early this afternoon we hope.

19        And it may also depend upon whether or not either

20   defendant, or both defendants request a lesser include

21   instruction, that will affect what the verdict form says as well.

22   But we will continue to work with Counsel to try to come up with

23   a verdict form that everyone can live with.  And I think it's

24   still somewhat in flux because we're not sure exactly what

25   instructions the defendants may request.

1          THE COURT:  Okay.

2          MR. AMOLSCH:  Your Honor, thank you.  And just for the

3     record, if you could just please note that Mr. Lumho joins all of

4     the objections Mr. Sears put on the record.

5          THE COURT:  Certainly.

6          MR. AMOLSCH:  Thank you, sir.

7          THE COURT:  All right.  Well, Mr. Stewart, Mr. Sears,

8     think about the forfeiture issue, and I can say I've only had one

9     forfeiture case following a criminal conviction where the jury

10    was involved.  Every other case, and I think most cases there's a

11    waiver of a jury, but there's an entitlement to a jury

12    determining forfeiture.

13         So think about that and let me speak with Mr. Wilson and

14    let me know because we'll use this same jury, should that

15    forfeiture case continue on with the jury.  You know, and as soon

16    as they've made their decision on guilt or innocence, if they

17    found Mr. Wilson guilty of the charges that would require

18    forfeiture, then we'll go right into that phase.  If we're going

19    to use the jury we won't recess the jury.  So let's be ready for

20    that.

21         MR. STEWART:  Your Honor, that's what we had anticipated

22    and we also expect that we'll have a decision for, Your Honor,

23    about waiver when the time comes.

24         THE COURT:  Okay.

25         MR. STEWART:  Thank you, Your Honor.

```
 1          THE COURT:  All right.  Thank you.  All right.

 2          Anything before we bring our jury in?  Is Mr. Lumho going

 3     to testify?

 4          MR. AMOLSCH:  Yes, Your Honor.  He is.

 5          THE COURT:  Okay.  And so you -- we went over this in your

 6     last trial, but -- and you testified in that case, but I'll

 7     remind you that you have a right to remain silent and that

 8     Constitution guarantees you that right and no inference can be

 9     made of your guilt based on your failure to testify.

10          On the other hand, if you do testify, then certainly

11     you'll be subject to cross-examination as you were previously in

12     all of the areas that the government can rightfully go into.  You

13     had an opportunity to discuss that with Counsel?

14          THE DEFENDANT:  Yes, Your Honor.

15          THE COURT:  And you've decided that you want to testify in

16     the case.

17          THE DEFENDANT:  Absolutely.

18          THE COURT:  Okay.  All right.  Let's get our jury.  Ira,

19     please.

20          (Jury in at 9:47 a.m.)

21          THE COURT:  All right.  Please, have a seat.  Good morning

22     ladies and gentlemen.  Thank you once again for making your way

23     back in here timely.  We've been doing a little work out here.  I

24     apologize for the delay.  Let me have a show of nods that you

25     didn't do any investigation or research or talk to anybody about
```

```
 1    the case.

 2            THE JURY PANEL:  (Nodded head affirmatively.)

 3            THE COURT:  All right.  Thank you very much.  All right,

 4    Mr. Amolsch.

 5            MR. AMOLSCH:  Yes, Your Honor, we call Mr. Lumho, please.

 6             (MATTHEW LUMHO, DEFENDANT IN THE CASE, SWORN)

 7              DIRECT EXAMINATION OF MATTHEW KEKOA LUMHO

 8    BY MR. AMOLSCH:

 9    Q.      Good morning, Mr. Lumho.

10    A.      Good morning.

11    Q.      And I'm going to tell you what the government told every

12    other witness, just make sure you --

13    A.      -- not too close.

14    Q.      Not too close, but not too far away.

15    A.      Okay.

16    Q.      Could you introduce yourself to the jury, please?

17    A.      Good morning.  My name is Matthew Kekoa Lumho.  It's

18    M-A-T-T-H-E-W, Lumho, L-U-M-H-O.

19    BY MR. AMOLSCH:

20    Q.      And how old are you, sir?

21    A.      46.

22    Q.      And where were you born?

23    A.      I was born in Fort Knox, Kentucky.

24    Q.      And where did you grow up?

25    A.      My father was an Army officer, so I grew up all over the
```

1   world, in Germany, California, Fort Leavenworth, ultimately here

2   in the Washington, D.C. area since I was in 4th grade.

3   **Q.**    4th grade.  You said your father was a veteran?

4   **A.**    Yes, sir.

5   **Q.**    And what branch of the service was he in?

6   **A.**    He was a colonel in the Army.

7   **Q.**    Did he retire as a colonel?

8   **A.**    He did, after 32 years in the Army.

9   **Q.**    Did you go to high school around here?

10  **A.**    I did.  I went a high school in Fairfax County, Robert E.

11  Lee High School.

12  **Q.**    Do you know what it's called now?

13  **A.**    I don't.

14  **Q.**    I know they changed the name.

15  **A.**    Did they?

16  **Q.**    Yeah.  Okay.

17  **A.**    I don't know.

18  **Q.**    Did you play any sports when you were there?

19  **A.**    Yes.  I played lacrosse all four years of high school.

20  **Q.**    All right.  And did you have any particular position or

21  role on the lacrosse team?

22  **A.**    I was a captain my junior and senior year.  I played

23  attack.

24  **Q.**    And did you play -- did you go to college afterwards?

25  **A.**    I went to college.  I was recruited to go to a number of

1    colleges, but chose to go to a community college in Baltimore,

2    Maryland, where they have a strong lacrosse team.  So I went

3    there for a year, and decided after a year of schooling that

4    schooling and myself didn't get along very well, so I stopped

5    going to school.

6    **Q.**    All right.  What was that school?

7    **A.**    It was Essex Community College.

8    **Q.**    Essex Community College?

9    **A.**    Which I think they changed their name.

10   **Q.**    And are you married, sir?

11   **A.**    I am.

12   **Q.**    Who's your wife?

13   **A.**    Delilah Lumho.

14   **Q.**    Did she also work with you at the Office of the Inspector

15   General?

16   **A.**    She did.

17   **Q.**    What was her position there?

18   **A.**    She was the chief of administration, logistics division.

19   **Q.**    Did other -- were there other people who worked at OIG

20   who were also married and working together?

21   **A.**    There were a number of auditors then also.  Folks in my

22   division that -- or in my directorate that were married.

23   **Q.**    All worked together?

24   **A.**    Yes.

25   **Q.**    Do you have any children?

1    **A.**    I do.

2    **Q.**    And how old are they?

3    **A.**    I have a 24 year old, Mia, and a 22 year old Nina, who

4    both live -- moved out recently, and a 16 year old -- or a 15

5    year old, and a 10 year old.

6    **Q.**    All right.  And do they live with you as well?

7    **A.**    My son, my ten-year old lives with me.

8    **Q.**    And what's his name?

9    **A.**    His name is Kekoa as well.

10   **Q.**    Do you call him little Kekoa, is that how you keep track

11   of it?

12   **A.**    I call him a number of things but mostly it's either

13   buddy or Kekoa, yes.

14   **Q.**    And do you also know a man named Fidel Ramos?

15   **A.**    Yes.

16   **Q.**    And who is Fidel?

17   **A.**    He is my father-in-law.

18   **Q.**    And does he live with you?

19   **A.**    He lives -- yes, he does live with me.

20   **Q.**    Okay.  And how did that come to be?

21   **A.**    So he had moved from California where he -- where he grew

22   up and was living to Mexico with a girlfriend of his, and he

23   lived in a small little town near Queretaro, Mexico with his

24   girlfriend, and he started a little secondhand store.

25          And after a few years the relationship started to break

1    up, and so he didn't have any family there and he -- I think he

2    was -- he wasn't happy there anymore.  So he came -- after my

3    son was born, my son was almost six months old, we convinced him

4    to come visit to see his grandson, knowing that we were going to

5    try to convince him that you should be with family and not away.

6    And so he came and visited and he hasn't left since.

7    **Q.**    Okay.  And where does he live in your house?

8    **A.**    Initially, he lived in one of our spare bedrooms, but we

9    have an attic that's finished, it's a suite up in our attic, and

10   so he lives in our finished attic suite.

11   **Q.**    Does he help look out for little Kekoa?

12   **A.**    He does, yes.

13   **Q.**    Does he have a particular name for little Kekoa?

14   **A.**    Yeah.  He calls him, "little buddy."

15   **Q.**    His little buddy?

16   **A.**    Yeah.

17   **Q.**    Can you describe briefly your relationship with Fidel?

18   **A.**    Um, it's -- I mean he's my father-in-law and I love him,

19   but he's -- he's another man in the house and we have our own

20   ways of doing things.  So we don't see -- we're very cordial and

21   respectful of each other's space, and -- but -- we have a good

22   relationship, it -- it's just -- since the situation that's

23   happened here, we don't talk.  We haven't talked very often.

24   **Q.**    Are you still helping him out with his taxes and banking

25   and things like that?

1   **A.**      So his taxes, for example, up until 2017 when all this

2   unfolded and happened, I had been doing his taxes.  When he

3   first moved in with me he hadn't done his taxes since 2007 or

4   '08.

5        And so after the year of him living with me, I told him,

6   "You got to -- you need to get your taxes straight.  The last

7   thing I want is for something as simple as taxes to come and

8   bite you."

9        And so I did his taxes for the -- from 2007 until 2012 or

10  the tax year of 2011, is when I caught up all of his taxes.  So

11  I went back and did all of his taxes and paid all of his taxes

12  to make sure that he was straight.

13  **Q.**      Who paid those?

14  **A.**      I did.

15  **Q.**      You did?

16  **A.**      Yes.

17  **Q.**      And why did you do that for him, rather than having him

18  do it himself?

19  **A.**      He's not able to -- he wouldn't have be- -- he wouldn't

20  have been -- he gets frustrated very easily when he tries to

21  read and write.  Yeah.  He can read a bit, but my son can read

22  better than him.  My son is going in 4th grade, my son.  So he

23  gets very frustrated when -- when -- when he has to deal with

24  that.

25  **Q.**      Do you have any volunteer activities outside of the

1    house?

2    **A.**    Yes.  So I -- since I was indicted, my current employer,

3    Department of Justice has me on indefinite suspension, so I'm

4    not able to work.  So for the past three years I have been

5    volunteering at my church.  We are -- the Burke Community Church

6    in Burke, Virginia.  We have started a -- I'm sorry, I'm drawing

7    a blank what it's called.  It's called the Community Outreach

8    Center.

9        So our church just rebuilt and we added on a huge new

10   section of our church and so we are able to -- we are starting,

11   and I was volunteering as a director of the Community Outreach

12   Center for our community, trying to look at gaps in our County

13   where the government is struggling.

14       So, yes, it's a big one.  Adult generation transportation

15   is another one that I figured out is a gap in the community that

16   we can hopefully pardon that gap through volunteers and through

17   our church.

18       I do that.  I'm also on an advisory board for a ministry

19   in Africa in Kazeba.  It is an orphanage and a school combined

20   that takes kids that have -- you know, that are struggling, and

21   we put teachers and we send doctors there.  And so I'm on an

22   advisory board for the -- specifically the orphanage of that 25,

23   40 ministry.

24       I also am involved in a small what's a -- it's a country

25   wide, but the chapter in Manassas, Virginia, it's called Sleep

```
1    in Heavenly Peace.  We --

2         THE COURT:  Slow down just a little bit.

3         THE WITNESS:  Sorry.  Sleep in heavenly peace in the

4    nonprofit organization.  And we build beds for kids that don't

5    have beds.  So the theory behind the nonprofit is all kids should

6    be able to have a bed to sleep in.  So we literally build bunk

7    beds out of wood, and we get donations, and we get mattresses and

8    bedding.

9         And just a month ago or a month and a half ago, my son and

10   I went and built 12 bunk -- I'm sorry, 4 bunk beds, 12 beds for

11   families that needed it, refugees -- there was an Afghan refugee

12   family, a family from Bolivia, a family from El Salvador and a

13   Caucasian family in -- oh, and in another Virginia area that we

14   do.  Sorry if I'm talking too fast.

15   BY MR. AMOLSCH:

16   Q.    That's fine.  So school didn't work out for you, you guys

17   didn't get along so well.  Is that how you found your way into

18   computers?

19   A.    Yes.  So I started working at a small computer company in

20   McLea- -- in Sterling, Virginia building computers.  So we would

21   kind of an assembly line build hundreds of computers from mother

22   boards, memory, hard drives, CPU.  This was back in mid-90s.

23   And we would sell those to the government, and so we had

24   contracts with different departments downtown.  So we would

25   build computers, load the operating system to the machine, and
```

1    then sell them to the government.

2    Q.     How long were you there doing that?

3    A.     I did that for about a year and a half until the company

4    split into two and we started doing the actual insulation of the

5    PC's.  We had agencies that wanted us to not just sell them but

6    also install them.  So then I started to -- I was contracted to

7    start installing these PC's that the company was building with

8    the Department of Justice.

9         A number of different agencies within the Department of

10   Justice, Civil Rights division, civil division, tax division,

11   the environmental and natural resources division, executive

12   office of immigration review division, so I was downtown and

13   selling PC's and hooking them up to their networks.

14   Q.     At what point did you go to work at the State Department?

15   Was that around the same time?  Is that part of what we're

16   talking about?

17   A.     So after I started as an implementation manager for these

18   machines, I was -- I got a job at the Census Bureau and there I

19   was a -- I learned how to rebuild networks from old hubs to

20   network switches, which is a better technology.  And then I was

21   hired at the Pension Benefit Guaranty Corporation.

22        THE COURT REPORTER:  Where?

23        THE WITNESS:  The Pension Benefit Guaranty Corporation.

24        I was -- actually, I did the upgrade of the Census

25   Bureau's infrastructure.  I got a call from another company that

1    wanted me to do the same thing at the Pension Benefit Guaranty

2    Corporation in D.C., which is another government agency.  And so

3    I was a contractor there for a number of years upgrading their

4    infrastructure to a new redundant robust network.

5         Then I was called by a company to work at the State

6    Department doing both networking and security, IT security.

7    BY MR. AMOLSCH:

8    Q.    And then from there did you find your way to the

9    Department of Defense Office of the Inspector General?

10   A.    From there, sorry, this is a -- from there, I was called

11   to go to the pentagon to assist them with migrating from the

12   Office of the Under Secretary of Defense policies division.

13        They were being -- when the pentagon was being renovated,

14   as their wedges were getting renovated, the Army was taking over

15   all the infrastructure.  So all the departments needed to

16   negotiate with the Army on how to get their infrastructure into

17   the Army's infrastructure essentially.  So I was the liaison

18   between the OUSD policy and the Army.

19        So I was there for a year and a half helping with the

20   renovation -- on the IT side, the renovation of the pentagon.

21   Q.    And then from there?

22   A.    From there I decided to apply for a government position.

23   And I was called to interview at the Department of Defense

24   Inspector General's Office in 2006.

25        So I went to the interview and Matthew Steiniger was the

1   branch chief of the telecommunications and networks division, so

2   I had an interview.  The interview went very well.  I helped him

3   with some issues that he was actually having while I was there.

4   And so I showed him how to fix the Spanning Tree problem that he

5   was having on his network.  And so he hired me after -- after

6   the interview.

7   **Q.**    So what was the name of the -- was it called the

8   Information Security Directorate?

9   **A.**    Information Systems Directorate.

10  **Q.**    Systems Directorate.  And generally speaking, what did

11  you do when you very first started in 2006 or 2007?

12        What were your initial roles prior to you becoming chief

13  of the Unicom division?

14  **A.**    So the Inspector General's Office, I was hired by Matthew

15  to do the same thing I did at the Census Bureau and the

16  Pension Benefit Guaranty Corporation, which was upgrade their

17  old network to a new redundant switched ten gig network.  So

18  Matthew asked me if I could do that.

19        So my main focus at that time in 2006 and 2007 was

20  designing and implementing a new network for the Office of the

21  Inspector General's office.

22  **Q.**    Did you work with the -- like Voice Over IP?

23  **A.**    So after I designed and was approved for the

24  infrastructure upgrade, I could then layer more technology on

25  top of the secure robust network.  Before I had gotten there,

1    their hubs wouldn't have been able to handle the Voice oIP.  So

2    once I upgraded their infrastructure I was able to layer on more

3    technologies that would save and make the IG more cost-effective

4    and efficient.

5    Q.    And how much do you think it saved OIG?

6    A.    So initially, when I -- when I -- so the project for the

7    network infrastructure, at 400 Army Navy Drive, was I believe it

8    was about $8 million.  The upgrade for the Voice oIP I think was

9    $4 million, but the savings we did every year was -- once we

10   have had the Voice oIP completely implemented we saved

11   $1.8 million a year on ISDN lines, POTS lines, which are old

12   analog telephone lines, and long distance.  We saved quite a bit

13   of money on telco lines after that.

14   Q.    And one more question.  Did you have a chance to look at

15   how OIG was billing -- being billed for their telecommunications

16   services through GSA?

17   A.    Yes.  So once I was upgraded and established myself, I

18   guess, as a -- as a good engineer, Matthew asked me to start

19   leading the network telecommunications team.  So once I had the

20   team lead position, I -- we were just paying bills.  We would

21   get bills from GSA for all of our ISDN lines, but once we

22   upgraded to Voice oIP and we started to cut those lines, we

23   still received bills.  It was easy for me to see that we just

24   cut Ohio or Columbus, Ohio's ISDN phone lines and two months

25   later we're still getting bills.

1          So I had a contractor and a government employee focus on

2     just our billing.  And so they started reviewing our bills and

3     we figured out that we had been paying for ISDN lines and analog

4     lines in total for four years -- I believe it was four years.

5     We had overpaid $800,000 in bills to GSA because they just never

6     disconnected what we asked them to disconnect.

7          So we went back to GSA, showed them the disconnect that

8     we sent back in 2007, and once we talked to the right folks, we

9     were able to recoup the $800,000 for the year.  I think that was

10    2009 or '08.  I think it might have been late '08 or early '09

11    when GSA was able -- refunded the money.  When I say refunded,

12    they credited the agency back the $800,000.

13    **Q.**    All right.  Make sure you step over there, and make sure

14    you don't get too far away.

15         So now am I right in 2009 you're a division chief and

16    just briefly, what were you focused on as the division chief

17    from 2009 until the time you left?

18    **A.**    So in 2009, Matthew was promoted to director of ISD.  So

19    Matthew then moved up from a GS-14 to a GS-15, so his position

20    obviously opened up, which I applied for and was interviewed by

21    a panel, including Matthew and was hired as the chief of the

22    telecommunications networks.

23         So after I became the chief in a supervisory role, I

24    reorganized our division from the Telecommunications Network to

25    the Unified Communications Network so that we can -- I can now

1    start laying more technologies on to our network.

2         Our video was still using ISDN lines for video

3    teleconferencing.  We can now layer that into an IP address and

4    start using our infrastructure to do these video

5    teleconferences.

6         Our Blackberries, our cell phones, was another issue that

7    we were having.  The agency didn't embrace everybody having

8    Blackberries at the time.  They thought it was an expensive

9    thing, so we put -- I put together a case -- a white paper on

10   why cell phones in agents and auditors hands would help them be

11   more effective and efficient.  Ultimately, we were successful

12   and we were able to get phones in everybody's hands.

13   Q.   Were you ever asked to travel outside of the United

14   States on behalf of the Office of the Inspector General?

15   A.   Yes.  So as one of my responsibilities as the chief of

16   Unified Communications, was to -- we had at the time about 64,

17   65 field offices across the world, and the GSA leases were in

18   constant renewal.

19        Every five years -- most of our leases, I believe were

20   five years there might have been some ten-year leases, but as

21   leases are renewed the agency has a standard requirement of, for

22   example, for DCIS the new standard was a Grand Jury cage.  And

23   so with our facility folks and with IT we would go out there and

24   update them to our current need.

25        So we would travel a lot to these sites that were being

1  renovated or moving to a new location to put fiber in the wall

2  for the infrastructure or bring in new telco lines or new Cat 6

3  cables instead of Cat 5.  So we -- it required me to travel

4  quite a bit, or one of my staff to travel quite a bit so I

5  traveled to -- most states I traveled to in the past -- in those

6  years, and including Korea, Germany, Afghanistan, Iraq, Qatar,

7  Kuwait.

8  Q.     Now, you've mentioned Matthew Steiniger was the one who

9  hired you?

10  A.     Yes, sir.

11  Q.     And he's the one who's job you were promoted into when he

12  was promoted?

13  A.     Yes.

14  Q.     Can you describe your relationship with him?

15  A.     Um, obviously since he hired me into the government and

16  he hired me into the chief, he -- we got along very well.  He

17  was a young leader.  I wouldn't say he was a leader, I would say

18  he was more of a manager, he managed things.  He definitely

19  didn't have the leadership skills to lead a directorate, but he

20  managed us, you know, and made sure we were on time and stuff

21  like that.  But he -- he was a smart guy, he was very smart.

22  Q.     Describe -- when you say his management style, was he --

23  I mean was he focused on what you were doing, was he aware of

24  your activities within --

25  A.     So the culture of the Inspector General's Office, if I

1    can use that culture, we are an entity of the Department of

2    Defense.  Most of the folks that work at the Inspector General a

3    lot of them have a military background.  So there is a

4    definitely command and control element from the GS -- SCS's to

5    the GS-15, to the GS-14 to the GS-13.

6         So our -- it's called an AIG, Assistant Inspector

7    General, Mr. Steve Wilson, was a retired colonel and he was an,

8    in the weeds, tell me everything and I'll tell you -- and I'll

9    forget what I need to forget.  But I want to know everything.

10   And so that kind of fell down to the directors, so Matthew was

11   absolutely a in the weeds micro managing because he needed to be

12   because Stephen Wilson would come down at 5:00 in the evening

13   and would want to know what's going on with everything.

14        And so we would have meetings about meetings often.

15   Updating Matthew before he had a meeting with Mr. Wilson, before

16   they had a meeting with the Inspector General about anything

17   that was going on.  It was -- it was a -- definitely a

18   comunica- -- constant communication on what was going on.

19   Q.   How often do you think you spent each day with

20   Matthew Steiniger in it?  Did you see him briefly?  Did you

21   spend time together in your office?  Did you see him around?

22   How did that go?

23   A.   Um, so we had a lot of meetings, formal meetings.  We had

24   our weekly activity -- weekly staff meeting with Matthew.  But

25   from a, how often we would see each other, Matthew would -- he

1    was -- he was most often in my office or I was in his office.

2          I don't think -- I think the other division chiefs

3    thought that there was favor with me on Matthew because Matthew

4    trusted me.  I made him look good by redesigning our

5    infrastructure and started putting these things in place.  So he

6    reaped the fruit that I built, and so he was in my office often.

7    Q.    Jumping ahead and we're going to get to all of this,

8    Mr. Lumho, but did you ever submit a service order on the WITS

9    contract to Level 3 without first showing it to

10   Matthew Steiniger?

11   A.    Never.

12   Q.    Did he review every single one of them?

13   A.    Every single service order request form, he physically

14   saw it.

15   Q.    Let's talk about -- you talked a little bit about this

16   but is it fair to say -- so you had regular conversations with

17   him about your duties?

18   A.    Yes.

19   Q.    Okay.  Regular conversations with him about the WITS

20   orders?

21   A.    Yes.

22   Q.    Did you have conversations with Stephen Wilson about the

23   WITS orders?

24   A.    Yes, I did.

25   Q.    Okay.  Did you have conversations with Jennifer Paper or

1    anybody else in the comptroller's office about the WITS orders?

2    **A.**     Every order that I placed, every order that I placed, I

3    had approval from Matthew and from the comptroller's office.

4    Now, I get the comptroller's office in the money folks, but they

5    looked at every single order I placed.  I was not going spend

6    money without the comptroller telling me that we had money for

7    it, and budgeting for it.  And I wasn't going to spend money

8    without Matthew telling me that it was okay.

9    **Q.**     Did you have conversations with other people within the

10   information security division about your duties and about the

11   orders you were placing with WITS?

12   **A.**     Many people, because the orders weren't placed from me.

13   There were a few that my division needed but a lot of stuff was

14   needed by other divisions.  So they would come to me or they

15   would come to Matthew saying, "I need to get tapes.  I need to

16   get stuff for our continuity of operations."  Those were not

17   things that were in my AOR, not my area of responsibility, so

18   they would come to Matthew or they would come directly to me

19   saying, "Can you get this off WITS?"

20   **Q.**     So they would come to you and say, just to make sure that

21   I heard, they would come to you and say, "Can we get this?"

22   **A.**     Yes.

23   **Q.**     This was not something that you went out actively trying

24   to solicit --

25   **A.**     No.

1  **Q.**     -- to put on the WITS contract?

2  **A.**     There was no secret in ISD that we were using WITS and it

3  was a vehicle that everybody was jumping on to get stuff,

4  including folks outside of ISD.

5  **Q.**     Now, do you know Mark Walker?

6  **A.**     Yes, I do.

7  **Q.**     Was he outside of ISD?

8  **A.**     He was our chief architect.

9  **Q.**     How about Brandon Williamson?

10 **A.**     Yes, I do know him.  He was our chief of business

11 operations.

12 **Q.**     Was he also within ISD?

13 **A.**     He was my peer, so he was the chief over the business

14 operations.  I was the chief of unified communications, so him

15 and I were peers, we're both GS-14.

16 **Q.**     All right.  And with Matthew Steiniger let's start with

17 him.  Did you have regular e-mail exchanges with him about your

18 duties?

19 **A.**     Yes.

20 **Q.**     Okay.  Did you have regular e-mail exchanges with him

21 about the duties he's asked to you perform at the office of the

22 Inspector General?

23 **A.**     Yes.

24 **Q.**     Were these e-mails sent to you like in the regular course

25 of business as you were conducting your work at the office of

1    the Inspector General?

2    **A.**      Yes.

3    **Q.**      And are you familiar with the e-mail retention policies

4    at the Office of the Inspector General?

5    **A.**      Yes.

6    **Q.**      Okay.  What are those policies?

7    **A.**      I believe for e-mail, if they are an official record if

8    there's official act then it's indefinite, but normal every day

9    course of action e-mail is, I believe, it's -- I believe it's

10   two years of retention for e-mail.

11   **Q.**      So there was a minimum -- you were aware that there was a

12   minimum of two year policy of OIG retaining any e-mail you sent

13   or was sent to you?

14   **A.**      As far as I know, yes.  And again, that was ten years

15   ago, but I remember there were policies about that, yes.

16   **Q.**      And the same questions I just asked you apply to

17   Stephen Wilson, same thing, you e-mailed with him and he

18   e-mailed back to you in the course of your work?

19   **A.**      Yes.  In fact in Stephen Wilson since he was an SES all

20   of his e-mails had to be retained.

21   **Q.**      All of them?

22   **A.**      All of them.

23   **Q.**      And did you have e-mail exchanges with the comptroller?

24   **A.**      Yes.

25   **Q.**      How about with Mr. Spivey or the people in the

1    acquisitions directorate?

2    **A.**     Yes.

3    **Q.**     And, again, other people within ISD.  Mark Walker,

4    Brandon Williamson, did you e-mail with them?

5    **A.**     Yes.  Justin Perot to those.  Yes.

6    **Q.**     And, again, your same questions, you understood that

7    these were going to be retained.  You sent them in the normal

8    course of your work and it had to do with your duties at ISD?

9    **A.**     Yes.  I knew they were going to be retained, absolutely.

10   **Q.**     All right.  So let's talk about the BRAC move.  So we've

11   heard some about that, but you tell us what it was about from

12   your perspective.  This is when 400 Army Navy Drive is now being

13   relocated over to the Mark Center?

14   **A.**     Sure.

15   **Q.**     All right.  So when did you first learn that this was

16   going to happen, that you all were going to be moved into the

17   Mark Center?

18   **A.**     Um, the -- the law, the BRAC law for BRAC 133, I believe

19   was some time in 2009, I think is when Congress passed that on

20   who was going, but we knew many years before that we were moving

21   to the Mark Center.

22   **Q.**     And were you aware when your lease was expiring at

23   400 Army Navy Drive?

24   **A.**     As we got closer, yes.  I was in many meetings where I

25   knew that our lease was going to expire at the end of February.

1    Q.      And were you -- in those meetings did you learn about any

2    penalties Office of the Inspector General might suffer if they

3    over stayed their lease?

4    A.      Yes.  There was discussion of penalties, and the price

5    was floated.  I don't remember who said it, but it was --

6    Q.      Without saying who said anything, what was your

7    understanding --

8    A.      My understanding was that it was a million dollars a day

9    that was going to be penalized to the IG if we were past

10   February 28th.

11   Q.      Now, who was responsible for making sure that the

12   information security directorate got -- was organized and got --

13   was moved into the Mark Center like on time?

14   A.      Matthew.

15   Q.      Matthew.  And was there also a requirement, or was it

16   your understanding about how much downtime or off line time you

17   would be allotted after you moved to the Mark Center, before you

18   were up and doing your job again?

19   A.      Zero.  There -- there was zero downtime.  We could not --

20   we have -- most of the folks that do the work of the Inspector

21   General's Office are out in the field not here in headquarters.

22   So we could not have any downtime, zero downtime during the

23   transition from 400 Army Navy Drive to the Mark Center.

24   Q.      And was this a frequent topic at meetings?

25   A.      Very frequent.

1    Q.    How many meetings do you think, on average, do you think

2    you had a week or a month about ISD needing to be moved out on

3    time and ready to go when they got there?

4    A.    On average per week -- I mean leading up it was every

5    day, but a year back it was at least twice a week.  It came up

6    in every one of our staff meetings so that's once a week and

7    then we had specific meetings with its components about their

8    requirements at the Mark Center.  So it was many, many times.

9    Q.    A constant topic of conversation; is that fair?

10   A.    Constant.

11   Q.    Now, the office of the Inspector General as I understand

12   it investigates fraud or waste or abuse over the larger

13   Department of Defense; is that right?

14   A.    Yes.

15   Q.    Okay.  Is there -- was it uncomfortable or was there

16   tension about the idea of now you in the Office of the Inspector

17   General sharing space and living quarters, for lack of a better

18   word, with the larger Department of Defense?

19   A.    Yes.  So if I could explain, so I had already done this

20   before at the pentagon when I worked for OUSD policy we were

21   taken over by another agency.  So I knew when we were moving to

22   the Mark Center the issue was not people.  The people -- the

23   people were going to move.  We had space.  That was already

24   allocated for them, the IG.

25         The issue was, and still is the IT perspective, because

1    all of our data, all of the investigative and audit data is --

2    is sensitive data.  So we couldn't have our data -- we didn't

3    want our data on the same storage area network that the SAND,

4    which is like the cloud --

5    Q.    Can I interrupt you for a second?

6    A.    Yes.

7    Q.    Try not to say things like, "SAND."  Like, I need you

8    to --

9    A.    Okay.

10   Q.    -- because --

11   A.    That's why I said, "Storage Area Network."

12   Q.    Great.  So what's a sand?

13   A.    It's a bunch of drives.  It's hard drive space.

14   Q.    Okay.  So start again.  There was concern about sharing

15   server space?

16   A.    There was concern about sharing server space with other

17   components.  So very easily somebody could have mistakenly put

18   Judge O'Grady's computer inadvertently on to the IG's network

19   just by miss typing or typing a 1 instead of a 2.  That machine

20   would then be on the IG's network which has access to all of the

21   data, or if somebody was malicious and was under investigation,

22   they could -- it's called, "SPAN the Port," which is mirror the

23   port of the IG and put a sniffer on to it and listen to all

24   e-mail exchange that was going on, on the network or all

25   traffic.

1        So it was a very big concern from IT perspective, it was

2   a very big concern that we did not want to go on to the shared

3   infrastructure, at the Mark Center, so the Mark Center was going

4   to take over our IT infrastructure.

5   Q.      And how did -- was there initially a solution about not

6   sharing your data or moving your servers over to the

7   Mark Center?

8   A.      So there was discussion about us moving some of our --

9   our -- our servers to Kansas City.  Kansas City was our

10  continuity of operations, it was another data center that we had

11  that was being managed by the IG.  That was one idea that we

12  floated by the leadership.  And we could also look at an

13  off-site data center here in the Northern Virginia area that was

14  leased to us through the many data centers that are out in the

15  Dulles Corridor.  So we could put our data in a non-DoD secure

16  data center, or we could move into the data center with the rest

17  of the folks and try and manage that through technology, through

18  encryptors.

19  Q.      So you talked about the initial idea of just leasing

20  space or moving the servers somewhere else.  Did

21  Matthew Steiniger ask you to go look at locations or come up

22  with possible solutions?

23  A.      So Matthew tasked me with looking at locations in the

24  Northern Virginia area.  So I visited 15 or 20 data centers in

25  the Northern Virginia and Maryland area looking to see how

1    secure they were, just if they met our requirements and our

2    requirements of security, physical security, their network

3    security, a bunch of technical stuff, and physical stuff.  So,

4    yes, I visited many, many data centers in the area trying to

5    find a place that we could, as a -- as a plan B, put our stuff.

6    Q.    Now, did the move take place all at one time or was the

7    move kind of done in stages?

8    A.    It was in stages.  The first move, once the Mark Center

9    was built and they were ready to start accepting tenants, we

10   were a tenant, we moved.  We did what we call, "The flag pole

11   move," which is we moved all the nonessential folks, so the

12   support staff, the IT folks moved, the HR folks moved, folks

13   that -- that if someone didn't work, the impact on the mission

14   wouldn't necessarily affect it.

15        So A & M the administration and management, Stephen

16   Wilson's group, we moved first and then we had a phased approach

17   moving in DCIS, the auditors, the special planning and

18   operations, our Intel.  So we all -- it all came in a phased

19   approach, yes.

20   Q.    So you all moved but did the servers stay behind at 400

21   Army Navy Drive?

22   A.    So on the initial flag pole move we moved, the servers

23   stayed behind and we leased a dark fiber between 400 Army Navy

24   Drive and Mark Center, so that we could start accessing our

25   data.

1  **Q.**    But they remained there?  They were not --

2  **A.**    They remained at 400 Army Navy Drive until we made a

3  decision on what we were going to do.

4  **Q.**    All right.  And could you just briefly describe the size

5  of the servers and the server rooms and the server racks to give

6  the jury a sense of --

7  **A.**    At 400 Army Navy Drive?

8  **Q.**    Yes, sir.  Give us a sense of what we're talking about?

9  **A.**    I don't know the square foot, but Donnie's testimony

10  described the server room about half of size of this is probably

11  pretty accurate.  It might be a little bit smaller, but the

12  racks, as he described it, he described them very well, they're

13  about 7 feet tall loaded with servers, and communication gear

14  and batteries.

15        I think -- there must have been 50 racks of equipment,

16  and that was just our main data center.  And then we had a

17  classified data center that was on another floor that was half

18  the size of that, but again stacked with servers and coms eq- --

19  communications equipment.

20  **Q.**    Now, after all of those servers were eventually -- at

21  some point they were going to be moved out of the 400 Army Navy

22  Drive.  Was there also a responsibility to get the racks out,

23  get the cables out, you know, put it back into the -- into a

24  rentable, leasable condition --

25  **A.**    -- Yes --

1        THE COURT REPORTER:  I'm sorry, I couldn't hear you.

2        MR. AMOLSCH:  Oh, I'm sorry.

3   BY MR. AMOLSCH:

4   Q.    Was there a -- given all the cabling and the racks you

5   just talked about, was there a requirement from the landlord

6   that also the Inspector General reconditioned or put that space

7   back into the condition where they could then release the

8   building?

9   A.    Yes.  There was a requirement that came up later to -- we

10  called it "The Restoration" -- to restore Lerner.  Lerner is

11  the -- was the lessor for 400 Army Navy Drive, and their

12  requirement was for us to return the building back to them in a

13  clean, leasable state which meant bringing -- removing all of

14  our equipment, removing all of our cabling, and just

15  reconditioning the -- the -- the building.

16  Q.    And you said that was -- was a condition that the

17  Lerner's put on OIG like down the road?  Like, I mean, what

18  month do you think this came up, July, August, March?  When do

19  you think this was a --

20  A.    Of when that information -- the information that I think

21  trickled down to myself later than that.  I think it was like

22  December of 2011.  It might have been a little bit earlier, but

23  I remember we were -- the flag pole move had already happened

24  when it came up that we needed to do this, and it -- it was a

25  panic.  It was panic.

1    **Q.**     It was a panic?

2    **A.**     Beyond us already trying to figure out how we're going to

3    get all of our stuff in and us moving and working out of two

4    locations.  It was a -- it was definitely a panic when we heard

5    that we had to return the building back to a condition that we

6    didn't plan for.

7    **Q.**     But is this something any -- I mean, could this have been

8    planned for?  I mean did you see -- did anybody see this coming?

9    **A.**     Not that I know of.

10   **Q.**     The -- now you said -- talked about the flag pole move.

11   Did you or Matthew or together go over to the Mark Center ahead

12   of time as part of this process to figure out, or try to figure

13   out what your equipment requirements would be once you arrived

14   in this new building?

15   **A.**     Physically, I'm not sure if we physically went back and

16   forth.  But we were in meetings often, I mean multiple times a

17   week with leadership from WHS, Washington Headquarters Services,

18   who were responsible for moving us into the building, the Army's

19   Information Technology agency, which was ITA.  They were going

20   to be the ones who were going to maintain our equipment once we

21   moved.  WHS was just going to move us and then leave, and ITA

22   was going to maintain us.

23        So we had to negotiate with both entities on what we were

24   going to do and how we were going to do it.  If it was up to

25   them, we would just move like any other tenant and they would be

1   happy, but we had -- we had -- our -- our -- our foot down on --

2   on securing our data separate from the rest of the DoD data.

3   **Q.**    Was the government also operating under a continuing

4   resolution during this time period?

5   **A.**    So all of 2011 there was never a budget passed.  So

6   leading up to this perfect storm that was happening, we had a

7   continuing resolution all 2011 and into 2012 where we had -- we

8   could not spend anymore money than we spent the previous year,

9   and we couldn't purchase anything that we didn't purchase the

10  year before.

11       So if we had purchased a plane in 2011, we could purchase

12  another plane in 2012.  But we just couldn't -- because of the

13  continuing resolution, we couldn't buy anything new that we

14  didn't buy actually in 2010.

15  **Q.**    And based on these meetings and your expertise, I mean

16  were you already aware of things you were going to need that you

17  couldn't buy once you arrived at the Mark Center?

18  **A.**    Yes.  So, for example, the Mark Center did not have a --

19  they didn't have a Blackberry server that they used.  The Mark

20  Center uses DISA's, Defense Information Systems Agency, which is

21  the IT side of DoD.  They used DISA's Blackberry servers for

22  their soldiers's Blackberries.  We have our own, again because

23  of the secure communication that we do.

24       We needed to buy up a new bud- -- server -- Blackberry

25  server to put into the Mark Center, so there were definite

1    requirements that we had that we needed by moving it, yeah.

2    **Q.**    Now, in the middle of all this is when you get asked to

3    start working on the WITS contract; is that right?

4    **A.**    Yes.

5    **Q.**    Does that happen around March of 2011?  Does that sound

6    about right?  It's been a long time?

7    **A.**    About March of 2011.

8    **Q.**    Now, who asked you to begin working with the WITS

9    contract?

10   **A.**    Matthew Steiniger.

11   **Q.**    Had you ever worked with any government contract before?

12   **A.**    No.

13   **Q.**    Had you ever received any government contracting at all

14   before?

15   **A.**    No.

16   **Q.**    Did you have any idea how WITS worked?

17   **A.**    No.  I didn't -- I didn't want to do WITS, that was

18   Tommy's -- Tommy did it.

19   **Q.**    Okay.  Well, we'll get to that in a second.  But, and was

20   this job his responsibility that Matthew asked you -- Steiniger

21   asked you to take over, was this going to be an additional

22   responsibility on top of all the other things you were doing?

23   **A.**    Yes.

24   **Q.**    And you were beginning to say -- did you want to do this?

25   **A.**    No.

1    **Q.**    Okay.

2    **A.**    I'm --

3    **Q.**    Why'd you say, yeah?

4    **A.**    Because I'm Tommy's boss.  What had happened, Tommy took

5    a leave of absence because he had a baby.  And so there was no

6    backup DAR to manage the WITS contract.

7         So when he returned, Tommy caught up on the stuff that we

8    did and didn't do, and he spoke -- he spoke to Matthew and there

9    needed to be a secondary DAR to back up Tommy.

10   **Q.**    Now, did you ever receive any training on how to order

11   through the WITS contract?

12   **A.**    No.

13   **Q.**    Did you have any training on how not to order through the

14   WITS contract?

15   **A.**    No.

16   **Q.**    About what is allowed?

17   **A.**    No.

18   **Q.**    Not allowed?

19   **A.**    No training.

20   **Q.**    Fair opportunity requirements?

21   **A.**    Didn't even know what it was.

22   **Q.**    Okay.  You saw the WITS contractor, Mr. Ron Capallia

23   describe the WITS contract, it's about the size of a phone book.

24   Did you ever try to review that on your own?

25   **A.**    I don't believe I ever tried to, no.

1    **Q.**    I mean is it --

2    **A.**    I mean I have read it since.

3    **Q.**    Okay.

4    **A.**    And it's -- I'm glad I'm not a contracting officer.  It's

5    very complicated.

6    **Q.**    And you said that Tommy was a DAR.  Was Matthew Steiniger

7    also a DAR?

8    **A.**    He was a DAR.  When he was the 14 before he was promoted

9    he was the DAR for the IG.  And so Tommy and -- so Matthew was

10   the backup for Tommy.  And when Tom- -- and when Matthew was a

11   GS-13 he was the DAR, so it -- the responsibility just kind of

12   trickled up as Matthew went up, it -- it -- it was just the way

13   I guess it had been done.

14   **Q.**    So you had a DAR ahead of you and a DAR below you?

15   **A.**    Yes.

16   **Q.**    Did that give you some comfort that you were --

17   **A.**    Yes.

18   **Q.**    Tell me about that.

19   **A.**    Well, I knew that Matthew was a trained DAR, that -- that

20   he had -- that he was a prior DAR for many years, and Tommy was

21   a DAR -- an active DAR.  And so if, you know, those were my --

22   my rumble strips on either side of the road that if I were to do

23   something, fall asleep and get off the side of the road it would

24   bump me and get me back into the right lane.

25   **Q.**    Is that the reason why you showed Mr. Steiniger every one

```
 1    of the orders you submitted?
 2    A.    That was one of the reasons.  The other reason was
 3    because -- he was -- he was my boss, and again, I wasn't going
 4    to spend money on anything without leadership knowing what we
 5    were buying.
 6    Q.    All right.
 7    A.    But -- but -- but, I mean, I wouldn't just go and buy all
 8    of a sudden Tandberg video equipment when we are Polycom,
 9    without getting a buy in from my leadership on what we're doing.
10    Q.    Do you know Tracy Hall?
11    A.    Yes.
12    Q.    Okay.  Who is Tracy Hall?
13    A.    Tracy Hall was a space manager.
14    Q.    Was she married to Jeff Hall?
15    A.    She was married to Jeff Hall, who was a help desk manager
16    in ISD.
17    Q.    And do you also know Terry Peck?
18    A.    Yes.
19    Q.    James Ale {Phonetic}?
20    A.    Yes.
21    Q.    David Mulino {Phonetic}?
22    A.    Yes.
23    Q.    Marry Norris?
24    A.    Yes.
25    Q.    Elana Breathlaw {Phonetic}?
```

1    A.      Yes.

2    Q.      You're familiar with their e-mail addresses?

3    A.      Yes, I am.

4    Q.      You e-mailed them in the scope of your duties; they

5    e-mailed you in the scope of their duties?

6    A.      Yes.

7    Q.      I'm going to ask you to take a look at this.  It's been

8    previously marked for admission as Defendant's Exhibit 15.  If

9    you could take a look at this and tell me if you recognize it?

10   A.      Yes, sir.

11   Q.      Okay.  I want to ask you some questions about what you

12   understood this e-mail to be telling you about how the Office of

13   the Inspector General had decide to pay to recondition the

14   server rooms and move the servers to Kansas City and --

15   A.      Sure.

16   Q.      Okay.

17           MR. AMOLSCH:  Your Honor, then at this point I would like

18   to readmit or move to admit Defense's 15.

19           THE COURT:  Any objection?

20           MR. CARLBERG:  No objection, Your Honor.

21           THE COURT:  All right.  It's received.

22           (Defendant's Exhibit 15 admitted into the record.)

23           MR. AMOLSCH:  Thank you, Your Honor.

24   BY MR. AMOLSCH:

25   Q.      All right.  Let's start at the bottom, Mr. Lumho.

1          All right.  Do you see this Mr. Lumho?

2   **A.**     Yes.

3   **Q.**     During the May scheduling session with Gilbane, who is

4   Gilbane?

5   **A.**     Gilbane was a subcontractor -- they were a contractor to

6   help us with the move to the Mark Center.

7   **Q.**     It was said that the ISD was in the process of obtaining

8   a quote from a vendor regarding, "Cable abatement."  Do you see

9   that?

10  **A.**     Yes.

11  **Q.**     And what did you understand cabling to be referring to?

12  **A.**     The removal of cabling.

13  **Q.**     Have you received the quote and was it for all four

14  facilities; CGN, Century, 400 Army Navy Drive, and EAD's?  Those

15  were all four of the OIG facilities, right?

16  **A.**     Yes.  There was 400 Army Navy Drive -- Mark was our

17  headquarters.  Crystal Gateway North, Century One, and EAD's

18  were our satellite offices.

19  **Q.**     You also indicated the AV inventory had still not been

20  developed.  What's that about?

21  **A.**     So we weren't sure if we were going to move our old AV

22  stuff, which is -- that's referring to our telecommunications or

23  our video teleconferencing equipment, if we were going to move

24  the old 2004 AV stuff to the Mark Center, or if we were going to

25  buy new.

1   **Q.**    And due to a lack of information about what equipment

2   would be located to the Mark Center, who would make that

3   decision?

4   **A.**    That would be Matthew Steiniger.

5   **Q.**    Matthew.  And then there is an e-mail follow-up from

6   David Mulino, again asking what equipment is going to Kansas

7   City.  Is that again your understanding of where this equipment

8   was going -- possible location?

9   **A.**    Possible locations is Kansas City, right.  That's where I

10  was describing either an off-site data center in Kansas City or

11  moving to the Mark Center.

12  **Q.**    Was that David Mulino in this e-mail telling you that

13  they still haven't figured out where it's going?

14  **A.**    Yes.

15  **Q.**    And then the last e-mail up here is, "ISD will be

16  responsible for excising all equipment from all four

17  facilities."

18  **A.**    Yes.  We were responsible for accessing our equipment,

19  yes.

20  **Q.**    Have you received the Statement of Work in quote from the

21  vendor for cable abatement, and has anyone been working on a

22  quote for the removal of the equipment?  So what vendor do you

23  understand them to be talking about there?

24  **A.**    At this time Tommy Carlyle was already talking with WITS

25  and Level 3 about the removal of equipment.

1   **Q.**     Okay.  And did you understand that, that quote would

2   involve cabling?

3   **A.**     Yes.

4   **Q.**     So when you saw or forwarded to Tommy Carlyle the WITS

5   order that said, "Cable installation."  What did you understand

6   about whether that was an approved use of WITS?

7   **A.**     I mean, it didn't shock me.

8   **Q.**     I mean did it -- did it tell you -- did it tell you that,

9   that was an approved use of WITS as they have been discussing

10  it?

11  **A.**     Yes, Tommy was the one involved in the order, yes.

12  **Q.**     And ultimately, jumping ahead, but EAD's warehouse, CGN,

13  those were all paid for with a service order request form that

14  lists cabling as the contract line item number, is that -- do

15  you remember that?

16  **A.**     Yeah.

17          MR. CARLBERG:  Objection.  I believe that misstates the

18  actual --

19          THE COURT:  All right.  Rephrase.

20  BY MR. AMOLSCH:

21  **Q.**    Was cabling -- I'll move on.  We'll get to that later.

22          Now, ultimately did some equipment get moved to Kansas

23  City?

24  **A.**     Yes.

25  **Q.**     And who did that work?

1    **A.**    Um, I --

2    **Q.**    Who drove the equipment out?  Do you know who drove the

3    equipment out to Kansas City?

4    **A.**    At the time I didn't know.  I didn't care who drove it

5    out to Kansas City.  But now in hindsight after all this data

6    that I received from the government, I do know who took the

7    stuff out to Kansas City.

8    **Q.**    Who was that?

9    **A.**    It was Donnie Ravas.

10   **Q.**    Donnie Ravas.

11          Was -- did you -- did Mr. -- was Tony Jenks part of this

12   organization of the move from --

13   **A.**    Yes.

14   **Q.**    Did you see Tommy Jenks -- Anthony Jenks and Donnie Ravas

15   interacting?

16   **A.**    Yes.

17   **Q.**    Together as part of this move?

18   **A.**    Yes.  Like I said, the whole -- we were a very hands on

19   agency.  There was a lot of micro management so there was no way

20   that things were happening without leadership and folks being

21   involved.

22   **Q.**    You mentioned something called, "COOP."  Is that

23   continent -- Continuity of Operation?

24   **A.**    Yes.

25   **Q.**    Okay.  And just briefly if you can describe for the jury

1  what continuity of operations means?

2  **A.**    COOP, for continuity of operations is essentially another

3  data center that's off-site that if your headquarters or your

4  main data center were to have catastrophic event, that your

5  offices would swing over and start using the other data center.

6  It was basically a COOP level 1 that is -- level 3 is just a

7  dead center that is sitting there with redundant data, and a hot

8  data center.  Level 1 is a data center that's active and being

9  used.  But both A and B are being utilized at the same time.

10  **Q.**    All right.

11  **A.**    Sorry.

12  **Q.**    And just to finish that, the COOP is in Kansas City, the

13  Continuity of Operations Center?

14  **A.**    At this time our COOP site was in Kansas City.

15  **Q.**    All right.

16  **A.**    DCIS office -- we had a DCIS in Kansas City and we had

17  rented space at the courthouse in Kansas City, Four Data Center,

18  500 State Street.  I've been there many times.

19  **Q.**    Let's jump ahead to October and talk about the Bridge

20  Contract?

21  **A.**    Okay.

22  **Q.**    All right.  Now, in a nutshell, the way I understand it,

23  there's a company called EES that had the contract?

24  **A.**    Yes.

25  **Q.**    The contract was expired in GSA awarded it to a company

1    called Phacil?

2    **A.**    Yes.

3    **Q.**    EES protested GSA's decision?

4    **A.**    Yes.

5    **Q.**    And neither EES or Phacil could provide workers to ISD to

6    your directorate while the protest was going on?

7    **A.**    Correct.

8    **Q.**    All right.  And that was a decision that came down from

9    the -- the General Council's Office?

10   **A.**    I believe it was GSA that made that decision that we

11   couldn't have either the incumbent or the new awardee have any

12   employees there.

13   **Q.**    And how much of your work -- ISD's workforce at this

14   point was contractors versus government employees?

15   **A.**    In October of 2011, I want to say we had maybe 30 --

16   between 30 and 40 government employees and 80 contractors.  The

17   majority of our workforce was done by contractors.

18   **Q.**    Is it fair to say about half -- you lost close to half of

19   your contract employees as a result of this?

20   **A.**    More than half, yes.

21   **Q.**    More than half.  Who took -- which agency took over the

22   responsibility for finding a solution to replace the workers who

23   had just been ordered off-site?

24   **A.**    GSA.

25   **Q.**    Um, and what -- is it fair to say that the contractors

1    that walked off or were ordered off, were IT specialists like

2    kind of specialized personnel?

3    **A.**     Yes.  They were -- they were -- they were in with each of

4    our divisions helping with -- yeah.

5    **Q.**     And how critical was it for those replacement workers to

6    be found as soon as possible?

7    **A.**     Mission critical.

8    **Q.**     Still under a continuing resolution at this point?

9    **A.**     Yes.

10   **Q.**     Who made the decision to use the WITS contract to pay for

11   the replacement workers?

12   **A.**     GSA.

13   **Q.**     Did you have any part of that have decision?

14   **A.**     Not in the decision, no.

15   **Q.**     Okay.  Did you make any suggestions about using WITS?

16   **A.**     No.

17   **Q.**     Okay.  Did anybody ask your opinion about whether you

18   should use WITS?

19   **A.**     Not my opinion, no.

20   **Q.**     Are you familiar with the name Carmelo Nuestro?

21   **A.**     Yes.

22   **Q.**     Okay.  And who do you understand Carmelo Nuestro to be?

23   **A.**     Carmelo was the GSA representative from Region 9 in

24   California.  He was the responsible contracting official that

25   was involved in the award and protest of the EES contract.

1  **Q.**    Did you understand him to be the one running the show,

2  for lack of a better word?

3  **A.**    Yes.  The decisions were going to come from him.  He was

4  the contracting officer.

5  **Q.**    All right.  And again, did you he e-mail at all with

6  Carmelo Nuestro, if you remember?

7  **A.**    Yes.

8  **Q.**    Okay.  And again, in the course and scope of your duties?

9  **A.**    Yes.

10  **Q.**    And we've heard about the -- something called, "the

11  barebones".

12  **A.**    Yes.

13  **Q.**    Why don't you briefly describe to the jury what is meant

14  by, "barebones replacement".

15  **A.**    So the barebones -- once the protest happened,

16  Willie Spivey wanted to -- he asked to whittle down the large

17  contracts since this was only going to be a bridge contract down

18  to just the essential things that we needed to keep the IG

19  running, keep the boat floating.  So he asked to whittle down

20  our requirements to just the essential pieces.

21  **Q.**    All right.  And that's what's meant by barebones?

22  **A.**    Yes.  The barebones was just the minimum that we could

23  have.

24  **Q.**    And who was responsible ultimately for choosing which

25  positions were barebones requirements and which positions were

1    not?

2    **A.**     Matthew Steiniger.

3    **Q.**     And was Matthew the one primarily coordinating with

4    Willie Spivey about this?

5    **A.**     Yes.

6         MR. AMOLSCH:  Okay.  If I could bring up Government

7    Exhibit 152, please.  It will appear on your monitor.  Okay.  If

8    we could go to the bottom of this, please, Ms. Sandvig.

9         All right.  I'm sorry, the next page.  And the next page,

10   and the next page.

11   BY MR. AMOLSCH:

12   **Q.**     Okay.  Let's focus on the first e-mail.  This is an

13   e-mail that's sent from Willie Spivey to Matthew Steiniger,

14   Cristina Bucher; is it Butcher (phonetic) or Bucher?

15   **A.**     It's Bucher.

16   **Q.**     Bucher.  Cristina Bucher, who is Cristina Bucher?

17   **A.**     She was the GS-14 in charge of budget for the

18   comptroller's office.

19   **Q.**     So she was in the comptroller office?

20   **A.**     She was in the comptroller office.

21   **Q.**     And Frank Bailey, who is Frank Bailey?

22   **A.**     He was in the procurement shop.  He was the chief of the

23   procurement shop.  He was Willie Spivey's boss.

24   **Q.**     Okay.  He was Willie Spivey's boss.  Okay.

25        So Willie's e-mailing his boss, the head of the

1  comptroller and the head of ISD, Matthew Steiniger, talking

2  about, you know, a poss- -- the protest and the barebones

3  required to support ISD, right?  While this was going on?

4  **A.**     Yes.

5  **Q.**     You then also mention we're under a CR.  Does that mean,

6  "Continuing Resolution?"

7  **A.**     Yes.

8  **Q.**     Okay.  And it says he's attached -- he's not -- are you

9  copied on this e-mail?

10 **A.**     No, I'm not.

11 **Q.**     No.  Okay.  So this didn't come to you.  And Willie

12 Spivey says, "There's a spreadsheet that's attached," right?

13 **A.**     Correct.

14 **Q.**     Okay.  And then we go to the next e-mail.  Matthew then

15 responds, "Requested information attached, I don't feel a

16 hundred percent comfortable."  Did you understand him to be

17 saying he actually wanted more --

18 **A.**     Yes.  So barebones was -- that was a tough thing to try

19 and figure out what was most essential.

20 **Q.**     Okay.  And do you see anything in there about pricing

21 information or anything about what related to money?

22 **A.**     No.

23 **Q.**     Okay.  What did you understand the attachment to be?

24 **A.**     The barebone descriptions.

25 **Q.**     Just the descriptions of the people that --

1    **A.**     Yes.

2    **Q.**     ISD needed to --

3    **A.**     Yes.

4    **Q.**     Okay.  And then we can go all the way to the top of this

5    e-mail chain.  Okay.  And then he sends that to you.

6          MR. AMOLSCH:  Is that the top of that e-mail, Ms.

7    Sandvig?  Okay.

8    BY MR. AMOLSCH:

9    **Q.**     And then he asks you to weigh in.  Okay.  So let's go

10   to -- I'll show you some things.

11         The next e-mail I want to ask you about, Mr. Lumho, is --

12   after you got this barebones -- the e-mail from

13   Matthew Steiniger, did you have any conversations with him about

14   finding the employees to satisfy ISD's immediate needs, and

15   where those employees would come from?

16   **A.**     Did I have a conversation with him?

17   **Q.**     Yes.

18   **A.**     Yes.

19   **Q.**     Okay.  Did you have e-mails -- did you have e-mails --

20   did you e-mail with him about this?

21   **A.**     I would imagine I did, yes.

22   **Q.**     Take a look at this and let me know if you recognize

23   this?

24         MR. AMOLSCH:  This is going to be Defense's 37, Your

25   Honor.

1        THE COURT:  Okay.

2        MR. AMOLSCH:  Oh, I'm sorry.  Thank you, sir.

3   BY MR. AMOLSCH:

4   **Q.**    Okay.  Do you recognize -- do you see that e-mail?

5   **A.**    Yes.

6   **Q.**    Do you recognize that?

7   **A.**    I do.

8   **Q.**    All right.  It was sent to you in the scope and course of

9   your duties?

10  **A.**    Yes, it was.

11  **Q.**    Okay.  I want to ask you some questions about how you

12  understood the IT personnel were going to be provided to replace

13  the replacement workers.  Okay?

14  **A.**    Sure.

15       MR. AMOLSCH:  All right.  Your Honor, at this point I move

16  Defense's 37 in.

17       THE COURT:  Any objection?

18       MR. CARLBERG:  No, sir.

19       THE COURT:  It's received.

20       (Defendant's Exhibit 37 admitted into the record.)

21       MR. AMOLSCH:  Thank you, Your Honor.

22  BY MR. AMOLSCH:

23  **Q.**    First e-mail is from Willie Spivey to Stephen Wilson and

24  Matthew Steiniger.  You're copied at the top of this, at the

25  top, but I want to -- but you got the whole e-mail, so I want to

1    ask you about your understanding.

2         Now, this is dated October 6th, 2011, is the e-mail from

3    Willie Spivey to Matthew Steiniger and Marry Norris.

4         This is one day after the protest has happened, right?

5    **A.**    Yes.

6    **Q.**    Okay.  And Willie Spivey writes, as it relates to the IT

7    contract, "Current contract is under protest.  To support the

8    immediate requirements, GSA, in parentheses, Region 9, will

9    award a bridge contract utilizing the GSA WITS3 contract."

10        So what did you understand at this point about what GSA's

11   decision was about which contract they were going to use to pay

12   for these replacement workers?

13   **A.**    It says they're going to use -- GSA -- is going to use

14   the WITS3 contract.

15   **Q.**    And was that your understanding?

16   **A.**    Yes.

17   **Q.**    Okay.  Matthew then forwards it to you, and also to

18   Ricardo Farrerah.  Who is Ricardo Farrerah?

19   **A.**    He was a -- he was the chief of customer support.

20   **Q.**    Steve McKinney?

21   **A.**    He was the chief of information security.

22   **Q.**    Lyle Raznick?

23   **A.**    He was the chief of server integration.

24   **Q.**    Brandon Williamson?

25   **A.**    He was the chief of operations -- business operations.

1    **Q.**    Winoda Mathis?

2    **A.**    She was an acquisitions person under Brandon.

3    **Q.**    Okay.  So it's your understanding that

4    Matthew Steiniger's informing the people at the top who need to

5    know how the process is proceeding?

6    **A.**    Yes.

7    **Q.**    Okay.  He writes, "All," including you, "FYI, WITS will

8    be used as a bridge for IT support.  Currently we estimate

9    having people starting back on board no later than Wednesday."

10   So that would be within five days; is that correct?

11   **A.**    Yes.

12   **Q.**    Okay.  He then writes, "Level 3, (within parenthesis, the

13   contractor under WITS) is aware of our requirements and is

14   already starting to coordinate this action."

15        What did you understand that e-mail to mean about which

16   company GSA was going to rely on to provide the WITS workers?

17   **A.**    Matthew said that it was going to be Level 3.

18   **Q.**    All right.  And is that your understanding that on

19   October 7th, it had already been decided?

20   **A.**    Yes.

21   **Q.**    Okay.  Was there any confusion about that?

22   **A.**    No, it was pretty plain English.

23   **Q.**    And did you then proceed with your task of helping

24   coordinate the IT workers as if this contract was already

25   decided to be awarded to Level 3?

```
 1   A.      Yes, I did.

 2           MR. AMOLSCH:  Court's indulgence.

 3           THE COURT:  Yes, sir.

 4   BY MR. AMOLSCH:

 5   Q.      And it says, "Level 3 is aware of our requirements and

 6   are already starting to coordinate this action."  Had you made

 7   Level 3 require- -- aware of your requirements?

 8   A.      No, I hadn't.

 9   Q.      Okay.  Do you know who had made Level 3 already at this

10   point aware of ISD's requirements?

11   A.      Well, Matthew wrote that.  So I would assumed it was

12   Matthew.

13   Q.      But it wasn't you?

14   A.      It was not me, no.

15   Q.      And then let me ask you about another e-mail, Mr. Lumho.

16           MR. AMOLSCH:  I don't believe this is in, Your Honor.

17           Thank you, sir.

18           THE WITNESS:  Thank you.

19   BY MR. AMOLSCH:

20   Q.      Do you recognize that e-mail?

21   A.      Yes.

22   Q.      Is that sent to your e-mail address from Willie Spivey?

23   A.      Yes, it is.

24   Q.      I want to ask you some questions about what you

25   understood GSA's decision to be about Level 3.
```

1        THE WITNESS:  Is this already in?

2        MR. AMOLSCH:  Yes.  Your Honor, I move to admit Defense's

3   38.

4        THE COURT:  Any objection?

5        MR. CARLBERG:  No, sir.

6        THE COURT:  It's received.

7        (Defendant's Exhibit 38 admitted into the record.)

8   BY MR. AMOLSCH:

9   Q.    This is an e-mail from Willie Spivey to you, right, and

10  Carmelo Nuestro.  And Carmelo Nuestro is who?

11  A.    He is the GSA contracting officer.

12  Q.    It's an e-mail to you, "Kekoa, GSA Region 9 called me and

13  informed me that Level 3 indicated it would be next week before

14  you receive support."

15        So what was your understanding after reading this about

16  whether GSA had decided on October 11th that Level 3 would be

17  providing the workers pursuant to the bridge contract?

18  A.    It says it right there in plain English that --

19  Q.    Okay.  What was your understanding of it?

20  A.    That GSA was going to give it to Level 3.

21  Q.    So on October 11th, and this is of course before any bid

22  had gone out, correct?

23  A.    Yes.

24  Q.    There's been no request for a quotation issued by GSA?

25        THE COURT REPORTER:  I'm sorry, can you ask that again?

1    BY MR. AMOLSCH:

2    **Q.**    There's been no official request submitted by GSA to

3    fulfill the requirements of the bridge contract?

4    **A.**    Not that I was aware of, no.

5    **Q.**    Do you know when that actual -- that request for bid

6    actually went out?

7    **A.**    October 25th, I believe.

8    **Q.**    So this is about two weeks before any of that happens.

9    GSA is telling you Level 3 has indicated, "It will be next week

10   when you all receive your support?"

11   **A.**    Yes.

12   **Q.**    And that's what you understood was going to happen?

13   **A.**    Yes.

14   **Q.**    Now, you e-mailed Ron Capallia a list of -- you forwarded

15   the e-mail as we saw in Government's Exhibit 152?

16   **A.**    Yes.

17   **Q.**    A list of the requ- -- of the bare -- of the positions

18   that Matthew Steiniger wanted filled.  You forwarded it to

19   Ron Capallia?

20   **A.**    Correct.

21   **Q.**    And where does Ron Capallia work?

22   **A.**    Level 3.

23   **Q.**    And why did you forward -- just forward it to Level 3, as

24   it relates to needing support for the WITS -- for the bridge

25   contract through WITS?

1    **A.**    They were going to be the ones fulfilling the needs, so

2    they -- they needed to know which positions to fulfill.

3    **Q.**    Did you intend to give Level 3 any advantage by sending

4    that e-mail to Ron Capallia before Level 3 had even put out the

5    bid for --

6    **A.**    No.

7    **Q.**    Okay.  Let's talk about briefly the level of support you

8    received from Level 3.  Did Level 3 subcontract that work out?

9    **A.**    They did.

10   **Q.**    Okay.  And was that to Mr. Wilson's company, MSO?

11   **A.**    Yes.

12   **Q.**    Okay.  How would you describe the support?  Was it good,

13   bad?

14   **A.**    It was awesome.  It was outstanding.

15   **Q.**    Do you think they provided a positive value to the

16   government?

17   **A.**    Very much so, yes.  They were very, very highly qualified

18   engineers that were hired.

19   **Q.**    Were they already actually on site providing other IT

20   support services?

21   **A.**    There was.  I believe there were four -- there were four

22   Level 3 folks, MSO folks that were already on site.  From

23   earlier on in 2011 we had a -- we had an issue where our -- we

24   almost got kicked off of the Internet -- off of the gig, which

25   is called -- it's called the, "gig."

1          DoD came in and did an inspection of our infrastructure

2     which they do randomly.  And when they came and did that,

3     they -- It's called a, "Red Team," came in and they -- and they

4     tried to infiltrate our environment.  They were successful.

5     Many of the servers had been patched for over a year, and so we

6     were at risk of losing our connection to the DoD because we were

7     then a vulnerable component of the DoD's infrastructure.

8          So, um -- so -- so, Matthew got Level 3 through WITS to

9     provide patching -- patching engineers that came in and they

10    patched all of our servers, all of our PCs up to the current

11    patch and they did it fairly quickly.  I think it was three

12    weeks they patched everything.

13         And then had the computer network defense team, the CNDSP

14    team come and do another red team and we passed, but because of

15    these Level 3 folks that came, we were able to maintain our

16    posture.

17    Q.    Do you feel like ISD had an ongoing relationship with

18    Level 3?

19    A.    I felt like we did.

20    Q.    All right.  Did you have any input at all into Level 3

21    ultimately subcontracting out any work out to Mr. Wilson's

22    company?

23    A.    No.  I -- I could care less where it came from.

24    Q.    I'm sorry, say that again?

25    A.    I could care less where that came from.  The folks that

1   they gave us were very qualified, over-qualified in some

2   instances.  If they came from Level 3, great, if they came from

3   MSO, it didn't matter to me.  It didn't matter to any of us.  We

4   just were happy to get support and get folks that came in

5   already knowing how to do things and not having to be trained on

6   how to do stuff.

7         MR. AMOLSCH:  Your Honor, I'm about to transition into

8   another area, do you want me to continue on or do you want to

9   take a morning break.

10        THE COURT:  Ready for a break?  Okay.  All right.  Let's

11  take our morning break.

12        MR. AMOLSCH:  Thank you, Your Honor.

13        THE COURT:  Let's take 15 minutes and we'll continue with

14  the testimony.  You're excused.  Thank you.

15        (Jury out at 11:03 a.m.)

16        THE COURT:  All right.  Anything before we break?

17        MR. AMOLSCH:  No, Your Honor.  Thank you.

18        THE COURT:  You're in the middle of your testimony, so

19  don't discuss the testimony or talk with anyone while we're in

20  the recess, all right, sir.

21        THE WITNESS:  Yes, sir.

22        THE COURT:  All right.  We're in recess.

23        (Thereupon, a recess in the proceedings occurred from

24  11:04 a.m. until 11:24 a.m.

25        THE COURT:  All right.  Anything before we get the jury?

1          MR. AMOLSCH:  No, sir.

2          THE COURT:  Okay.  Ira, let's get our jury, please.

3          (Jury in at 11:25 a.m.)

4          THE COURT:  Please be seated.  And Mr. Amolsch, continue,

5     sir.

6          MR. AMOLSCH:  Thank you, Your Honor.  May it please the

7     Court.  Good after- -- morning again, Mr. Lumho.

8          THE WITNESS:  Morning.

9     BY MR. AMOLSCH:

10    **Q.**    Let's move out of the bridge contract award to Level 3

11    and to the ultimate move that took place the end of January

12    2012, the last part of the move from the 400 Army Navy Drive

13    over to the Mark Center?

14    **A.**    Okay.

15    **Q.**    Had you talked with Matthew Steiniger about using the

16    WITS contract to pay for removing the servers, cleaning up the

17    server room, and completing the move to the Mark Center?

18    **A.**    Yes.

19    **Q.**    Okay.  Did he tell you that GSA had approved using WITS

20    for this purpose?

21    **A.**    He did.

22    **Q.**    Did he tell you that Mr. Wilson his boss had approved

23    using WITS for this purpose?

24    **A.**    Yes.

25    **Q.**    Did he tell you that the Office of the General Council

1    approved the use of WITS for this?

2    **A.**     Yes, he did.

3    **Q.**     How about Mr. Spivey?  Did he tell you Mr. Spivey

4    approved --

5          MR. CARLBERG:  Your Honor, this is extremely leading.

6          MR. AMOLSCH:  I apologize.

7          THE COURT:  It's all leading.

8          MR. AMOLSCH:  I'm sorry.

9          THE WITNESS:  He told me that a lot of people had approved

10   it.

11         MR. AMOLSCH:  I'm sorry, I was just trying to move along.

12   Thank you, Your Honor.

13   BY MR. AMOLSCH:

14   **Q.**     Based on those discussions, what was your understanding

15   about whether it was okay to use WITS for the move?

16   **A.**     We were going to use WITS.  That was my understanding.

17   **Q.**     Based on your conversations with Mr. Steiniger, was he

18   aware of the costs that would be associated --

19   **A.**     Yes.

20   **Q.**     -- with the move?

21   **A.**     Yes.

22         MR. AMOLSCH:  Can I ask for Defense's Exhibit 17.

23         This is one of the exhibits, Your Honor, that was

24   admitted last night.

25         THE COURT:  All right.

```
 1          MR. CARLBERG:  Which one?

 2          MR. AMOLSCH:  I'm sorry, 17.

 3          MR. CARLBERG:  Thank you.

 4          MR. AMOLSCH:  I'm sorry.

 5   BY MR. AMOLSCH:

 6   Q.     Okay.  Mr. Lumho, I'm going to show you this part of the

 7   conversation to begin with just to set the stage.  January 23rd

 8   2012, Matthew is writing to you, "Kekoa, what's the hold up,

 9   who's acting for you?"  Do you remember this e-mail?

10   A.     Yes, I do.

11   Q.     Okay.  What is Matthew asking you there?

12   A.     He was referring to the 400 Army Navy Drive clean out and

13   when it was going to get signed and approved or -- signed to

14   begin the work.  I sensed his frustration there.

15   Q.     And you respond with, "Tommy's acting for me while I'm

16   out."  Where were you at this point?

17   A.     Can you move it up a little bit more so I can see the

18   rest of it?

19   Q.     I'm sorry, my mistake.  It says, "Tommy is acting for me

20   while I'm out."

21   A.     I was in South Korea at the time.

22   Q.     So is that why you are -- is that why Tommy is acting in

23   your stead?

24   A.     Yes.

25   Q.     Okay.  And then we have this e-mail to him, "Please tell
```

1    me you submitted the request to WITS3 for the 400 Army Navy

2    Drive server room effort."

3         What did you understand him to be asking you there?

4    **A.**    He's telling me -- asking me if I submitted the request

5    for the WITS3 400 Army Navy Drive server room clean out.

6    **Q.**    And did you understand that Matthew had already requested

7    funds for this -- specifically for this purpose?

8    **A.**    Absolutely.  Again, we wouldn't -- we wouldn't spend any

9    money without the comptroller knowing.

10   **Q.**    And do you remember who you requested those funds from?

11   **A.**    I believe it was Jennifer Paper.

12        MR. AMOLSCH:  Could we bring up Government 76B?

13   BY MR. AMOLSCH:

14   **Q.**    And is this the quote that he's waiting for?

15   **A.**    Yes, it is.

16        MR. AMOLSCH:  Okay.  Could we bring up Government

17   Exhibit --

18        MR. CARLBERG:  Objection.  This is not a quote.

19        MR. AMOLSCH:  Oh, I'm sorry.

20        THE WITNESS:  This is a service order request --

21        MR. AMOLSCH:  -- service order request form.  My mistake.

22        THE COURT:  All right.

23        MR. AMOLSCH:  Can we bring up Government's Exhibit 162?

24   BY MR. AMOLSCH:

25   **Q.**    All right.  Do you remember this e-mail chain, Mr. Lumho?

1   **A.**      Yes, sir.

2   **Q.**      Okay.  This is -- if we can go to the bottom of the

3   e-mail, this is Ron Capallia sending you over the service order

4   and task -- Statement of Work and task order for the Army Navy

5   clean out, correct?

6   **A.**      Yes, it is.

7   **Q.**      Is there a three pa- -- is there a Statement of Work

8   attached to this?  Do you remember?

9   **A.**      I believe there was, yes.

10  **Q.**      Okay.  And is that the Statement of Work describing --

11  **A.**      The work being done.

12  **Q.**      -- that's going to be done?

13  **A.**      Correct.

14  **Q.**      And then if we go up, I'm sorry, back, you then forward

15  this to Tommy, "Please sign and send to me, please."

16  **A.**      Yes, it was --

17  **Q.**      Why did you -- why did you ask Tommy to sign it and send

18  it?

19  **A.**      Because it was sent to me, and I was in Korea, so I

20  didn't have the ability to -- I probably sent this from my

21  Blackberry, so I didn't have the ability to sign and then either

22  scan and get it back to Ron.  I was TDY.

23  **Q.**      And you were "TDY."  What does TDY mean?

24  **A.**      Temporary duty.

25  **Q.**      Okay.  And did you have an understanding about Tommy's

1  role in getting the work from Level 3 to complete the move and

2  clean out?

3  **A.**    So Tommy was in charge of the clean out of 400 Army Navy

4  Drive.  He was -- from my division, he was the representative

5  for this effort.  So he was very aware of what it was, so when I

6  forwarded it to him, there was no issue.  I didn't have to

7  explain to him what it was or anything.  He knew what it was.

8  **Q.**    All right.  And can we go to the very top?  "And TDY in

9  South Korea, What is going on?  This is much higher than I

10  originally thought it was going to be, significantly higher."

11  Why did you find the price that was being quoted now higher than

12  what you were expecting?

13  **A.**    Um, why was it significantly higher?

14  **Q.**    Yes.  I mean, why were you expecting --

15  **A.**    -- we had -- we had already budgeted --

16      THE COURT REPORTER:  I'm sorry.  One at a time.

17      THE WITNESS:  I'm sorry.

18  BY MR. AMOLSCH:

19  **Q.**    Why did you expect the price to be lower than the quote?

20  **A.**    Because based off of the walk-through that Tommy had done

21  with the folks, the price quote that we got back was, I believe

22  it was $300,000.

23  **Q.**    And is that why Mr. Steiniger was requesting $300,000?

24  **A.**    From Jennifer Paper, correct.  Yes.

25  **Q.**    Okay.  Because that was the number that everybody was

1  expecting?

2  **A.**     That was the number we were expecting.

3  **Q.**     All right.  Do you know why the price went up?

4  **A.**     Because when we did the walk through with Tracy hall of

5  the buildings, the scope of work changed from not just doing the

6  data centers but now we had to go through and rip out the

7  cabling of the rest of the floors, not just the data center.  So

8  we had to remove all the cabling from 400 Army Navy Drive to

9  include the risers in the ceiling, the telco closets that are

10 between each floor where all the fiber goes.  So all that had to

11 get removed.

12 **Q.**     All right.  And this was -- did this -- when was this

13 requirement made known to Office of the Inspector General, in

14 January?

15 **A.**     It was mid-January, yes.

16 **Q.**     And was there a decision made to just pay for that as

17 well?

18 **A.**     Yes.

19 **Q.**     Okay.  And what was the -- how were they going to pay for

20 that?

21 **A.**     Through WITS.

22         MR. AMOLSCH:  If I can see what's previously been

23 admitted as Defense's 18.

24 BY MR. AMOLSCH:

25 **Q.**     This is again same date and time, "Kekoa, attached is the

1    task order for --"

2    **A.**    Yes.

3    **Q.**    Okay.  Then -- you then, again, say, "Tommy is to sign

4    this and return this in the morning"?

5    **A.**    Correct.

6    **Q.**    And you were also -- above that is Matthew Steiniger

7    replying to Jennifer Paper about the quote coming in

8    significantly higher.

9           Now, based on your knowledge of how the e-mail system

10   worked at the Office of the Inspector General, was this

11   attachment included in the e-mail that you sent Mr. Steiniger?

12   **A.**    Um, so, if you could move down --

13   **Q.**    Sure.

14   **A.**    Farther.  He -- well, so if you go to the first page

15   where Ron Capallia sent it to me --

16   **Q.**    Hold on.  Let me get there.  Okay.

17   **A.**    So he -- I received the attachment, and I forwarded the

18   e-mail, so when you forward an e-mail, it attaches the

19   attachment to the e-mail.  If you respond to an e-mail, the

20   attachment is then removed from the e-mail so you don't send the

21   same attachment on every single response back, but whenever you

22   forward an e-mail, the attachment is attached.  So as you can

23   see, I forward- -- on the bottom part I forwarded to

24   Matthew Steiniger so the attachment is there.  He forwards it to

25   Jennifer Paper.  The attachment is there.  And then she responds

1    as you see, "Subject, RE semicolon -- colon OIG 400."  That's

2    her response, so at that point the attachment is then removed

3    from the e-mail chain and there's no longer an attachment.  So

4    up to the point where Matthew forwards it to Jennifer Paper the

5    attachment is still there.

6    **Q.**    So Matthew Steiniger -- you forwarded the service order

7    request form and the Statement of Work to Matthew Steiniger for

8    his review?

9    **A.**    Yes, and he then forwards it for her to review.

10   **Q.**    Okay.  He writes, "This quote came in significantly

11   higher."  What does that tell you about whether he reviewed the

12   service order request form?

13   **A.**    That tells me that Matthew is reviewing.

14        MR. CARLBERG:  Okay.  Personal knowledge, lack of personal

15   knowledge.

16        MR. AMOLSCH:  His understanding, Your Honor.

17        THE COURT:  All right.  I'll allow it.

18   BY MR. AMOLSCH:

19   **Q.**    Based on -- based on this, what is your understanding

20   about whether --

21   **A.**    That Matthew was aware of everything that's going on.  He

22   reviewed and is now asking for more money from Jennifer Paper

23   because of the increase in cost.  So he was very aware of what

24   was going on with this -- this ordeal.

25   **Q.**    And do you see at the top where Jennifer says, "Yes,

1   proceed, Matthew"?

2   **A.**     Yes.  It says, "Yes, please proceed, and I know we just

3   spoke about it but this has been coordinated through Marry and

4   Leslie."  So they had already been speaking about it.

5   **Q.**     And -- I'm sorry, go ahead.  And the FYI?

6   **A.**     And then he forwards it to me FYI just letting me know,

7   hey, the money was approved, but to go ahead and proceed with

8   this.

9   **Q.**     Based on this e-mail, can you tell the ladies and

10  gentlemen of the jury, did you feel like you had authority to

11  use -- to be part of the process of securing work from the

12  Office of the Inspector General for the Office of the Inspector

13  General from Level 3 for the move from 400 Army Navy Drive over

14  to the Mark Center?

15  **A.**     So, again, if I used my rumble strips analogy, Matthew is

16  on one side and Tommy is on the other side, and Tommy signed it.

17  He's a trained DAR.  And Matthew Steiniger is my boss who is a

18  trained DAR.  He told me to proceed, so my understanding was

19  proceed.

20  **Q.**     Okay.  And was this -- and again, was this an unusual

21  course of conduct or is this how it always worked?

22  **A.**     Everything we did was a coordinated effort.  Everything,

23  not just this.  Anything we did, there was a lot of planning,

24  processing.  I mean those -- things didn't happen really, really

25  quick at the IG.

1    **Q.**    All right.  Now, did Level 3, if you're aware, do the

2    work themselves or did they subcontract out the work?

3    **A.**    I am not aware of the work -- this was Tommy's project,

4    so I didn't hear any complaints.  So if the work was done, we

5    were out of the -- of the -- of the 400 Army Navy Drive by the

6    end of February.  So, yes.  The work got done.

7    **Q.**    Did you make any requests to anybody at Level 3 that

8    Mr. Wilson receive any subcontracted work for this work?

9    **A.**    I didn't care who did it.

10    **Q.**    Sorry, say that again.

11    **A.**    I didn't care who did it.

12    MR. AMOLSCH:  If I could see Defense's 16.

13    BY MR. AMOLSCH:

14    **Q.**    Mr. Lumho, this is, again, did there come a time when the

15    rest of EAD's, Century, the other locations were moved over to

16    Army Navy Drive?

17    **A.**    Yes.  That's what we call phase two of the reconditioning

18    of the spaces that we had vacated, the buildings we had vacated.

19    **Q.**    All right.  And is Jennifer Paper here asking you about

20    the money associated with those moves?

21    **A.**    Yes, she is.

22    **Q.**    Okay.  And she says, "I know 442,000 was 400 Army Navy

23    Drive."  What does that tell you about whether she was aware of

24    how the money -- how that move was paid for?

25    **A.**    She knew that it was paid through WITS.

1  **Q.**    And 800,000 -- I'm sorry, 80,000 for CGN.  What's your

2  understanding of that?

3  **A.**    That she knew we had spent $80,000 on CGN, EAD's, and

4  everything else.  Again, this was coordinated even before we

5  signed the service order request form.

6  **Q.**    Do you know who did the work moving CGN, Century, and

7  EAD's over to the ware- -- out of their locations?

8  **A.**    So I'll -- I'll clarify what I had said before.  So at

9  the time, in my state of mind and where I was that time, I had

10  no idea.  I do know now and after reviewing all the millions of

11  documents I've reviewed and testimony here who did the work.

12  So --

13  **Q.**    Did you know who did the work for Century, Army Navy

14  Drive and EAD's at that time?

15  **A.**    No, I did not.

16  **Q.**    Did you make any request that Mr. Wilson be included in

17  that project?

18  **A.**    No.

19  **Q.**    All right.  So after you all arrive, did you continue to

20  participate in weekly meetings or monthly meetings or meetings

21  of any frequency about the IT needs of the Office of the

22  Inspector General, once you had arrived at the Mark Center?

23  **A.**    Yes.  So once we arrived at the Mark Center, we had a

24  constant turn of meetings.  There was -- we had -- we were

25  obviously involved in IT meetings with WHS and ITA concerning

1    how we were going to finish and get the rest of our stuff over.

2        But we, at the same time had -- Stephen Wilson had

3    neighborhood meetings where we would go and have a

4    representative from IT go and meet with our components to find

5    out how the move was and what other needs they need or what

6    expectations were.  So there was -- it was a good three months,

7    four months of nothing but BRAC.

8    **Q.**    As a result of those meetings, did it become apparent, or

9    tell me as a result of those meetings, did you all discover that

10    there were IT needs that needed to be solved?

11    **A.**    There were -- Yes.  There were a lot.  So once we decided

12    to move -- if we could back up real quick.  Once we decided that

13    the decision was made by the IG that we were going to co-locate

14    our equipment and our data on the ITA and WHS's system, we had

15    to figure out how to make that work.  So the IG made the

16    decision.  Now, it came down to us to figure out how to safely,

17    securely have our data on the WHS equipment.

18    **Q.**    Were there other IT needs that were unrelated to data

19    management but that were needed in order for OIG to complete

20    this mission?

21    **A.**    Yes.  So I was getting there.  So once we figured out the

22    whole data part, we had to deal with the extra components that

23    we didn't have that WHS did not have to support us.

24        For example, the Blackberry -- the Blackberry enterprise

25    server, the Bud server, our Polycom VTC system.  WHS has

1    Tandberg systems, we don't use Tandberg we use Polycom.  At the

2    time they didn't speak to each other, so we had to have our own

3    VTC system servers.

4    **Q.**     What does VTC stand for?

5    **A.**     Video teleconferencing.

6    **Q.**     Okay.

7    **A.**     So we had to purchase new servers for the Mark Center.

8    We also had a decision on whether or not we were going to

9    continue with the Kansas City COOP site we had, which was a tier

10   3, it was only a backup of our data, or if we were going to use

11   the defense continuity Internet network, which was the DCIN

12   network, which was a robust multiple phase dark fiber up to a

13   secure location outside of the Washington, D.C. area.  And

14   whether we were going to utilize their system, which was a much

15   better, much better fit for us.

16         And it was one of the big advantage of us co-locating at

17   the Mark Center data wise, was we would have access to their

18   robust COOP so we could then --

19   **Q.**     Continuity of operations?

20   **A.**     Continuity of operations.

21   **Q.**     Who would have directed the purchase of the equipment for

22   the Office of the Inspector General, the IT equipment?

23   **A.**     Matthew Steiniger.

24   **Q.**     Did you have an understanding about how -- about whether

25   you were encouraged to use WITS to solve these problems?

1   **A.**    Encourage is a -- isn't an accurate way.  I was -- I

2   think the whole directorate, including Stephen Wilson, utilized

3   WITS or wanted to utilize WITS to the most of their ability

4   because it was a quick and easy way to get equipment and

5   services that we need.  And the comptroller was happy that money

6   was being spent and not having to wait months for funding to get

7   ready.

8   **Q.**    Let's slow down on that.  So you said the contract --

9   compo was happy that money was being spent through WITS, what

10  does that mean?

11  **A.**    Again, we're in a continuity -- continuing resolution

12  until, I believe it was signed -- Congress signed it in at the

13  end of December, which means that then that released the money

14  for us to then start spending money.

15       So that takes weeks and months for the money to actually

16  be released for us to actually start spending the money.  And

17  then once the money is available to be spent, that's when

18  Willie Spivey's group starts going through the contract process

19  with GSA to spend money.

20       From the comp- -- from the comptroller's perspective or

21  from a comptrol- -- from -- from a spending, they have to have

22  their procurements closed out and money spent by a certain date.

23       And every year at the end of the FY, everybody scrambles

24  to spend the money that the comptroller has and the comptroller

25  gets on everybody, hey, we need to spend this money.  And WITS

1    was chewing off the money so they're happy money was being taken

2    off of their books, out of the O and M fund, operation of

3    management fund.

4    **Q.**    How would you describe the ordering process from the

5    point of view of you receiving a request from a component to

6    purchase equipment, to ultimately that equipment being purchased

7    through WITS?  Was it formal, informal?  How would you describe

8    it?

9    **A.**    I would describe it as informal.

10   **Q.**    Okay.  And why would you say that?

11   **A.**    Um, I would get -- so, again, we had weekly meetings

12   within ISD.  And in those weekly meetings one of the division

13   chiefs would express a need for backup tapes or -- or something

14   that failed, and we needed to purchase something.

15        For example, I'll use backup tapes as one of the

16   purchases.  We needed to get backup tapes.  The agency had run

17   out of backup tapes.  If you see kind of a -- our server team

18   didn't do a very good job of maintaining their systems, so we

19   ran out of backup tapes.  They needed backup tapes.

20        We're in a staff meeting and the discussion was, "How do

21   we get backup tapes?  We need them now.  We had a big failure."

22   And always, it always looked at me at, "Can we get it off WITS?"

23   And I would always, "Let me check."  And I'd reach out to Ron,

24   and Ron would send me back a service order request form.  And I

25   would take that form, and I would show it to Matthew.  "Matthew,

1    can we get it?" "Yes, we can.  Let's go talk to the

2    comptroller."  So then we would go talk to the comptroller's

3    office.  "Do we have money?"  "We have money.  Sign the service

4    order request form."  Sign the form, and the rest is history.

5    Now, that was within ISD.

6         And then there were times where DCIS would come to me and

7    say, "Hey, we need switches and routers for our internal -- I

8    forgot what it was called, but they had an internal network for

9    forensics, a forensics network.  "How can we get it?"  Matthew

10   says, "We can use WITS."  Okay.  "Well, let's use WITS."  And so

11   it was -- it was the umbrella of our procurements for that year.

12   **Q.**    Now, you're talking about Ron sending, Ron Capallia from

13   Level 3, sending you a service order request form.  Did you ever

14   fill one of those forms out?

15   **A.**    I don't know how to.  No, I didn't.

16   **Q.**    You don't know how --

17   **A.**    I mean, I have access to it.  No.

18   **Q.**    Okay.  Did you have any input into the price associated

19   for the goods or services that were provided to you?  Did that

20   come from Ron?

21   **A.**    That came from Ron.

22   **Q.**    Did you ever have any input into the selection of which

23   CLIN, or contract line item number was used?

24   **A.**    No.

25   **Q.**    Okay.  That was all done by Ron?

1    **A.**    Yep.

2    **Q.**    Did you ever ask Ron, when you saw service order request

3    form and contract line item number, would say, LAN/WAN

4    integrator, and you would be getting something that wasn't a

5    LAN/WAN integrator?  Did you have a conversation with him about

6    how that would work?

7    **A.**    I did.

8    **Q.**    Okay.

9    **A.**    In fact Matthew Steiniger and I both did.  We -- we had a

10    conversation --

11    **Q.**    I need you -- come step closer.

12    **A.**    Okay.  I'll talk slowly.

13    **Q.**    Okay.  So you said -- I asked the question was, did you

14    ever ask Ron about the in consist -- the internal

15    inconsistencies between what was being ordered and the contract

16    line item number on the service order request form that Ron sent

17    to you?

18    **A.**    Yes.  So the way Ron Capallia explained it to Matthew and

19    I was that since we had -- we had 60, 50, Level 3 contractors on

20    site because again, this is during the bridge.  The way he

21    explained it was, since we have professional services on site,

22    that they can bill for equipment as professional services, since

23    we had the guys there that were going to install it.  And that's

24    the way they did it at DHS, and that's the way they could do it

25    here.

1    Q.    Ron told you that's the way they do it at DHS?

2    A.    Yes.

3    Q.    And what does DHS stand for?

4    A.    Defense Homeland -- Department of Homeland Security.

5    Q.    So the service order request forms you would get back

6    from Ron, how did you understand he was arriving at the price

7    reflected in that service order request form?

8    A.    How would he get the --

9    Q.    Yeah.  How would he come up with the number because there

10   was equipment involved too?

11         MR. CARLBERG:  Objection.  Calls for speculation at this

12   point.

13   BY MR. AMOLSCH:

14   Q.    If you know?

15         THE COURT:  Rephrase.

16   BY MR. AMOLSCH:

17   Q.    If there was a 760 hours for LAN/WAN integration for the

18   purchase of Sam's Polycom machines, just as an example --

19   A.    I got it.

20   Q.    -- how did you understand he arrived at the price charged

21   to the Office of the Inspector General for those Polycom

22   machines with a professional services contract line item number?

23   A.    Just by math and using a CLIN that was $50 an hour, if

24   you needed to be $150 you would multiply it by 3 hours to get

25   the 150 hours --

1    **Q.**    Without the cost of the equipment?

2    **A.**    How would he get that cost of the --

3    **Q.**    How would he factor the cost of equipment into the price

4    he charged the government?

5    **A.**    He would reverse it, right.

6    **Q.**    I don't know what that means.

7    **A.**    So if he needed $400,000, if the cost of the equipment

8    was a $100,000, their markup was, I think he said 35 percent

9    when he testified, and so that's $135,000.  He would divide

10   $135,000 by a CLIN number and come up with the amount of hours.

11   **Q.**    Did that also include -- so did it include a purchase,

12   the cost for the equipment and for the installation, if it

13   needed installation?

14   **A.**    At times there wer- -- at times there were, but normally

15   it was just for the equipment.

16   **Q.**    All right.  Is that how, as far as your involvement with

17   the WITS3 project contract, is that how it worked for all these

18   orders?

19   **A.**    Yes.

20   **Q.**    When you showed the comptroller the service order request

21   form, do you think you were being clear about the work being

22   done and the equipment being purchased?

23   **A.**    Yes.  I mean there were multiple e-mails where I had to

24   explain what was equipment and what was installation for some of

25   these.

1    **Q.**    Did anybody in the comptroller's office ever question

2    you, what was this being used for?

3    **A.**    No.

4    **Q.**    Did you ever submit manipulated or forged paperwork to

5    the comptroller's office?

6    **A.**    No.

7    **Q.**    Did you ever encourage people to place orders they didn't

8    need?

9    **A.**    No, I did not.

10   **Q.**    Was everything you ordered delivered and installed?

11   **A.**    Every piece.

12   **Q.**    Did you ever specifically request that any of that work

13   or any of the equipment come from MSO?

14   **A.**    I didn't care where it came from.  So, no.

15   **Q.**    So tell me how you met Ron Capallia.

16   **A.**    So I believe I was at 400 Army Navy Drive, there was a

17   gentleman by the name of Jim Sweeney.  He was a Level 3

18   employee.  I think he was a sales guy.  And when we had the four

19   or three or four patch level guys, the patch guys who updated

20   all of our systems prior to us getting kicked off, he would come

21   by, see how things are going and try to sell me more things or,

22   you know, just a typical sales guy trying to drum up business

23   for Level 3.

24          And I -- we were right in the middle of BRAC.  I didn't

25   have time for sales guys to try and come and sell me something I

1    didn't need, so I reached out to -- I asked him who his boss was

2    and I think his boss was Hoeymans or somebody.  So I reached out

3    to them and said, "Hey, don't send this guy down here again.  I

4    don't need anybody selling me stuff I'm trying to get us moved."

5    And so they didn't, and so Ron Capallia reached out and said

6    that he was the WITS manager for Level 3, and that Sweeney won't

7    come down anymore, and I said, "Okay.  Perfect."

8    Q.    Did you know about any relationship Ron Capallia may or

9    may not have had with Mr. Wilson?

10   A.    No, I -- I had no idea.

11   Q.    That never came up in conversation?

12   A.    No.

13   Q.    What did you understand Ron Capallia's role to be at

14   Level 3 as it relates to the WITS3 contract?

15   A.    He was the WITS expert.

16   Q.    Okay.  What do you mean by expert?

17   A.    Well, he was their -- their -- their WITS program

18   manager, is what I -- I thought his position was.  So he was in

19   charge of the -- of the WITS orders and the WITS contract.

20   Q.    Did you come to rely on his advice?

21   A.    Yes.

22   Q.    Did you come to trust that Capallia knew -- Ron knew what

23   he was doing?

24   A.    Yes.

25   Q.    Okay.  So the government asked you about a fair

1   opportunity letter you sent to Ron that National Capital Region

2   letter that was -- that you sent in August -- April or whenever

3   it was back dated.  Tell me about that.

4   **A.**    So Ron Capallia called me whenever that date was in a

5   panic, and said, "Hey, I'm going to get in big trouble, I don't

6   have this letter.  If I get audited, we're going to get in

7   big -- I'm going to get in big trouble.  Tim Donelson is on me.

8   Is there any way you can back date this letter?"

9        I didn't know what it was.  I was -- I was not happy that

10  he was coming -- coming to me to ask me to save his butt, but I

11  did.  I -- I comp- -- I complied and I -- he sent me the letter,

12  and -- and I signed it.

13  **Q.**    All right.  Did he send one to Tommy Carlyle as well?

14  **A.**    He had.  He -- he had told me that he had sent one to

15  Tommy.

16  **Q.**    All right.  Did you have a discussion with

17  Matthew Steiniger about this?

18  **A.**    I did.  I showed it to Matthew.  Matthew was like, "What

19  the -- you know, what hell is going on, what are these guys

20  doing, those bozos."  And I said, "I don't know.  I just signed

21  it.

22  **Q.**    And this letter described fair opportunity requirements.

23  Had you had any training on what fair opportunity requirements

24  were?

25  **A.**    Honestly, I didn't even really look at the letter.  It

1    was -- it wasn't explained to me that this might affect the IG,

2    it was about saving Ron that I was -- that I was doing that.  So

3    I didn't really pay attention to what that letter even said.  I

4    just signed it and sent it to him.

5    **Q.**    Was it your intent to deceive the Office of the Inspector

6    General into paying for goods and services they otherwise

7    wouldn't?

8    **A.**    No, not at all.  No, not at all.  It was a -- it was a

9    regret that I -- that I did that.

10   **Q.**    Was your decision to do that in any way related to

11   Bill Wilson and MSO?

12   **A.**    No, not at all.

13   **Q.**    Was it based on your relationship with Ron Capallia?

14   **A.**    Yeah.  I mean, I was trying to go help him.

15   **Q.**    I'm sorry?

16   **A.**    I was trying to help him.

17        MR. AMOLSCH:  If we could bring up

18   Government Exhibit 164.

19   BY MR. AMOLSCH:

20   **Q.**    All right.  If we could go to the bottom of this e-mail,

21   please.

22        All right.  This is Melissa Jones sending an e-mail to

23   Justin Perot.  Do you know Justin?

24   **A.**    Yes.

25   **Q.**    Okay.  Who is Justin?

1   **A.**     Justin worked for me.  At some point the IT security came

2   under Matthew -- Matthew security folks under me, so I had all

3   the IT security folks under me.

4   **Q.**     All right.  And he was one of those people?

5   **A.**     He was one of our security engineers, yes.

6   **Q.**     Okay.  If we could go to the next e-mail.  So this is --

7   Justin is forwarding you and Mark Walker a refresh quote.  And

8   remind me between who Mark Walker is?

9   **A.**     He was our chief architect.

10  **Q.**     Okay.

11  **A.**     Of the ISD.

12  **Q.**     "Hey, guys, see Niksun quote attached.  Can we get this

13  through WITS?"  What is he referring to when he says Niksun?

14  **A.**     So a Niksun, if you think of it as a VCR or TVO for --

15  for -- for data networks.  It records a certain amount of --

16  depending on how large the hard drive is, it will record all

17  activity on a span -- on a port that span to their entire VLAN

18  or whatever it is.  So it is a VCR that records data.  So if

19  anything were to happen, we can go back on the Niksun to see

20  what had happened.  If it was an e-mail, if it was an intrusion,

21  it would come back -- you can go back and reverse to see exactly

22  what had happened, what had taken place at that timestamp.

23  **Q.**     Okay.  Was this something that they, they needed -- that

24  information security division needed for the Office of the

25  Inspector General to complete its mission?

1   **A.**    This was a requirement by DISA for us to have a device

2   that would do something like this.

3   **Q.**    Okay.  When you say it was a, "Requirement by DISA," what

4   does that mean?

5   **A.**    So in order for us to be on the DoD network we have to

6   meet certain level requirements, and this was one of the

7   requirements that we have.  You have to have a firewall.  You

8   need to have an IDS, or intrusion detection system.  You just

9   need a cadre of security appliances, and this was one of the

10  flavors of a recorder for IT security.

11  **Q.**    If you didn't have that, what would happen to your

12  access?

13  **A.**    It would have been cutoff.

14  **Q.**    Okay.  Would that have made it difficult, if not

15  impossible for --

16  **A.**    We wouldn't be able to get e-mails out.

17  **Q.**    Okay.  And are you also familiar with something called

18  Adtran?

19  **A.**    Yes.

20  **Q.**    What's Adtran?

21  **A.**    The Adtran in this case is a -- it changes from a fiber

22  digital signal to an analog signal so that a fiber optic signal

23  can be transferred into a non-fiber analog signal that can go

24  into our network.

25  **Q.**    Okay.  Was this also something that ISD needed in order

1    for the Inspector General to complete its mission?

2    **A.**    Yes.

3    **Q.**    Now, you are asking -- he is asking you, "Can we get this

4    through WITS?"  So if we go to the next e-mail.  You then

5    send -- I'm sorry, the next one down from that.  I'm sorry.

6    Beginning here -- you then forwarded it to Ron?

7    **A.**    Yes.

8    **Q.**    And asking him -- basically forwarding the request from

9    Justin to Ron?

10   **A.**    Right.  So it's a -- it is a piece of equipment that has

11   many different flavors of it.  And so rather than me go and

12   retype what all the requirements are and what cards we need in

13   the appliance, it was just easier for me just to forward exactly

14   what Justin needed to Ron, to get exactly what we needed.

15   **Q.**    All right.  And are you asking him as well, "Ron, can we

16   get this off WITS?"

17   **A.**    Yes.

18   **Q.**    You're asking his opinion.  All right.  And did this --

19   is this something that would need to -- needed to be, the Niksun

20   machines and the Adtran, would they need to be professionally

21   installed as well, or is that just equipment that would arrive?

22   **A.**    This was just equipment that would arrive.  There were

23   Level 3 guys that were already on staff in their security

24   division that would help install it.

25   **Q.**    All right.  And did you take the service order -- and

1   then did Ron ultimately send you back a service order request

2   form for this material?

3   **A.**     Of course.

4          MR. AMOLSCH:  Can we bring up Exhibit 164?  Or -- Oh, I'm

5   sorry.  This is 164.  I apologize.

6   BY MR. AMOLSCH:

7   **Q.**     Now, in this e-mail, let's stick with this one just

8   briefly, there's nothing in the e-mail about your preference

9   about how Ron acquires this equipment?

10  **A.**     Right.

11  **Q.**     Did you have an opinion one way or the other about where

12  this equipment came from?

13  **A.**     I did not care.  I didn't care.

14  **Q.**     Would it have been all right with you if he had purchased

15  it from OSI?

16  **A.**     Sure.

17  **Q.**     What was your primary concern?

18  **A.**     Getting the equipment in.

19         MR. AMOLSCH:  If we could go to 169.  If we could go to

20  the bottom.

21  BY MR. AMOLSCH:

22  **Q.**     So is this the service order request form that Ron sent

23  over to you?

24  **A.**     Yes, it is.

25  **Q.**     All right.  And do you under- -- what do you understand

1    this to be about, his answer about whether you can get it

2    through WITS?

3    **A.**    You can get it through WITS.

4    **Q.**    All right.  And the technical -- the remarks section in

5    the listing of the equipment, who filled all that out?

6    **A.**    Ron Capallia.

7    **Q.**    Okay.  Did he fill in the product I.D. information?

8    **A.**    Yes, I didn't --

9    **Q.**    Okay.  Did you ask him, is this one of the times you

10   asked him about the fact that the -- if we can go to the very

11   bottom of this e-mail the service order request form where it

12   lists LAN/WAN integrator -- it lists labor CLINs for the

13   purchase of equipment?

14   **A.**    Mm-hmm.

15   **Q.**    Is this one of the situations in which you asked him, or

16   was this the first time you asked him, "Ron, how are we -- how

17   does this work?"

18   **A.**    Can we go back and look at the date of this?

19   **Q.**    Sure.  Let me go to the bottom.  The date of this one is

20   April 4th?

21   **A.**    No.  We had -- I had, had that discussion -- I had, had

22   that discussion with Ron and Matthew earlier than this.

23   **Q.**    When was that discussion?

24   **A.**    Early in the year.  It was probably February or March.

25   **Q.**    Okay.  After your arrival at the Mark Center?

1    **A.**    After the arrival at the Mark Center, yes.

2    **Q.**    Did you sign and return this?

3    **A.**    Yes.

4    **Q.**    Service order request form?

5    **A.**    I did.

6    **Q.**    After -- did you show it to Matthew?

7    **A.**    I'm sorry, I want to make sure that --

8           Yes.  I -- after I had showed it to Matthew and our

9    comptroller's office.

10          MR. AMOLSCH:  Court's indulgence, please.

11          THE WITNESS:  Sorry, I didn't want to speak over you.

12   BY MR. AMOLSCH:

13   **Q.**    No.  Thank you.

14          Did you also send this quote that you got from

15   Ron Capallia to Jennifer Paper at the comptroller's office?

16   **A.**    Yes, I did.

17   **Q.**    Okay.  Let me ask you to take a look at this and see if

18   you recognize it.

19          MR. CARLBERG:  Permission to approach on this, Your Honor.

20          THE COURT:  I'm sorry?

21          MR. CARLBERG:  Permission to approach briefly.

22          THE COURT:  Yes.

23          MR. CARLBERG:  Thank you, sir.

24          (Following sidebar discussion had on the record at 12:05

25   p.m.:)

1          MR. CARLBERG:  Your Honor, this is another one of these

2    e-mails where there's no actual attachment, just the e-mail.  And

3    I will represent that we understand what the attachment actually

4    looked like coming in and looks like going out, and it's

5    misleading to present it this way.  And we would object to it as

6    an incomplete document and lacking the attachment.  It's

7    referencing an attachment; no attachment to it again.

8          MR. AMOLSCH:  Your Honor, I can -- can I question

9    Mr. Lumho about whether that's the attachment he sent, and then

10   they can cross-examine him about whether it's the same one.

11         THE COURT:  Yeah.  If he knows what the attachment is,

12   then he can testify about that.

13         MR. AMOLSCH:  Okay.

14         THE COURT:  You can identify it.

15         MR. AMOLSCH:  Yes, sir.

16         THE COURT:  Right.

17         MR. AMOLSCH:  Okay.

18         THE COURT:  Yeah, I think that's right.

19         (Sidebar discussion concluded.)

20         MR. AMOLSCH:  May it please the Court.

21         THE COURT:  Yes, sir.  Go ahead.

22   BY MR. AMOLSCH:

23   **Q.**    Mr. Lumho, do you recognize that?

24   **A.**    I do.

25   **Q.**    Okay.

1      MR. AMOLSCH:  What number is this going to be?

2      MS. GAMLIEL:  39.

3      MR. AMOLSCH:  39?

4  BY MR. AMOLSCH:

5  **Q.**    And what is that?

6  **A.**    This is an e-mail that I had sent to Jennifer Paper after

7  I received the quote from Ron Capallia.

8  **Q.**    And the -- Jennifer Paper works where?

9  **A.**    In the comptroller's office.

10 **Q.**    Okay.  You were referencing an attached quote.  Are you

11 forwarding this e-mail to Ms. Paper?

12 **A.**    Yes, I am.  It says in the subject, "FW."

13     MR. AMOLSCH:  I'm sorry, Your Honor, may I publish?  May I

14 admit this?

15     THE COURT:  Yes, exception is noted.

16     (Defendant's Exhibit 39 admitted into the record.)

17 BY MR. AMOLSCH:

18 **Q.**    All right.  So you were forwarding this -- it says,

19 "Kekoa, this is the attached quote," the e-mail we saw earlier?

20 **A.**    Correct.

21 **Q.**    And you're then forwarding this to Jennifer Paper?

22 **A.**    Yes, I am.

23 **Q.**    Okay.  "Tax quote is for hardware, equipment, and

24 maintenance."  It is -- you're telling her about the cost

25 associated with this equipment; is that correct?

1    **A.**      Yes, I am.

2    **Q.**      And because you forwarded this e-mail rather than

3    replying to it, did Ron Capallia's attachment that he originally

4    sent to you also go along to Jennifer Paper?

5    **A.**      Yes.  The attachment is attached to this e-mail that I

6    forwarded to her.

7    **Q.**      Okay.  And that's the same attachment that you got --

8    **A.**      From Ron Capallia.

9    **Q.**      -- from Ron Capallia?

10   **A.**      Yes.

11   **Q.**      All right.  And did she respond to you, do you remember,

12   about whether she had a problem with that purchase?

13   **A.**      There was no problem with the purchase.

14   **Q.**      And based on -- and this is also the same service order

15   request form that you showed to Matthew Steiniger?

16   **A.**      Yes.

17   **Q.**      Okay.  After showing it to Jennifer and showing it to

18   Matthew, is it at that point that you signed it and sent it back

19   to Mr. Capallia?

20   **A.**      Yes.

21   **Q.**      Did you do that intending to deceive the government?

22   **A.**      No.

23   **Q.**      Did you do that in good faith thinking this was something

24   that you were permitted to do?

25   **A.**      Yes, absolutely.

1           MR. AMOLSCH:  If we could go to Government's

2    Exhibit 101B.

3    BY MR. AMOLSCH:

4    Q.    All right.  Do you recognize this service order request

5    form?

6    A.    Yes, I do.

7    Q.    All right.  There's a 6O34 in the upper right-hand

8    corner.  Do you know what that -- who put that there?

9    A.    Yes.  I put those on the orders, yes.

10   Q.    Okay.  Do you know when you put -- when you put that

11   particular one on that order, in what context?

12   A.    I put those on there after I would sign them, and I had

13   them in my file.

14   Q.    Was -- did there come a time when you reviewed these --

15   when you reviewed service order request forms with agents

16   from --

17   A.    Yes.

18   Q.    -- DCIS or other places?

19   A.    Yes.

20   Q.    Okay.  During those meetings, were you asked about these

21   service order request forms?

22   A.    Yes.

23   Q.    Okay --

24   A.    So I --

25   Q.    Is that when you put the -- is that when you wrote on the

```
 1    service order request form?
 2           MR. CARLBERG:  Objection.  This is very leading and vague.
 3           THE COURT:  Sustained.
 4    BY MR. AMOLSCH:
 5    Q.     Is that --
 6           THE COURT:  Rephrase.
 7           MR. AMOLSCH:  Yes, sir.
 8    BY MR. AMOLSCH:
 9    Q.     During that meeting, was that 6034 put on during the
10    meeting with the agents or had it been put on before?
11    A.     So when I -- when I met with the agents during the --
12    during the investigation, I provided them a stack of these
13    service order -- all of the service order request forms that I
14    had.  And in order for me to correlate which purchases they
15    were, since the service order request form doesn't have an
16    identifier of which order it is, I wrote down and showed them
17    which portal order number these were.  So that's why it has a
18    6034 because it matched a spreadsheet that I had on SharePoint
19    that kept track of all these orders.
20    Q.     Is that the point that you wrote that on there?
21    A.     Yes.
22    Q.     Okay.
23    A.     The agents wouldn't have -- it would have taken them more
24    time to try to figure out what this order was if I hadn't put
25    that detail on there along with my spreadsheet that I had given
```

1   them.

2   **Q.**    By putting that identifier on the service order request

3   form, were you trying to deceive or otherwise limit the

4   government's investigation?

5   **A.**    No.  I was trying to help them.  I mean, I didn't do

6   anything wrong, so --

7   **Q.**    Do you remember a time when senior executive staff needed

8   video monitors in their offices in order to participate in video

9   teleconferencing events --

10  **A.**    Yes.

11  **Q.**    -- as part of their job at OIG?

12  **A.**    Yes.  So again, we had standard -- standard requirements

13  that we would create and get approved through the senior

14  leadership.  And when we moved into the Mark Center, the

15  approved requirement for all SESes and conference rooms were to

16  have a video teleconference in their office -- in their office

17  and in all the conference rooms because again we were -- the

18  agency was spread out worldwide.  And to make them more

19  cost-effective and efficient, we put out video teleconferencing,

20  like we all know Zoom is now, thanks to COVID.  Back then it was

21  a new technology.

22  **Q.**    So there was --

23  **A.**    Newer.

24  **Q.**    Let me see if I have this correct.  You mentioned Polycom

25  which we'll get to later.  Is that the brains of the video

1    teleconferencing apparatus?

2    **A.**    So, yes.  You could -- you could hook up to any TV a VTC

3    as long as you had the Polycom end unit.  The Polycom end

4    unit -- end unit is like a cable box for non-IT person.  It's

5    the computer that transmits the video and the voice to the TV.

6    So the TV is just a peripheral to the Polycom.

7    **Q.**    And did there come a time when senior executive staff,

8    Stephen Wilson, Ross Weiland, needed video monitors in their

9    offices to participate in these video teleconferences?

10   **A.**    Yes.  So when we moved into the Mark Center, for example,

11   Stephen Wilson, our SES, we put a VTC in his office.  He was our

12   SES so he was our guinea pig.  He was our first SES to get the

13   VTC in his office.  And so we knew by doing that it would

14   quickly spread that the SESes -- When is my VTC going to come in

15   and depending on the table since Mr. Wilson has one.

16        So, yes, our standard was all SESes get a VTC and a

17   television inside -- inside their office, along with all the

18   conference rooms.

19   **Q.**    Are you familiar with a man named Ross Weiland?

20   **A.**    Yes.  Ross Weiland was an SES in the Defense Criminal

21   Investigative Services.

22   **Q.**    He was in DCIS?

23   **A.**    He was -- yes.  He was DCIS over operations -- I don't

24   remember exactly where he was, but I know he was a SES in DCIS.

25   **Q.**    And he was in the same level as Stephen Wilson from a

1   government hierarchy or higher or lower?

2   **A.**    From an organizational, he was a peer to -- he was a peer

3   to Stephen Wilson.

4   **Q.**    Now, did there come a time when Mr. Weiland requested the

5   same TV that Mr. Wilson had installed in his office?

6   **A.**    Yes.

7   **Q.**    And did other SESes make similar requests?

8   **A.**    Yes.  I mean, again, there was a standard where we just

9   hadn't been able to get them out to them as fast as they wanted.

10  **Q.**    All right.  And did you communicate with Mr. Steiniger

11  about how to acquire these TVs?

12  **A.**    Yes.

13  **Q.**    And in particular did you have a conversation with him

14  about acquiring a TV for Ross Weiland?

15  **A.**    Yes.

16  **Q.**    Do you know who Terry Peck is?

17  **A.**    Yes.

18  **Q.**    Who is Terry Peck?

19  **A.**    He was my video teleconferencing manager.  He worked for

20  me.  He managed the VTC contractors.

21  **Q.**    And you're familiar with his e-mail address and --

22  **A.**    Yes.

23  **Q.**    All right.  Did there come a time when Samsung TVs were

24  ordered and then delivered to the Mark Center?

25  **A.**    Yes.

1    **Q.**    Who were those TVs delivered to, if you know, prior --

2    were they delivered right to the Mark Center or were they

3    delivered off-site and then delivered, if you know?

4    **A.**    So it -- it's -- it's -- I'm not sure how to answer that

5    question because I -- I know now how they're delivered because

6    of --

7    **Q.**    All right?

8    **A.**    -- testimony and because of discovery that was given to

9    me --

10   **Q.**    Okay.

11   **A.**    At the time I didn't care.  Give me what I wanted.  We

12   needed TVs give them to me.  And how they got there, how they

13   were delivered didn't matter.  There's an issue that there was

14   ongoing issues with our receiving area at the Mark Center where

15   folks weren't able to deliver, but I didn't know who delivered

16   them at that time.

17   **Q.**    Um, ultimately they were delivered, the TVs were

18   delivered to the Mark Center?

19   **A.**    They were ultimately delivered to the Mark Center, yes.

20   **Q.**    And was there first stop accountable property?

21   **A.**    Yes.  For the TVs, yes.

22   **Q.**    And what is your understanding of what happens in

23   accountable property?

24   **A.**    So accountable property they need the contract

25   information, they look at if it has a hard drive.  There's a

1    accountable property policy that was loosely adhered to at the

2    IG.  But if you -- if you ask one person what it was and another

3    person, you will get two different answers.  Our accountable

4    property was a hot mess.

5    Q.    But did the TVs originally get delivered to accountable

6    property?  Is that how it --

7    A.    They originally got delivered to accountable and sat in

8    accountable property --

9         MR. CARLBERG:  Your Honor, objection.  He said he doesn't

10   know how they were delivered.  I don't understand how this is

11   possible.

12        THE COURT:  Sustained.

13        MR. AMOLSCH:  Can I pull up Government Exhibit 237.

14   BY MR. AMOLSCH:

15   Q.    All right.  Take a look -- if we can go all the way to

16   the bottom of this e-mail.

17        Do you see this is an e-mail from Joe Hart to Matthew

18   Steiniger, to you, Terry Peck, and Patria Richardson?

19   A.    Yes.

20   Q.    Who is Patria Richardson?

21   A.    I believe she was an assistant in AI, I think.

22   Q.    All right.  I'm going to ask you to look at this e-mail,

23   this exchange and then look at the e-mail chain directly after

24   it, and then I'm going to ask you some questions.  So let me

25   know when you read that.

1   **A.**      Okay.  Okay.

2   **Q.**      Okay.  So let's go to the next one in the chain.

3         Matthew is responding to Terry, "Have you had a chance to

4   respond."  Go to the next one.  Okay.  "Matthew, this has been

5   an ongoing issue."  I want you to read that --

6   **A.**      Okay.

7   **Q.**      -- and then I'm going to ask you some questions about

8   what your understanding that was about.

9   **A.**      Okay.

10  **Q.**      All right.  Do you understand now the context of that

11  e-mail?

12  **A.**      Yes.

13  **Q.**      Okay.  And what is going on in this e-mail exchange with

14  you and Matthew and Terry Peck?

15  **A.**      Um, that the TVs were down in the -- the TVs were down in

16  the accountable property waiting to be delivered, but they

17  couldn't be delivered because the paperwork that Terry needed

18  from MSO wasn't -- hadn't been provided.

19  **Q.**      All right.  So do you take from this that MSO is the one

20  that provided the TVs?

21  **A.**      Yes.

22  **Q.**      And MSO is associated with what particular --

23  **A.**      Level 3, WITS contract.

24  **Q.**      And was there a -- and -- how was Level 3 related to the

25  WITS3 contract?

1    **A.**    They were the one that we purchased off of the WITS

2    contract.

3    **Q.**    So based on this, Terry Peck is telling Matthew Steiniger

4    that MSO has delivered -- has delivered TVs, which had been

5    purchased through WITS?

6    **A.**    Correct, yes.

7    **Q.**    Okay.  Then we look up to see Matthew responding to

8    Terry.

9    **A.**    Yes.

10   **Q.**    "We got this, you know, this is starting to challenge my

11   patience.  We got the issue as part of the install from WITS."

12          What is your understanding about whether Mr. Steiniger

13   knew these TVs had been purchased through WITS and from MSO?

14   **A.**    He understood --

15          MR. CARLBERG:  Objection.  Compound through WITS and MSO.

16   BY MR. AMOLSCH:

17   **Q.**    What is your understanding about whether these TVs were

18   purchased through WITS?

19   **A.**    He knew.

20   **Q.**    All right.  And about where and who provided them

21   pursuant to the WITS contract?

22   **A.**    It says right there from Terry Peck, that it was provided

23   by MSO.

24   **Q.**    All right.  And then you send an e-mail to Barry Atwood

25   and Bill Wilson and Ron Capallia.  What are you asking for here?

1    **A.**     So when Level 3 would -- would deliver our equipment that

2    we ordered through WITS, the property accountable- -- property

3    accountability folks downstairs were used to seeing normal GSA

4    contracts, contracts that had their contract numbers, and

5    everything else.

6         Well, through WITS we didn't have a contract associated

7    with these, they were from WITS.  And so accountable property

8    had a hard time dealing with -- how do we barcode these and put

9    the information we need inside of our accountable -- accountable

10   property system.  And so they sat down in the cage for a month

11   and a half before they would deliver them.

12        Until, finally, after harping on Capallia, he finally

13   gave them, or gave me to give to them, what they needed, which

14   was the contract information number and everything else.

15   **Q.**     Why did you e-mail Mr. Wilson about this?

16   **A.**     Um, I e-mailed Barry and Mr. Wilson because I knew that

17   it came from MSO, evidently.

18   **Q.**     And did you -- would they have had the information you

19   were looking for?

20   **A.**     Yeah.

21   **Q.**     You signed the service order request form purchasing the

22   TVs from Level 3?

23   **A.**     I'm pretty sure I did, yes.  It was either myself or

24   Tommy --

25   **Q.**     Did you do that before --

```
1            THE COURT REPORTER:  I'm sorry.  Say that again.
2            THE WITNESS:  It was either myself or Tommy, but I'm
3    pretty sure it was myself.
4    BY MR. AMOLSCH:
5    Q.    Did you do that before showing the service order request
6    form in its entirety to Mr. Steiniger?
7    A.    No.  He saw the service order request form.
8    Q.    How about the comptroller's office?
9    A.    They saw it.
10   Q.    Did you sign that service order request form with any
11   intention to defraud the government?
12   A.    No.
13   Q.    Did you sign that in good faith because you thought you
14   were allowed to do so?
15   A.    Yes.
16   Q.    Did part of your duties include purchasing and testing
17   equipment for potential use within the broader Office of the
18   Inspector General?
19   A.    Yes.  So within my area of -- of telecommunications and
20   networks and phones and security, most things that came under my
21   area or "lane," as Matthew would call it, we would be
22   responsible for testing -- testing it to make sure that it
23   worked on our infrastructure.
24   Q.    And was that one of your responsibilities?
25   A.    It was, yes.
```

1    Q.    Did the information security division Matthew Steiniger's

2    group, your group, did they use Apple equipment?

3    A.    We did, yes --

4    Q.    In '11, 2012?

5    A.    Yes, we did.  And it's the Information Systems Director.

6    I just don't want to confuse the jury that it was -- the

7    security was under me, but Matthew was in charge of the.

8    Q.    My mistake, Information Systems Directory.  Were there

9    both Apple servers and MacBooks in use or just one or the other?

10   A.    There were both.

11   Q.    Now, did you have a Mac server that you used --

12   A.    -- I did --

13   Q.    -- at the Office of the Inspector General?

14         THE COURT REPORTER:  I'm sorry, I didn't hear your

15   question.

16   BY MR. AMOLSCH:

17   Q.    Did you have a Mac server that you used at the office of

18   the Inspector General?

19   A.    I did have a Mac Pro in my office.

20   Q.    And where did -- where was that ser- -- where was that

21   Mac server physically located?

22   A.    Right in front of my door, where my desk was.

23   Q.    Did you take any -- any steps to conceal the fact that,

24   that server was sitting in your office?

25   A.    No.  Everybody knew that I had the server in my office.

1    It was a -- it was a -- an often talked about piece of equipment

2    that I had in my office.

3    Q.    Why was it often talked about?

4    A.    It was a really powerful server that our security

5    division was going to use for virtual machines for our -- for

6    virtual machines.  I'll just leave it at that.

7    Q.    And how -- was that -- was that -- how did that Mac

8    server -- how was that acquired?

9    A.    We purchased that off of the WITS3 contract.

10   Q.    And why did you purchase it off WITS?

11   A.    It was --

12   Q.    -- why was it purchased off WITS?

13   A.    For me to test it.  To make sure the Mac OS security --

14   security posture that is required by DoD could be laid on top of

15   a Mac Pro prior to us buying them for our web team.

16   Q.    All right.  Was Mr. Steiniger aware of this purchase?

17   A.    Absolutely.

18   Q.    Did he authorize this purchase?

19   A.    Yes, he did.

20   Q.    All right.  Did he tell you to use WITS to acquire it?

21   A.    Yes.

22   Q.    Let's talk about MacBook's.

23   A.    Mm-hmm.

24   Q.    Did ISD use MacBook's as opposed to servers or in

25   addition to servers in 2012?

1   **A.**     We did.  We had a number of MacBook Pros.

2   **Q.**     Did there come a time when ISD acquired laptops for the

3   purposes of testing?

4   **A.**     Yes.

5   **Q.**     Can you tell me about that?

6   **A.**     Again, we had during this similar timeframe, we needed to

7   test it on both a Mac Pro and a MacBook device.  So we -- we

8   purchased MacBook Pro as well.  We purchased a number of MacBook

9   Pros.

10  **Q.**     Okay.  And the purchase of MacBook Pros, did that come to

11  you as a request from one of the components you supported?  Do

12  you remember?

13  **A.**     There was a request from a component for MacBook Pros.

14  There was.  There was one.

15  **Q.**     All right.  And did you discuss the purchase of the

16  MacBook Pros with Matthew Steiniger?

17  **A.**     Yes.

18  **Q.**     Okay.  And how did he tell to you acquire them?

19  **A.**     Through WITS.

20  **Q.**     Okay.  Did you -- is that how acquired them?

21  **A.**     Yes.

22  **Q.**     Okay.  When you acquired the MacBook Pros for testing

23  purposes for ISD through WITS, was it your intention to deceive

24  the government?

25  **A.**     No, it wasn't.

```
 1          And if I could clarify the way that sounds.  So Matthew
 2    didn't say, "Use WITS," he said, "Check and see if we can get it
 3    off of WITS."
 4    Q.    Okay.  Check and see if you can get it off WITS.  So what
 5    did you do after he told you that.
 6    A.    I checked to see if I could get it off WITS.
 7    Q.    With who?
 8    A.    Ron Capallia.
 9    Q.    Okay.  And what did Ron say?
10    A.    "Yes."
11    Q.    Okay.  Did Ron send you back a service order request
12    form?
13    A.    Yes, he did.
14    Q.    Okay.  Did you take that service order request form to
15    Matthew?
16    A.    Showed it back to Matthew.
17    Q.    Did you show it to him?
18    A.    Yes, I did.
19    Q.    Did he approve it?
20    A.    Yes, he did.
21    Q.    Did he si- -- did you take it to the comptroller's office
22    to see if there was money for this purchase?
23    A.    Always.
24    Q.    Did you take the service order request form with you?
25    A.    Yes, I did.
```

1    **Q.**    Did you receive approvals from both the -- did you

2    receive approvals from the comptroller?

3    **A.**    Yes.

4    **Q.**    And from Matthew Steiniger?

5    **A.**    Yes.

6    **Q.**    And after receiving those approvals, did you submit the

7    invoi- -- did you sign and submit the service order request

8    form?

9    **A.**    Yes, I did.

10   **Q.**    All right.  And did the government get what it paid for

11   in the sense that the MacBooks arrived?

12   **A.**    Yes, they did.

13   **Q.**    Okay.  And were they put into use --

14   **A.**    Yes, they were.

15   **Q.**    -- at the offices of the Inspector General?

16   **A.**    Mm-hmm.

17   **Q.**    I'm sorry?

18   **A.**    Yes, they were.

19   **Q.**    Are they -- do you know where they are now?  Are they

20   still there, do you know where they are?

21   **A.**    According to the inventory that was given to me from the

22   discovery from the government, they are still.

23       MR. CARLBERG:  Objection to commenting on the discovery.

24       THE COURT:  Well, it's irrelevant any way.

25       THE WITNESS:  They're still at the IG's office.

1          MR. AMOLSCH:  I'll move to another question.

2          THE COURT:  I'll strike the question and answer.  Next

3   question.

4          MR. AMOLSCH:  Yes, sir.

5   BY MR. AMOLSCH:

6   **Q.**     Are you familiar with SMART Boards?

7   **A.**     Yes.

8   **Q.**     Okay.  What are SMART Boards?

9   **A.**     They are a whiteboard that is, an interactive whiteboard,

10  that is hooked up to your computer system so that you can save

11  what's written on the whiteboard.  You can manipulate what's on

12  the whiteboard from a laptop.  It's basically a whiteboard and a

13  laptop combined.

14  **Q.**     Did OIG use SMART Boards?

15  **A.**     Yes, we purchased some.

16  **Q.**     Where were they used?

17  **A.**     They were in the training room -- the -- the -- the

18  training -- our training directorate's training rooms.  And I

19  believe we also had one inside of -- a number of conference

20  rooms including ISD's conference room.

21  **Q.**     Is this something that ISD was aware they were going to

22  need to purchase before they actually made the move, or did this

23  become apparent after you arrived?

24  **A.**     That was apparent after we arrived.  Mr. Stephen Wilson

25  went to a, just a trade show, at a trade show for DISA, and came

1   back with a shiny object called, a "SMART Board" that he wanted

2   to get.  And so he wanted to get those for our conference rooms

3   that were heavily used for meetings and our training room.

4   **Q.**    Did Mr. Wilson give you any directions about acquiring

5   these SMART Boards?

6   **A.**    Um, through a conversation with Matthew and Mr. Wilson,

7   yes.  It was discussed using WITS3.

8   **Q.**    Okay.  So they were -- so -- the SMART boards, were they

9   ultimately acquired using the WITS3 contract?

10  **A.**    They were.

11  **Q.**    This was done at the request -- who requested you to use

12  the WITS3 contract for this?

13  **A.**    Again, Matthew checked to see if we could get it, and I

14  checked to see if we could get it through Ron Capallia.

15  **Q.**    And did you understand this coming from even higher than

16  Matthew Steiniger, his boss?

17  **A.**    Yes.

18  **Q.**    Okay.  Same questions as before.  You received the

19  service order request form, did you take it to

20  Matthew Steiniger?

21  **A.**    Yes, I did.

22  **Q.**    Did he approve it?

23  **A.**    Yes.

24  **Q.**    Did you take it to Jennifer at the comptroller's office?

25  **A.**    Yes, I did.

1    **Q.**    Did they approve it?

2    **A.**    Yes.

3    **Q.**    Was it after that, that you signed and sent the work

4    order back?

5    **A.**    Yes.

6    **Q.**    Did you do it with the intent to deceive the government?

7    **A.**    No, I did not.  And we received them and they were

8    installed.

9    **Q.**    I'm sorry.  What was that?

10   **A.**    And they were received and installed and being used still

11   today, as far as I know.

12   **Q.**    Did there come a time when the Office of the Inspector

13   General did an upgrade of Windows operating systems?

14   **A.**    Yes.  So that was -- if I could explain real --

15   **Q.**    Mm-hmm.

16   **A.**    So our desktops at the time in 2012 were still using

17   Windows XP, which by then was very, very old.  And Microsoft was

18   at the end of life for Windows XP.  And so they were stopping to

19   support Windows XP, which meant that they were no longer going

20   to push patches for Windows XP, which was going to be a huge

21   security problem for us.

22        So a day late and a dollar short we were behind the gun

23   to, within months, upgrade all of our systems to Windows 7 -- or

24   was it Windows 7?  Yeah, Windows 7.

25   **Q.**    And who was ultimately responsible within the Office of

1   the Inspector General for the Windows 7 roll out and upgrade?

2   **A.**     Matthew Steiniger.

3   **Q.**     Did the upgrade have to happen just at OIG headquarters,

4   or did it have to also include the field offices?

5   **A.**     It was required at all work stations, all laptops across

6   the world.

7   **Q.**     All right.  And again, that was -- you described security

8   concerns?

9   **A.**     Yes.  So, again, Microsoft was going to stop providing

10  patches for Windows XP.  I don't exactly recall the date but it

11  was looming when we needed to kick this thing off, yes.

12  **Q.**     Were there IT -- did you -- did the ISD IT people assist

13  with the Windows 7 upgrades at OIG headquarters?

14  **A.**     Yes.  So we hadn't done a roll out of a new software in a

15  long time, and so we had technicians with their users as these

16  upgrades were happening to make sure that drives were mapped

17  again, that they would work, printers, the whole -- the whole

18  thing.  So that the upgrade was successful and didn't impact the

19  users.  So we had -- we had technicians on site.

20  **Q.**     Did you have a discussion with Stephen Wilson about

21  whether IT technicians should be on site at the field offices?

22  **A.**     Yes.

23  **Q.**     And what was his opinion on that?

24  **A.**     Must have.

25  **Q.**     Let me show you an e-mail, if I could.

1        MS. GAMLIEL:  It's 39.

2        MR: AMOLSCH:  Thank you, sir.

3    BY MR. AMOLSCH:

4    **Q.**    Okay.  Do you recognize that?

5    **A.**    I do.

6    **Q.**    Okay.  Is that an e-mail from Stephen Wilson to you, to

7    Matthew Steiniger, and others?

8    **A.**    Yes, it is.

9        MR. AMOLSCH:  Your Honor, I move at this time Defense's

10   40.

11       THE COURT:  Any objection?

12       MR. CARLBERG:  No, sir.

13       THE COURT:  It's received.

14       (Defendant's Exhibit 40 admitted into the record.)

15       MR. Amolsch:  How do I turn this on Ms. Sandvig?

16   BY MR. AMOLSCH:

17   **Q.**    Okay.  Do you see an e-mail from Stephen Wilson to you,

18   Matthew Steiniger; April 11th, 2012?

19   **A.**    Yes, I do.

20   **Q.**    Do you know who Lyle Raznick is?

21   **A.**    Yes, he was the division chief over the server

22   integration.

23   **Q.**    Ricardo Farrerah?

24   **A.**    He was the division chief over customer support.

25   **Q.**    And who is colonel -- I'm sorry it looks like

1   Jose M. Ramos, colonel?

2   **A.**    Colonel Ramos was the military assist to Stephen Wilson,

3   he was Stephen Wilson's deputy.

4   **Q.**    Mr. Wilson is writing to you, "Concur with the request

5   for a technician to be on site for the Windows 7 upgrade.  Just

6   good business."

7   **A.**    Yes.  So he's --

8   **Q.**    I'm sorry.  Tell me about that.

9   **A.**    So he is approving and thinking- -- and telling us that

10  he's approving for a technician to be on site for the Windows 7

11  upgrade.  Specifically for OGC, but this was -- set the

12  precedent.  This was our -- our pilot for the Windows 7 upgrade

13  so this set the precedent for us having technicians on site for

14  all the Windows 7 upgrades.

15  **Q.**    And the top of this e-mail says, "Windows 7 deployment

16  schedule and call for volunteers."  Do you see that?

17  **A.**    Yes.

18  **Q.**    So what's that about?

19  **A.**    So Ricardo had -- this project was under

20  Ricardo Farrerah's purview so he had created a deployment

21  schedule for Windows 7 to all of our field techs around the

22  world.

23  **Q.**    Um, did there come a time when there was a decision to

24  send IT contractors out to the sites to help with the Windows 7

25  installs?

1    **A.**     Yes.  So there was.  During one of our division staff

2    meetings, Ricardo brought this up.  There was no way for the

3    government folks to be able to travel to all the sites around

4    the world to do it and to complete it in the time that we needed

5    for the Windows XP upgrade cutoff for the patches.  Excuse me.

6    So Matthew decided -- Matthew decided that it was going to be a

7    necessity for our contractors to travel to -- around the world.

8    Again, this was a time-constraint requirement.  If we had more

9    time I don't think it would have happened that way.

10   **Q.**     I'm sorry.  Say that again?

11   **A.**     It was a time constraint.  So if we had a year to do this

12   or if we had planned this in 2010, then we wouldn't have been

13   under the gun to do this, but this was another must do before we

14   get --

15   **Q.**     Um, so let's take a look at, um -- I'll show you another

16   e-mail, Mr. Lumho.

17         MS. GAMLIEL:  41.

18         MR. AMOLSCH:  I got it.  Thank you.

19   BY MR. AMOLSCH:

20   **Q.**     Okay.  Take a look at that Mr. Lumho, and let me know

21   when you're ready.

22   **A.**     Yes, I recall this.

23   **Q.**     Okay.  And this is an e-mail from you -- from Ricardo to

24   Matthew Steiniger and you about the Windows 7 deployment

25   schedule?

1    **A.**      Yes, it is.

2           MR. AMOLSCH:  I move Defense's Exhibit 41, Your Honor.

3           THE COURT:  Any objection?

4           MR. CARLBERG:  No, sir.

5           THE COURT:  Received.

6           (Defendant's Exhibit 41 admitted into the record.)

7    BY MR. AMOLSCH:

8    **Q.**      So let's start at the back, Mr. Lumho.  Well, first of

9    all, this says, "Windows 7 deployment schedule."  And it says

10   here, "Tab B, field sites."  What is that referring to?

11   **A.**      The attachment that was on this original e-mail from

12   Ricardo had the deployment schedule.

13   **Q.**      It says, "Notes regarding field site trips there's a

14   total of 26 trips."  What did you understand those 26 trips to

15   be referring to?

16   **A.**      The 26 trips for the Windows 7 upgrade.

17   **Q.**      Okay.  And if we go to the back of this e-mail, this

18   is -- this is the back of the e-mail from Ricardo to Matthew, "I

19   have talked to Barry about contractor travel costs."  Who is

20   Barry?

21   **A.**      That was Barry Atwood, he was the program -- he was the

22   PM from MSO on site with -- for Level 3.

23   **Q.**      So he's an employee of MSO contracted to the Department

24   of -- the Office of the Inspector General?

25   **A.**      Correct, through Level 3.

1    Q.    And this is Ricardo saying he's talked to Barry from MSO

2    about travel costs, and there's a reference in there to the

3    amount of money per month per employee?

4    A.    That's what it says, yes.

5    Q.    And Matthew Steiniger is copied on the discussion Ricardo

6    is having with you about Barry and the contractor costs for the

7    field trips?

8    A.    Yes.  And if I could clarify something --

9    Q.    Absolutely.

10   A.    -- real quick.  I had said earlier that Ricardo Farrerah

11   was the -- was the chief in charge of customer service.  At this

12   point Ricardo had been moved to systems integration and Lyle had

13   been removed from that position.  So just to clarify that

14   Ricardo was now the chief of server integration.  Sorry.

15   Q.    So what is your understanding about whether

16   Matthew Steiniger knows that MSO is going to be sending

17   contractors to these field sites?

18   A.    So Matthew was very aware that MSO, Level 3 was going to

19   be sending their contractors to the sites for this Windows 7

20   upgrade.

21   Q.    And MSO is a subcontractor to Level 3?

22   A.    Correct.

23   Q.    And how is Level 3 paid by the Office of the Inspector

24   General?

25   A.    Through WITS3.

1    Q.    Now, were you part of any discussions with Willie Spivey

2    and the acquisitions division about arranging for these -- the

3    travel expenses of these MSO techs through his office?

4    A.    Through Willie Spivey?

5    Q.    Yes, sir.

6    A.    Yes.

7    Q.    Okay.  And was -- was -- based on those discussions, was

8    Willie Spivey and acquisitions able to accommodate the travel

9    requests for these IT technicians?

10   A.    They were not.  No.

11   Q.    And why is that?

12   A.    Because they were not government employees and it was --

13   AQD didn't -- AQD was the travel office, was for government

14   employees not contractors.

15   Q.    So is it -- so it had to do with the fact that they were

16   contractors not employees?

17   A.    Yes.

18   Q.    All right.  Rather than full employees.

19         Now, did MSO technicians, in fact, travel from the field

20   offices to assist with the windows 7 installs?

21   A.    They did.

22   Q.    Okay.  Did that happen between June and September of

23   2012?

24   A.    Yes.

25         MR. AMOLSCH:  Can I bring up -- I don't have the

1    exhibits.  I apologize.  Let's first pull up Government

2    Exhibit 174.  Can we go to the bottom of this?  Is there another

3    page to this?  Okay.  There we go.

4    BY MR. AMOLSCH:

5    **Q.**    All right.  Do you recognize this, Mr. Lumho?

6    **A.**    Yes, I do.

7    **Q.**    Okay.  And what is this service order request form?

8    **A.**    This was the service order request form that was given to

9    me for the travel of this Windows 7 deployment.

10   **Q.**    All right.  And if we can go to the bottom of that.  Up

11   charge of $179,000; is that right?

12   **A.**    Correct, yes.  That's correct.

13   **Q.**    For the Windows 7 travel?

14   **A.**    Yes.

15   **Q.**    Can we go to your -- to this e-mail.  This is -- you then

16   send an e-mail to Tim Donelson, "Give me a call when you get a

17   chance, please."  Why are you sending it to Tim Donelson?

18   **A.**    I had already tried to reach Ron Capallia a number of

19   times regarding this order and he was non-responsive.

20   **Q.**    Non-responsive?

21   **A.**    Right.

22   **Q.**    Okay.  And then we go to the next e-mail.  "Kekoa, sorry

23   for the late reply.  I believe what you're looking for is

24   attached to this e-mail."

25          And then if we can go down one more.  This is an e-mail

1    from you to Tim Donelson again.  What are you talking about here

2    about the cost associated with the MSO's travel to those field

3    offices?

4    **A.**    I am expressing my unhappiness with the cost that they

5    had given me in that quote based off of my knowledge of me

6    booking a family reunion trip for my family to Hawaii.  I had

7    recently done that I think at this timeframe.  And the

8    conversation that I had with Ron Capallia about a vacation that

9    he had taken, that he had recommended I take -- to a -- on a

10   Disney cruise or something, and how much it cost him and how --

11   how -- how cheap it was.

12   **Q.**    Okay.  And were you comparing that cost to this -- the

13   cost Level 3 was charging?

14   **A.**    That's all I had to go by, yes.  Is what I had

15   researched, yes.

16   **Q.**    And what is your feeling about the cost that Level 3 is

17   charging?

18   **A.**    That is was astronomically higher.  Too much money for

19   what we were requesting to do.

20   **Q.**    Okay.  Did you -- in response to that --

21        MR. AMOLSCH:  If I could bring up Government's Exhibit

22   109D.

23   BY MR. AMOLSCH:

24   **Q.**    In response to that, did Ron Capallia send you another

25   invoice for the Windows 7 travel?

1   **A.**     Yes, he did.

2   **Q.**     Is that, that invoice?

3   **A.**     Yes, it is.

4   **Q.**     And what is the cost on this invoice?

5   **A.**     It's about $130,000 less.

6   **Q.**     I'm sorry?

7   **A.**     It was about $130,000 less than what the original one

8   was, this is 42,000.

9   **Q.**     And this is the -- do you know why Ron Capallia sent you

10  service order request form?

11  **A.**     Because of my complaint about the price.

12  **Q.**     And when you were complaining, did you know that the

13  reduction in cost was ultimately going to fall on Mr. Wilson, or

14  did you not have any idea?

15  **A.**     I didn't -- I didn't know -- I didn't care.  I'm sorry.

16  It was -- I didn't care.  It was what we needed.

17  **Q.**     Um, let's talk about iPads.

18  **A.**     Okay.

19  **Q.**     Um, were iPads used in OIG in the regular course of their

20  business?

21  **A.**     We had a small -- we had a handful of iPad 2s for senior

22  executives, yes.

23  **Q.**     All right.  And --

24  **A.**     And we also had a few in ISD again for testing, we had a

25  few in ISD.

1    Q.     All right.  And were you aware of something called iPad

2    initiative?

3    A.     Yes.

4    Q.     What was that?

5    A.     That was again to move to the next iteration of iPads

6    which was the iPad 3 at the time.  To give those out for

7    executives when they travel.  We were doing a lot of traveling

8    to southwest Asia at this time because of the global war on

9    terror, and we were -- the IG or the staff was bringing booklets

10   the size of the one on Agent Russo's desk in front of her with

11   all their meetings, their bios of all the generals that were at

12   the meeting, and so we could accommodate them with an iPad that

13   had all that information.

14   Q.     And you ultimately purchased seven iPads?

15   A.     We did.  We bought some for testing.

16   Q.     For testing.  And were those iPad 3s, iPad 2s, what were

17   they?

18   A.     They were iPad 2s.

19   Q.     The testing ones --

20   A.     I mean, I'm sorry.  Those were iPad 3s.  IPad 2 is what

21   we had, we needed to do buy iPad 3s.

22   Q.     Why did you need to buy iPad 3s, if you already had iPad

23   2s?

24   A.     Because they were the -- the newest ones that were

25   appr- -- that were getting ready to be approved by DISA for us

1    to use on the DoD network.

2    Q.    Did you have to, um -- did you have to acquire them in

3    order to test them?

4    A.    Yes.  We had to buy them in order to test them.

5    Q.    And did you ultimately acquire them?

6    A.    Yes, we did.

7    Q.    Okay.  We're going to come back to that in a second.

8    Let's talk about the camera and the lens.

9    A.    Yes.

10   Q.    Were there occasions when the Office of the Inspector

11   General would make use of professional photographers?

12   A.    There were, yes.

13   Q.    Okay.  Tell me how that worked?

14   A.    So we had an in-house photographer that was in our

15   communications directorate.  She was a part-time photographer,

16   and so at her availability we would have her take photos for

17   events, retirements, training seminars, different events that we

18   had at the IG.

19        At the Mark Center there's an auditorium that is four

20   times the size of this courtroom with raised seats and a big

21   stage, and we would have a lot of events there for training

22   seminars, again, just a number of different events.

23   Q.    Did you have an occasion to actually coordinate the

24   arrival and availability of those photographers?

25   A.    Yes.  So during the IG's retirement, Gordon Heddell was

1    our IG in 2011.  And he was retiring and he insisted on having a

2    photographer or -- it -- it was a -- it needed to be documented,

3    and so it came down from the top to get a photographer.

4    Q.    My understanding is that this photographer is actually

5    assigned to a different part of Office of the Inspector General;

6    is that right?

7    A.    So, yes, the part-time photographer that we had is

8    assigned to the IG.  She works for the IG but for this

9    particular retirement she was not available.

10   Q.    Were there other times when OIG wanted to document with

11   photography, events where, likewise, there was no photographer

12   available?

13   A.    Yes.

14   Q.    All right.  How did -- you know, did you have

15   conversations with Stephen Wilson about that?

16   A.    Yes.

17   Q.    Did you have conversations with Matthew Steiniger about

18   that?

19   A.    Most definitely.

20   Q.    The last thing, let's talk about the Windows 7 active

21   direct- -- active directory project.  Do you know what that was?

22   A.    Yes.

23   Q.    I'm sorry?

24   A.    Yes, I do.

25   Q.    Okay.  What was that?

A.      So the actively directory needed to be upgraded to a
newer version.  We were on a very old active directory platform.
The active directory, is where all of our users are housed in a
Microsoft environment.  It contains -- it contains everything
from what you have access to.  It's kind of the central nervous
system for a Windows environment.

        So we needed to upgrade our active directory.  And by
upgrading our active directory, it enabled us to have
enhancements that we didn't have prior to the older active
directory.

        For example, adding -- the ability to add photos to our
active directory profile so that when you sent an e-mail my ugly
picture would be there and they will know how unattractive I am
when I would e-mail them.  Or when they would send an instant
message to somebody, their photo would -- would show up.

        It was -- so the importance of it was, as a customer
service arm of -- of the Inspector General's Office, we would
travel to go see these sites and there were many times, for
example, during the Windows 7 upgrade where we were turned away
by the agents because they had no idea who we were.  They knew
we were coming, but they didn't know that we were there.

        So put the picture in their hand of who we were when you
e-mail them and it was just going to be a good success for ISD
and A & M in general.

Q.      Did there come a time when ISD arranged for a

1    professional photographer to take professional head shots for

2    the active registry?

3    **A.**    Yes.  So we tried using the --

4    **Q.**    Let me stop you there.

5    **A.**    Yes.

6    **Q.**    I'm going to show you something --

7    **A.**    Okay.

8    **Q.**    -- and ask you some questions.

9          MR. AMOLSCH:  Thank you.

10   BY MR. AMOLSCH:

11   **Q.**    All right.  Do you know do you recognize what that is?

12   **A.**    I do.

13   **Q.**    What is that?

14   **A.**    This is an e-mail from our admin assistant,

15   Holly Reynolds to a large number of us, all of ISD -- all of

16   ISD, excuse me, to organize -- a shared organized -- a session

17   with a photographer for us get our pictures taken.

18         MR. AMOLSCH:  Your Honor, I move Defense's Exhibit 42.

19         THE COURT:  Any objection.

20         MR. CARLBERG:  No.

21         THE COURT:  It's received.

22         (Defendant's Exhibit 42 admitted into the record.)

23         MR. AMOLSCH:  I don't think it went on.  All right.  Thank

24   you.

25   BY MR. AMOLSCH:

1   **Q.**    All right.  So this is sent from Holly Reynolds?

2        And who was Holly Reynolds?

3   **A.**    She was our admin assistant.

4   **Q.**    Okay.  IFD a photographer from OCCL?

5        What's OCCL?

6   **A.**    That's where the photographer worked.

7   **Q.**    Okay.  Taking professional head shot pictures.  Tell me

8   about the professional head shot pictures.

9   **A.**    So we had tried using the small digital camera that has

10  been talked about to do these photographs.  At the Mark Center

11  there's just white walls behind -- all the walls are just plain

12  white, so trying to find a location one where we can get a photo

13  and not have this huge shadow behind our head, call it vanity or

14  whatever, Matthew was not happy with the photos that we had

15  taken with that.  So he wanted to arrange for the photographer

16  from OCCL to take these photos.

17  **Q.**    All right.  And was it a professional type of

18  environment?

19  **A.**    It was a -- I call it a studio.  They had extra flashes

20  and -- yes, it was a -- it was a photog- --

21  **Q.**    Professional studio?

22  **A.**    Yeah.  It was a professional studio.

23  **Q.**    Um, this lists March, I'm sorry, May 24th through

24  Tuesday, May 29th as when people are supposed to come by for

25  their head shots; is that correct?

1    **A.**    It was a four hour window, I believe, from 9:00 to 12:00

2    in one day.

3    **Q.**    All right.  Was everybody able to get their picture

4    taken --

5    **A.**    No.

6    **Q.**    -- during that time period?

7    **A.**    No.  We had 120 folks, contractors and the government

8    folks.  So, no.

9    **Q.**    All right.  So during that time period some photos were

10   taken, but not everybody could get their shots?

11   **A.**    Correct, but the photos were good.

12   **Q.**    How did Mr. Wilson feel about the delay in getting

13   everybody's picture taken in a way that could be used on the

14   active service directory?

15   **A.**    So Mr. Wilson, has common term would say, "This is a hot

16   item, this is hot."  He liked it.  It was a positive thing that

17   was -- that was visually you could see, so he was hot to get

18   this done, and it was the perfect concept within ISD.

19   **Q.**    Did you have any discussions with him about ISD acquiring

20   its own camera and lens for the purposes of completing this

21   project?

22   **A.**    Yes, again, Matthew and Mr. Wilson and I were having a

23   conversation about this project, and -- and how if Mr. Wilson's

24   SES photo was nice and polished, and Matthew's photo was nice

25   and polished, but I had this photo from a hand-held camera that

1    wasn't polished like theirs.  And so they made fun of me.

2         So, yes, we had a discussion about getting a camera, a

3    professional camera that had a good flash for not only this.  It

4    was a combined win, so to speak for not only this, but also for

5    our events that we held at the Mark Center or at different

6    events that we had at the IG.

7    Q.    Now, why did you -- why was this purchased through WITS

8    as opposed to any other contracting mechanism?

9    A.    Um, Matthew said to get it through WITS.  We could have

10   split the purchase up into multiple credit card purchases, but

11   Willie Spivey, he wouldn't have allowed us to split purchases

12   into multiple $3,000 purchases.

13   Q.    Um, did there, um -- was that camera used to complete the

14   rest, or work on completing the rest of the professional

15   photographer pictures for the active service directory project?

16   A.    It was used for that and many other thing, yeah.

17   Q.    Now, did you ever take this camera and equipment outside

18   of the Office of the Inspector General?

19   A.    So I didn't -- I did not take it outside of the Office of

20   the Inspector General.  There was an event at -- we had an IG

21   picnic every year, and at the IG picnic, somebody used it.  I

22   believe -- it was somebody within ISD used it to photograph the

23   IG picnic for our Internet -- our Internet -- our -- our --

24   Web page -- internal to our users was updated dated every day.

25   Every day there was something.  It wasn't like a stale Web page

1    that you went to.  It was like if you go to CNN or wherever, Fox

2    News, it's a constant update.  So we updated our Internet all

3    the time with photos or events or anything else.  So those

4    photos were used for those things.

5    **Q.**    Did you ever take this camera lens anywhere to use it for

6    your own personal benefit?

7    **A.**    I never used it for my own personal benefit.  I have my

8    own camera.  I have my own camera.  I never used it for my own

9    personal.

10   **Q.**    Let's talk about the Bose SoundDocks?

11   **A.**    Okay.

12   **Q.**    Tell me about the Bose?

13   **A.**    So Terry Peck, my AV guy, he was also our -- just like

14   OCCL had a part-time photographer, Terry Peck was our part-time

15   DJ for a lot of the events we did.  We had these big 1980 cloth

16   covered speakers that he would get out for events for music,

17   Christmas party, retirement, chili cook off.  We had a lot of

18   these diversity day events.

19          And it was frustrating to me that Terry would take a day

20   or two out of his work where he's supposed to be doing AV stuff

21   to do these DJ things for music.  And so Matthew and I talked,

22   and Mr. Wilson, again was in that conversation, about getting a

23   small stereo that we could use an iPad Nano to play music.

24   **Q.**    Now, there was some discussion about Mark Center being a

25   secure environment and you can't -- tell me about that.

1    **A.**    So if we had put an iPhone on that Bose SoundDock, then,

2    yes, you cannot bring a personal iPhone into the secured space

3    because of Bluetooth and wireless connections.  But if you have

4    an iPad Nano, at the time, if you guys remember what an iPad

5    Nano it's just a simple stick with a screen that doesn't have

6    Bluetooth.  It didn't have anything, and you could stick it into

7    the Bose SoundDock and you could have it in a secured space.

8    So, we had, again retirement parties, events, Christmas parties,

9    pot lucks where that SoundDock was used.

10          That was one of them.  The other one was used at --

11   Mr. Wilson requested to have.  I believe -- I don't -- it was

12   going to go to the IG's front office.  The IG G's front office

13   was in a large space, probably a quarter -- less than a quarter

14   of this size courtroom, as the old front office.  And so there

15   would be visitors that would come and visit, and his conference

16   room was right next to it so I guess Mr. Wilson wanted to have

17   light music going on in there, and I think the secretaries made

18   the request.  I don't know how it came about, but the last I saw

19   it came in I gave it to Mr. Wilson -- I gave it to Matthew,

20   Matthew gave it to Mr. Wilson, and I never saw it again.

21   **Q.**    All right.  Again, did you ever take this equipment

22   outside of the Office of the Inspector General?

23   **A.**    No, I did not.

24   **Q.**    Did you ever use it for personal use?

25   **A.**    No.

1    Q.    The camera and the lens, was that a bribe paid to you by

2    Mr. Wilson in exchange for any official action?

3    A.    No.

4    Q.    Was the Bose, the $350 Bose system --

5          THE COURT REPORTER:  I'm sorry.

6          MR. AMOLSCH:  Sorry.

7    BY MR. AMOLSCH:

8    A.    No, it was not.

9    Q.    Was the Bose SoundDock a bribe paid to you by Mr. Wilson

10   in exchange for favorable treatment?

11   A.    No.  That's --

12         THE COURT:  Thank you, Mr. Amolsch.  Why don't we break

13   for lunch now.

14         MR. AMOLSCH:  That's absolutely fine, Your Honor.  I had

15   just a few more questions about this particular event, or we can.

16         THE COURT:  Okay.  Finish up.

17         MR. AMOLSCH:  All right.

18   BY MR. AMOLSCH:

19   Q.    Just two more -- a couple more questions.  If we could

20   bring up -- actually, you know what, Your Honor, let's break now

21   so I don't try the Court's patience.

22         THE COURT:  All right.  Let's take an hour for lunch, and

23   we'll come back at 2:00 and continue testimony.  You're excused.

24   Thank you.

25         (Jury out at 1:02 p.m.)

```
1          THE COURT:  All right.  Anything before we break?
2          MR. AMOLSCH:  No, sir.
3          MR. SALVATO:  No.
4          THE COURT:  I have an arraignment at 10 minutes to 2, so
5   just leave a little space up there for us to get the -- it will
6   only take five minutes, and do you want to talk about the
7   willfulness issue before we bring the jury back at 2 or.
8          MR. SEARS:  Your Honor, I -- maybe I'm stating the obvious
9   but maybe not but my guess is we won't be closing today after
10  all, given where we are, so if you want to save that for the end
11  of the day we're happy to do it then so the government has enough
12  time to review it.  However, the Court wants to do it is okay
13  with us.
14         THE COURT:  I still don't know whether we'll get
15  instructions done today.  That was still leaving out some hope
16  that we would get some portion of it done.  But let's -- you all
17  talk about it before we resume.  I've read the Mayor case, and
18  Ted Greenberg was the prosecutor.
19         MR. SEARS:  Yes, Your Honor, and I will tell the Court and
20  we don't need to do it now obviously, but I had spoken to
21  Mr. Wilson and it's our preference to not have a jury trial on
22  the forfeiture issue, and when the appropriate time you can have
23  that colloquy with Mr. Wilson directly but I can tell the Court
24  that, that issue is off the table at this point.
25         THE COURT:  All right.  Thank you.  All right.  Sir,
```

1   you're in the middle of your testimony, so don't discuss the

2   testimony you've given so far with anybody, all right?

3          THE DEFENDANT:  Yes, sir.

4          THE COURT:  All right.  We're in recess.

5          (Thereupon, a luncheon recess was had beginning at

6   1:04 p.m.)

7

8                  **AFTERNOON SESSION, JUNE 22, 2021**

9   (2:15 p.m.)

10         THE COURT:  All right.  I see everyone is present.  Any

11  preliminary matters?

12         MR. AMOLSCH:  No, sir.

13         THE COURT:  Okay.  Ready for the jury?  Ira, please.

14         (Jury in at 2:16 p.m.)

15         THE COURT:  All right.  Please, have a seat.

16         Mr. Amolsch, please continue.

17         MR. AMOLSCH:  Thank you, Your Honor, may it please the

18  Court.

19         CONTINUED DIRECT EXAMINATION OF MATTHEW KEKOA LUMHO

20         MR. AMOLSCH:  Can we bring up Government's Exhibit 177.

21  Can we go to the bottom of that, Ms. Sandvig, please.  Thank you.

22  BY MR. AMOLSCH:

23  **Q.**    Do you recognize this, Mr. Lumho?

24  **A.**    Yes, I do.

25  **Q.**    Okay.  What is that?

1    **A.**     That is a service order request form for MacBook Pro --

2    **Q.**     I need you -- I really need you to focus on the

3    microphone.

4    **A.**     Yep.  Right.  It's hard for me.

5    **Q.**     I know, but -- yeah, just make sure.  Okay.

6    **A.**     So it's a service order request form for a MacBook Pro, a

7    Canon camera, an SD card for the camera, Inline dock kit for the

8    MacBook, looks like seven iPads, an XtremeMac charger for the

9    MacBook Pro, remote desktop for the MacBook Pro, and an SD card

10   reader.

11   **Q.**     Does that service order request form contain a lot of the

12   equipment we were talking about just prior to before we went to

13   lunch?

14   **A.**     Yes, it does.

15   **Q.**     After receiving this, did you call and leave a voicemail

16   for Mr. Capallia regarding this service order request form?

17   **A.**     I did.

18   **Q.**     Okay.  Tell me about that.

19   **A.**     When I received this service order request form, I do

20   what I always did.  I took it to Matthew.  Matthew looked at it,

21   and didn't like the way the remarks was, and so he said, "Have

22   it removed."  And I did.

23   **Q.**     All right.  This references the iPads we were talking

24   about earlier.  Is that what's referenced on this service order

25   request form?

| | |
|---|---|
| 1 | **A.**   Yes, it is. |
| 2 | **Q.**   And what level of iPads are those? |
| 3 | **A.**   Those are the iPad 3s. |
| 4 | **Q.**   Were they put into use? |
| 5 | **A.**   They were. |
| 6 | **Q.**   Did Mr. Steiniger have one of those iPads? |
| 7 | **A.**   He was.  He was assigned one. |
| 8 | **Q.**   Did there come a time when it became necessary to |
| 9 | purchase Webcams for computers in relation to the Windows 7 |
| 10 | upgrade? |
| 11 | **A.**   Yes. |
| 12 | **Q.**   Okay.  Tell me about that. |
| 13 | **A.**   When we upgraded -- when we upgraded our desktops and |
| 14 | laptops to Windows 7, they were a 64-bit, as opposed to a 32-bit |
| 15 | operating system.  So things that are 32-bit no longer work in a |
| 16 | 64-bit environment.  So the Webcams that we had were only |
| 17 | 32 bits so we could not get the cameras to work with our new |
| 18 | upgraded machines. |
| 19 | **Q.**   All right.  And did -- did -- did -- were those Webcams |
| 20 | cameras ultimately purchased? |
| 21 | **A.**   Yes.  We bought those purchases. |
| 22 | **Q.**   Did you discuss that purchase with Mr. Steiniger? |
| 23 | **A.**   Yes, I did. |
| 24 | **Q.**   Did the Webcams get delivered? |
| 25 | **A.**   Yes, they were. |

1    **Q.**    And were they put into use?

2    **A.**    Yes.

3    **Q.**    All right.  In June of 2012, was there a time when ISD,

4    your department, needed or arranged to purchase Lenovo laptops?

5    **A.**    Yes.

6    **Q.**    Okay.  Tell me about that.

7    **A.**    Well, there was an influx of money.  Congress had given

8    the IG an increase funding for more personnel.  So I don't

9    recall how many personnel were approved, but -- but we had an

10   influx and a hiring spree of OIG employees.

11         So we tried to maintain in ISD a certain amount of spare

12   laptops for hardware breaks, new employees, but this influx took

13   us through our threshold and through our spare laptops.  And so

14   we forecasted that we were going to need a lot more laptops

15   including the ones for the immediate need.  But at the time we

16   had like under five laptops left in our spare to give to new

17   employees that were being hired.

18   **Q.**    Did you discuss this purchase with Mr. Steiniger?

19   **A.**    Yes.  They came to me about it, yes.

20   **Q.**    Did you discuss it with Mr. Spivey?

21   **A.**    Yes.

22   **Q.**    Okay.  Can I show you something real quick?

23   **A.**    Yes.

24         MR. AMOLSCH:  Thank you, sir.

25   BY MR. AMOLSCH:

1    **Q.**    Do you recognize that, Mr. Lumho?

2    **A.**    Yes.

3    **Q.**    E-mail to Jeff Hall, to you, and Mr. Spivey, and Matthew

4    Steiniger?

5    **A.**    Yes, it is.

6          MR. AMOLSCH:  Move to admit Defense's Exhibit 43, please,

7    Your Honor.

8          THE COURT:  Any objection?

9          MR. CARLBERG:  No.

10         THE COURT:  It's received.

11         (Defendant's Exhibit 43 admitted into the record.)

12   BY MR. AMOLSCH:

13   **Q.**    I want to direct your attention to the top of this

14   e-mail, "Kekoa, Willie has given us the green-light to purchase

15   200 Lenovos from WITS."

16   Do you see that?

17   **A.**    Yes, I do.

18   **Q.**    What was your understanding of the purchase of the

19   Lenovo's using WITS after you saw that e-mail?

20   **A.**    That Willie had given us the green-light to purchase 200

21   Lenovo's from WITS.

22   **Q.**    Did there come a time when that order was ultimately

23   cancelled?

24   **A.**    Yes.

25   **Q.**    And why is that?

1   **A.**      Um, the model of the Lenovo laptop that we needed had to

2   be a certain level - it needed to have a certain chip set for

3   our security posture for - it's called HBSS, which is a Host

4   Based Security System, which is required by DoD for us to have.

5        So the chip set on the Lenovo that we needed was a

6   specific chip set.  Lenovo told Level 3 they can get it and so

7   we were proceeding with the order.  But, ultimately, when they

8   needed it, they couldn't produce what we needed.  They could not

9   produce the chip set that we needed.  They didn't have any more

10  in stock.  Lenovo did not.

11  **Q.**      Is that why the order was cancelled?

12  **A.**      Yes.

13  **Q.**      Did you cancel the order or did somebody else?

14  **A.**      I cancelled the order.

15  **Q.**      When did you come to learn about whether money had

16  already been paid to Level 3 for those computers?

17  **A.**      So the WITS bill comes in, I believe a month or two later

18  after the service order request is signed.  So two months later

19  the bill comes, my staff, my billing staff monitors the bills

20  showed me that we had a $438,000 charge that was not on my

21  SharePoint spreadsheet that I had accounted for.

22       So I reached out to Ron and said, "What gives?  We have a

23  $438,000 charge, and I cancelled that order."  And he fixed the

24  problem.  He went back and - went back to GSA and on the

25  prev- -- the next bill of that -- that next bill, if it was in

1   May, the next one would be June -- My goodness, I'm having a

2   hard time with my calendar -- but there was a credit of

3   $438,000.  So they didn't return the money to us, they just gave

4   us a credit on our next bill.

5   **Q.**     Had anybody but you noticed the discrepancy between the

6   money that had been gone -- that had been paid to Level 3 and

7   the equipment that had been provided?

8   **A.**     No.

9   **Q.**     Did anybody ask you to go arrange for that refund or

10  credit?

11  **A.**     No.

12  **Q.**     Is that something you did on your own?

13  **A.**     Yes.

14  **Q.**     We mentioned Polycoms earlier.  That's the computer

15  brains?

16  **A.**     Yes.

17  **Q.**     Okay.  Why was it -- was that something that was mission

18  critical for the Office of the Inspector General?

19  **A.**     It was.  We had -- we had about 20 different agents and

20  auditors that were rotating in and out of Southwest Asia, out of

21  Afghanistan and Iraq.  In addition to we had folks that were in

22  Kuwait and Qatar.

23         And so the way that our operations staff would meet with

24  them was through VTC.  So we had weekly meetings with our staff

25  in Southwest Asia, as well as normal VTC meetings.  DCIS would

1    have with their headquarters to all the field offices at a

2    variable rate.  But yes, they used them often and cut back on

3    their travel cost of the agency because they can now do meetings

4    over video.

5    **Q.**    Did you ever have a conversation or an e-mail exchange

6    with Mr. Steiniger about using WITS to purchase Polycoms?

7    **A.**    Yes.

8    **Q.**    All right.  Let me show you something, Mr. Lumho?

9         MR. AMOLSCH:  Thank you.

10   BY MR. AMOLSCH:

11   **Q.**    Let me know when you've read that and reviewed that,

12   Mr. Lumho.

13   **A.**    I -- I remember this, yes.

14   **Q.**    All right.  Is this an e-mail exchange you're having with

15   Mr. Steiniger about the VTC Polycoms?

16   **A.**    Yes.

17        MR. AMOLSCH:  Your Honor, I move Defense's Exhibit 44,

18   please.

19        THE COURT:  Any objection.

20        MR. CARLBERG:  No objection.

21        THE COURT:  All right it's received.

22        (Defendant's Exhibit 44 admitted into the record.)

23        MR. AMOLSCH:  Thank you, Your Honor.

24   BY MR. AMOLSCH:

25   **Q.**    This is an e-mail at the bottom from Steve McClellen at

1   Ultra Criticom.  What's Ultra Criticom?

2   **A.**      There were a VTC vendor that did VTC installs.

3   **Q.**      All right.  This is an e-mail to you and Barry Atwood and

4   Terry Peck and Delilah.

5   Do you see that?

6   **A.**      Yes.

7   **Q.**      And who did Barry Atwood work for?

8   **A.**      MSO.

9   **Q.**      You say here, "Here is a quote for the VTC installs.  I'm

10  already looking at the list and where we can cut the cost.  The

11  total right now is $860,000."

12  Do you see that?

13  **A.**      Yes, I do.

14  **Q.**      What are you -- and then there's all the way at the top,

15  "You are already on your way to the Mark Center I hope."  Does

16  that reference -- does that particular line represent trips made

17  back and forth between 400 Army Navy Drive and the Mark Center?

18  **A.**      Yes.  This was October 25th, so we were -- the flagpole

19  move had happened, and we were working split between 400 Army

20  Navy Drive and the Mark Center, yes.

21  **Q.**      All right.  And isn't this where you're discussing the

22  costs associated with the Polycom machines?

23  **A.**      Yes.

24  **Q.**      All right.  Thank you.  Are you familiar -- or do you

25  remember, sir, if those Polycom machines were ever ultimately

1    purchased?

2    **A.**    We did end up --

3    **Q.**    -- Can I --

4         THE COURT REPORTER:  I'm sorry.

5         THE WITNESS:  We did end up purchasing those, yes.

6         MR. AMOLSCH:  Can I bring up Government's Exhibit 111B.

7    BY MR. AMOLSCH:

8    **Q.**    Do you recognize this?

9    **A.**    Yes.

10   **Q.**    Do you see where it says, "Senior telecom specialist for

11   Polycom installation"?

12   **A.**    Yes, I do.

13   **Q.**    Do you see the price there of fi- -- 668,820.24?

14   **A.**    Yes.

15   **Q.**    Is that how much these machines ended up costing?

16   **A.**    Yes, they were.

17        MR. AMOLSCH:  Let's move to Government's Exhibit 119B.

18   BY MR. AMOLSCH:

19   **Q.**    Do you see the 6129 in the corner there, Mr. Lumho?

20   **A.**    Yes, sir.

21   **Q.**    And now from the bottom, do you see something that says,

22   "DCIN HW"?

23   **A.**    Yes.  That's my handwriting.

24   **Q.**    Yeah, what's that?

25   **A.**    That is labeled DCIN hardware.  That was hardware we

1    purchased for the COOP, the agent -- the DoD COOP.

2    **Q.**    And tell me -- explain to the ladies and gentlemen of the

3    jury again, what DCIN is as it relates to securing OIG's data at

4    an off-site location?

5    **A.**    So as I described before, the COOP was -- the DoD COOP

6    was in a location north in a secure location.  There was a large

7    dark fiber path between the Pentagon and this location.  So when

8    we moved to the Mark Center, the Mark Center didn't have that

9    large path to get to the -- to the location north.  So this

10   hardware was going to be used to bring the optical fiber into

11   the Mark Center for not just the OIG but for anybody at the Mark

12   Center.

13       So we were kind of the first people that requested it.

14   Most other agencies that were at the Mark Center were already at

15   the Pentagon so they didn't necessarily need the DCIN at the

16   Mark Center.  Our entire headquarters were at the Mark Center so

17   we were kind of the first folks that requested to use the DCIN

18   COOP site.

19   **Q.**    And did you need special -- did you need to purchase new

20   equipment in order to get access to that dark fiber in order to

21   back up your data at an off-site location?

22   **A.**    Yes.

23   **Q.**    Who managed the dark fiber -- the dark fiber route to the

24   off-site location?  Was that ISD or was in a WHS or who was

25   that?

1    **A.**     That was WHS who managed the infrastructure to the

2    location.

3    **Q.**     So how were you able to get your data onto W -- the

4    Washington Headquarters Services?  How were you able to get your

5    data onto their network in order to back it up?

6    **A.**     Through this hardware.

7    **Q.**     All right.  So let me ask -- this has been previously

8    admitted as government -- Defense Exhibit 21A?

9            MR. AMOLSCH:  There's -- Oh, I'm sorry.  Thanks.

10   BY MR. AMOLSCH:

11   **Q.**     Okay.  This is -- show you it's an e-mail from Mark

12   Walker to you and Matthew Steiniger and Brandon Will- --

13   Brandon Williamson.  "DoD OIG COOP network components."

14   Do you see that?

15   **A.**     Yes.

16   **Q.**     Now, in here, there's a discussion of purchasing this

17   equipment through WITS?

18   **A.**     Correct.

19   **Q.**     What does that mean?  What -- what -- what's going on

20   here?

21   **A.**     So Mark Walker who was our chief architect who was

22   working with WHS to accomplish this task and had sent me an

23   e-mail asking me if we could get this hardware.  And he wrote

24   again saying -- I believe if you move the paper up --

25   **Q.**     That way?

1   **A.**    The other way.

2   **Q.**    I'm sorry.  Yep.

3   **A.**    "I'm getting a quote from Level 3."  So I was getting a

4   quote from Level 3 to purchase it, and Mark is saying, "Awesome,

5   thanks.  If we do purchase the equipment through WITS, will it

6   be difficult to sign over the ITA."

7        So as I said prior, WHS was responsible to get us into

8   the Mark Center, and then once we got into the Mark Center, ITA,

9   the Army Information Technology Agency was going to take over --

10       THE COURT REPORTER:  Sir, slow down.

11       THE WITNESS:  Sorry.  The Army Information Technology

12   Agency was going to take over the management of the Mark Center.

13       So when we bought this hardware, Mark was inquiring

14   whether he would it would be a problem to get it off our

15   property book and give it to ITA.  So basically just take it

16   from our property accountability book and giving it to ITA.

17       Sometimes that's an issue because property has an issue,

18   but for this instance, it wasn't going to be a problem

19   because -- because we'll see in a -- in a second.

20   BY MR. AMOLSCH:

21   **Q.**    And was this hardware purchased through WITS?

22   **A.**    It was purchased through WITS, yes.

23   **Q.**    And then if you flip to the front of this, there's a

24   discussion with Matthew Steiniger, "Kekoa, Mark, again, about

25   the DCIN issues requesting approximately $100,000 for funding,"

1    and Matthew Steiniger's comment, "Mr. Wilson is 100 percent on

2    board."

3    Do you see that?

4    **A.**    Yes.  So Matthew was going to verify with Mr. Wilson

5    that -- doing the property accountable was not going to be an

6    issue because that's under him.

7    **Q.**    Was that 100 percent on board also referencing the

8    purchase of the equipment through WITS?

9    **A.**    Yes.

10   **Q.**    Was that purch- -- and did that -- did that equipment

11   arrive.  Did that equipment arrive?

12   **A.**    Yes.

13   **Q.**    Was it installed?

14   **A.**    It was.

15   **Q.**    You mentioned HP tapes earlier --

16   **A.**    Yes.

17   **Q.**    -- in your testimony.  Did there come a time when there

18   was a loss of OIG's backup data?

19   **A.**    Yes, there was.

20   **Q.**    Okay.  What was -- what was that about?

21   **A.**    Um, the SAND had a, if I recall correctly, there was a

22   corruption on the SAND on our backup data.

23   **Q.**    What's a SAND?

24   **A.**    Our Storage Area Network where all of our data resides.

25   And then, so there was a -- a -- a -- a significant crash that

1    happened, a -- a -- a corruption that happened.

2    Q.    All right.  And what was the result of the -- how big of

3    a deal was that?

4    A.    That was a very big -- that was a very big deal.

5    Q.    Why was that such a big deal?

6    A.    Again that's our data where all of our investigative

7    data, all of our audits.  That's -- that's -- I think this was

8    right after we moved into the Mark Center, so we were still

9    fresh on not really wanting to have our data there.  And then

10   the thing that we didn't want to happen happened.  They had a

11   significant failure, and we were living our fear.

12   Q.    Was Mr. Wilson made aware of this problem?

13   A.    Oh, yes.  Many times.

14   Q.    Was Mr. Steiniger aware of the problem?

15   A.    Absolutely.

16   Q.    Was it considered an emergency situation?

17   A.    Yes.

18   Q.    Did you meet with Mr. Steiniger and Mr. Wilson for the

19   purposes of discussing how to solve this problem?

20   A.    Yes.

21   Q.    Let me ask you to take a look at this e-mail Mr. Lumho.

22         MR. AMOLSCH:  Thank you.

23   BY MR. AMOLSCH:

24   Q.    Do you recognize that?

25   A.    Yes, I do.

1    Q.     Is that an e-mail exchange between you and Mr. Wilson and

2    Mr. Steiniger?

3    A.     Yes.

4           MR. AMOLSCH:  All right.  Move to admit Defense's 45.

5           THE COURT:  Any objection.

6           MR. CARLBERG:  No.

7           THE COURT:  It's received.

8           (Defendant's Exhibit 45 admitted into the record.)

9           MR. AMOLSCH:  Thank you.

10   BY MR. AMOLSCH:

11   Q.     All right.  You see there the bottom of this e-mail --

12   I'm sorry, you're sending this to Mr. Wilson and Steiniger,

13   "We'll know more tomorrow about the impact of this incident."

14   What incident are you talking about?

15   A.     The data -- the crash that happened, the backup solution

16   that --

17   Q.     "We'll come see you as soon as we assess the impact."

18   What does that mean?

19   A.     I informed Mr. Wilson our SES that we will come update

20   him as soon as we figure out what the impact is.  This was at

21   10:00 at night.

22   Q.     All right.  That was at 10:00 at night, and he respond at

23   10:21, telling you where he'll be and also, "Please be prepared

24   to discuss contracts."

25   A.     Yes.  We could tell our status the next day.  Yeah.

1    **Q.**    Did you have a discussion with Mr. Wilson and

2    Mr. Steiniger about contracts?

3    **A.**    Yes.

4    **Q.**    And what was that conversation about?

5    **A.**    About getting these backup tapes for the -- for our data.

6    **Q.**    And what contract did you decide -- was it decided would

7    be used?

8    **A.**    WITS.  Well, initially we were going to -- we were so

9    behind the ball that we purchased as many tapes as we could

10   through a $3,000 -- $2,500 GPC card.

11   **Q.**    Okay.

12   **A.**    So to kind of stop the bleeding, we bought as many

13   cart- -- backup tapes as we could, which I don't recall how many

14   that was, that might have been six or seven.  And the real fix

15   was to buy an additional 2,000 tapes, backup tapes for this.

16   **Q.**    Are you familiar with a woman named Charlene White?

17   **A.**    Yes.

18   **Q.**    Okay.  Was she someone who had access to the GPC card?

19   **A.**    She was a GPC card holder.

20   **Q.**    Would that purchase have run through her?

21   **A.**    Yes.

22   **Q.**    Is that how you remember that purchase happening?

23   **A.**    The initial, yes.

24   **Q.**    And -- and did Matthew -- did you and

25   Matthew Steiniger -- were you in contact about when these tapes

1    would arrive?

2    **A.**    Yes.

3    **Q.**    How quickly they could get there?

4    **A.**    Everybody was anxious to get these tapes because we

5    were -- we were trying not to copy over tapes that had data on

6    it, old tapes.

7    **Q.**    All right.  I'm going to show you another e-mail,

8    Mr. Lumho.

9         MR. AMOLSCH:  Thank you.

10   BY MR. AMOLSCH:

11   **Q.**    Take a look at that and let me know when you're ready.

12   **A.**    I remember this.

13   **Q.**    All right.  Is this e-mail exchange between and you

14   Matthew Steiniger and Thomas Wedige?

15   **A.**    Wedige.

16   **Q.**    Wedige.  Who is Thomas Wedige?

17   **A.**    He was an executive at WHS.

18   **Q.**    All right.  And is this e-mail in reference to the HP

19   tapes we were just talking about?

20   **A.**    Yes.

21   **Q.**    Okay.

22        MR. AMOLSCH:  Your Honor, I move Defense's Exhibit 46.

23        MR. CARLBERG:  No objection.

24        THE COURT:  Received.

25        (Defendant's Exhibit 46 admitted into the record.)

BY MR. AMOLSCH:

**Q.**     All right.  The first e-mail at the bottom of this string

is an e-mail from Donny Ravas to you and Billy Hall.

Who is Billy Hall?

**A.**     He was an MSO person.  I don't know who he was.

**Q.**     Okay.  And, "Kekoa, here is the status regarding the

tapes."  This is from Donny to you.

Which tapes is he referring to?

**A.**     These are the backup tapes that we were -- that purchased

for this backup failure.

**Q.**     "The 2000 HP tapes were received at approximately 11:15

this morning at our warehouse."

Who's warehouse is he talking about?

**A.**     I assume Donny's warehouse.

**Q.**     "All equipment was assigned control numbers and

processed.  These tapes are scheduled for delivery the first

thing in the morning."

**A.**     Yes.  So the control numbers are the ones that we had a

hard time getting stuff up from there.

**Q.**     And so were these tapes delivered off-cite to Donny Ravas

for him to bring into the Mark Center?

**A.**     It appears so, yes.

**Q.**     Did you then copy Mr. Steiniger?

**A.**     Yes.

**Q.**     Okay.  And then he copies you and Thomas --

1    **A.**     Wedige.

2    **Q.**     Wedige.  "Tom heads up you're about to be the proud

3    recipient of a lot of tapes?"

4    **A.**     Correct.

5    **Q.**     And those are the tapes that were acquired through WITS?

6    **A.**     Yes.  These are the tapes from WITS, yes.

7    **Q.**     Did there come a time when Office of the Inspector

8    General needed to rearrange furniture and various desks with

9    inside of the Office of the Inspector General?

10   **A.**     Yes.

11   **Q.**     Was that referred to as the "restack"?

12   **A.**     Yes, it was a restack.

13   **Q.**     Okay.  Tell the ladies and gentlemen of the jury a little

14   bit about the restack?

15   **A.**     So the restack, when we were -- when BRAC 133 first

16   started, we were at 1800 employees at the OIG.  Two-and-a-half

17   years later when we are actually moving to the Mark Center we

18   are at like 2100 employees of the OIG.  So we had to kind of fit

19   into our -- the space didn't change.  So it was built based off

20   of three-year-old numbers.  So when we moved in we had to start

21   sorting our folks into different spaces.

22           And once we got in and we were sort of established, we

23   worked out with WHS to get more space at the Mark Center so we

24   then had to what we call restack.  We had to shift people around

25   to separate components and to give people more space.

1    Q.    All right.  And were you part of the planning process for

2    that?

3    A.    I was a vote, yes.

4    Q.    Did you have meetings about that?

5    A.    Yes.

6    Q.    Was Tony Jenks part of those meetings?

7    A.    He was.

8    Q.    Was Donny Ravas part of those meetings?

9    A.    He was.

10   Q.    Were Donny Ravas and Tony Jenks in the same meeting?

11   A.    Yes, they were.

12   Q.    How many times?

13   A.    Half a dozen times at least.

14   Q.    I want to show you what's been previously admitted as

15   Defense's Exhibit 28.  Do you see that's an e-mail from

16   Matthew Steiniger to Jeffrey Hall, Anthony Jenks, Kekoa Lumho,

17   Delilah Lumho, and Brandon Williamson on June 12th.

18   Do you see that?

19   A.    Yes.

20   Q.    "Kekoa, not sure about GDIT."  What's GDIT?

21   A.    General Dynamics Information Technologies.  It's -- it's

22   General Dynamics --

23   Q.    I'm sorry.  "But obviously we can get this support via

24   WITS?"

25   A.    Right, Matthew says, "Obviously, we can get the support

1    via WITS."

2    **Q.**    And what is he referring to?  What support?

3    **A.**    Getting the movers to move our IT equipment.  The users

4    IT equipment from space A to space B.

5    **Q.**    Using WITS to handle ISD's portion of the -- WITS -- of

6    the restack?

7    **A.**    Correct.

8    **Q.**    And what did you take from that regarding whether you

9    could use WITS -- for the purposes of the restack?

10   **A.**    That it was going to be -- it was approved to use WITS.

11   **Q.**    Last e-mail I want to talk to you about, Mr. Lumho is

12   SmartNet.

13   **A.**    Okay.

14   **Q.**    Cisco SmartNet.  Can you explain to the ladies and

15   gentlemen of the jury what the SmartNet maintenance program is?

16   **A.**    Sure.  So Cisco equipment is very expensive, networking

17   equipment, and it is a -- you can -- you purchase a maintenance

18   contract with it so that if anything happens, if you're in the

19   federal government or you have mission critical devices,

20   SmartNet is a maintenance plan for all your hardware, all your

21   routers and switches, your Voice over IP, voice handling.  So

22   that if anything ever happened to the hardware, one, it could be

23   replaced within four hours, if that's what your SLR is your

24   Service Level Agreement is, or you can continue getting security

25   patches for your equipment.

1        If you didn't have SmartNet you don't get -- you don't

2   get software support.  So if there's a vulnerability on one of

3   your Cisco firewalls or your routers which happened often, you

4   don't get an upgrade for the routers.

5        So it was extremely important for us to have maintenance

6   on our Cisco equipment, including our phones -- all of our Cisco

7   equipment which there was quite a bit.

8   Q.     Now, had you had previous discussions with Mr. Steiniger

9   about using WITS to purchase some of these Cisco maintenance

10  programs?

11  A.     Yes.

12  Q.     Okay.  Were some of those programs available on WITS or

13  were they -- the larger SmartNet contract, was that available on

14  WITS?

15  A.     Um, yes.

16  Q.     Um, so, did there come a time when one of the maintenance

17  contracts on your Cisco equipment expired?

18  A.     Yes.

19  Q.     Okay.  Tell me, were there multiple different maintenance

20  contracts floating around, or was it all one big maintenance

21  contract?

22  A.     So to sum it up, when you purchase through GSA, we would

23  buy, let's say 15 routers this year and another 15 routers next

24  year.  Every year you renew your maintenance contract, and each

25  time you purchased an order of Cisco equipment they give you a

1    new contract number.

2         So then you had to manage 30 or 40 contract numbers

3    associated with each router.  It became really a complicated

4    thing to call Cisco and say, "I have a Cisco router that just

5    crashed."  "What's your contract number?"  And we would have to

6    go figure out which contract it is based off the purchase order

7    that we did in the past.

8         So we wanted to use WITS to purchase a single SmartNet

9    maintenance contract with all of our serial numbers of every

10   Cisco device that we had.  One contract number for all of our

11   devices.  And so we had a discussion with Matthew and Brandon

12   about doing that.

13   Q.    Okay.  So who is Brandon Williamson?

14   A.    He is in charge of the IT business operations.

15   Q.    And who is Mark Walker?

16   A.    He is our chief architect.

17   Q.    Was he involved in the purchase of the Cisco SmartNet?

18   A.    Yes.

19         MR. AMOLSCH:  This one here.  Thank you.  Good, sir.

20   BY MR. AMOLSCH:

21   Q.    Do you recognize that Mr. Lumho --

22   A.    I'm sorry --

23   Q.    -- when you're ready?

24   A.    I do, yes.

25   Q.    All right.  And is this a discussion amongst yourself,

1   Mark Walker, and Brandon Williamson about Cisco SmartNet and

2   with the WITS contract?

3   **A.**    Yes, it is.

4   **Q.**    Was this e-mail ultimately and the information here in

5   ultimately provided to Matthew Steiniger?

6   **A.**    Yes, it was.

7         MR. AMOLSCH:  Your Honor, I move Defense's Exhibit 48 --

8   47.

9         THE COURT:  Any objection?

10        MR. CARLBERG:  No, sir.

11        THE COURT:  Received.

12        (Defendant's Exhibit 47 admitted into the record.)

13  BY MR. AMOLSCH:

14  **Q.**    All right.  So let's start at -- let's start at the back

15  of this e-mail.  So the beginning of this e-mail is from you to

16  Jennifer Paper and Brandon Williamson.

17  Do you see that?

18  **A.**    Yes.

19  **Q.**    Okay.  Breakdown of hardware and line item numbers and

20  invoice dates.

21  Do you see that?

22  **A.**    I'm not sure.  I'm trying to --

23  **Q.**    I'm sorry.  I apologize, I moved it too quick.

24  **A.**    Yes.

25  **Q.**    Okay.  Do you see that?  All right.  And does that refer

1    back to information on the back of the e-mail?

2    **A.**    Yes, it did.  But this is the breakdown that the

3    comptroller's office wanted for the hardware and software

4    purchase from WITS.

5    **Q.**    Okay.  And you provided that -- you were providing that

6    to Jennifer Paper?

7    **A.**    Yes.

8    **Q.**    There was then an e-mail message back from

9    Brandon Williamson to you and Mark Walker, WITS equipment

10   orders, and it says here, "We are not to proceed with the Cisco

11   smart maintenance order.  It has not been funded."

12   Do you see that?

13   **A.**    Yes, I do.

14   **Q.**    So what did -- what did --what do you understand is going

15   on there?

16   **A.**    That Jennifer Paper had -- had said that there was no

17   funding right now for the SmartNet contract.

18   **Q.**    Okay.  So was that going to put that purchase on hold?

19   **A.**    Again, it says, "Regarding the WITS purchases."  So that

20   there was no funding for the SmartNet through WITS, right.  So

21   the funding -- so the purchase was put on hold, yes.

22   **Q.**    Okay.  And that was -- just to make sure I understand,

23   was Jennifer Paper telling you there was not money to purchase

24   this, right?

25   **A.**    Correct.

1    **Q.**    Okay.  So after that, did Mark Walker send you an

2    explanation about why we needed the WITS in order to get the

3    expired maintenance contract renewed quickly?

4    **A.**    Yes.

5    **Q.**    All right.  And did he ask you to review this?

6    **A.**    Yes.

7    **Q.**    Okay.  And it says -- do you see where it says,

8    "Explanation for using WITS to renew Cisco maintenance

9    contract?"

10   **A.**    Yes.  Above one, yes.

11   **Q.**    "The maintenance contract needs to be renewed quickly

12   ASAP because our existing maintenance contract has expired.  We

13   currently have no support or licensing for our critical

14   operational systems including our phone system and field site

15   connectivity devices."  That's Brandon Williamson to you?

16   **A.**    That's -- that's Mark Walker to me --

17   **Q.**    -- Mark Walker to you.  Was that -- is that accurate?

18   **A.**    Yes.

19   **Q.**    Okay.  So is this Mr. Walker's explanation to you about

20   why WITS is important to purchase this maintenance program?

21   **A.**    Yes.

22   **Q.**    What did you do with this information after you received

23   it from Mr. Walker?

24   **A.**    I responded to him that that's accurate.  And I once was

25   approved to -- to use WITS, or that the money was there,

1    requested for a service order request from Ron Capallia.

2    **Q.**    And, ultimately, this order was approved and delivered?

3    **A.**    Yes.

4    **Q.**    Was Cisco SmartNet put in place?

5    **A.**    One single contract number for all of our Cisco devices,

6    yes.

7    **Q.**    All right.  Who is Althea Williams?

8    **A.**    She was an auditor that worked in the Comptroller's

9    office.

10   **Q.**    Okay.  Was she a financial manager, do you know?

11   **A.**    She was a financial manager.  She was originally hired as

12   an auditor, but then I think they had a request to have an

13   auditor in the Comptroller's Office.  And so Althea volunteered

14   to move to Comptroller's -- the Comptroller's Office.

15        MR. AMOLSCH:  Okay.  Can I bring up Government's

16   Exhibit 244?

17   BY MR. AMOLSCH:

18   **Q.**    Okay.  Do you see this Mr. Lumho?

19   **A.**    Yes.

20   **Q.**    Okay.  So this is an e-mail from Althea to you,

21   Matthew Steiniger, Brandon Williamson, and Cristina Bucher

22   regarding an audit being performed on the WITS orders.

23   Do you see that?

24   **A.**    Yes.

25   **Q.**    Okay.  What do you understand her to be asking you to do

1    in that e-mail?

2    **A.**     They're asking for a contract agreement that we have in

3    place to support the obligation.  So they're -- they're -- she

4    was looking for paperwork.

5    **Q.**     Was she looking for paperwork about orders placed against

6    the WITS contract in 2012?

7    **A.**     Yes.  All of our WITS orders for 2012.

8    **Q.**     Now, did you keep that information on hand?

9    **A.**     I had some of them on hand.

10   **Q.**     Did you reach out to Mr. Capallia to see what he could

11   provide you?

12   **A.**     I double check- -- I wanted to verify what I had was all

13   my orders.  So, yes.  I reached out to Ron Capallia to ask him

14   to send me all the orders that we placed for 2012.

15   **Q.**     All right.  Then this e-mail is sent Thursday, October

16   11th at 2:27.

17            MR. AMOLSCH:  Can I go to Government Exhibit 246.  All

18   right.  Can I go to the bottom of this e-mail?

19   BY MR. AMOLSCH:

20   **Q.**     All right.  This is an e-mail from you to

21   Matthew Steiniger.  "Do you have time to look at these orders

22   before I send it to them."

23            MR. AMOLSCH:  Okay.  Can we go to the front page.

24   BY MR. AMOLSCH:

25   **Q.**     All right.  Do you remember saying that?

1    **A.**      Yes, I do.

2    **Q.**      Okay.  And do you see where Mr. Steiniger responds,

3    "Yes"?

4    **A.**      Yes, at 9:13.

5    **Q.**      Yes.  Did you have any conversations with Mr. Steiniger

6    after 9:13 p.m. regarding the invoices that you sent him for his

7    review?

8    **A.**      Yes.  We spoke on the phone.

9    **Q.**      Okay.  Tell me about that conversation.

10   **A.**      We had a conv- -- a phone conversation about the orders.

11   And I don't know if we necessarily went through all the orders,

12   but we had a phone conversation about these orders before I was

13   going to send them to the Comptroller's office.

14   **Q.**      And why did you reach out to Mr. -- why did you send

15   these to Mr. Steiniger before you send them on to

16   Althea Williams?

17   **A.**      He's my leadership.  He's my leadership, so he approved

18   them with me.

19   **Q.**      Okay.

20        MR. AMOLSCH:  So then if I can bring up Government's

21   Exhibit 247.

22   BY MR. AMOLSCH:

23   **Q.**      October 12th.  This is an e-mail sent a little after

24   midnight it appears on February 12th, 2012.

25   Do you see that --

1    **A.**    Yes.

2    **Q.**    -- October 12th, 2012?

3    **A.**    Um-hmm.

4    **Q.**    In-between the time of the first e-mail and this e-mail

5    at 12:14 a.m., is this when your conversation with Mr. Steiniger

6    happened?

7    **A.**    Yes.

8    **Q.**    How long did that conversation last, if you remember?

9    **A.**    An hour.  45 minutes.

10   **Q.**    So you are then sending this information as well to the

11   people listed in the e-mail chain.

12   Who is Joan Deem?

13   **A.**    Joan Deem was our comptroller.

14   **Q.**    And who's Marlin Molena?

15   **A.**    He was the comptroller's deputy, I believe.

16   **Q.**    And then Tommie Sendsook?

17   **A.**    She was a budget analyst, I believe was what her tile

18   was.

19   **Q.**    Santiki Sanders?

20   **A.**    Another budget analyst.

21   **Q.**    And with Althea Williams, and Cristine Bucher, and

22   Matthew Steiniger.  And so, is this basically the same

23   information that you provided to Mr. Steiniger just now being

24   forwarded on?

25   **A.**    Yes.

1    Q.    Okay.  Was there a conference call the next day among the

2    auditors discussing the invoices that you provided?

3    A.    Yes, there was.

4    Q.    All right.  Were you part of that phone call?

5    A.    I was not part of the phone call.

6    Q.    Was Matthew Steiniger part of that phone call?

7    A.    Yes, he was.

8    Q.    Did he call you afterwards and tell you what happened as

9    a result of that conference?

10   A.    Yes, he did.

11   Q.    Without telling me what he told you, how did you come

12   away from that conversation with Mr. Steiniger about whether

13   there was a problem with any of these invoices?

14   A.    There was no problem.

15   Q.    All right.  Based on that conversation, what was your

16   understanding about whether you had done anything wrong with the

17   WITS contract?

18   A.    Nothing.  That --

19   Q.    None?

20   A.    None.

21   Q.    In November of 2012, did Mr. Steiniger write his review

22   of you?

23   A.    Yes, he did.

24   Q.    An annual review?

25   A.    Um-hmm.

1   **Q.**    How would you characterize that review?

2   **A.**    Excellent.  I always had exceeded.

3   **Q.**    At the time of that review, was Mr. Steiniger aware of

4   the way you had been using the WITS contract?

5   **A.**    For sure.

6   **Q.**    Had he been aware the entire time?

7   **A.**    Yes, he was.

8   **Q.**    Was it ever your intention to defraud the government with

9   any of these orders?

10  **A.**    No.

11  **Q.**    Let's talk a little bit about Fidel.  How long has he

12  lived with you?

13  **A.**    Since 2011.

14  **Q.**    About ten years?

15  **A.**    Yes.

16  **Q.**    And I believe you said he came to live with you after

17  having a break up in Mexico with a girlfriend?

18  **A.**    Yes.

19  **Q.**    Would you describe him as a proud man?  How would you

20  describe his personality as it relates to work?

21  **A.**    He's very proud.

22  **Q.**    Okay.  Was it -- did you have conversations with him

23  about him wanting to be employed?

24  **A.**    Yes.

25  **Q.**    Okay.  Did he come to you with those conversations?  Did

1    you go to him with these conversations?

2    How did that happen?

3    **A.**      He came to me.

4    **Q.**      Did you encourage him to get a job?

5    **A.**      Yes.

6    **Q.**      Okay.  And why is that?

7    **A.**      Um, he is a -- how -- I don't want to say a worry-wart,

8    but he carries a lot of pride on himself, and him sitting

9    stagnant at home like he was doing in Mexico was eating away at

10   him.

11   **Q.**      All right.  Did you reach out to anybody about helping

12   Fidel find ago job?

13   **A.**      I did.

14   **Q.**      Who did you call?

15   **A.**      I -- well, I -- in a conversation --

16   **Q.**      Who did you have a conversation with?  Sorry.

17   **A.**      In a conversation with Barry Atwood, that -- the -- the

18   need for a job that -- somebody to help Barry or somebody came

19   up.

20   **Q.**      Okay.  And did you -- and was it your suggestion to Barry

21   that Barry interview Fidel or hire Fidel or was that his

22   suggestion to you?

23   How did that happen, if you remember?

24   **A.**      I don't remember specifically, but I know that I talked

25   with Barry about my father-in-law needing a job.

1    **Q.**    Were there other people at the Office of the Inspector

2    General who were -- who had relatives working for MSO at that

3    time?

4    **A.**    Yes, there was.

5    **Q.**    Who is Lyle Rasnick?

6    **A.**    Lyle Rasnick was the chief of our server integration

7    team.

8    **Q.**    And did he have a brother named Thayer?

9    **A.**    He did.  He had a younger brother named Thayer.

10   **Q.**    And did Thayer work for MSO?

11   **A.**    Thayer worked for MSO under -- I'm not sure if he worked

12   directly under his brother but he worked within ISD.  Thayer was

13   a technician.

14   **Q.**    So --

15          THE COURT:  Let's be careful about the leading.  This is

16   all leading.

17          MR. AMOLSCH:  I'm sorry, Your Honor.

18          THE COURT:  Yes, sir.

19          THE WITNESS:  So nobody ever -- there was never an issue.

20          THE COURT:  Please wait for a question.

21          MR. AMOLSCH:  I'm trying to rephrase my question, Your

22   Honor.

23          THE WITNESS:  I'm sorry.

24          MR. AMOLSCH:  Thank you.

25   BY MR. AMOLSCH:

1    **Q.**    When you recommended Fidel, or when Fidel expressed

2    interest in working for MSO, did that cause you any concern?

3          THE COURT:  I'm sorry.  Did he say that?  Did he just

4    testify to that?  Did I miss that?

5          MR. AMOLSCH:  I -- I lost track of the question, Your

6    Honor, when you told me not to lead, so I was just trying to go

7    back to the question.

8          THE COURT:  Okay.  All right.

9    BY MR. AMOLSCH:

10   **Q.**    Did that cause you any concern with Fidel working for MSO

11   while you were working at the Office of the Inspector General?

12   **A.**    So I didn't think Fidel was getting a job with MSO.

13   **Q.**    Okay.  What did you think?

14   **A.**    I was clear with Barry that I didn't want Fidel working

15   with MSO because of any sort of conflict of interest.  And Barry

16   had friends and knew folks that had companies and so I threw it

17   out there for him to find Fidel a job if he -- if he could.

18   **Q.**    We talked a little bit about where you were in January

19   2012, end of January 2012.  Do you remember where you were?

20   **A.**    I was in South Korea in January.

21   **Q.**    And when you came back what did you discover about

22   Fidel's employment?

23   **A.**    That he had received employment.

24   **Q.**    Did you help him with that application?

25   **A.**    No.

1    **Q.**    Did you fill out any paperwork?

2    **A.**    No.

3    **Q.**    Did you have any discussions with MSO about hiring Fidel?

4    **A.**    No.

5    **Q.**    Okay.  Who did all that, if you know?

6    **A.**    I'm not sure.

7    **Q.**    Okay.  Did there come a time when you learned that Fidel

8    actually wasn't working with MSO as soon as he would have liked?

9    **A.**    So he in a conversation told me that he hasn't received a

10   phone call, he hadn't received a phone call.

11   **Q.**    Okay.

12   **A.**    And I went to Barry shortly after that, I don't know how

13   much shorter, but maybe later that week, the next time I saw

14   Barry I said, "Hey, I don't know who got Fidel a job, but tell

15   him they need to call him."

16   **Q.**    Okay.  Did you have any other quest- -- did you have any

17   other discussions with Barry Atwood about Fidel's employment

18   after that conversation?

19   **A.**    All Barry said was that, "He was on call and they're

20   going to call him."

21   **Q.**    All right.  Did you have any more conversations with

22   Fidel about this -- the on-call nature of this job?

23   **A.**    I just told him, "They're going to call you.  You're on

24   call.  They're going to call you.  Have your phone with you."

25   **Q.**    All right.  Did you -- did you know where Fidel was going

1    in the morning?

2    **A.**    I had no idea.

3    **Q.**    All right.

4    **A.**    I worked -- I mean, I worked very early in the morning

5    and got home later in the evening and I -- as you can hear,

6    there was a lot going -- there was a lot going on at work that I

7    was dealing with on my own.

8    **Q.**    Did there come a time when you took Fidel to the Navy

9    Federal Credit Union to open up a bank account with him -- for

10   him?

11   **A.**    Yes.

12   **Q.**    Open a bank account?

13   **A.**    Yes.

14   **Q.**    How did that -- why did you do that?

15   **A.**    He needed help transferring money from his Golden One

16   account, which is at a bank in California.  And he was always

17   asking for somebody -- for myself or Delilah to help him log

18   into his Golden One.  And so I'm like, "Just get an account here

19   locally so you can just drive over there and talk with somebody

20   else who can help you."

21   **Q.**    All right.  Did you suggest Navy Federal Credit Union, or

22   how did that happen?

23   **A.**    No, I suggested it.  They're a bank right there not too

24   far from my house that is a credit union that I belong to.  And

25   since I'm a member I'm able to get him -- I'm able to get him a

1  membership there as a relative.

2  **Q.**    All right.  Did you go with Fidel to the bank?

3  **A.**    I did.

4  **Q.**    All right.  Did you help him with the paperwork?

5  **A.**    I did.

6  **Q.**    Did you help him open the account?

7  **A.**    I did.

8  **Q.**    Now, was this an account in Fidel's name only, or was it

9  a joint account?

10 **A.**    It was just Fidel's account.

11 **Q.**    All right.  Is that the way he wanted it?

12 **A.**    I assume so.  I -- I -- I wasn't going to do a joint

13 account for him.

14 **Q.**    But did you have access to that account?

15 **A.**    I did, yes.

16 **Q.**    Okay.  And why is that?

17 **A.**    Because, again, his computer literacy was -- is still --

18 my -- my -- my ten-year-old son has more computer literacy than

19 Fidel does.  So if he needed to log in to see how much money he

20 had in the account, he would still drive to the ATM to check his

21 balance.  And so I showed him.  Just use your access code to log

22 in and see how much you got.  Log in and see how much money you

23 have in there, for example.

24 **Q.**    Did Fidel receive checks at the house?

25 **A.**    He did.

1  **Q.**    Okay.  And did you open those checks and see them?

2  **A.**    I didn't open them, no.

3  **Q.**    But did you see the checks that Fidel received?

4  **A.**    I did, yes.

5  **Q.**    Okay.  And what did it say on the top of the checks?

6  **A.**    FrankCrum.

7  **Q.**    FrankCrum.  And what did you understand by looking at the

8  checks that said FrankCrum on them?  What did you understand

9  about Fidel employment.

10  **A.**    So, again, at that time my state of mind and where I was

11  at that time I assumed he had a job at FrankCrum.

12  **Q.**    All right.  Did you have any conversations with him about

13  it?

14  **A.**    No.

15  **Q.**    All right.  Did you sign some of the checks, his

16  FrankCrum checks before depositing them into Fidel's account?

17  **A.**    I did.

18  **Q.**    Okay.  Did Fidel sign some of those checks before they

19  were deposited into Fidel's account?

20  **A.**    Yes, he did.

21  **Q.**    All right.  Why -- why were there occasions when you

22  would sign the back of the checks versus Fidel?

23  **A.**    If I was going to Wal-Mart down the street and a check

24  came in, I would tell Fidel, "Hey, I'll deposit your check."

25  And so I would open it and sign it and take it to the Navy

1    Federal Credit Union right next door to Wal-Mart and deposit the

2    account -- deposit it.

3    **Q.**    Did you ever forge Fidel's signature, or did you sign it

4    with your own name.

5    **A.**    I had to sign my own name.

6    **Q.**    Would it have been easier for you if Fidel just had

7    direct deposit?

8    **A.**    Easier for me to deposit it, yeah.

9    **Q.**    Deal with his accounts?

10   **A.**    Yes.

11   **Q.**    Why did Fidel receive paper checks as opposed to having

12   the money just directly deposited into his account?

13   Do you know?

14   **A.**    I have no idea.

15   **Q.**    Okay.  Did you ever trans- -- did you ever transfer money

16   out of Fidel's account for things like living expenses and debts

17   on credit cards?

18   **A.**    Yes.

19   **Q.**    Did you always -- did you ever do that without his

20   permission?

21   **A.**    He always knew that I was doing it.

22   **Q.**    Okay.  Was it something that he wanted to have happen?

23   **A.**    Yes.

24   **Q.**    All right.  And you mentioned filing taxes on behalf of

25   Fidel.

1    Do you remember that?

2    **A.**    Yes.

3    **Q.**    Okay.  And did you file taxes -- help Fidel file taxes

4    for the money he earned in 2012?

5    **A.**    I did.

6    **Q.**    Okay.  And those taxes would have been filed in 2013?

7    **A.**    Correct.

8    **Q.**    All right.

9         MR. AMOLSCH:  Can I bring up Government's Exhibit 648,

10   please.  Is this in?  Mr. Burke, do you know?

11        MR. BURKE:  Yes.

12        MR. AMOLSCH:  I'm sorry.

13        MS. SANDVIG:  Yes, it's in.

14        MR. AMOLSCH:  It's in.  It's been previously admitted,

15   Your Honor.

16        THE COURT:  All right.

17   BY MR. AMOLSCH:

18   **Q.**    Is this the W-2 that you saw that you used to help Fidel

19   file his taxes?

20   **A.**    Yes, that's it.

21   **Q.**    Do you see where it says employer name?

22   What does it say?

23   **A.**    It says FrankCrum 1, Inc. as employer.

24   **Q.**    FrankCrum 1, Inc. Is that consistent with the name and

25   identification that appeared on the checks that Fidel received?

1   **A.**     Yes.

2   **Q.**     What was your impression about where Fidel was working?

3   **A.**     FrankCrum.

4   **Q.**     Did there come a time when Fidel got a DUI?

5   **A.**     Yes.

6   **Q.**     Or driving while intoxicated charge?

7   **A.**     Yes.

8   **Q.**     All right.  Did he -- did -- was there a lawyer to

9   represent Fidel?

10  **A.**     Yes.

11  **Q.**     Okay.  And who paid for that lawyer?

12  **A.**     I did.

13  **Q.**     Okay.  Do you remember the name of the lawyer, who it

14  was?

15  **A.**     Rod Leffler.

16  **Q.**     And you paid Mr. Leffler on behalf of Fidel?

17  **A.**     Yes.

18  **Q.**     Did you pay that with your own funds or the money -- or

19  use some of the money from Fidel's account?

20  **A.**     I paid for it with my own money first.

21  **Q.**     Did you go with Fidel -- did you go to court with Fidel

22  on the day of his court date?

23  **A.**     I did not.

24  **Q.**     Okay.  Were you there for any part of the proceedings.

25  Did you even stay outside of the courthouse?

1    **A.**    No.  I went and picked him up after, the morning after it

2    happened, but -- and then I got an attorney for him.  And, no, I

3    was not there at court.

4    **Q.**    You said you picked him up you mean from --

5    **A.**    From the lock up, yes.

6    **Q.**    From the lock up.  Got him an attorney and that was it?

7    **A.**    Yep.

8    **Q.**    Do you know who paid Fidel's court costs?

9    **A.**    I know now based on --

10   **Q.**    Okay.

11   **A.**    -- what I've seen but at that time --

12   **Q.**    Did Fidel have to go through alcohol classes as a part of

13   his DWI?

14   **A.**    He did.

15   **Q.**    Okay.  Who paid for those?

16   **A.**    I did.

17   **Q.**    Did -- because of the nature of Fidel's DWI, was he

18   required to drive a car with an ignition interlock system on it?

19   **A.**    I had to put an interlock system on my -- Fidel doesn't

20   have a car, so he was using my -- one of our cars, yes.  So I

21   had to put an interlock on one of our cars, yes.

22   **Q.**    And who paid for that?

23   **A.**    I did.

24   **Q.**    Fidel lives with you.  Have you ever asked him to lie on

25   your behalf?

1   **A.**    Never.

2   **Q.**    Have you asked him ever to not come to this courthouse?

3   **A.**    No.

4   **Q.**    Have you ever put any pressure on him at all regarding

5   any statement he has made to this jury, Judge O'Grady, any

6   agent?

7   **A.**    The only thing I ever told Fidel about this whole thing

8   is just be honest.

9   **Q.**    And does he still live with you and your family?

10   **A.**    He does.

11       MR. AMOLSCH:  If I could bring up Government Exhibit 622.

12   BY MR. AMOLSCH:

13   **Q.**    Do you recognize this Mr. Lumho?

14   **A.**    Yes.

15   **Q.**    And what is that?

16   **A.**    That is the OGE450 form.

17   **Q.**    I mean, what is that in real language?

18       MS. SANDVIG:  It's not in.

19       MR. AMOLSCH:  Oh, it's not in?  I ap- -- which one -- is

20   it 1102 that's in?

21       MR. BURKE:  Yeah.

22       MR. AMOLSCH:  Okay.  1102.  That's the one that's in?

23       MR. BURKE:  Yeah, that's it.

24   BY MR. AMOLSCH:

25   **Q.**    Okay.  I'm sorry, Mr. Lumho.  1102.  Is that the same

1   form we were looking at before?

2   **A.**     Yes.

3   **Q.**     It says, "Financial Disclosure Report."

4   **A.**     Yes.

5   **Q.**     What is a financial disclosure report as you understand

6   it?

7   **A.**     It is a -- it's a form that we have to fill out as a

8   supervisor.  In the government you have to disclose any

9   financial investments you have.

10  **Q.**     Are there instructions that go along with these forms?

11  **A.**     Yes.

12  **Q.**     Okay.  Did you read the instructions before you filled it

13  out?

14  **A.**     Yes, you have to.

15  **Q.**     Um, based on your reading of the instructions, what are

16  the types of inform- -- income, non-investment income you're

17  required to provide as part of this financial disclosure form?

18  **A.**     Um, any investments you have, any salaries you're paid by

19  another company, any -- any interest you have in other

20  companies.

21  **Q.**     Okay.  All right.  Fees and salaries you said?

22  **A.**     Yes.

23  **Q.**     Like sales commissions?

24  **A.**     Yes.

25  **Q.**     Retirement benefits?

1    **A.**      Retirement benefits, yes.

2    **Q.**      Did you receive any of those from Fidel?

3    **A.**      No, I did not.

4    **Q.**      There are instructions that come along in terms of the

5    non-investment income that set forth the kinds of funds you

6    don't have to report.  Do you remember reading those

7    instructions?

8    **A.**      I do.

9    **Q.**      Do you remember what those instructions said about

10   whether you are -- the form is looking for any money given to

11   you by a relative?

12   **A.**      So you don't have to claim any of that.  My dad lives

13   with me, so I've gone through the ethics and spoken with ethics

14   folks about this form because every job I've had, or every

15   agency I've gone to it's always been a -- this isn't a very easy

16   form to fill out because it's not really clear.  So I know I

17   don't have to claim anything that a relative gives me.

18   **Q.**      Okay.  Like --

19   **A.**      Rent or anything.

20   **Q.**      You mentioned your father.  Tell me about that.

21   **A.**      So my dad because of Vietnam he was exposed to Agent

22   Orange and he ended up getting cancer in 2016, '16.  He ended up

23   having marrow breast cancer that metastasized into his lymph

24   nodes.

25            So he was living in Ocean City, Maryland at the time, and

1    he was being treated at Fort Belvoir.  So him and his girlfriend

2    came to live with me for a year and a half before he passed away

3    at my house.

4    Q.    All right.  And did he -- did he give you money towards

5    living expenses and rent and things like that?

6    A.    He did, yes.

7    Q.    Okay.  Is that the kind of thing that is required to be

8    put on this financial disclosure form?

9    A.    I do not have to claim that, no.

10   Q.    Did Fidel contribute to the living expenses and operating

11   expenses of the house?

12   A.    Yes, he does.

13   Q.    Based on your understanding, did you have to report that

14   kind of income on this form?

15   A.    No, I did not.

16   Q.    The last thing I want to ask you about Mr. Lumho is your

17   participation in the technical review board in March of 2012.

18   Do you remember participating in that technical review board?

19   A.    I do.

20   Q.    Okay.  And what was the purpose of that technical -- your

21   participation in that technical review board?

22   A.    So the EES contract that I believe we talked about

23   earlier was protested.  It was awarded to Phacil.  This was in

24   October of 2011.  It was protested so GSA stopped our work and

25   this bridge contract was put in place as a stopgap.

1        Fast forward to the middle of 2012 or early 2012, GSA

2    wanted us to reevaluate all five companies that put in bids.

3    And do a technical evaluation of the bids again and be more

4    precise on -- on what we selected.

5    **Q.**    All right.  And did you participate in that technical

6    review board?

7    **A.**    I was one of three, yes.

8    **Q.**    Who were the other two members?

9    **A.**    Well -- there was four of us.  Willie Spivey was the lead

10   in acquisitions but the voting members were myself,

11   Matthew Steiniger and Ricardo Farrerah.

12   **Q.**    During that review board, did all of you discuss the

13   merits of the various proposals?

14   **A.**    Um, we initially were instructed to do it in a bubble and

15   not -- not discuss what our ratings were going to be.  But after

16   we came up with our own evaluation, we met multiple times, yes,

17   concerning what we -- our ranking was.

18   **Q.**    Now, were you aware at the time you were conducting this

19   technical review evaluation that Mr. Wilson was one of the

20   companies submitting a bid?

21   **A.**    Yes.

22   **Q.**    Okay.  Which company was he submitting a bid in

23   conjunction with?

24   **A.**    So on AIS's bid on the cover sheet was AIS and MSO

25   contract bid for the contract number 9Q, whatever it was, "F"

```
1    something.  So it was on the cover page that MSO was partnered
2    with AIS.
3    Q.    All right.  After reviewing the bid from Phacil and from
4    AIS, MSO, did you have an opportunity to then rank these
5    companies in terms of which company you thought would provide
6    the best -- best -- best value to the government?
7    A.    Yes.
8    Q.    Let me show you what's been previously admitted as
9    Defense Exhibit --
10          MR. AMOLSCH:  Court's indulgence --
11          (Discussion held off the record between Counsel.)
12          MR. AMOLSCH:  Eleven.  It's Defense Exhibit 11.
13   BY MR. AMOLSCH:
14   Q.    Do you see this where it says AIS --
15   A.    Yes.
16   Q.    -- at the top.  And that's AIS MSO we're talking about?
17   A.    Yes, it is.
18   Q.    Do you see to the right there are rankings?
19   A.    Yes.
20   Q.    Okay.  Who is K?
21   A.    That would be myself.
22   Q.    And who is R?
23   A.    Ricardo.
24   Q.    And who is M?
25   A.    Matthew.
```

1    **Q.**     Okay.  And next to it is an overall, right?

2    **A.**     Correct.

3    **Q.**     Now, on in this technical review board being one is --

4    where one is the highest and five is the lowest, how did you

5    rank Mr. Wilson's firm in providing the best value to the

6    government?

7    **A.**     I ranked them, AIS at number two.

8    **Q.**     Number two.  At the time you ranked Mr. Wilson's company

9    a two --

10        MR. CARLBERG:  Objection, Your Honor.  That misstates the

11   record.  AIS is not Mr. Wilson.

12        MR. AMOLSCH:  I'm sorry.  I apologize, AIS.

13   BY MR. AMOLSCH:

14   **Q.**     At the time that you ranked AIS number two, were you

15   aware that the value of the bid was $31,733,000?

16   **A.**     Yes, I did.

17   **Q.**     Can you tell us briefly -- explain to the ladies and

18   gentlemen of the jury why you selected Phacil as the company

19   offering the best value to the government?

20   **A.**     After reviewing their Statement of Work, Phacil offered

21   better quality -- it was a better quality bid.  They had better

22   retention, better history, past history, and had a better value

23   cost-wise.

24   **Q.**     It says here that R actually ranked AIS number one.

25   **A.**     Correct.  Ricardo ranked them a one, overall.

1    Q.    All right.  So somebody thought they were the best value?

2    A.    Ricardo thought they were the best value, correct.

3    Q.    This is my final series of questions for you, Mr. Lumho.

4    At any time did you ever take a bribe from Mr. Wilson?

5    A.    Never.

6    Q.    At any time, did you ever act in his best interests

7    versus the best interests of the government?

8    A.    Never.

9    Q.    Did you do your best?

10   A.    I did -- I tried to do my best.

11   Q.    Did you try to deceive anyone?

12   A.    I never did.

13   Q.    Did you try to mislead anyone?

14   A.    No.

15   Q.    Have you ever now -- have you ever been in the position

16   to accept money or gifts from Mr. Wilson in exchange for taking

17   any action in his benefit?

18   A.    No, I have not.

19         MR. AMOLSCH:  Thank you, Your Honor, I have no further

20   questions.

21         THE COURT:  Cross-examination.

22         MR. CARLBERG:  Yes, Your Honor.  I need just a moment to

23   organize.

24         THE COURT:  Sure.  Do you need a break?  Okay.  Hold on.

25   While you're doing that, we're going to take a short recess.  Ten

1    minutes, is that -- will that do it.  Stay down here versus going

2    outside.  All right.  All right.  We'll take a ten minute recess.

3            (Jury out at 3:18 p.m.)

4            THE COURT:  All right.  We're in recess.

5            (Thereupon, a recess in the proceedings occurred from

6    3:18 p.m. until 3:34 p.m.)

7            THE COURT:  All right.  Anything before we bring the jury

8    back?

9            MR. AMOLSCH:  No, sir.

10           MR. BURKE:  No, Your Honor.

11           MR. AMOLSCH:  Oh, Your Honor, I'm sorry.  During the

12   course of my examination, I asked to admit in Exhibit 28.  The

13   government had to objection to it.  I don't believe I actually

14   went through the process of admitting it.  The clerk -- court --

15   clerks tell me, so I'm now belatedly moving -- we talked about it

16   on display.  I think I forgot to admit it, so I would like to

17   admit it now if that's all right.

18           THE COURT:  Any objection?

19           MR. CARLBERG:  No, sir.

20           THE COURT:  All right.  It's received.

21           MR. AMOLSCH:  Thank you, Your Honor.

22           (Defendant's Exhibit 28 admitted into the record.)

23           (Jury in at 3:36 p.m.)

24           THE COURT:  All right.  Please, have a seat.

25

1    CROSS-EXAMINATION OF MATTHEW KEKOA LUMHO

2    BY MR. CARLBERG:

3    Q.    Good afternoon, Mr. Lumho.

4    A.    Good afternoon, Mr. Carlberg.

5    Q.    Sir, a little bit before your wound up your testimony,

6    you were talking about Fidel, so I want to ask you a few

7    questions.  When I was listening to your testimony about Fidel,

8    you were talking about how he was proud and how he wanted a job.

9    Do you remember that?

10   A.    Yes.

11   Q.    Okay.  And do you remember, sir, that you said you had a

12   conversation with Barry Atwood about Fidel getting a job, right?

13   A.    Yes.

14   Q.    And you knew Barry Atwood worked for MSO Tech, right?

15   A.    I did, yes.

16   Q.    And in fact, you'd been fishing with Barry Atwood, and

17   Bill Wilson, and Tim Donelson back in 2011, right?

18   A.    I had, yes.

19   Q.    So you knew who all these people were?

20   A.    Yes.

21   Q.    Okay.  And then you had this conversation with

22   Barry Atwood and you -- I take pretty good notes sometimes and I

23   think I have a direct quote from you on your testimony when you

24   said, "I didn't think Fidel was getting a job with MSO."  Do you

25   remember telling Mr. Amolsch and this jury that a few minutes

1    ago?

2    **A.**    Yes.

3    **Q.**    Okay.  And you said that you expressed to Barry Atwood a

4    concern about a conflict of interest.

5    Do you remember that?

6    **A.**    Yes.

7    **Q.**    And to -- to find him another job?

8    **A.**    Yes.

9    **Q.**    Okay.  So I would like you to please turn to Government's

10   Exhibit 525, and it's going to be Page 100 in the bottom left

11   corner or 2314 up on the right-hand side.

12   **A.**    I'm sorry.  You said -- what was that number again?

13   **Q.**    It's Page 100 in the bottom left in the small font, and

14   up in the top right-hand corner 2314.  So when you're there, and

15   you have a chance to look at it, I'm going to ask you a question

16   or two, okay?

17   **A.**    Sure.  Yes, I see it.

18   **Q.**    So Mr. Lumho you recognize that as prior testimony you've

19   given in another hearing.

20   Do you remember that?

21   **A.**    Yes.

22   **Q.**    And it was under oath, correct?

23   **A.**    Yes.

24   **Q.**    And it was in 2018, correct?

25   **A.**    Um, yes.

1    Q.    Okay.  And do you remember you were being asked questions

2    by Mr. Amolsch, and he said, "Okay.  Question:  How did it come

3    to be if you know that he ended up with MSO."  And your answer:

4    "So when this was going on with Fidel I had a conversation with

5    Barry Atwood.  Barry Atwood and I were at lunch, and Barry was

6    upset about having to go run and pick up Bill from the airport.

7    His daughter, I think, Barry's daughter had a volleyball game

8    and he was upset that he had to go pick her up."

9         And then Mr. Amolsch says, "I ask you to slow down again

10   and lean forward."  And you said, "Sure."  "Barry was upset that

11   he was having to go pick up Bill at the airport."  And you --

12   and that was your response.  And Mr. Amolsch said, "Okay."  And

13   then you said again, "And that he was having to constantly run

14   errands for Bill."  And Mr. Amolsch said, "Okay."  And then you

15   responded, "And through that conversation Barry expressed that

16   they needed somebody that can do those little types of things

17   for Bill to run around and do stuff."  And he said, "Okay."

18   Do you remember --

19   A.    I do remember that --

20   Q.    -- that testimony?

21   A.    Yes.

22   Q.    So that testimony was about Fidel doing things for

23   Bill Wilson, wasn't it?

24   A.    That was another conversation, yes.

25   Q.    Okay.

1    **A.**    But --

2    **Q.**    That was my question.

3    **A.**    Sorry.

4    **Q.**    Let's talk a little bit more about Fidel and that -- that

5    job.

6         MR. CARLBERG:  If we could go to Government's 938,

7    please.

8    BY MR. CARLBERG:

9    **Q.**    I'm going to show you Government's 938.

10        Now, this is a payroll form with Fidel's information on

11   it, is it not?

12   **A.**    I believe so, yes.

13   **Q.**    And he can't fill that out himself, can he?

14   **A.**    Can't -- that's -- no.

15   **Q.**    So somebody provided this information to go to

16   Reva Sue Wilson, MSO's payroll person, correct?

17   **A.**    I don't have any knowledge of this document, so --

18   **Q.**    Well.  Let's go to the second page.  Do you see there

19   where it has Fidel's signature?

20   **A.**    Yes, I do.

21   **Q.**    And then it says, "Hourly pay, $10 per hour biweekly."

22   Do you see that?

23   **A.**    Yes.

24   **Q.**    And do you see where it says, "Job description,

25   secretary/assistant"?

1   **A.**     Yes, on the left.

2   **Q.**     Mr. Ramos wasn't capable of being a secretary was he?

3   In terms of his education level?

4   **A.**     I wouldn't think so, no.

5   **Q.**     Now, sir, your father-in-law, Mr. Ramos has never met

6   Bill Wilson, has he?

7          MR. AMOLSCH:  Objection, calls for speculation?

8          THE COURT:  His knowledge.

9   BY MR. CARLBERG:

10  **Q.**     To your knowledge has he ever met Bill Wilson?

11  **A.**     Not that I'm aware of, no.

12  **Q.**     At that time, 2011, 2012?

13  **A.**     Not that I'm aware of, no.

14         MR. CARLBERG:  Now, let's go to Government 644, please.

15  BY MR. CARLBERG:

16  **Q.**     You testified on direct about checks coming from

17  FrankCrum.

18  Do you remember that?

19  **A.**     Yes.

20  **Q.**     And they came to your house, right?

21  **A.**     They did, yes.

22  **Q.**     And they were mailed there?

23  **A.**     Correct.

24  **Q.**     Basically, every -- every two weeks?

25  **A.**     I don't recall the frequency but they came, yes.

1    **Q.**    Well, if he was paid bi-weekly and we have a lot of

2    checks, probably every two weeks.

3    Would that be fair to say?

4    **A.**    Yes.

5    **Q.**    Okay.  So your -- your testimony is that sometimes you

6    signed some of them and sometimes Fidel signed the backs of

7    others; is that fair to say?

8    **A.**    Yes.

9    **Q.**    Okay.  So when you open the mail and you have the check

10   and you're looking at it --

11        MR. CARLBERG:  Ms. Sandvig could you blow-up this portion

12   here, this upper left-hand portion.  And can we highlight this

13   portion here.

14   BY MR. CARLBERG:

15   **Q.**    Mr. Lumho, what does that say on the face of the payroll

16   check for your father-in-law?

17   **A.**    That says, "411104MSO Tech, Inc."

18   **Q.**    And those came to your house every couple weeks?

19   **A.**    Yes.

20   **Q.**    And you signed some of them?

21   **A.**    I did, yes.

22   **Q.**    And your testimony is you never had an idea that he was

23   working for MSO Tech?

24   **A.**    Correct.

25   **Q.**    And you never saw that MSO Tech for all of those months

201

1   that entire time?

2   **A.**    I didn't pay -- I -- honestly, Mr. Sandberg, I didn't pay

3   attention to it.

4   **Q.**    Carlberg.  Sorry.

5   **A.**    I'm sorry.

6   **Q.**    It's okay.

7   **A.**    Carlberg.  I'm sorry.

8   **Q.**    That's all right.

9   **A.**    I apologize.

10  **Q.**    It's okay.  So you also testified you had access to

11  Mr. Ramos's bank account; is that correct?

12  **A.**    I did.  Yes.

13  **Q.**    And you actually personally deposited a number of those

14  checks at the local branch; is that right?

15  **A.**    Yes.

16  **Q.**    I want to talk a little bit about the Government

17  Exhibit 174.

18        MR. CARLBERG:  Could we please go to that.

19  BY MR. CARLBERG:

20  **Q.**    We've seen this e-mail before.

21  **A.**    Yes.

22  **Q.**    So this is your e-mail to Timothy Donelson on May 23rd,

23  2012.

24  Do you see that?

25  **A.**    Yes, I do.

1   **Q.**     And you testified on direct that there was -- you were

2   pushing back on the cost that MSO Tech was -- or Level 3 was

3   charging for some contractors; is that right?

4   **A.**     Yes.

5   **Q.**     Okay.  And then apropos this discussion, and, in fact,

6   attached to this e-mail right in the back, if we go to the last

7   page, was a service order with a bunch of positions that were

8   sent to you; is that correct?

9   **A.**     Yes.

10  **Q.**     Okay.  So this discussion is in the context of an

11  official service order that Level 3 is asking you to sign,

12  right?

13  **A.**     Um, yes.  Yes.

14  **Q.**     So in the context of your role and your official action

15  as a government official?

16  **A.**     To sign --

17  **Q.**     The service form.

18  **A.**     Yes.  They are sending it back for me to review and sign,

19  yes.

20  **Q.**     Review and sign.  Correct.  So this e-mail conversation

21  is in the context of your reviewing and potentially signing this

22  service order, correct?

23  **A.**     Yes.

24  **Q.**     Okay.  So in the middle of this discussion you volunteer,

25  correct, "Ron's whole seven day Disney cruise vacation with his

1    family including his extended family costs less that this"

2    Exclamation point.

3    Do you see that?

4    **A.**    Yes, I do.

5    **Q.**    And your testimony on direct was that Ron had described

6    this Disney cruise and had recommended that you take one, too,

7    right?

8    **A.**    He had recommended that I go on a Disney cruise, yes.

9    **Q.**    Paid for by a mutual friend, Bill Wilson?

10   **A.**    No.

11   **Q.**    He didn't mention that part?

12   **A.**    No.

13   **Q.**    Okay.  So apropos of this official service order, you

14   volunteered, you know something about Ron's Disney cruise

15   vacation and its cost, correct?

16   **A.**    Correct.

17   **Q.**    To Timothy Donelson, correct?

18   **A.**    Yes.

19   **Q.**    And then you mentioned the next paragraph right down

20   below apropos of I don't know what, "I'm going Hawaii and

21   staying at the Hawaiian -- Hilton Hawaiian Village for two

22   weeks, staying in a two bedroom suite and the total cost with

23   airfare is 14K and that is for six adults" Exclamation point.

24   "Granted, food isn't in the cost but using Level 3 figures it

25   should cost 132K."

1    Do you see that?

2    **A.**    Yes.

3    **Q.**    So immediately after you reference Ron Capallia's

4    vacation that we know now was paid for by Bill Wilson, you

5    reference your own vacation plans, correct?

6    **A.**    Yes.

7    **Q.**    Okay.  And then down be- -- next, you go on and

8    talk about -- in fact, you mentioned on direct how WITS was this

9    great vehicle for purchasing things and getting services

10   quickly, right?

11   **A.**    Correct.

12   **Q.**    Okay.  Then you this mention, "I'm getting really beat up

13   bad lately due to hardware taking forever to get purchased.

14   When I say forever, I mean months.  I can't even get a quote for

15   hardware within two weeks."  Right.  You wrote that to

16   Tim Donelson?

17   **A.**    Yes.

18   **Q.**    And then below that you stated, "My customers and

19   co-workers are quickly losing their confidence in my ability to

20   get what they need in a timely manner.  What use to take a

21   matter of weeks is now taking months.  Everyone is just about

22   done with me and WITS."  You stated that, too, didn't you?

23   **A.**    Yes, I did.

24   **Q.**    And you had the power to sign or not sign that service

25   order that was sent to you, didn't you?

1    **A.**    Yes.

2    **Q.**    You were the DAR, right?  The Designated Agency

3    Representative?

4    **A.**    I was one of them.  Yes.

5    **Q.**    You were the DAR this e-mail was addressed to and this

6    service order was addressed to?

7    **A.**    Yes.

8    **Q.**    Okay.  Now, let's see what happens next.

9         MR. CARLBERG:  Can we go back out real quickly before we

10   lose this exhibit, Ms. Sandvig.  Up above just highlight the top

11   part.

12   BY MR. CARLBERG:

13   **Q.**    Tim Donelson at Level 3 then forwards this to

14   Bill Wilson, and he says, "We need to talk immediately."

15   Do you see that?

16   **A.**    Yes.

17   **Q.**    Okay.

18        MR. CARLBERG:  Now, can we go to Government's 942.

19   BY MR. CARLBERG:

20   **Q.**    So this is in evidence, and it's a payroll increase form

21   for your father-in-law, Fidel, correct?

22   **A.**    It would appear so, yes.

23   **Q.**    Yes.  And the effective date that's stated down below is

24   June 15th, 2012, correct?

25   **A.**    Yes.

1    **Q.**     And it says, "This pay period," right?

2    **A.**     Yes.

3    **Q.**     Now, and it has above, "Fidel Ramos, Jr., Client name MSO

4    Tech, Inc."

5    You see that, right?

6    **A.**     Yes.

7    **Q.**     And then you see that the pay rate goes from $10 to $50

8    right after you sent that e-mail; isn't that right?

9    **A.**     Was that from the pay- -- can we go back and look at the

10   dates.  I wasn't following the dates.  I was looking at the

11   other things.

12          MR. CARLBERG:  Can we go back to the 174 real quick and

13   put them side-by-side?  Thank you.

14   BY MR. CARLBERG:

15   **Q.**     Your e-mailed to Tim Donelson, in which you mention

16   you're going to Hawaii and your knowledge of Ron Capallia's trip

17   was dated May 23rd, correct?

18   **A.**     Correct.

19   **Q.**     Okay.  And then we go forward and a couple weeks later on

20   942, his payroll for a non-existent job because he never showed

21   up, right?

22   **A.**     Not that --

23   **Q.**     He never worked there?

24   **A.**     -- I know of.  Not that I'm aware of.

25   **Q.**     Right.  It goes from $10 to $50, right?

1  **A.**    Yes.  What was the date of the -- there's not a date on

2  that blown-up part.

3  **Q.**    There's a fax date of June 15th across the top?

4  **A.**    Okay.  Correct.

5  **Q.**    And there's an effective date here.

6  Do you see that?

7  **A.**    So, yeah.  May 23rd I send the e-mail and June 15th the

8  fax was sent with this change.

9  **Q.**    Correct.

10 **A.**    Correct.

11 **Q.**    That's what it looks like to me, right?

12 **A.**    Yes.

13 **Q.**    Fair enough?

14 **A.**    Yeah.

15 **Q.**    Mr. Lumho, how many times have you had your pay

16 quintupled in one pay period?

17 **A.**    I don't remember that ever happening.

18 **Q.**    That would be pretty memorable, wouldn't it?

19 **A.**    Quintupled, yes.  That would be memorable.

20 **Q.**    500 percent?

21 **A.**    Sure.

22 **Q.**    Pretty memorable day.  I would remember it, too.  Now --

23         MR. SALVATO:  Your Honor, I have to object to that last

24 statement, just ask to strike it.

25         THE COURT:  Yeah.  Just ask questions and no commenting.

1          MR. CARLBERG:  I'm sorry.

2          THE COURT:  Not to say that Mr. Amolsch hasn't been doing

3     the same thing for a while now.  But let's try and keep it to a

4     minimum, please.

5          MR. CARLBERG:  Certainly, absolutely.

6     BY MR. CARLBERG:

7     **Q.**    Now, as far as you know, nothing about Fidel's lack of a

8     job changed in this time period, right?  He was still at home?

9     **A.**    I mean, I have no idea.  I was not at home.  I was

10    working.

11    **Q.**    Okay.  So let's see what happened with the money.

12         MR. CARLBERG:  Could we go to Government 961, Page 39,

13    please.

14    BY MR. CARLBERG:

15    **Q.**    This is a Navy Federal Credit Union statement for

16    Fidel Ramos.

17         MR. CARLBERG:  Page 39, sorry.

18    BY MR. CARLBERG:

19    **Q.**    So you see that check, don't you?

20    **A.**    Yes.

21    **Q.**    Lumho.  And Mr. Lumho, that's deposited -- do you see the

22    date of the deposit?

23    **A.**    7-9.  Yes.

24    **Q.**    Okay.  And what's the amount of the check?

25    **A.**    6,580 signed by Fidel.

1    Q.    Right.  And on the left-hand side it says again for MSO

2    Tech.

3    Do you see that?

4    A.    Above -- or below the big FrankCrum, yes.

5    Q.    Correct.

6    A.    Yes.

7    Q.    Okay.  And then right after that --

8          MR. CARLBERG:  We go to the next page, Ms. Sandvig.

9    BY MR. CARLBERG:

10   Q.    There were a bunch of expenditures in Hawaii; is that

11   correct?

12   A.    That is correct, yes.  After reviewing this document,

13   yes.

14         MR. CARLBERG:  If we could go Ms. Sandvig to page -- I'm

15   sorry, I said next page, 42.

16   BY MR. CARLBERG:

17   Q.    Do you see ATM withdrawal beginning on the 16th of July

18   in Honolulu?

19   A.    Yes.

20   Q.    Okay.  For $202?

21   A.    Yes.

22   Q.    Yes.  And then a debit charge at Pearl Harbor for $217.

23   Do you see that?

24   A.    Correct.

25   Q.    If we go to the next page, you see here -- I won't go

1    through them all, but a bunch of charges at the Grand Waikiki

2    Honolulu in the amounts of 2 and $300.  Do you see that?

3    **A.**     I do, yes.

4    **Q.**     In July, throughout July really?

5    **A.**     Yes.

6    **Q.**     And Tesoro.  That's a gas station, right?  In Honolulu?

7    **A.**     I believe so, yes.

8    **Q.**     For $56?

9    **A.**     Oh, yes.  On the bottom, yes.

10   **Q.**     And then it looks like on -- do you see July 30th there's

11   a deposit of another $6,580 there.

12   Do you see that?

13   **A.**     On July 30th, yes.

14   **Q.**     And that's a deposit in Fairfax Station.  So that must

15   have been right after you got back from Hawaii; is that fair to

16   say?

17   **A.**     Um, yes.

18   **Q.**     Okay.  So let's look at that check, how it comes in.

19       MR. CARLBERG:  So could we blow up the -- I'm sorry,

20   that's Page 45, Ms. Sandvig.  Can you blow up the --

21   BY MR. CARLBERG:

22   **Q.**     So Mr. Lumho, the amount of this check is $6,580.74; is

23   that correct?

24   **A.**     Yes, it is.

25   **Q.**     And again on the face below the big FrankCrum it says,

1    "For MSO Tech, Inc.," right?

2    **A.**    I see that now, yes.

3    **Q.**    And you actually signed this check.

4    Did you not?

5    **A.**    That is my signature, yes.

6    **Q.**    Yes.  And you deposited that.

7    Did you not?

8    **A.**    I -- I'm not sure if I deposited it myself or not, but it

9    was deposited.

10   **Q.**    But you got the check.  You had it in front of you?

11   **A.**    I signed it, yes.  That's my signature.

12   **Q.**    You turned it over and signed it, right?

13   **A.**    That's how you sign it, yes.

14   **Q.**    Okay.  And then it was deposited, correct?

15   **A.**    It was deposited, yes.

16       MR. CARLBERG:  Could we go to Government's Page 46,

17   please.  46.

18   BY MR. CARLBERG:

19   **Q.**    Now, after that was deposited, do you see on August 2nd a

20   transaction there paid to Barclay card $7,000.

21   Do you see that credit out?

22   **A.**    I do, yes.

23   **Q.**    Okay.

24       MR. CARLBERG:  Now, let's go next to Government's Exhibit

25   910, please?

1    BY MR. CARLBERG:

2    Q.    This, Mr. Lumho, is your statement for U.S. Airway miles

3    through Barclay's Bank; is that correct?

4    A.    That is, yes.

5          MR. CARLBERG:  And if we go to Page 4 of this exhibit,

6    and we highlight the middle portion that says, "Activity for

7    Matthew Lumho."

8    BY MR. CARLBERG:

9    Q.    Mr. Lumho, do you see on August 1st top line --

10         MR. CARLBERG:  Ms. Sandvig could you highlight the top,

11   the $7,000, and then this line as well.

12   BY MR. CARLBERG:

13   Q.    So Mr. Lumho, this is $7,000 of money from that check,

14   that FrankCrum check for MSO Tech that went into the Fidel

15   account and then directly to your Barclay card; is that correct?

16   A.    That is, yes.

17   Q.    Okay.  And then you paid off most of the balance there,

18   and you can see the activity below.  Do you see that other

19   highlighted activity, July 24th, 25 posting date for $2,114 for

20   Hertz rental car?

21   A.    Yes.

22   Q.    And that was for a rental car in -- it says Waikiki.  So

23   that's Honolulu, right?

24   A.    Yes.

25   Q.    Yeah.

1          MR. CARLBERG:  And just show 1101 real briefly.

2     BY MR. CARLBERG:

3     **Q.**     Mr. Lumho, you're aware this was the Outlook file on your

4     computer that was recovered; is that correct?

5     **A.**     Yes.  That's from my Blackberry.  Actually, yes.

6     **Q.**     Right.  And that has Mr. Ramos' bank account access

7     information for that Navy Federal Credit Union account?

8     **A.**     His tax information, his -- yes.  His Navy Federal, yes.

9     **Q.**     So that's how you would remember to -- if you needed to

10    remember how to log in, you would look at this; is that right?

11    **A.**     Correct, yes.

12    **Q.**     Okay.  I'm not going belabor the point by going through

13    all of these in great detail, but you'll remember that the --

14    the court record for Mr. Ramos's DUI, that listed MSO Tech as an

15    employer.

16    Do you remember that?

17    **A.**     Yes.  I -- yes.

18    **Q.**     You said you weren't there, but you remember that that

19    wound up on the --

20    **A.**     That was on there -- his, yes.

21    **Q.**     Not FrankCrum, but MSO Tech?

22    **A.**     Correct.  Yes.

23    **Q.**     And the same thing for the employment application for the

24    Catholic Arch Diocese in Arlington?

25    **A.**     Yes.  MSO Tech, correct.

1    **Q.**    Thank you.

2           MR. CARLBERG:  One moment please.  Court's indulgence.

3    BY MR. CARLBERG:

4    **Q.**    So Mr. Lumho, I want to talk a little bit about some of

5    the forms you signed when you were a government employee, some

6    of the ones we've seen here already, okay.

7    **A.**    Sure.

8           MR. CARLBERG:  I apologize.  I'm going to get a sip of

9    water if I can.

10          Can we look at Government's 231, please, Ms. Sandvig.

11   BY MR. CARLBERG:

12   **Q.**    So Mr. Lumho, this is the DAR appointment form appointing

13   you as a DAR for the WITS3 contract.

14   Do you see that?

15   **A.**    Yes, I do.

16   **Q.**    Okay.  And you see your signature down there, right?

17   **A.**    I do, yes.

18   **Q.**    Okay.  And you signed this, correct?

19   **A.**    I did.

20   **Q.**    Okay.  Let's take a look at a few things it says.

21          MR. CARLBERG:  Ms. Sandvig -- it might be a little hard

22   to highlight this, but can you blow up this second paragraph

23   here.

24   BY MR. CARLBERG:

25   **Q.**    So do you see where it says, "As a DAR for your

1    organization, you are responsible to the agency you represent"?

2    **A.**     Yes.

3    **Q.**     And "In accordance with the WITS3 contract your agency

4    policies and procedures, the federal acquisition regulation, and

5    applicable anti-deficiency laws."

6    You see that, right?

7    **A.**     I do, yes.

8    **Q.**     And it says, "You can cannot delegate this responsibility

9    to others," correct?

10    **A.**     Yes.

11    **Q.**     And it says, "The appointment does not include the right

12    to modify the contract."

13    Do you see that?

14    **A.**     Yes.

15    **Q.**     "Or any of its terms or conditions as only the GSA

16    contracting officer may make contract modifications."

17    You see that, right?

18    **A.**     Yes, sir.

19    **Q.**     And do you see where it says, "If you have any questions

20    related to your roles and responsibilities as outlined in this

21    letter, please contact the DTS-W customer care service center at

22    703-697-2193."

23    You see that, right?

24    **A.**     Yes, I do.

25    **Q.**     So it does not say, "Contact Matthew Steiniger," right?

1   **A.**      No, it does not.

2   **Q.**      Okay.  And it also says, "You may not delegate your

3   authorities to anybody else."  Right?

4   **A.**      Yes.

5   **Q.**      Okay.  And at this time Matthew Steiniger was not a DAR

6   was he?

7   **A.**      I don't think -- No, he was not, at 2011.

8   **Q.**      Now, he was not a DAR in 2011 or 2012, right?

9   **A.**      Correct.  Yes.  He was not a DAR during this timeframe.

10  **Q.**      Right.  But you were?

11  **A.**      I was starting in March of 2011.

12  **Q.**      Okay.  And further down below it says in the bullet

13  point --

14          MR. CARLBERG:  Can we blow up the bullet point box there

15  and maybe the sentence that introduces it.  Sorry, Ms. Sandvig.

16  BY MR. CARLBERG:

17  **Q.**      It says, "Consider the following in carrying out your

18  responsibilities as a DAR:"

19  You see that, right?

20  **A.**      Yeah.  It says, "considering the following?"

21  **Q.**      Right.

22  **A.**      Yes.

23  **Q.**      The first bullet is:  "Be familiar with the terms and

24  conditions of the referenced contract."  Right?

25  **A.**      Yes.

1    Q.    And if we go down to the third one it says:  "Verify that

2    the service order requirements are consistent with the scope of

3    the fair opportunity decision number referenced in the service

4    order."  Right?

5    A.    Yes.

6    Q.    Okay.  And then the last bullet point:  "Comply with all

7    appropriate agency standards of conduct."

8    A.    Yes.

9    Q.    You see that, right?

10   A.    Yes, I do.

11   Q.    Okay.  And then it says, "Promptly notify" the same phone

12   number and service center, "should you no longer be able to

13   perform the functions."  Right?

14   Do you see that?

15   A.    Yes, I do.

16   Q.    Okay.  And then down below it says --

17        MR. CARLBERG:  Yeah, that's good enough.

18   BY MR. CARLBERG:

19   Q.    "Your signature below certifies that you accept and

20   understand the responsibilities and limitations contained

21   herein."

22   Do you see that?

23   A.    Yes, I do.

24   Q.    And you -- you -- you knowingly signed that, didn't you?

25   A.    I did, yes.

1    **Q.**    Um, I want to talk briefly about the ethics training you

2    received.

3          MR. CARLBERG:  Could we go to Government's 232, first

4    slide.

5    BY MR. CARLBERG:

6    **Q.**    Do you remember Keith Williams testifying about this --

7    this exhibit?

8    **A.**    I do, yes.

9    **Q.**    And you, as a -- as an Inspector General's employee

10   received this annual ethics training; is that correct?

11   **A.**    Yes, I did.

12   **Q.**    Okay.  And so you received this 2011 annual ethics

13   training as well, correct?

14   **A.**    I'm sure I did.  Yes.

15   **Q.**    Okay.

16         MR. CARLBERG:  And if we could go, Ms. Sandvig, to

17   Page 27, please.

18   BY MR. CARLBERG:

19   **Q.**    Do you see that, Mr. Lumho where it says, "Rule:  You may

20   not solicit, accept, or coerce the offering, directly or

21   indirectly, a gift, either from any prohibited source or given

22   based on your official position."

23   Do you see that?

24   **A.**    I do, yes.

25   **Q.**    Okay.  So you were informed of that, correct?

1    **A.**    I was.

2    **Q.**    And then below, the next slide 28, it says, "Gifts from

3    prohibited sources," and it says, "A prohibited source means any

4    person who or entity which seeks official action by the

5    Department of Defense."  Basically, OSD, correct?

6    **A.**    Yes.

7    **Q.**    "Or does or seeks to do business with the office of the

8    Secretary of Defense."  Correct?

9    **A.**    Correct.

10   **Q.**    And we can agree that Level 3 was doing business with the

11   Department of Defense, correct?

12   **A.**    They were, yes.

13   **Q.**    And they were subcontracting with MSO Tech, correct?

14   **A.**    They were -- yes.  They were subcontracting --

15   **Q.**    -- So MSO Tech had people in --

16          THE COURT REPORTER:  I'm sorry.

17   BY MR. CARLBERG:

18   **Q.**    Go ahead.  Sorry.

19   **A.**    Yes.  I answered yes.

20   **Q.**    Okay.  And you knew that MSO Tech had people inside the

21   Department of Defense, Office of Inspector General?

22   **A.**    I did, yes.

23   **Q.**    Okay.  Then next page defines a gift, Page 29.  And it

24   says here correct, "Anything of value?"

25   Do you see that?

1    **A.**    Yes, I do.

2    **Q.**    And that includes, "Cash, tangible items, services,

3    travel, so forth."

4    Do you see that?

5    **A.**    I do.

6    **Q.**    Okay.  And Mr. Lumho, can we go to the last slide --

7          MR. CARLBERG:    Page 30, please, Ms. Sandvig.

8    BY MR. CARLBERG:

9    **Q.**    And it talks about, "Indirect gifts include items given

10   to a parent, spouse, sibling, child, dependent relative because

11   of that person's relationship with you."  Correct?

12   **A.**    Yes.

13   **Q.**    "Or any other person including a charity, based on your

14   designation."

15   Do you see that?

16   **A.**    Yes.

17   **Q.**    Okay.  And I want to go now to Government's 234.  We'll

18   come back to this minute a little bit later, Mr. Lumho.  But you

19   remember you talked about this technical evaluation, with AIS

20   right?

21   **A.**    Yes.

22   **Q.**    And you claimed at the time that you knew MSO Tech was

23   involved with AIS in this -- in this -- presenting this bid; is

24   that right?

25   **A.**    Correct.

1   **Q.**    And at that same time, your father, those checks from

2   FrankCrum for MSO were coming to your house; isn't that correct?

3   **A.**    The ones from FrankCrum, yes.

4   **Q.**    Yes.  With -- with the notation, "For MSO Tech?"

5   **A.**    Again, at that time I didn't know they were from MSO.

6   **Q.**    But they're on the face of the check, right?

7   **A.**    They are on the face of the check but again, I didn't --

8   **Q.**    I understand.

9   **A.**    Yeah.

10  **Q.**    So in this letter, Mr. Lumho --

11      MR. CARLBERG:  If we can do the second page,

12  Ms. Sandvig -- actually let's go to the third page.  Sorry.

13  BY MR. CARLBERG:

14  **Q.**    The two paragraphs above your signature, you

15  electronically signed this on June 26th, 2012; is that correct?

16  **A.**    Yes, sir.

17  **Q.**    Okay.  And above your signature, it states first -- "To

18  the best of my knowledge, neither I nor any member of my family

19  has any direct financial or employment interest in any of the

20  firms submitting quotes for consideration and evaluation, which

21  conflicts substantially or appears to conflict substantially

22  with my duties as a member of the evaluation board."

23  Do you see that?

24  **A.**    I do, yes.

25  **Q.**    And it says, "In the event I later become aware of such

1    conflict of interest, I agree to disqualify myself and report

2    this fact to the contracting officer of the board and to abide

3    by any instructions which he/she may give me this matter."

4    Correct?

5    **A.**    Yes.

6    **Q.**    And you made no such notification to the board; is that

7    correct?

8    **A.**    I'm going to answer what I answered before, which is, "I

9    didn't know that MSO was involved in this job."

10   **Q.**    My -- my question was:  You made no notification for

11   this?

12   **A.**    I did not, no.  No, I did not make any.

13        MR. CARLBERG:  Court's indulgence for just one moment,

14   please.

15        THE COURT:  Yes, sir.

16   BY MR. CARLBERG:

17   **Q.**    Mr. Lumho, do you remember the prior testimony that we

18   went through at the top of this cross-examination?

19   **A.**    Yes.

20   **Q.**    And do you remember when I read you -- in the interest of

21   time I'm not going to pull it back up, but do you remember when

22   I read to you the conversation that you recounted with

23   Barry Atwood?

24   **A.**    Yes.  I -- Yes.

25   **Q.**    And about driving Bill Wilson around.  Fidel would be

1    driving Bill Wilson around, right?

2    **A.**     Correct, yes.

3    **Q.**     So Mr. Lumho, I want to talk a little bit about WITS.

4          MR. CARLBERG:  If we go to Government's 157, please.  And

5    could we go to the bottom of Page 1 here and highlight that?

6    Sorry.

7    BY MR. CARLBERG:

8    **Q.**     This is a November 4th, 2011 e-mail from you to

9    Ron Capallia regarding OIG WITS3 project manager task order.

10   Do you see that?

11   **A.**     Yes, I do.

12   **Q.**     Okay.  And do you see where you wrote to Mr. Capallia,

13   "Hey, can you remove Tommy's name and put mine on the orders and

14   all future orders."

15   Do you see that?

16   **A.**     I do, yes.

17   **Q.**     Okay.  And then do you see up above at the top where

18   Ron Capallia responds, "Hey, Bill told me they found a person

19   for this.  Are you ready to sign the order?"

20   Do you see that?

21   **A.**     I do, yes.

22   **Q.**     So Mr. Lumho, that's you telling Ron Capallia that you'll

23   handle future service orders for WITS?

24   **A.**     I -- yeah.  I had him change the name on the WITS order,

25   correct.

1    **Q.**    To include your name, right?

2    **A.**    To include my name, yes.  Which he didn't do, by the way.

3    **Q.**    But your name appears on a lot of them; is that fair to

4    say?

5    **A.**    Not all of them.  That's fair to say, too.

6    **Q.**    Yes, but quite a few, right?

7    **A.**    Fair to say.

8    **Q.**    Okay.

9    **A.**    Thank you.

10    **Q.**    And most of the ones charging in the indictment probably,

11    right?

12    **A.**    Yes, except for one.

13    **Q.**    Okay.  So let's go to 158.  And here on November 7th, is

14    it's fair to say that you've -- this is the e-mail exchange

15    about the fishing trip.

16    Do you remember that?

17    **A.**    Yes, I do.

18    **Q.**    And it's you talking to Tim Donelson and Tim Donelson

19    saying at the top, "I haven't talked to Bill yet, but I'll call

20    him tomorrow.  Do I need to bring a fishing pole, hooks, and

21    some worms, or does the guide service have that covered?"

22    Do you see that?

23    **A.**    I do, yes.

24    **Q.**    And then you did go on the fishing trip with, um --

25           MR. CARLBERG:  If we can go to Government's 159, please,

1    Page 6.

2    BY MR. CARLBERG:

3    **Q.**    You -- you did go on the fishing trip, correct?  With

4    Barry Atwood, Bill Wilson, and Tim Donelson around November 10th

5    of 2011; is that right?

6    **A.**    Um, I believe it was that timeframe, yes.

7    **Q.**    Yeah --

8    **A.**    Based on that last e-mail, yes.

9    **Q.**    Correct.  And the receipt for the Chesapeake Beach,

10   Maryland, Traders Seafood.

11   Do you see that?

12   **A.**    Yes, I do.

13   **Q.**    And that November -- you recall eating there?

14   **A.**    I recall eating there and everybody paying for their own

15   food, yes.

16   **Q.**    Sure.  But you were there with Barry Atwood, correct?

17   **A.**    Barry was there, yes.

18   **Q.**    And Bill Wilson, correct?

19   **A.**    And Tim Donelson and Bill Wilson.

20   **Q.**    And Tim Donelson, right?

21   **A.**    Correct.

22   **Q.**    Okay.  And then, with the assistance of the courtroom

23   security officer, I'm going to hand you up a new --

24        MR. CARLBERG:  I need an exhibit tag for this,

25   Ms. Sandvig.  I don't think I have one.

```
 1              (Discussion held off the record between Counsel.)

 2              MR. CARLBERG:  One up to the Court, too.  Sorry.

 3         I'll mark this as 1564.  We'll mark it as 1564.

 4              (Government's Exhibit 1564 marked.)

 5    BY MR. CARLBERG:

 6    Q.    Mr. Lumho, do you recognize that as an e-mail you sent to

 7    Mauricio Covarrubias and others at the DoD IG at the end of

 8    October of 2011?

 9    A.    I do, yes.

10    Q.    Okay.  Is it true and accurate?

11    A.    It is.

12    Q.    Okay.

13              MR. CARLBERG:  And if we can go ahead and move to admit

14    1564, please.

15              THE COURT:  Any objection?

16              MR. AMOLSCH:  No objection.

17              THE COURT:  Received.

18              (Government's Exhibit 1564 admitted into the record.)

19    BY MR. CARLBERG:

20    Q.    Now, this is -- Mr. Lumho, this is before Fidel went on

21    the payroll of MSO Tech, right?  This is end of October, 2011,

22    right?

23    A.    Correct.

24    Q.    Okay.  And the first -- let me go over here, Government's

25    1564.
```

1        And in this e-mail to your colleagues the DoD IG, you

2   write, "Attached is the equipment and cost.  WITS, Washington

3   Interagency Telecommunications Services, primary use is for

4   ordering telecommunication services, which is my job.  Period."

5   Did you write that?

6   **A.**     I did, yes.

7   **Q.**     As it says in the title, "Period."  Correct?

8   **A.**     Correct.

9   **Q.**     "Thanks.  How is the protest going?"

10  **A.**     Correct.

11  **Q.**     And then you attached a service order that you signed.

12  Do you see that?

13  **A.**     Um.  I don't --

14  **Q.**     -- actually, it's not a service order, my apologies.

15  What is -- it's Summary of Materials; is that right?

16  **A.**     Yes.  I don't recall this.  But, yes.  Yes.

17  **Q.**     Okay.  So letting people know that you are -- you

18  understood WITS was for telecommunication services and ordering

19  was your job?

20  **A.**     Yes.  That was a snarky e-mail to Willie and I -- we were

21  bantering back and forth, yeah.

22  **Q.**     I understand.

23        MR. CARLBERG:  Court's indulgence, please.

24  BY MR. CARLBERG:

25  **Q.**     Could we -- I want to talk a little bit about the BRAC

1    move and some events after that.  Okay.  And I'll try to move

2    somewhat expeditiously through this.

3    **A.**    Sure.

4        MR. CARLBERG:  So could we pull up Government's 161,

5    please?

6    BY MR. CARLBERG:

7    **Q.**    So 161 appears to be an e-mail, right, from Ron Capallia

8    to you where he says, "Attached is the task order and Statement

9    of Work for 400 Army Navy Drive clean-out."

10   Do you see that?

11   **A.**    Yes, I do.

12   **Q.**    It's not addressed to Matt Steiniger, is it?

13   **A.**    No, it's not.

14   **Q.**    And it's not addressed to Tommy Carlyle, correct?

15   **A.**    No, it is not.

16   **Q.**    And the Statement of Work --

17       MR. CARLBERG:  If we can go to Page 2, please.

18   BY MR. CARLBERG:

19   **Q.**    The Statement of Work is a couple pages, but effectively

20   it talks about -- do you see the second bullet point under

21   responsibilities of the OIG?

22   **A.**    Yes.

23   **Q.**    "OIG shall provide escort services into the facilities

24   for movers."

25   Do you see that?

1    **A.**    Yes.

2    **Q.**    And below that two bullets down, "OIG shall provide

3    specific locations of the storage sites, which each unit is to

4    be shipped prior to unracking."

5    Do you see that?

6    **A.**    Yes.

7    **Q.**    Okay.  So Mr. Lumho, you -- you -- you were the point of

8    contact for Ron Capallia on the restack on this particular

9    e-mail, correct?

10   **A.**    Yes, I was.

11   **Q.**    And he provided you with a Statement of Work to review?

12   **A.**    Yes.

13        MR. CARLBERG:  And then can we go to, Ms. Sandvig --

14        I'm sorry I misspoke and said restack.  Thank you Mr.

15   Amolsch.  The BRAC move.

16        THE WITNESS:  Yes.  I understood what you meant though.

17   I'm sorry, for the record.

18        MR. CARLBERG:  Yes.  Thank you.  Thank you for that.

19   BY MR. CARLBERG:

20   **Q.**    So that's the BRAC move, correct?

21   **A.**    Yes, sir.

22   **Q.**    Okay.  And then attached to this last page, that's a

23   service order that Ron Capallia sent to you; is that right?

24   **A.**    Yes, it is.

25   **Q.**    And it states, "Cable installer."  Correct?

1   **A.**      Yes.

2   **Q.**      Outside normal business day?

3   **A.**      Yes.

4   **Q.**      And then it says, "4,171 hours."  Correct?

5   **A.**      Correct.

6   **Q.**      At a cost per unit of $106, correct?

7   **A.**      Yes.

8   **Q.**      For a total of $442,501.39, correct?

9   **A.**      Yes.

10  **Q.**      And, sir, that description of work does not match the

11  Statement of Work, does it?

12  **A.**      No.  I would say it's inconsistent with what the

13  Statement of Work is.

14          MR. CARLBERG:  Okay.  You can take it down now.

15  BY MR. CARLBERG:

16  **Q.**      And 162, Mr. Lumho.  I know your counsel showed this to

17  you on direct, and, uh, this is the one where you comment in the

18  top --

19          MR. CARLBERG:  We can go to the top portion first,

20  Ms. Sandvig.

21  BY MR. CARLBERG:

22  **Q.**      This is the one where you commented you were, "TDY in

23  Korea this week and next.  What is going on?"

24  And you said, "This is much higher than I originally had

25  thought, significantly higher."  Correct?

1    **A.**    Yes.

2    **Q.**    Okay.

3          MR. CARLBERG:  And then if we can go down below to the --

4    I'm sorry.  I misspoke, Ms. Sandvig.  Saying down below, I mean

5    the bottom of the page.  I'm misleading you, so to the bottom of

6    that first page, please.  Yeah.  Sorry.

7    BY MR. CARLBERG:

8    **Q.**    And you tell Tommy Carlyle, "Please sign and send to me,

9    please."  Because you were in Korea, right?

10   **A.**    Correct, yes.

11   **Q.**    And Mr. Lumho you forwarded the signed service order,

12   signed by your subordinate, Tommy Carlyle, as part of this

13   chain.

14   Did you not?

15   **A.**    Yes.

16   **Q.**    Okay.

17          MR. CARLBERG:  So if we could go to the last page and

18   display that.

19   BY MR. CARLBERG:

20   **Q.**    And this is a -- in the middle it lists you as contact

21   number one, Kekoa Lumho, correct?

22   **A.**    Yes.

23   **Q.**    And contact number two, Tommy Carlyle.  And it's the

24   same, Cable installer 4,171 hours for $442,000.  And Tommy

25   Carlyle was your subordinate, right?

1  **A.**     He was, yes.

2  **Q.**     And he signed it after you sent him that e-mail?

3  **A.**     Yes.

4  **Q.**     And he -- you forwarded this to Level 3, correct?

5  **A.**     Yes.

6  **Q.**     Then -- and you knew Mr. -- so when you forwarded that

7  signed document, you knew that it was pretty high priced, didn't

8  you?

9  **A.**     I knew that it was a price that Matthew approved us to

10  use, yes.

11  **Q.**     Well, my question was you said it was "significantly

12  higher," correct?

13  **A.**     Correct, yes.

14  **Q.**     And so you knew it was high, right, high priced?

15  **A.**     I knew it was significantly higher than what we had

16  discussed before for the clean-out.

17  **Q.**     So you knew -- you had read the service order, correct?

18  **A.**     Yes.

19  **Q.**     And you knew what the price was, correct?

20  **A.**     Yes.

21  **Q.**     And you knew it was not for one -- four hundred -- 4,171

22  hours of cable installer work, right?

23  **A.**     I knew it was for the Statement of Work that was attached

24  to the service order request, yes.

25  **Q.**     Which did not match the service order, correct?

1    **A.**    Right.  It was incorrect, inconsistent.  Yes.

2    **Q.**    And this was the BRAC clean-out project that Donny Ravas

3    worked on, right?

4    **A.**    Yes.  And I know that now.  At the time I didn't know who

5    did the clean-out.  I just knew that it was done.

6    **Q.**    You know -- you were friends with Barry Atwood and

7    Donny Ravas.

8    Were you not?

9    **A.**    I was friends with Barry from work, yes.

10   **Q.**    And you came to know Donny Ravas, correct?

11   **A.**    I came to know Donny through Barry, yes.

12   **Q.**    In 2011, 2012.

13   **A.**    It was in two thousand --

14   **Q.**    Let me ask a better question.  I'm sorry, I'll be more

15   precise.  At least by 2012 you knew Donny Ravas, correct?

16   **A.**    It's hard to say when I met Donny.  I don't -- I don't

17   remember the timeframe.  I know I did meet Donny I'm just not --

18   I don't want to say it was 2011 or 2012.  It had to be 2012, but

19   I don't know if it was 2011 as well.

20   **Q.**    We'll get to him in a little bit.

21   **A.**    Okay.

22   **Q.**    Maybe it will get clearer?

23   **A.**    Okay.  Thank you.

24   **Q.**    And just in terms of time right after you sent this

25   e-mail to Ron Capallia with that service order that was signed

1    by your subordinate, that's right around the same time Fidel

2    started receiving checks at your house; isn't that right?

3    **A.**    Um, I don't know when Fidel -- if you could refresh my

4    memory of when Fidel started getting the checks.  I haven't tied

5    the two together, but if that's when the checks were then that's

6    when the checks started arriving.

7    **Q.**    Okay.

8         MR. CARLBERG:  If we could go to 164, please.

9    BY MR. CARLBERG:

10   **Q.**    Now, Mr. Lumho, I think your counsel showed you this one

11   on direct as well.

12        Do you see down below on the first page where you are

13   sent NIKSUN quotes?

14   Do you see that?

15   **A.**    I do, yes.

16   **Q.**    Okay.  And if we go back to Page 3, that's a quote from

17   another company, right?  OSI Federal Technologies?

18   **A.**    Yes.

19   **Q.**    And if we go to the very first page at the top, you

20   forwarded that internal quote information to Ron Capallia at

21   Level 3, correct?

22   **A.**    I did, yes.

23   **Q.**    And you copied Bill Wilson, correct?

24   **A.**    Yes, I did.

25   **Q.**    And that's in February of 2012, right?

1    **A.**      February 29th, yes.

2    **Q.**      So you knew this work was going to Level 3 and then down

3    to Bill Wilson's MSO Tech, right?

4    **A.**      I assumed that Ron was going to give it to MSO, yes.

5    **Q.**      Okay.  So as early as February 29th you knew Ron was

6    taking stuff to MSO Tech?

7    **A.**      I believe I knew before February 29th.

8    **Q.**      Okay.

9    **A.**      I believe I knew that during the -- I'm sorry.  There

10   wasn't a question asked.

11          MR. CARLBERG:  Court's indulgence.

12          MR. CARLBERG:  If we go to 167, please.

13   BY MR. CARLBERG:

14   **Q.**      So Mr. Lumho, this is an e-mail from Ron Capallia to you

15   saying, "See attached scope of work," right.

16   Do you see that on March 26th, 2012?

17   **A.**      Yes.

18   **Q.**      And that was the last part of the clean-out portion of

19   the BRAC; is that right?

20   **A.**      I believe that was the last part of the clean-out.  The

21   400 Army Navy Drive with Donny Ravas was part of the satellite

22   build- -- satellite offices of the three.

23   **Q.**      And then Page 2 of this exhibit, once again, "The scope

24   of work is attached for your review"; isn't that right?

25   **A.**      Yes.

1    **Q.**    And it talks about scope of work for additional IT

2    equipment relocation and disposing of equipment; is that fair to

3    say?

4    **A.**    Yes.

5    **Q.**    Okay.  And then page -- the next Page 3, I believe, is a

6    draft service order form for cable installer.

7    Do you see that?

8    **A.**    Yes, I do.

9    **Q.**    And for $80,097.95, right?

10   **A.**    Correct.

11   **Q.**    And that does not match the Statement of Work that you

12   reviewed, correct?

13   **A.**    Correct.

14   **Q.**    And on this e-mail --

15        MR. CARLBERG:  If you go back up to the top please of the

16   first page.

17   BY MR. CARLBERG:

18   **Q.**    There's no Matthew Steiniger on this e-mail, right?

19   **A.**    Not on the e-mail, no.

20   **Q.**    No.

21        MR. CARLBERG:  Ms. Sandvig, if you can go to 168, please.

22   Ms. Sandvig, thank you.

23   BY MR. CARLBERG:

24   **Q.**    Mr. Lumho, you see this as the next e-mail in the series

25   March 28th, 2012.  It's you sending that signed service order

1    form back to Ron Capallia, right?

2    **A.**     Correct.

3    **Q.**     Okay.  And we can go to Page 2, please.  That's your

4    signature on March 28th, 2012 for, cable installer, 755 hours

5    for over $80,000, correct?

6    **A.**     Yes.

7    **Q.**     And that work description that you signed does not match

8    the Statement of Work you reviewed in the previous e-mail, does

9    it?

10   **A.**     That's correct, right.

11   **Q.**     Okay.

12          MR. CARLBERG:  Back to the first page, Ms. Sandvig.

13   BY MR. CARLBERG:

14   **Q.**     There's no Matthew Steiniger on this e-mail, is there?

15   **A.**     No, there is not.

16   **Q.**     And you were the DAR at this point in time, right?

17   **A.**     Yes, I was.

18          MR. CARLBERG:  Can we go to -- one moment.  Can we go to

19   172, please.

20   BY MR. CARLBERG:

21   **Q.**     I want to talk a little bit about the fair opportunity

22   letter.  You talked about that on direct, right?

23   **A.**     I did, yes.

24   **Q.**     Okay.  You admitted on direct that you back-dated that

25   letter, right?

1   **A.**     I did, yes.

2   **Q.**     And you signed it?

3   **A.**     I did.

4   **Q.**     And your testimony was that you did it to help

5   Ron Capallia, right?

6   **A.**     Correct.

7   **Q.**     And you didn't do it for any other purpose, just to help

8   Ron out, right?

9   **A.**     Correct, at that time.  That's correct.

10  **Q.**     And Mr. Lumho, I want to -- do you recall previously

11  testifying that it was a mistake that you regretted doing that?

12  **A.**     I do, yes.

13  **Q.**     That you wished you had not sent it?

14  **A.**     Absolutely.

15  **Q.**     And that you went ahead and did it anyway, right?

16  **A.**     I did.

17  **Q.**     So I want to break this down a little bit and talk about

18  what a mistake is versus what intentional conduct is, okay.

19          So Ron called you and told you he had a fair opportunity

20  letter; is that right?

21  **A.**     I don't believe he called it a "fair opportunity letter."

22  I believe it was a, "Hey, I'm -- I'm -- I'm in trouble.  Tim's

23  on me, I need to get this thing signed that we didn't get signed

24  before."  I don't recall if he -- he -- he might have said it

25  was a fair opportunity letter.  I don't recall if he specified

1    what it was.

2    **Q.**    And so he called you first, right?

3    **A.**    He did, yes.

4    **Q.**    And then, did he -- he must have e-mailed you the letter?

5    **A.**    He must have, yes, because I didn't provide it.

6    **Q.**    And so you must have been waiting for that e-mail after

7    he called you?

8    **A.**    I mean, I wasn't waiting for an e-mail from him to --

9    **Q.**    Okay.  Well, at some point you got the e-mail with the

10   letter attached, right?

11   **A.**    I did, yes.  Yeah.

12   **Q.**    Okay.  So you opened it, and you had to print the letter

13   out, right?

14   **A.**    Yes.

15   **Q.**    Okay.  So let's look at this page.  Let's look at this

16   letter, Page 3.

17        So Mr. Lumho, at the top of the letter it's official

18   Department of Defense letterhead, right?

19   **A.**    Yeah.  I didn't look at the letter when I signed it, but

20   go ahead.

21   **Q.**    You didn't look at the letter?

22   **A.**    I did not.

23   **Q.**    So let me get this straight.  It comes in an e-mail and

24   it must have an icon, an attachment, right?

25   **A.**    I'm not following you.  It showed it as an attachment

1    correct, yes.

2    Q.    And you would have to open that attachment to print it,

3    right?

4    A.    Yes.

5    Q.    So your testimony is that you opened it up on your

6    computer screen but didn't look at it on the computer screen?

7    A.    This was not something that was -- that I thought over --

8    Q.    But you said on direct that you walked it down to

9    Mr. Steiniger's office, and he said, "Who are these guys,"

10   right?

11   A.    Right.

12   Q.    Do you remember telling Mr. Amolsch that?

13   A.    That's correct, yes.

14   Q.    So you must have looked at it and shown it to

15   Mr. Steiniger by your previous testimony, right?

16   A.    I did.

17   Q.    Okay.  So you looked at it, right?

18   A.    Matthew Steiniger looked -- I mean, I didn't look at

19   it --

20   Q.    You didn't look at it but Matthew Steiniger --

21   A.    Mr. Carlberg, I'm -- I'm -- I'm telling you I didn't read

22   the -- the letter.  I signed it.  I talked to Matthew, and

23   Matthew said, "sign it."  I signed it.

24   Q.    So uh --

25   A.    I didn't lose too much sleep over it when I signed it.  I

1    lost sleep over it when I was indicted.

2    **Q.**    Mr. -- Mr. Lumho --

3    **A.**    Yes --

4    **Q.**    Let's look at the letter?

5    **A.**    Okay.

6    **Q.**    It says, "Dear Ms. Bentley.  As the designated agency

7    representative for the Regional Contracting Office, National

8    Capital Region, RCONCR, I would like to take this opportunity to

9    advise you of our selection of Level 3 Communications, LLC under

10   WITS3 contract" -- I'll skip reading the number -- "as our

11   preferred provider for the following WITS3 services:

12   Professional services and customer premises equipment."

13   Do you see that?

14   **A.**    I do, yes.

15   **Q.**    There's no such thing as the regional capital -- Regional

16   Contracting Office National Capital Region, that you're a part

17   of, is there?

18   **A.**    So I can answer what I know now, or I can answer what I

19   knew then.

20   **Q.**    My question is:  Were you part of a Regional Contracting

21   Office National Capital Region?

22   **A.**    I answered -- I -- I can answer what I know now, or I can

23   answer what you knew then.

24   **Q.**    I'm asking you what you knew then, when you reviewed

25   this?

```
1   A.      I had no idea.

2   Q.      Okay.  So then, it says below, "Pursuant to this fair

3   opportunity notification letter, I hereby certify that funding

4   for orders associated with this notification will be obligated,

5   prior to order issuance, in accordance with federal government

6   and RCONCR procurement laws, policies, and regulations."

7   Do you see that?

8   A.      I do see that, yes.

9   Q.      Do you know what RCONCR procurement laws, policies, and

10  regulations are?

11  A.      No, I don't.

12  Q.      And Mr. Lumho, then you signed it.  Right?

13  A.      I did.

14  Q.      So where were you when you signed it?

15  Do you remember?

16  A.      I was probably at my desk at that point.

17  Q.      So you took a pen out like this one and signed it?

18  A.      I'm not sure how else I would have signed it if I

19  didn't --

20  Q.      You used a pen, right?

21  A.      Yeah.

22  Q.      Okay.  Then you must have scanned it, right, back into

23  something to send it back to Ron Capallia?

24  A.      That's correct.

25  Q.      Okay.  So you had at least several minutes in this whole
```

1    process to stop and think about it, right?

2    **A.**     Okay.  Yes.  Yeah.

3    **Q.**     But your testimony is you never really looked at it,

4    right?

5    **A.**     I'm just telling the truth.  You can paint a picture of

6    how you want, but I'm just telling you what the truth is.

7    **Q.**     All right.  When you sent it back to Ron Capallia, you

8    did not copy Matt Steiniger, did you?

9    **A.**     No, I didn't.

10   **Q.**     It's just you and Ron Capallia, right?

11   **A.**     That's correct.

12          MR. CARLBERG:  If we can go to 173, please.

13   BY MR. CARLBERG:

14   **Q.**     I want to talk briefly about Lenovos.

15          MR. CARLBERG:  We can go to Page 3 -- Oh, yeah, Your

16   Honor.  Yeah.

17          So Ms. Sandvig, we need to go back to the previous one

18   real quickly.

19   BY MR. CARLBERG:

20   **Q.**     I forgot to ask you something Mr. Lumho.

21          MR. CARLBERG:  172 again.

22   BY MR. CARLBERG:

23   **Q.**     The e-mail, Page 2, top, is you to Ron Capallia, right?

24   **A.**     Yes.

25   **Q.**     And you typed this e-mail, right?

```
1    A.      I did, yes.

2    Q.      And it says, "Ron, attached is the fair opportunity

3    letter I thought I had sent last year" period.  You said that,

4    right?

5    A.      I did, yes.

6    Q.      And that wasn't true, was it?

7    A.      No, that's not true.

8    Q.      Okay.  So when you wrote that sentence on official

9    government e-mail attaching that back-dated letter, you knew

10   that wasn't true?

11   A.      Correct.

12   Q.      Okay.  But you wrote it anyway?

13   Is that a "yes"?

14   A.      Yes, it was sent.  Yes.

15   Q.      And then you wrote, "I looked through my e-mail and, in

16   fact, I did not send it."  That wasn't true either, was it?

17   A.      No.  That's not true.

18   Q.      And you wrote, "My bad," exclamation point?

19   A.      My bad, yes.

20   Q.      And once again, just you and Ron on that exchange, right?

21   A.      Yes, sir.

22   Q.      So you went to the extra step of adding those untruths to

23   the e-mail, correct?

24   A.      Yes.

25           MR. CARLBERG:  Can we go to Page 3 of Government's
```

1    Exhibit 173, please.

2    BY MR. CARLBERG:

3    Q.    We've seen this before.  I just want to ask you a quick

4    question about it.  May 14th, 2012.  Matthew Steiniger to you.

5    And he's writing to you, the DAR, "Kekoa, where did we leave off

6    on the concept of acquiring laptops via the WITS vehicle?  You

7    need specs," question mark?

8    Do you see that?

9    A.    I do, yes.

10    Q.    And that's him asking you about WITS, right?

11    A.    He's asking where do we leave off on the concept of

12    acquiring laptops via WITS, yes.

13    Q.    And he was not the DAR at that time, was he?

14    A.    Not at that time, no.

15    Q.    But you were?

16    A.    Yes.

17    Q.    And then Mr. Lumho, you got the specs for that, right,

18    which is Page 4 of this e-mail?

19    A.    Yes, I believe Ricardo Farrerah sent them to me.

20    Q.    Right.

21          MR. CARLBERG:  And then if we go to Page 2, Ms. Sandvig,

22    top.

23    BY MR. CARLBERG:

24    Q.    Ricardo Farrerah who you just mentioned says, "Attached

25    are the specs for the Lenovo T420s."  And he said, "The

1    estimated cost is $360,000."

2    Do you see that?

3    **A.**    I do.

4    **Q.**    Okay.  And then Mr. Lumho, you go to the first page, in

5    the middle you forwarded that to Ron Capallia, correct?

6    **A.**    Yes.

7    **Q.**    "Ron, see below"?

8    **A.**    Yes.

9    **Q.**    And then in turn up at the top, Ron Capallia forwards

10   that to Bill Wilson and says, "We need to quote this ASAP,"

11   right?

12   **A.**    That's what Ron did, yes.

13   **Q.**    Yes.  And that was government bid information and price

14   information that you shared with Ron Capallia, correct?

15   **A.**    Um, yes.  From the quote, yes.

16   **Q.**    Right.  You didn't keep it close to the vest, right?

17   **A.**    No.

18   **Q.**    No.  So you told Ron exactly what the price was or how

19   high the government would be willing to go, right?

20   **A.**    I told him what the price was that the quote was, yes.

21   The price was on the quote, yes.

22   **Q.**    And he could match that or beat it or go higher?

23   **A.**    It was -- I guess his discretion.

24   **Q.**    You didn't forward that to anybody at Verizon, did you?

25   **A.**    No.

1    Q.    And you didn't get a quote from Verizon on this, did you?

2    A.    Not that I recall, no.

3    Q.    In fact, for these service orders, you didn't send any of

4    them to Verizon, did you?

5    A.    No.  None that are in the indictment, no.

6    Q.    None in the time period whether Fidel was on the payroll,

7    right?

8    A.    I don't recall.

9    Q.    February 2012 through --

10   A.    October.

11   Q.    October 2012?

12   A.    I believe I did get one from Verizon for some Cisco

13   equipment.

14   Q.    So you knew Verizon was out there and was another vendor

15   you could use, right?

16   A.    They're on the WITS contract, yes.

17   Q.    Yeah.  They're on the WITS contract, right?

18   A.    Correct.

19   Q.    And you knew that at the time, right?

20   A.    I knew it was Level 3 and Verizon, yes.

21   Q.    Right.  And yet everything that we've seen in this trial

22   is you and Level 3 and Bill Wilson, right?

23   A.    As far as WITS goes -- it was -- yeah.

24   Q.    Yeah.

25         MR. CARLBERG:  And then can we go to 112B, please.

1    BY MR. CARLBERG:

2    **Q.**    Mr. Lumho, this is the service order that you've been

3    shown before, it's $438,000, 496- -- I'm sorry.  I misspoke.

4    $438,496.74 for a total -- that's a total cost.

5    Do you see that?

6    **A.**    Yes, I do.

7    **Q.**    And you signed this, right?

8    **A.**    I did, yes.

9    **Q.**    As agency DAR --

10   **A.**    Correct --

11   **Q.**    -- on or about June 21st, 2012?

12   **A.**    Correct, yes.

13   **Q.**    Okay.  And the description of work is not correct, is it?

14   **A.**    It is inconsistent, correct.

15   **Q.**    Senior telecommunications specialist, that's a person,

16   right?

17   **A.**    That is a person, yes.

18   **Q.**    And that's for 2,237 hours of that person's work,

19   correct?

20   **A.**    Correct.

21   **Q.**    And that's at a price of $196 per hour of that person's

22   work?

23   **A.**    Correct.

24   **Q.**    Right.  And in fact, that was for the Lenovo laptops,

25   right?

1    **A.**     Yes.

2    **Q.**     That Ricardo Farrerah originally said 360 thousand on in

3    the e-mail?

4    **A.**     Was that -- yes.

5    **Q.**     Okay.  And then above, in the remarks, it says, "Senior

6    telecom specialist for Lenovo installation."

7    Does it not?

8    **A.**     Yes, it does.

9    **Q.**     And there's no senior telecom specialist installing

10   Lenovos on this service order, is there?

11   **A.**     No, there is not.

12   **Q.**     Okay.  Now, I want to put this up side by side with

13   Government's 803, which we've seen before as well.

14         Now, Mr. Lumho, on the left is the service order we just

15   talked about, and what is the date on that service order, the

16   date of your signature?

17   **A.**     6-21.

18   **Q.**     Of 2012?

19   **A.**     Ah, yes.

20   **Q.**     And what's the printed date on the upper left-hand

21   corner?

22   **A.**     6-20.

23   **Q.**     Okay.  And then on the right-hand side is the e-mail,

24   Government's 803 that you've seen before and you remember this

25   one, right?

1    **A.**    I do, yes.

2    **Q.**    Okay.  And so this is from your Gmail account to

3    Barry Atwood at MSO Tech, Inc., right?

4    **A.**    Yes.

5    **Q.**    Okay.  And what's the date of this e-mail that's the

6    subject "additional lens"?

7    **A.**    6-20.

8    **Q.**    That's the same date as the date on the service order

9    request form, the printed date?

10   **A.**    Yes, it is.

11   **Q.**    And it's sent one day before the date of your signature;

12   is that right?

13   **A.**    Yes.

14   **Q.**    Okay.  And in this e-mail, you're listing a Canon zoom

15   lens for $1,799, right?

16   **A.**    Yes.

17   **Q.**    And a -- two black and white clear UV haze

18   multi-resistant coating for $60.39 each, right?

19   **A.**    Correct.

20   **Q.**    And the Canon Speedlight flash for 699, right?

21   **A.**    Yes.

22   **Q.**    And Mr. Lumho this was also after your e-mail to

23   Tim Donelson about Ron Capallia's Disney cruise.

24   Was it not?

25   **A.**    What's the date of that e-mail?

1        MR. CARLBERG:  Let's pull up 174.  Government's 174,

2   please.

3        THE WITNESS:  That was after this, correct.  This was

4   5-23 and the other one was 6-20.

5   BY MR. CARLBERG:

6   Q.    So you had already referenced Ron Capallia's Disney

7   cruise in the e-mail, correct?

8   A.    I had already got the price cut down from $130,000,

9   correct.

10  Q.    My question was:  You, in that e-mail, you had referenced

11  Ron Capallia's cruise to Disney, correct?

12  A.    I had, yes.

13  Q.    And you had referenced your Hawaiian vacation, correct?

14  A.    Yes.

15  Q.    In the context of that service order that was attached to

16  that e-mail, right?

17  A.    The one attached to the --

18  Q.    7-4?

19  A.    Yes, correct.

20  Q.    Okay.  Now, what I'm asking you is --

21       MR. CARLBERG:  We can take 174 down.

22  BY MR. CARLBERG:

23  Q.    So I'm just trying to establish a timeline here.  The

24  checks from FrankCrum MSO Tech have been coming in now for a

25  couple of months, fair enough?  To the house?

1    **A.**    Correct.

2    **Q.**    Okay.  And we have the e-mail about the Hawaiian vacation

3    at the end of May, correct?

4    **A.**    Correct.

5         MR. CARLBERG:  And then, if we can go back to these two

6    side-by-side, 803 and 112B.

7    BY MR. CARLBERG:

8    **Q.**    We have your e-mail from your private e-mail sent to

9    Barry Atwood listing camera equipment, correct?

10   **A.**    Correct.

11   **Q.**    On the same day that you're signing $438,000 WITS3

12   service order that has incorrect information in the description,

13   correct?

14   **A.**    Yes.

15   **Q.**    Okay.

16        MR. CARLBERG:  Now, can we go to 238, please.

17   BY MR. CARLBERG:

18   **Q.**    We get to the bottom portion, Willie Spivey to

19   Kekoa Lumho, July 31st, 2012.

20   **A.**    I see that.

21   **Q.**    Yes.  And in this e-mail, Mr. Spivey writes to you and

22   this is about the laptops, he said, "Kekoa, per our discussions

23   yesterday, please provide a status of the pending order for the

24   200 laptops requested through the WITS contract ordering

25   process," right.

1    Do you see that?

2    **A.**    Yes.

3    **Q.**    Okay.  And then he adds, "Additionally, provide the

4    order/requisition number used in the process, as well as the

5    delivery information," correct?

6    **A.**    Yes.

7    **Q.**    And the next paragraph he writes, "The time-sensitive

8    nature of this laptop order was predicated on the agency's

9    request to procure the items in support of a critical short fall

10   of the items.  Given the laptops have not been either ordered

11   shipped/delivered in a timely manner and with the award of the

12   original contract for laptops to the contracting center, it's

13   imperative we know the status of this order immediately," right?

14   Do you see where he wrote that?

15   **A.**    Yes, I do.

16   **Q.**    And above you didn't send him the service order or any of

17   the things he requested in this e-mail, did you?

18   **A.**    No.  Because I told him as we already discussed I've

19   cancelled it.  So why would I send him the orders --

20   **Q.**    Well, he asked for -- "Please provide the order

21   requisition number used in the process," correct?

22   **A.**    Right.  But I cancelled the order.

23   **Q.**    Okay.  Well, some of that order had already gone through

24   hadn't it?

25   **A.**    I had cancelled it.  As far as I knew, the order was

1    cancelled.  Ron Capallia didn't cancel the order, but I had

2    cancelled the order.

3    **Q.**    Well, Mr. Lumho, you -- let's -- let's talk a little bit

4    about, you were testifying a little bit ago about how WITS was

5    so fast and efficient for the Inspector General?

6    **A.**    Correct.

7    **Q.**    But these laptops -- Mr. Spivey here is saying these

8    laptops hadn't shown up, correct?

9    **A.**    Right, because we couldn't get the model that we needed.

10   **Q.**    Well, was that all that was wrong with MSO Tech's

11   performance?

12   **A.**    I'm sorry.

13   **Q.**    Was that all that was wrong with Level 3 and MSO Tech's

14   performance under WITS?

15   **A.**    I'm not sure your question.

16   **Q.**    Just the -- my question was:  Were there other things

17   that you were not happy about with Level 3 and WITS?

18   **A.**    There were things -- yeah.  Their -- their response time

19   had drastically changed, yes.

20   **Q.**    Okay.

21        MR. CARLBERG:  Well, I would like to hand up Government's

22   Exhibit 1550, please.

23        THE WITNESS:  Thank you.

24   BY MR. CARLBERG:

25   **Q.**    Do you recognize this Mr. Lumho as an e-mail you sent to

1    Ron Capallia?

2    **A.**     Yes.  I do remember this.

3          MR. CARLBERG:  I'd like to admit 1550, please.

4          MR. AMOLSCH:  No objection, Your Honor.

5          THE COURT:  Received.

6          (Government's Exhibit 1550 admitted into the record.)

7          MR. CARLBERG:  We can display it and blow up the relevant

8    portion, please.

9    BY MR. CARLBERG:

10   **Q.**     So Mr. Lumho, do you see here where you wrote, "I need to

11   know the status of the following, please.  Cisco maintenance.  I

12   haven't received a quote for this.  We need it badly."

13   Do you see that?

14   **A.**     I'm sorry, where are you?

15   **Q.**     The first sentence.

16   **A.**     Yes.

17   **Q.**     I mean, after the introductory part.  And then you said,

18   "Backup tapes" -- on the third line, "I need an answer of this

19   as well.  Signed the order three weeks ago and have nothing on

20   this."

21   **A.**     Correct.

22   **Q.**     "We are dead in the water right now.  We have not had a

23   backup of our data in two weeks."

24   Do you see that?

25   **A.**     Sounds pretty bad, yes.

1   **Q.**     Yeah.  So was everybody happy with WITS?

2   **A.**     No.

3   **Q.**     Okay.  "Cisco cables and hardware, this was another high

4   priority order that I signed three weeks ago that I have heard

5   nothing on."

6   **A.**     Correct.  Yeah.

7   **Q.**     Correct?

8   **A.**     Mm-hmm.

9   **Q.**     "And then Polycom order signed months ago.  Where is it?

10  When will it be here," correct?

11  You wrote that?

12  **A.**     Yes.

13  **Q.**     And then, "Status of 200 Cisco phones nine months ago.

14  We are down to 8 in stock, and we are completely out of

15  inventory."

16  Do you see that?

17  **A.**     I do, yes.

18  **Q.**     And then the next line you wrote, "My patience is wearing

19  thin.  I'm about two seconds from having to cancel these orders

20  per Spivey," correct?

21  **A.**     Correct.

22  **Q.**     So you wrote that like they would know who Spivey is,

23  right?

24  **A.**     They knew who Spivey was, yes.

25  **Q.**     Okay.  And up above you sent this to Ron Capallia and

1    Bill Wilson directly, correct?

2    **A.**      Directly.

3    **Q.**      And Barry Atwood?

4    **A.**      Yes.

5    **Q.**      All three of them?

6    **A.**      Yes.

7    **Q.**      And then down below the last line -- well, no let me go

8    back here.  You said, "Can we please add some items to the WITS

9    contract," and you list:  Mac Pro, Mac Server, Mac Thunderbolt

10   Displays."  And you said, "Pretty much anything Mac that is top

11   end starting with the new Mac Pro," and then you added, "We will

12   more than likely purchase 100K to 150K worth of these shortly,"

13   right?

14   **A.**      Correct.  Yes --

15   **Q.**      You were informing them there could be additional orders

16   through Level 3 and MSO Tech, correct?

17   **A.**      I was informing them that we were -- we had a request to

18   purchase more servers, yes.

19   **Q.**      So Mr. Spivey and you were not too happy with the

20   performance of MSO Tech and Level 3 on WITS at this point in

21   time, right?

22   **A.**      I'm not sure if Mr. Spivey necessarily had a distaste for

23   it, but I -- I certainly did.  I was the one handling it.

24   **Q.**      Well, they're certainly not fast and efficient, right?

25   **A.**      Not at this point, no. You're right.

1          MR. CARLBERG:  Could we put up government's 810, please?

2     BY MR. CARLBERG:

3     **Q.**     This is the exterior of MSO Tech.

4     Do you recognize that?

5     **A.**     Do I recognize it?

6     **Q.**     Yeah, from this trial?

7     **A.**     Yes, from the trial.  Yes, I do.

8     **Q.**     Now, Mr. Lumho, does that look like the right place to go

9     to buy MacBook Pro's and Mac Servers and Thunderbolt Displays?

10    **A.**     Is that really a question --

11    **Q.**     Yeah.

12    **A.**     -- for me?

13    **Q.**     Does it look like a Best Buy?

14    **A.**     We don't buy from Best Buy necessarily.  I -- I -- I have

15    no idea.  I can't answer that question.

16    **Q.**     Isn't the truth that these orders were being done by

17    Bill Wilson's company down in Lake Butler, Florida?  A company

18    that dug fiber optic cables?

19    **A.**     Yes.

20    **Q.**     Now, Mr. Lumho, you testified on direct -- one second --

21    that you never altered anything.  Never sent anything that was

22    altered or falsified to the Comptroller's Office.

23    Do you remember that?

24    **A.**     Correct.

25    **Q.**     And do you remember -- one moment --

1        MR. CARLBERG:  Defense Exhibit 39?  Do we have that

2    handy?

3        MR. CARLBERG:  We don't have to show it.

4    BY MR. CARLBERG:

5    **Q.**    But do you -- do you remember that -- that, where you

6    sent an e-mail to Jennifer Paper and that e-mail did not have

7    the attachment?

8    Do you remember that?

9    **A.**    The e-mail -- right.  The one where it was forwarded and

10   the attachment wasn't on there, correct.

11   **Q.**    Well, I want to hand 1551 and 1552 up.  Here's one set

12   and here's the other set.

13   **A.**    Thank you, sir.

14   **Q.**    Mr. Lumho, do you recognize --

15   **A.**    Yes, I recognize --

16   **Q.**    -- 1551.  I'm sorry.  1551 is an e-mail from Ron Capallia

17   to you with line items for equipment?

18   **A.**    Correct, yes.

19   **Q.**    Okay.

20       MR. CARLBERG:  And I move Government's 1551 in, please?

21       THE COURT:  Any objection.

22       MR. AMOLSCH:  No objection, Your Honor.

23       THE COURT:  Received.

24       (Government's Exhibit 1551 admitted into the record.)

25   BY MR. CARLBERG:

1    **Q.**    And Mr. Lumho, that's how the e-mail came in to you from

2    Ron Capallia with the equipment, right?

3    **A.**    Correct.

4    **Q.**    Okay.  Now, I'd like to ask you to look at 1552 that's in

5    your hand.

6    **A.**    Yes.

7    **Q.**    Do you see that?  It has the DoD OIG Bates number on the

8    bottom right hand corner?

9    **A.**    Yes.

10   **Q.**    And this is your forwarding information to Jennifer Paper

11   in the Comptroller's Office?

12   Do you see that?

13   **A.**    Yes.  This is from my Gmail account, correct.  From -- to

14   my work account and then me forwarding what I sent to my work

15   account, yes.

16   **Q.**    Right.

17          MR. CARLBERG:  Move 1552 in, please.

18          MR. AMOLSCH:  No objection.

19          THE COURT:  It's received.

20          (Government's Exhibit 1552 admitted into the record.)

21          MR. CARLBERG:  If we can display them side-by-side.

22   BY MR. CARLBERG:

23   **Q.**    So Mr. Lumho, on the left, do you see the e-mail coming

24   in from Ron Capallia with certain invoice numbers, labor costs,

25   equipment costs, numbers?

1    **A.**     Yes.

2    **Q.**     And do you see that that has an actual item description

3    that is really just equipment, right?  Microphones?

4    **A.**     Yes, I see it.

5    **Q.**     Cisco cables, NIKSUN 1, NIKSUN 2.  Do you see all that

6    equipment that's listed there?

7    **A.**     Yes.

8    **Q.**     Okay.  So -- and then down below do you see that when you

9    were home from your Gmail, that all of that equipment

10   description is taken out of that table?

11   **A.**     Correct.

12   **Q.**     Right?  And then you forwarded that to your work account,

13   correct?

14   **A.**     Yes.

15   **Q.**     And then from your work account you forwarded that to

16   Jennifer paper in the Comptroller's office, right?

17   **A.**     Yes.

18   **Q.**     And so you took out the equipment description, correct?

19   **A.**     Um, yes.  It isn't there, correct.

20   **Q.**     So Mr. Lumho, Ms. Paper was denied that information when

21   you forwarded it to her because of an action you took, correct?

22   **A.**     Ms. Paper was denied that information.  I guess you could

23   put it that way, yes.

24   **Q.**     I want to switch gears now and talk a little bit about

25   the camera, okay.

```
 1   A.     Yes, sir.

 2          MR. CARLBERG:  Could we go back to 803, please.

 3   BY MR. CARLBERG:

 4   Q.     That's your -- again, your e-mail from your Gmail account

 5   to Barry Atwood, correct?

 6   A.     Yes, it is.

 7   Q.     It's not from your work account?

 8   A.     No.  Just like the other e-mail was from my Gmail.

 9   Q.     And it lists several items to be ordered, correct?

10   A.     Correct.

11   Q.     And you -- you --- you mentioned I think on direct you

12   have a camera yourself, right?

13   A.     I do, yes.

14   Q.     Yeah.

15          MR. CARLBERG:  Could we go to 902, please, Ms. Sandvig.

16          Go ahead and blow up that -- you can't make it any

17   bigger, right?

18          THE WITNESS:  Same size.

19   BY MR. CARLBERG:

20   Q.     So Mr. Lumho, you see here in Government's 902, the

21   records from Amazon, right?

22   A.     Yes.

23   Q.     And do you see that you purchased 77 millimeter, 4-piece

24   camera accessories or -- or lens cover filter of some kind?

25   A.     It was a lens filter, correct.
```

1   **Q.**    A lens filter, right.

2   **A.**    Mm-hmm.

3   **Q.**    And that's the same size as the black and white 77

4   millimeter lens filter that Barry Atwood purchased; is that

5   correct?

6   **A.**    It's the standard size Canon filter, yes.

7   **Q.**    Right.  So they're consistent, right?  They fit the same

8   camera?

9   **A.**    They will fit any Canon camera, yes.

10  **Q.**    Any Canon camera?

11  **A.**    Any -- any lens that's of that millimeter size, yes.

12  **Q.**    Right.  So any DSLR, right, that has interchangeable lens

13  it fits, right?

14  **A.**    Yes.

15  **Q.**    Okay.  And down below it look like Barry Atwood was also

16  purchasing that EF24-70 millimeter zoom lens that we saw in the

17  previous exhibit as well, right?  Right around the same time?

18  **A.**    I believe that Tyler Dalton was.  Barry Atwood was, I

19  think, the shipping name, yes.

20  **Q.**    Okay.  If we go to Page 2 of this.  So around the same

21  time you're having the lens filters that you bought with your

22  card shipped to your house on Rondelay Lane; is that right?

23  **A.**    Correct.

24  **Q.**    And the other items that you had put in the e-mail to

25  Barry Atwood are being shipped to Barry Atwood's residence in

1   Ashburn, Virginia, right?

2   **A.**    I didn't dictate where they were shipped.  But yes, there

3   is a purchase by Tyler Dalton of the lenses that I -- I -- that

4   I requested being shipped to Barry Atwood's, yes.  And AD,

5   yes -- Section AD.  I'm sorry.

6   **Q.**    And Mr. Lumho, then around the same time, same month, you

7   received a service order from --

8        MR. CARLBERG:  If we go to Government's 177 next, please.

9   BY MR. CARLBERG:

10  **Q.**    You received a service order from Ron Capallia.

11  Do you remember this?

12  **A.**    I remember the e-mail, yes.  I remember --

13  **Q.**    Service order.

14  **A.**    Yes, sir.

15  **Q.**    Okay.  Cable installer underscore Apple installation in

16  the attachment?

17  **A.**    Yes.

18  **Q.**    Okay.  And if we go to the service order request --

19  **A.**    Oh, yeah.

20  **Q.**    -- it has remarks, "Technical support, Apple cable

21  installation."

22  Do you see that?

23  **A.**    Yes.

24  **Q.**    Okay.  And it lists a number of items, including a Canon

25  EOS 60D digital camera, right?

1    **A.**    Correct.

2    **Q.**    And you directed Mr. Capallia to remove that detail from

3    the service order request form, didn't you?

4    **A.**    Yes, after I spoke with Matthew.

5         MR. CARLBERG:  Ms. Sandvig, could we play Government's

6    Exhibit 179?

7         (Audiotape played.)

8    BY MR. CARLBERG:

9    **Q.**    And Mr. Lumho, nowhere in that voicemail did you say

10   Matthew Steiniger told me to do that, right?

11   **A.**    I did not say that, no.

12   **Q.**    And that was your voice on that recording, correct?

13   **A.**    That was my voice.

14   **Q.**    And then Ron Capallia did as instructed, correct?

15   **A.**    Yes.

16   **Q.**    And he sent it back to you in altered form, right?

17   **A.**    In the -- yes.  In the form that I asked him to send it,

18   yes.

19        MR. CARLBERG:  If we can go to 180, please, Ms. Sandvig.

20   BY MR. CARLBERG:

21   **Q.**    And at the bottom of the first page, it says, "June 11th,

22   2012, Kekoa new task order attached.  Thank you, sir."  And

23   that's the previous one, and then above after your voicemail he

24   says, "Kekoa, I have corrected the attached task order.  Thank

25   you, sir."

1        And if we go to Page 3 -- Page 4, sorry, no that's Page

2   3 -- I'm sorry, my apologies.  Page 3, the detail is removed; is

3   that correct?

4   **A.**     That's correct.

5   **Q.**     In remarks.  And it just says, "Apple cable

6   installation," right?

7   **A.**     Correct.

8   **Q.**     And for those kind of products like a -- like a Canon EOS

9   camera or the other Apple like the I Fi card --

10  **A.**     Mm-hmm.

11  **Q.**     -- you don't need -- you don't need anybody to install

12  that, do you?

13  **A.**     No, you do not.

14  **Q.**     Right.  So the cable installer description is incorrect,

15  right?

16  **A.**     Incorrect.

17  **Q.**     Right.  And it's 768 hours of a person's services being

18  billed, right?

19  **A.**     Correct.

20  **Q.**     For $54,320?

21  **A.**     Correct.

22       MR. CARLBERG:  If we can go to 108B, please.

23  BY MR. CARLBERG:

24  **Q.**     And Mr. Lumho, you signed that altered WITS3 service

25  order request form, did you not?

**A.**     I did, yes.

**Q.**     And you were the DAR, correct?

**A.**     Yes.

**Q.**     And once again, $54,320.64; isn't that right?

**A.**     Yes.

**Q.**     And you remember your testimony and evidence from the
forensic accountant that the real cost of that was about
$11,000.

Do you remember that?

**A.**     I -- I don't recall the -- the dollar amount.

**Q.**     I would like to go on now to -- I would like to ask the
assistance of the courtroom security officer to hand you the
physical items?

**A.**     Sure.

**Q.**     If he can pull them out.

       MR. CARLBERG:  Yes, could we do 1104, please.  And can
you pull up 177, one more time.

BY MR. CARLBERG:

**Q.**     Mr. Lumho, if you could just be kind enough take out a
bag for us.  Thank you, sir.

Does that match the description of the Canon EOS 60D digital
SLR?

**A.**     Yes, it does.

**Q.**     Okay.  You can go ahead and set it down on there.  Thank
you.  Could you now take a look at 1105, please.

1        MR. CARLBERG:  You can take this one down.  Thank you.

2        THE WITNESS:  Do you want me to open it?

3    BY MR. CARLBERG:

4    **Q.**    Yeah, yeah.  Please do.  Thank you, sir.

5    **A.**    Sure.

6    **Q.**    Could you just hold it up a little bit where I could see.

7    It has a tripod mount, right?

8    **A.**    Yes.

9    **Q.**    That's a pretty high-end lens, isn't it?

10   **A.**    Subjective to say that.  But it -- it's not your average

11   lens, correct.

12   **Q.**    Right.  So it's a -- what's the focal length on that?

13   **A.**    70 20 200 millimeter.

14   **Q.**    And do you see the F stop?

15   **A.**    Um, I -- I don't see it.

16   **Q.**    Maybe if you pop the lens cap off.

17       MR. CARLBERG:  Ms. Sandvig, can you put up 917 while he's

18   doing that.

19   BY MR. CARLBERG:

20   **Q.**    So Mr. Lumho, if you look at 9 -- Government's 917?

21   **A.**    Yes.

22   **Q.**    This is an order summary from Tyler Dalton at MSO Tech.

23   **A.**    Yes.

24   **Q.**    Do you see the two product items listed there?

25   **A.**    I do, yes.

1    Q.    And do you see EF 70-200 millimeter F/2.8?

2    A.    Yes.

3    Q.    Okay.  Is that the same lens that you're holding?

4    A.    It is.  Yes, it is.

5    Q.    And that's for about $2300 after discount?

6    A.    Yes.

7    Q.    Okay.  And if we go to Page 2, that is once again shipped

8    to that same Arapaho Terrace address in Ashburn, Virginia,

9    right?

10   A.    Correct.

11   Q.    Mr. Lumho, the last thing with that.  I appreciate you

12   putting it back, but can you take it out one more time real

13   quickly.  I won't ask you to mount it on the camera because we

14   might damage it, but that is not used for Outlook photos, right?

15   A.    No.  This was not for an Outlook photo, no.

16   Q.    It would be good for outdoor photography, wouldn't it?

17   A.    Or inside of an auditorium.

18   Q.    Or for outdoor photography and all kinds of other things,

19   right?

20   A.    Yes.

21   Q.    Okay.  Mr. Lumho, there was some questions on direct

22   about what that -- what the camera was used for.

23   Do you remember that?

24   A.    I do, yes.

25   Q.    And there was discussion about you wanted to use it for

1    Outlook photos and then maybe it would be used in the later

2    phase of the Outlook photos, right.

3    Do you remember that?

4    **A.**     In the later phase in the Outlook photos?

5    **Q.**     The Outlook photos, right, that were organized in May?

6    **A.**     Yes.  For the professional photographer that took the

7    photos, yes.

8    **Q.**     And that professional photographer was not using any of

9    this equipment, correct?

10   **A.**     No. Not this equipment, no.

11   **Q.**     Because that equipment was purchased later, right?

12   **A.**     Yes.

13   **Q.**     And, sir, do you recall previously testifying that that

14   equipment was used at Gordon Heddell's retirement?

15   **A.**     It couldn't have been used -- this equipment here?

16   **Q.**     Yeah?

17   **A.**     No.

18   **Q.**     That camera?

19   **A.**     No.  If -- that would have been impossible to be used at

20   Gordon Heddell's.

21   **Q.**     But I want to ask you if you remember testifying

22   before --

23          MR. CARLBERG:  Ms. Sandvig, if you go to 525, and 2377,

24   and I believe it's Page 163 and 164 of your book of Government's

25   525.  Sorry.  That's of the previous transcript.

```
 1              THE WITNESS:  What was the page number again?  I'm sorry.
 2              MR. CARLBERG:  The little page number will be 163 or --
 3              THE WITNESS:  Which tab is it?
 4              MR. CARLBERG:  Sorry.  It's 525, in Government's 525.
 5              THE WITNESS:  Okay.
 6              MR. CARLBERG:  Page 163, I believe is where it will
 7       start.
 8              THE WITNESS:  Okay.
 9       BY MR. CARLBERG:
10       Q.     And this was previous testimony of yours under oath,
11       correct?
12       A.     Correct.
13       Q.     And that was about -- that was in 2018, right?
14       A.     Yes.
15       Q.     And Mr. Amolsch was asking you questions about this
16       camera equipment.
17       Do you remember that?
18       A.     I don't exactly remember.  But if I could read it real
19       quick.  Yes.
20       Q.     And those questions were about that camera equipment,
21       right?
22       A.     No.  I don't think it was.
23       Q.     Well, the previous questions were, Mr. Lumho --
24       A.     Which line, please?
25       Q.     One second.
```

1  **A.**     Sure.

2  **Q.**     Were there other -- Question:  Line 17.

3  **A.**     Mm-hmm.

4  **Q.**     "Were there other reasons why that camera was put to use

5  other than the photo ID's for the ID badges."  Question.

6  Do you see that?

7  **A.**     Yes.

8  **Q.**     Your answer:  "Yes.  So the IG had state of agencies and

9  during his -- during the previous IG, Gordon Heddell, shortly

10  after we moved into Mark Center, excuse me, Mr. Heddell retired.

11  This was in December 2011 right after we moved into the Mark

12  Center.  He retired and our photographer was not available."

13  Do you see that?

14  **A.**     Yes, I do.

15  **Q.**     And then you continued:  "And Mr. Wilson our SES told us

16  to find a photographer.  So we reached out to the Pentagon AV

17  group that tried to get their photographer.  The Army didn't

18  have a photographer so they could use at that time.  And so we

19  reached out to -- they said reach out to WHS.  We reached out to

20  WHS and they finally were able to get a photographer to come and

21  take photos of that retirement.  But on the day of the

22  retirement WHS bailed, so the Army in turn sending up one of

23  their photographers which was my original request.  So we ended

24  having a photographer there to take these photos."

25          So the question was:  What that camera was used for?  And

1     you said, "The retirement of Gordon Heddell" is the first thing

2     you said?

3     **A.**     Okay.  That's -- that's not what I meant.  But I'm -- I

4     don't read it that way either.  But so what I was explaining was

5     during the IG's retirement ceremony, there was a whole ordeal

6     trying to get a photographer to photograph the event.  And at

7     the last minute WHS sent me an e-mail that morning and said they

8     couldn't make it.  So the Army ended up sending a photographer

9     of their own with their own camera to take the photo.

10          So I didn't intend to say that that camera -- that the

11    Army sent a photographer without a camera and used the camera

12    that we had in 2011 that we didn't have.

13    **Q.**     Okay.  But let me -- we'll move on in just a second.

14          But Mr. Lumho, the immediate question that Mr. Amolsch

15    asked you then was, "Were there other reasons why that camera

16    was put to use other than for photo ID's and badges?"  And you

17    immediately answered, "With the Gordon Heddell retirement,"

18    correct?

19    **A.**     Sorry.  Again, that -- that's not what I intended for it

20    mean.  If that's the way it came off then that was incorrect.

21    The camera was not even purchased.  And that's part of the

22    reason why we bought the camera is because of the fiasco we had

23    at Heddell's retirement.

24    **Q.**     And Gordon Heddell retired in December of 2011, correct?

25    **A.**     He did and I got an award for scrambling to get a

1    photographer for that event.

2         MR. CARLBERG:  One moment, please.

3         MR. SALVATO:  Your Honor, could we approach real quickly

4    on just the scheduling issue?

5         THE COURT:  Yes, sir.

6         (Following sidebar discussion had on the record at 5:14

7    p.m.:)

8         MR. SALVATO:  My apologies, Your Honor.  It looks like the

9    government is moving on to the next topic, so I hope I picked an

10   appropriate time.  We do have our two character witnesses that

11   have been patiently waiting for a couple of days.  I know one of

12   them does have a doctor's appointment that he needs to go to at

13   5:45, so I was just asking how long do you think you will have

14   left, and then with Mr. Amolsch's redirect perhaps I could excuse

15   him to come back first thing in the morning, but I'm -- I'm

16   conscious of the difficult task to cross-examine someone over a

17   period of time with a lot of information, so.....

18        MR. CARLBERG:  Thank you, Mr. Salvato.  I have, I believe,

19   two more lines of cross that I do not anticipate taking more than

20   20 minutes.

21        THE COURT:  It's 5:15 right now.  That gives you 5:35.

22   And how much redirect do you have?

23        MR. AMOLSCH:  A fair amount.  He's covered a fair amount

24   of ground, so I will not be able to finish it -- probably an

25   hour.  I don't know.  I don't want to mislead the Court.

1        THE COURT:  We're not going to repeat everything he did on

2   direct.

3        MR. AMOLSCH:  Actually, no, I'm only going to go over the

4   exhibits the government asked him about.

5        THE COURT:  Well, that's all your direct testimony, too,

6   so we're not going to go -- I mean, you can ask pointed questions

7   about stuff.

8        MR. AMOLSCH:  Yes, sir, but I just wanted to -- they've

9   gone over a fair number of exhibits.  There are some I've never

10  seen before, which is fine, but it's going to take me a little

11  while.

12       THE COURT:  We're not going to get to your witnesses.

13       MR. SALVATO:  I have two five-minute witnesses, so I can

14  tell them to be back right at quarter to 9 and just jam it out.

15       THE COURT:  Okay.  That's fine.

16       MR. SALVATO:  But I don't want to hold somebody up from

17  having a doctor's appointment.

18       THE COURT:  I agree.  Okay.  Thank you.

19       MR. SALVATO:  Can I step out for two seconds?

20       THE COURT:  Sure.

21       (Sidebar discussion concluded.)

22       THE COURT:  We're probably going to go until 6:00.  Do you

23  all need a quick comfort break, or are you okay?  Okay.

24  All right.

25       MR. CARLBERG:  Court's indulgence.  I'm going to cut it

1   down to one last line, so if I can have 30 seconds I'll be ready

2   to do that.  One moment, please.

3   BY MR. CARLBERG:

4   **Q.**    Mr. Lumho, do you recall on direct testimony with

5   Mr. Amolsch a few moments ago, well it's been more than a few

6   moments now, but do you remember that?

7   **A.**    Yes, I do.

8   **Q.**    And do you remember when you were discussing how you met

9   with certain agents at the Department of Defense to go over some

10  of the service orders?

11  **A.**    Yes, I do.

12  **Q.**    And you -- you testified that it -- you wrote the service

13  order portal numbers on those service orders, right?

14  **A.**    Correct.

15  **Q.**    And that by doing that you saved the agents a lot of

16  time, right?

17  **A.**    That was an assumption, yes.

18  **Q.**    Okay.  And that -- I think you said, if I have this

19  right, you were, "Not trying to deceive -- I was trying to help

20  them."  Is that right?

21  **A.**    Yes.

22  **Q.**    Okay.  Well, Mr. Lumho, do you remember a time when that

23  investigation sought your bank records?

24  **A.**    Yes.

25  **Q.**    And do you remember receiving a "Notice to Consumer"

1   about the Inspector General wanting to go look into your Navy

2   Federal Credit Union account?

3   **A.**   I do, yes.

4   **Q.**   Do you remember hiring a lawyer to try to fight that?

5   **A.**   Of course, yes.

6        MR. CARLBERG:  I'm going to hand up what's been marked as

7   Government's 1553.

8        THE WITNESS:  Yes.

9   BY MR. CARLBERG:

10  **Q.**   Is that the Motion to Quash subpoena that your attorney

11  filed in the Eastern District of Virginia on December 9th, 2014?

12  **A.**   Yes.  This is a motion that my attorney recommended I do,

13  yes.

14  **Q.**   And you -- if you turn to -- before we admit it and

15  publish it, if you turn to -- it looks like Page 8, it has a

16  subpoena.  Do you see that?  To you, or a subpoena to your bank?

17  **A.**   Yeah.  I don't -- I don't know which one Page 8 is, but I

18  do know there was a subpoena to the bank, yes.

19  **Q.**   Let's go to the last page?

20  **A.**   Okay.

21  **Q.**   Do you see that?  Is that your sworn statement that you

22  attached to that -- to that complaint or to that --

23  **A.**   Yes.

24  **Q.**   Okay.  And that's your signature?

25  **A.**   Yes.

1          MR. CARLBERG:  I'd like to move to admit and request

2     permission to publish 1553, Your Honor?

3          MR. AMOLSCH:  No objection.

4          THE COURT:  It's received.

5          (Government's Exhibit 1553 admitted into the record.)

6     BY MR. CARLBERG:

7     **Q.**    So Mr. Lumho this is your Motion to Quash the Inspector

8     General's subpoena for your bank records, right?

9     **A.**    Yes.  This is what my attorney had -- had submitted, yes.

10    **Q.**    Okay.  And if we go to -- because it's an Inspector

11    General subpoena --

12         MR. CARLBERG:  Ms. Sandvig, if we go to page one, two,

13    three, four -- Page 6.

14    BY MR. CARLBERG:

15    **Q.**    Because it was an Inspector General subpoena, they were

16    required to provide you notice of this, right?

17    **A.**    Um, sure.  Yes.

18         MR. CARLBERG:  Okay.  And if we go to three more pages,

19    Ms. Sandvig, to the --

20    BY MR. CARLBERG:

21    **Q.**    That's a copy of the subpoena, right?  Where they were

22    seeking your bank records, right?

23    **A.**    Yes.  Yes.

24    **Q.**    All right.

25         MR. CARLBERG:  And then one more page, Ms. Sandvig.

1    BY MR. CARLBERG:

2    **Q.**    Some of the documents they were seeking were monthly

3    statements, deposits, transfer records.

4    Do you see that?

5    **A.**    Yes.

6    **Q.**    Okay.

7         MR. CARLBERG:  And if we can go to the last page,

8    Ms. Sandvig.

9    BY MR. CARLBERG:

10   **Q.**    And this was your sworn statement, right, Mr. Lumho?

11   **A.**    Yes.

12   **Q.**    And you stated down below in this --

13        MR. CARLBERG:  You can enlarge the last bottom half.

14   BY MR. CARLBERG:

15   **Q.**    You stated that, "These records are not relevant to a

16   legitimate law enforcement inquiry, as they are outside of the

17   scope of the Department of Defense's purview, and the Department

18   of Defense lacks a factual basis to support the subpoena."

19   Do you see that?

20   **A.**    That's what my attorney wrote, yes.

21   **Q.**    But, well, you signed it, right?

22   **A.**    I did sign it.  Yes.

23   **Q.**    And you signed it under penalty of perjury, right?

24   **A.**    Correct.

25   **Q.**    That you believed it to be true and correct?

1    **A.**    At the time, yes.

2    **Q.**    And you lost that motion, right?

3    **A.**    I did.  Yeah.

4          MR. CARLBERG:  Okay.  So can we go to Government's 962

5    now.

6    BY MR. CARLBERG:

7    **Q.**    And Mr. Lumho, this is your bank account, right?

8    **A.**    It is.

9    **Q.**    This is what you did not want the Inspector General to

10   see, right?  It's what you were trying to prevent them from

11   getting access to?

12   **A.**    Okay.  Sure.  Yes.  Sure.

13   **Q.**    Okay.  And right here on the first page of this --

14         MR. CARLBERG:  Can we blow up the detail here.

15   BY MR. CARLBERG:

16   **Q.**    Do you see where it says, "Transfer from checking

17   Fidel O. Ramos Junior, $1,800"?

18   Do you see that?

19   **A.**    Yes, I do.

20   **Q.**    Well, Mr. Lumho if the Inspector General saw that, they'd

21   be able to trace back who Fidel Ramos was, wouldn't they?

22   **A.**    What year was that subpoena?

23   **Q.**    You filed your -- your motion in 2014.

24   **A.**    Right.

25   **Q.**    Yes.  It would cover bank records going back in time,

1    wouldn't it?

2    **A.**      Sure, yeah.

3    **Q.**      Yeah.  And so they would get these bank records, right?

4    **A.**      Mm-hmm.

5    **Q.**      And then they would see that money coming in from

6    Fidel Ramos, right?

7    **A.**      Yeah.  There was -- yeah.

8    **Q.**      And then that would lead them back to Fidel Ramos as MSO

9    Tech, wouldn't it?

10   **A.**      Yes.  Yeah.

11   **Q.**      So it might have been helpful to them to have that

12   information for their investigation, wouldn't it?

13   **A.**      Um, I -- yeah.

14   **Q.**      And you fought that?

15   **A.**      Based on my attorney's advice, yes.

16   **Q.**      But you fought it, you hired the attorney, you filed the

17   motion, right?

18   **A.**      I hired the attorney and my attorney did the rest of the

19   work.  I just signed the document, yes.  But based on what my

20   attorney told me that --

21   **Q.**      Just like Ron Capallia did all the work on all those

22   order you signed?

23   **A.**      Are you con- --

24   **Q.**      I'm just asking.  You said you just signed it.  Did you

25   review --

1   **A.**      My attorney wrote the document.

2   **Q.**      -- your sworn statement?

3   **A.**      I - I reviewed it, yes.

4   **Q.**      And you said they had no factual basis, right?

5   **A.**      Yes.

6   **Q.**      Okay.  And then the bank records show that Fidel Ramos

7   money, right?

8   **A.**      Yes.

9   **Q.**      Thank you.

10  **A.**      You're welcome.

11          MR. CARLBERG:  No further questions.

12          THE COURT:  Redirect.

13          MR. AMOLSCH:  Thank you, Your Honor.  May it please the

14  Court.

15          <u>REDIRECT EXAMINATION OF MATTHEW KEKOA LUMHO</u>

16  <u>BY MR. AMOLSCH:</u>

17  **Q.**      Good afternoon again, Mr. Lumho.

18          Could we bring up Government's Exhibit 158 and 159.

19          Do you remember Mr. Carlberg asking you questions about

20  this, these exhibits?

21  **A.**      Yes.

22  **Q.**      Okay.  So this is a -- tell the ladies and gentlemen of

23  the jury what -- what is -- what's the date on this e-mail from

24  Tim Donelson to you?

25  **A.**      11-7.

1    **Q.**    What year?

2    **A.**    2011.

3    **Q.**    Okay.  And what is -- what are you all discussing here?

4    **A.**    Um, I had a friend who called me and said, "Hey, I've got

5    a charter boat.  All my buddies bailed.  Do you want to go

6    fishing next or this coming Thursday" -- or whatever day it was.

7    **Q.**    What's your buddy's name?

8    **A.**    Dairush Maitari (Phonetic.)

9          THE COURT:  I'm Sorry?

10         THE WITNESS:  Dairush Maitari.

11   MY MR. AMOLSCH:

12   **Q.**    All right.  So Dairush has a charter, all right.  Go

13   ahead.

14   **A.**    And so he called me and said, "Hey, I already got it.  Do

15   you want to come fishing?"  And I said, "Sure."  And he said,

16   "Do you have any buddies?  I think there's four spots to fill."

17   **Q.**    All right.  And --

18   **A.**    So I reached out to -- I was actually at work and Barry

19   was I think in my office.  I don't know if he was in my office.

20   And I asked Barry, "Hey do you want to go fishing?"

21   **Q.**    All right.  And then -- did -- did -- who invited

22   Tim Donelson along?

23   **A.**    I believe it -- it was Bill invited -- I mean, Barry

24   invited Bill and Bill invited Tim.  I believe is how it went.

25   Either way --

1   **Q.**    So it was -- it was the five of you; is that right?

2   **A.**    I believe so.

3   **Q.**    All right.

4         MR. AMOLSCH:  Let's look at Government's Exhibit 159.

5   BY MR. AMOLSCH:

6   **Q.**    All right.  So the government asked you some questions

7   about who was present on this fishing trip?

8   **A.**    Correct.

9   **Q.**    And they asked you about four of the names on this.

10        MR. AMOLSCH:  I'm sorry.  At the very bottom.  I

11  apologize, Ms. Sandvig.  All the way at the bottom.  Right

12  there.  Thank you very much.

13  BY MR. AMOLSCH:

14  **Q.**    Okay.

15  **A.**    Yes.

16  **Q.**    The government asked you questions about four of the

17  people who were there.  They asked you about Kekoa Lumho, that's

18  you?

19  **A.**    Yes.

20  **Q.**    They asked you about Barry Atwood, whose that?

21  **A.**    MSO Tech. PVS.

22  **Q.**    They asked you about Bill Wilson --

23  **A.**    Yes.

24  **Q.**    -- who's that?  And they asked but Tim Donelson?

25  **A.**    Yes.

1   **Q.**     Now, did they ask you about Dar Maitari, Secret Service?

2   **A.**     No, they did not.

3   **Q.**     So Dar Maitari -- and Dar Maitari, Secret Service, is the

4   one who organized this trip?

5   **A.**     It was his organization, yeah.

6   **Q.**     All right.  And Dar is the one who paid -- who had

7   chartered the boat?

8   **A.**     He had charted the boat, arranged for the captain, and we

9   all paid cash to Dairush to pay for the charter boat, yes.

10  **Q.**     Everybody paid for themselves?

11  **A.**     Everybody paid for themselves.

12  **Q.**     All right.  The government asked you some questions about

13  your understanding about whether Fidel was going to be running

14  errands for Bill Wilson.

15  Do you remember those conversations?

16  **A.**     Yes.

17  **Q.**     Okay.  So what exactly happened?  How many conversations

18  were there about Fidel, Bill Wilson, and running errands.  Fill

19  that in.

20  **A.**     There was one conversation about it.

21  **Q.**     Do you remember what --

22  **A.**     Barry was complaining about having to pick up Bill

23  whenever Bill would fly in.  To go drive him around to meetings

24  at the DHS or at Level 3, and it was taking time away -- away

25  from -- from Barry.

1   **Q.**    Do you remember when this conversation happened?

2   **A.**    I don't recall exactly, no.

3   **Q.**    Do you remember if it was -- do you remember -- you don't

4   remember it at all?

5   **A.**    I mean.  I remember the conversation.  There was -- I --

6   I don't remember the exact time.  It was prior to Fidel getting

7   the job, though.

8   **Q.**    All right.  So did you -- so did you have more than one

9   conversation with Barry Atwood about trying to find

10  employment --

11  **A.**    Yes.

12  **Q.**    -- for Fidel?

13  **A.**    Yes.

14  **Q.**    All right.

15       MR. AMOLSCH:  Let's look up Exhibit 938, please.

16  BY MR. AMOLSCH:

17  **Q.**    Do you remember the government asked you questions about

18  this document?

19  **A.**    Yes.

20  **Q.**    Now, did you -- did you have anything to do with

21  preparing this document?

22  **A.**    No.  The first time I saw it is when it was given to me

23  from the government.

24  **Q.**    Do you know who provided the information on this

25  document?

1   **A.**     I have no idea.

2         MR. AMOLSCH:  Ms. Sandvig, so if we could go to the

3   bottom.

4   BY MR. AMOLSCH:

5   **Q.**     Mr. Carlberg asked you questions about

6   secretary/assistant.

7   Do you see that?

8   **A.**     Yes.

9   **Q.**     Do you know who wrote that there?

10  **A.**     No.  But it doesn't appear to match the handwriting of

11  the rest of the document.

12  **Q.**     Did you ever communicate to Mr. Wilson any desire to have

13  Fidel Ramos hired as a secretary/assistant?

14  **A.**     I never spoke to Bill about hiring anybody.

15  **Q.**     Okay.  All right.

16        MR. AMOLSCH:  So if we could pull up Government's 174

17  first, please.

18  BY MR. AMOLSCH:

19  **Q.**     The government asked you questions about this exhibit

20  relating -- referencing the Hawaii vacation?

21  **A.**     Yes.

22  **Q.**     All right.  Do you have family in Hawaii, Mr. Lumho?

23  **A.**     Yes.  A lot of family.

24  **Q.**     Okay.  Do you make -- how many trips have you made to

25  Hawaii do you think in the last 15 years?

1    A.    We go every other year to Hawaii.

2    Q.    All right.  And was Fidel along with you on this trip?

3    A.    Yes, he was.

4    Q.    And did he withdraw money with his own ATM card while you

5    were on this trip?

6    A.    Yes.

7    Q.    Okay.  Did he pay his own expenses when he -- or

8    contribute to his expenses when he was on this trip?

9    A.    Yes.

10   Q.    All right.  Mr. Carlberg asked you questions about

11   Tim Donelson and Bill Wilson.  "We need to talk immediately."

12   Do you see that?

13   A.    Yes.

14   Q.    Do you have any idea what that conversation was about?

15   A.    I have no idea.

16   Q.    Were you part of that conversation?

17   A.    No, I was not.

18   Q.    Mr. Carlberg asked you questions about Fidel's pay rate

19   going up from $10 to $50 an hour.  Did --

20   A.    Yes, I remember.

21   Q.    Did you have any knowledge about why that happened?

22   A.    I have no idea.

23   Q.    Did you even know that happened before that question was

24   posed to you?

25   A.    No.

1  **Q.**    The government asked you some questions about the $6,000

2  check and the $6,500 check that Fidel received around the

3  time -- in this time period.

4  Do you remember those questions?

5  **A.**    Yes, yes.

6  **Q.**    Okay.  What was your understanding about how the $6,000

7  check came to be?

8  **A.**    I assumed that it was a backlog of checks that he hadn't

9  received or --

10  **Q.**    Did you ask him any questions about the $6,000 check?

11  **A.**    No.  I did not.  Again, I don't even think I deposited

12  that check, but I don't know.

13  **Q.**    I'm sorry?

14  **A.**    I don't think I even deposited that check.  I signed it,

15  but I don't -- I don't remember depositing that check.

16  **Q.**    All right.  And the 6,500 -- $6,584 check.  Do you have

17  any idea what that -- how that number -- what that number

18  represents?

19  **A.**    No.

20  **Q.**    Do you have -- did you ever speak to Fidel about it?

21  **A.**    No, I did not.

22  **Q.**    At this point or at any point in 2012, tell me about how

23  much attention are you paying to the dates and times associated

24  with these events?

25  **A.**    Not very much.

1    **Q.**     Did you know of any connection between your going to

2    Hawaii and Fidel receiving a pay raise?

3    **A.**     No.  I -- I -- I. No -- I --

4    **Q.**     Do you know of any connection between your complaining

5    about the price MSO was charging for serv- -- Level 3's charging

6    for services and Fidel receiving a pay raise?

7    **A.**     No.  My -- my life at this point was extremely busy.  I

8    had plates that I was trying to keep up in the air spinning

9    between my home life with my son, who was under a year old.  I

10   had teenage daughters.  I had work that was -- that was

11   extremely busy.  It was a very, very busy time in my life.

12   **Q.**     Do you know of any connection between Fidel receiving

13   large checks and your complaining to Level 3 about how much

14   they're charging the government?

15        MR. CARLBERG:  Asked and answered.

16        THE WITNESS:  I have no idea.

17        THE COURT:  Yeah.  I'll allow it.

18   BY MR. AMOLSCH:

19   **Q.**     The government asked you some questions about Fidel's

20   DWI.  They asked you questions about his driver's license

21   application for a restricted driver's license.

22   Do you remember those questions?

23   **A.**     Yes, I do.

24   **Q.**     They asked you about MSO Tech being on the application.

25   Remember those questions?

1    **A.**      Yes, yes.

2    **Q.**      Did you have anything to do with putting together that

3    driver's license application?

4    **A.**      No.  I had nothing to do with it.

5    **Q.**      Oh.  Do you know who did?

6    **A.**      I have no idea.

7    **Q.**      All right.  Same with Fidel's application to work at the

8    Catholic church.  Were you involved in any way with his

9    application to work at the Catholic church?

10   **A.**      No.

11   **Q.**      Did you give him any information for him to use on

12   applying for the job?

13   **A.**      No.

14   **Q.**      Did he even speak to you about it beforehand?

15   **A.**      No, he did not.

16   **Q.**      All right.

17           MR. AMOLSCH:  Let's pick up Government's Exhibit 231,

18   please.

19   BY MR. AMOLSCH:

20   **Q.**      All right.  Mr. Lumho, do you remember Mr. Carlberg asked

21   you questions about this?

22   Do you remember this?

23   **A.**      Yes, I do.

24   **Q.**      He asked you specifically about the bullet points that

25   are kind of centered in the page.

1          MR. AMOLSCH:  Can we make that a little bit bigger.

2     BY MR. AMOLSCH:

3     Q.     "Consider the following in carrying out your

4     responsibilities as a DAR."

5     Do you remember he asked you about those?

6     A.     Yes, I do.

7     Q.     Did you ever receive any training that would make you

8     familiar with the terms and conditions of the referenced

9     contract?

10    A.     No, I did not.

11    Q.     Did you receive any training on ensuring the valid

12    obligating document was in place?

13    A.     No, I did not.

14    Q.     Did you receive any training on verifying service order

15    requirements?

16    A.     No, I didn't.

17    Q.     Did you receive any training on the fair opportunity

18    decision?

19    A.     No, I did not.

20    Q.     Did you receive any training on contractual service

21    ordering procedures?

22    A.     No, I did not.

23    Q.     Did you receive any training on what the agency standards

24    of conduct were as it relates to the WITS3 contract?

25    A.     No, I didn't.

```
 1   Q.     Tommy DAR -- Tommy DAR -- Tommy Carlyle, was he also a

 2   DAR?

 3   A.     He was.

 4   Q.     Would he have -- if you know, would he have signed this

 5   same document.  A DAR appointment?

 6   A.     Yes.

 7   Q.     Okay.

 8          MR. AMOLSCH:  Let's look at Government's Exhibit 232, if

 9   we could.  Could we go to page -- do you remember the government

10   asking you questions about this?

11          THE WITNESS:  Yes.

12          MR. AMOLSCH:  Could we go to Page 27?

13   BY MR. AMOLSCH:

14   Q.     The government asked you questions about this.  This

15   talks about what you may not do.

16   Do you remember this?

17   A.     Yes.

18   Q.     Did you ever solicit, accept, or coerce a gift from a

19   prohibited source?

20   A.     No.

21   Q.     Did you ever solicit, accept, or coerce a gift from

22   anybody?

23   A.     No, I did not.

24          MR. AMOLSCH:  Let's go to Page 28.

25   BY MR. AMOLSCH:
```

1    **Q.**    Did you ever --

2          MR. AMOLSCH:  I'm sorry, that just lists the prohibited

3    sources.  Can we go to Page 29.

4    BY MR. AMOLSCH:

5    **Q.**    Did you ever request, coerce, cash from anybody?

6    **A.**    No.

7    **Q.**    Tangible items?

8    **A.**    No.

9    **Q.**    Services?

10   **A.**    No.

11   **Q.**    A discount on a loan?

12   **A.**    No.

13   **Q.**    Okay.

14         MR. AMOLSCH:  And Page 30.

15   BY MR. AMOLSCH:

16   **Q.**    Did anybody indirectly give any of your family members

17   gifts who were a prohibited person, as far as you know?

18   **A.**    Not as far as I know.

19         MR. AMOLSCH:  Let's go to 234.

20   BY MR. AMOLSCH:

21   **Q.**    All right.  Do you remember being asked these questions?

22   **A.**    Yes.

23   **Q.**    This is a conflict of interest form, correct?

24   **A.**    Yes.

25   **Q.**    Okay.  What do you understand this conflict of interest

1  form to mean?

2  **A.**     What did I --

3  **Q.**     Take a look at it and -- I mean, take your time, but

4  Mr. Carlberg asked you questions about it.  And I want to follow

5  up.

6  **A.**     Okay.  So what did it -- what did it mean?

7  **Q.**     Did you understand what it means to have a conflict of

8  interest?  You understood that, right?

9  **A.**     Yes, I do.

10  **Q.**     Mr. Carlberg asked you questions about whether you

11  disclosed that you had a conflict of interest, prior to sitting

12  on the technical review board.

13  Do you remember that?

14  **A.**     Yes.

15  **Q.**     Was this the same technical review board where you voted

16  against Bill Wilson?

17  **A.**     Yes.

18  **Q.**     Did you have a conflict of interest that would have

19  prevented you from voting against Bill Wilson?

20  **A.**     No.

21       MR. CARLBERG:  Objection as to the --

22       THE COURT:  Sustained, improper question.  It's not the

23  conflict of interest that's the subject of this case.

24  BY MR. AMOLSCH:

25  **Q.**     Were you aware of any conflict of interest that you

1    violated?

2    **A.**      No, I was not.  I did not give -- I'm sorry.

3           THE COURT:  Wait for the next question.

4    BY MR. AMOLSCH:

5    **Q.**      The government asked you questions about Government's

6    Exhibit 157.

7    **A.**      Yes.

8    **Q.**      I think this was about -- yeah, at the bottom.  You

9    removed Tom's name and put mine on the orders for all the future

10   ones?

11   **A.**      Correct.

12   **Q.**      What's the date of this e-mail?

13   **A.**      November 4th, 2011.

14   **Q.**      And why did you send Ron that e-mail?

15   **A.**      Because I was the guy that he was going to be working

16   with for these orders.

17   **Q.**      Did Ron keep -- excuse me, keep putting -- did Ron do

18   what you asked?

19   **A.**      No, he did not.

20   **Q.**      Did he continue to put Tommy's name on it?

21   **A.**      Yes.

22   **Q.**      Did Tommy still receive orders?

23   **A.**      He did.

24   **Q.**      Did Tommy still sign orders?

25   **A.**      Yes, he did.

1          MR. AMOLSCH:  Let's look at Government's Exhibit -- I'm

2    sorry, I have to get this one.  I got it right here.

3    BY MR. AMOLSCH:

4    **Q.**    All right.  Do you remember -- I'm sorry.  Do you

5    remember the government asking you questions about this?

6    **A.**    Yes.

7    **Q.**    All right.  This is an e-mail from you to various people

8    about WITS.  What is the significance of this e-mail?

9    **A.**    Um, I'm not sure what the significance of the e-mail is.

10   There was --

11   **Q.**    Why did you write that e-mail?

12   **A.**    Willie and I were bantering back and forth about -- we

13   were joking, Willie and I had a personal relationship, so we

14   were joking with each other.

15   **Q.**    Sorry?

16   **A.**    We were joking with each other.

17   **Q.**    All right.  And what's the date on that e-mail?

18   **A.**    October 11th -- October 28th, 2011.

19   **Q.**    2011.

20          MR. AMOLSCH:  Let's look at Government's Exhibit 161.

21   BY MR. AMOLSCH:

22   **Q.**    All right.  Do you remember the government asking you

23   questions about this?

24   **A.**    Yes.

25   **Q.**    Do you remember who signed this service order request

1    form?

2    **A.**     This one was for the 400 Army Navy Drive clean-out.  That

3    was Tommy Carlyle.

4    **Q.**     Tommy Carlyle.  Was he aware of the service order --

5    Statement of Work that went along with that before he signed it?

6    **A.**     Yes.

7    **Q.**     How involved was Tommy Carlyle in the planning of the

8    move from 400 Army Navy Drive to the Mark Center?

9    **A.**     Well, Tommy was in charge of -- he was my liaison -- he

10   was the guy -- the project lead for the restoration, which is

11   what this was.

12   **Q.**     So the government asked you questions about the CLIN,

13   4,171 -- I'm sorry.  The CLIN being, I apologize, for the cable

14   installer.

15   **A.**     Yes.

16   **Q.**     Okay.  So what was your -- what is your understanding

17   about the relationship of the CLIN to the work and services

18   actually being provided?  What was your understanding of that?

19   **A.**     Um --

20        MR. CARLBERG:  Objection, asked and answered, going over

21   direct again.

22        THE COURT:  I'll allow it.

23        THE WITNESS:  What was my understanding of --

24   BY MR. AMOLSCH:

25   **Q.**     The relationship between the CLIN for cable installer and

1   the remarks section:  Professional services for network removal

2   400 Army Navy Drive?

3   **A.**     Um, that the more hours you add to it, the bottom line

4   number would -- would change.

5   **Q.**     So how did you view these invoices?  They're internally

6   inconsistent?

7   **A.**     So I looked at the service order request as not

8   necessarily placing an order.  I looked at it as how I was told

9   to pay for things that ISD was ordering.

10  **Q.**     I need you to stand a little bit closer to the

11  microphone.

12  **A.**     Okay.

13  **Q.**     I didn't hear that last part.  I'm sorry.

14  **A.**     I looked at the service order request form as a -- not

15  necessarily a way to place orders but how I was a told to pay

16  for things that ISD was ordering.

17  **Q.**     All right.

18          MR. AMOLSCH:  Let's look at 162.

19  BY MR. AMOLSCH:

20  **Q.**     All right.  Again, you're asking Tommy to sign and send

21  it back.  Do you see that?  It says, "Please sign and send --

22  **A.**     Yes.

23  **Q.**     -- to me?"  Okay.  And why are you asking Tommy to sign

24  it?

25  **A.**     Because Matthew told me to.  "Please tell me that the

1   task order was signed."

2   **Q.**    Why are you sign -- why are you asking Tommy to sign --

3   **A.**    I was TDY in Korea.

4   **Q.**    I think the government asked you some questions about the

5   costs associated with the move.

6   Do you remember that?  Like how much it cost?

7   **A.**    Yes.

8   **Q.**    All right.  Was that cost more or less than the fine for

9   over staying the lease?

10   **A.**    It was much less.

11       MR. AMOLSCH:  Could we look at Government's Exhibit 164.

12   BY MR. AMOLSCH:

13   **Q.**    All right.  Do you remember Mr. Carlberg and I both asked

14   you questions about this?

15   **A.**    Yes.

16   **Q.**    Why are you forwarding this to Bill Wilson and Level 3?

17   **A.**    To get it purchased.

18   **Q.**    I'm sorry?

19   **A.**    To get it purchased.

20   **Q.**    All right.  But why forward it to -- oh, I'm sorry, I'm

21   misreading it.  Never mind.  I apologize.  I misread your

22   e-mail.

23       MR. AMOLSCH:  Let's look at 167.  If we could go to the

24   service order.

25   BY MR. AMOLSCH:

1   **Q.**     Okay.  What is this service order request form for?

2   **A.**     This was for the additional phase 2 of the clean-out at

3   the IG, at our satellite offices.

4   **Q.**     This is the second part of BRAC?

5   **A.**     Yes.

6   **Q.**     Do you see the date?

7   **A.**     Yes.

8   **Q.**     What's the date?

9   **A.**     3-26-2012.

10  **Q.**     Had the work already been completed by the time you got

11  this order?

12  **A.**     Um, yes.

13  **Q.**     Okay.  Was that an unusual or regular occurrence that you

14  would get a service order request form after work had been

15  started or completed?

16  **A.**     That was probably unusual.

17  **Q.**     And the Statement of Work that was associated with that?

18  Do you see that?

19  **A.**     Yes.

20  **Q.**     All right.  Mr. Steinberg -- Mr. Carlberg asked you if

21  Mr. Steiniger was on this e-mail.  Did you provide this

22  Statement of Work and service order to Mr. Steiniger?

23  **A.**     Yes.

24          MR. AMOLSCH:  If we could look at 168.  If we can go to

25  the bottom.

1    BY MR. AMOLSCH:

2    Q.    Okay.  Again, look at the remarks section.  What does the

3    remarks section say?

4    A.    "Professional services for network removal at 400 Army

5    Navy Drive Arlington, Virginia, SOW dated 3-26."

6    Q.    So does the remark section describe the work being done?

7    A.    Yes.

8    Q.    All right.  Did you present that to Mr. Steiniger as

9    well?

10   A.    Yes.

11   Q.    Okay.

12         MR. AMOLSCH:  Let's talk about Government's Exhibit 172.

13   If we could go to the bottom, Ms. Sandvig.  Thank you.

14   BY MR. AMOLSCH:

15   Q.    Okay.  When Ron Capallia called you about this --

16   A.    Yes.

17   Q.    -- can you describe his demeanor?

18   A.    He was panicked.  He was panicked.

19   Q.    Okay.  And why was he -- did he tell you why he was

20   panicked?

21   A.    He said Tim Donelson was going to have his behind.

22   Q.    All right.  And are you familiar with Tim Donelson?

23   A.    I was familiar with him, yes.

24   Q.    Can you describe his personality?

25   A.    He was -- he was a -- he was a bit -- a bit gruff and a

1   bully.  I wouldn't want to work for him.

2   **Q.**    I mean, did -- how else did Ron sound?  Panicked?

3   **A.**    He did, yes.

4   **Q.**    So you signed it and you sent it back.  And you said it

5   was a mistake.  Now, why was it a mistake -- why was it a

6   mistake to sign and it send it back?

7   **A.**    Because I shouldn't have signed something that was

8   back-dated and that I didn't even really read.

9   **Q.**    All right.  And I think you testified you wished you'd

10  never done it?

11  **A.**    I do wish I'd never done it.  I didn't think it would

12  affect me.  I thought it was more for Level 3 and Ron.

13  **Q.**    All right.

14          MR. AMOLSCH:  If we could look at Government's

15  Exhibit 173.  If we could go to the bottom.  Okay.  Is this 173?

16  Is this the Dell?  The Lenovos?

17  **A.**    No.

18  **Q.**    Yes, it is.

19          MR. AMOLSCH:  Okay.  I'm sorry, Your Honor.  My Court's

20  indulgence.

21  BY MR. AMOLSCH:

22  **Q.**    All right.  So looking at the bottom, "Kekoa, where did

23  we leave off on the concept of acquiring laptops for the WITS

24  vehicle?"  Mr. Carlberg asked you questions about that.  Why is

25  Mr. Steiniger asking you about WITS as it relates to those

1    laptops?

2    **A.**    Because he's the one that approved us to -- him and

3    Willie to use WITS to purchase the laptops.

4    **Q.**    All right.

5         MR. AMOLSCH:  And if we could go to the actual service

6    order request form, which I think is 112B.

7    BY MR. AMOLSCH:

8    **Q.**    All right.  Mr. Carlberg asked you questions about senior

9    telecom specialists for Lenovo installations.

10   Do you remember those questions?

11   **A.**    Yes.

12   **Q.**    He asked you if Lenovo requires installation?

13   **A.**    Correct.

14   **Q.**    Does it?

15   **A.**    No.

16   **Q.**    Was that the same -- were those remarks:  "Technical

17   support for the Lenovo installation," in the service order

18   request form when you showed it to Mr. Steiniger?

19   **A.**    Yes.  This was the service order that I showed him.

20   **Q.**    Would he know that Lenovos don't require installation?

21   **A.**    Yes.

22   **Q.**    How about Mr. Spivey?  Is that what you showed him before

23   he green-lighted --

24   **A.**    Yes.

25   **Q.**    -- the purchase?

**A.**     Yes.

        THE COURT:  This is all the matters that you went over on direct examination, and beyond what was on cross.  So let's finish up.

        MR. AMOLSCH:  I'm about done, Your Honor.

        THE COURT:  Thank you.

        MR. AMOLSCH:  Okay.  If we could bring up Government's Exhibit 803 and Government's Exhibit 177.

BY MR. AMOLSCH:

**Q.**     This is 803.  Do you recognize that, Mr. Lumho?

**A.**     Yes.

**Q.**     The Canon purchase?

**A.**     Yes.

        MR. AMOLSCH:  If we could go to 177, go to the bottom.

BY MR. AMOLSCH:

**Q.**     All right.  So the date -- what's the date on the -- on the request?

**A.**     6-20.

**Q.**     All right.  And what's the date that you actually ordered it?  The service order request form is actually dated?

**A.**     6-11.

**Q.**     Are those the same cameras?

**A.**     Yes, it is.

        MR. CARLBERG:  Objection, these are two different exhibits and not what was shown by the government, side-by-side.

1          MR. AMOLSCH:  Okay.

2          THE COURT:  Overruled.  He can --

3          MR. AMOLSCH:  The -- um.  This is Government's 1550?  Oh,

4    I got it.  Never mind.  I'm sorry.  Okay.  Let me, um -- let's

5    take those down, Ms. Sandvig.

6    BY MR. AMOLSCH:

7    Q.    Let me ask you about Government's Exhibit 1 -- 1550.  And

8    the government asked you questions about the front of this

9    e-mail.

10   Do you remember that?

11   A.    Yes.

12   Q.    Okay.  I'm going to ask you some questions though, about

13   the back of the e-mail.

14          THE WITNESS:  I believe Ms. Sandvig has it on the --

15          MR. AMOLSCH:  Oh, she -- I apologize.  Thank you.  So,

16   um, this is, um -- can you go down, Ms. Sandvig.  I'm sorry, the

17   first -- I apologize.  Up.  Okay.

18   BY MR. AMOLSCH:

19   Q.    So this is from Jennifer Paper.  Do you see that at the

20   bottom?

21   A.    Yes.

22          MR. AMOLSCH:  Okay.  And then if we can go to the bottom.

23   Okay.  Thanks.

24   BY MR. AMOLSCH:

25   Q.    Okay.  So this is -- this is an e-mail to you and Mark,

1    right?

2    **A.**      Yes.

3    **Q.**      She's asking you about the Cisco maintenance having been

4    ordered through WITS; is that correct?

5    **A.**      Correct.

6    **Q.**      Is that referencing the SmartNet?

7    **A.**      Yes, it is.

8    **Q.**      Okay.  And is she asking about a final cost?

9    **A.**      She is.

10   **Q.**      All right.  And down here, do you provide her with

11   numbers?  533,000.  Do you see that at the bottom?  December?

12   **A.**      That was her e-mail, yes.

13   **Q.**      That was her e-mail to you --

14   **A.**      "Can you let me know if these are also equipment orders."

15   Yes.

16   **Q.**      Okay.  Then it says, "Kekoa, you had previously given me

17   some equipment break outs from the WITS bills."

18   **A.**      Correct.

19   **Q.**      What is she -- what are -- are the equipment break outs

20   on the WITS bills that she's talking about?

21   **A.**      I believe that was the spreadsheet that I had sent her.

22   **Q.**      Okay.  And did that list the equipment?

23   **A.**      Yes, it did.

24   **Q.**      And it listed the price?

25   **A.**      Yes.

1    Q.    And she then says, "Can you let me know if these are also

2    equipment orders."

3    Do you see that?

4    A.    Yes.

5    Q.    Is she asking you for more information on the equipment?

6    A.    On the equipment, yes.

7    Q.    And did you provide that information?

8    A.    Yes, I did.

9    Q.    Okay.

10         MR. AMOLSCH:  If we can go to the top.

11   BY MR. AMOLSCH:

12   Q.    And you reference in here Cisco maintenance, Polycom

13   maintenance, backup tapes.

14   Do you see that?

15   A.    Yes.

16   Q.    Do you remember those questions I asked you about the

17   service order request forms related to these?

18   A.    Yes.

19   Q.    Is that the -- are those the equipment purchases that

20   you're -- Jennifer Paper is talking about?

21   A.    Yes, it is.

22   Q.    And one last question.  I'm sorry, Mr. Lumho.  The

23   government asked you about Mr. Spivey, "My patience is wearing

24   thin.  I'm about two seconds from having to cancel these orders

25   per Spivey."

1    Do you see that?

2    **A.**     Yes.

3           MR. AMOLSCH:  Can you put it back up?

4    BY MR. AMOLSCH:

5    **Q.**     So was Mr. Spivey aware of these order?

6    **A.**     Yes, he was.

7    **Q.**     Was he aware of how they were ordered?

8    **A.**     Yes, he was.

9           MR. AMOLSCH:  Court's indulgence.  I'm about done.

10   BY MR. AMOLSCH:

11   **Q.**     All right.  The government asked you some questions and

12   put the camera in your hand.

13   Do you remember that, Mr. Lumho?

14   **A.**     Yes, I do.

15   **Q.**     Okay.  Let me ask you questions about both the camera and

16   the lens.

17   Do you remember that?

18   **A.**     Yes.

19   **Q.**     How much do those two items, if you remember, cost

20   together?

21   **A.**     They would have been over $3,000.

22   **Q.**     Were those items that could have been purchased using the

23   GPC card?

24   **A.**     That would have been a split purchase.

25   **Q.**     Okay.  And was that permitted?

1    **A.**    No.  That would have not been permitted.

2    **Q.**    Mr. -- Mr. Carlberg asked you questions about the use of

3    this.  And he asked you about questions that came up about use

4    in auditoriums.

5    Do you remember that?

6    **A.**    Yes.

7    **Q.**    All right.  Let's talk about Gordon Heddell; the last

8    thing --

9    **A.**    Yes.

10   **Q.**    -- I want to ask you about.  Tell me about Gordon

11   Heddell.  Was this -- this -- was this camera equipment used at

12   Gordon Heddell's reception?

13   **A.**    No.  It wasn't purchased yet.

14   **Q.**    Okay.  So walk me through that again.

15   **A.**    Okay.

16   **Q.**    What happened with Gordon Heddell, as it relates to that

17   camera purchase?

18   **A.**    So that camera purchase is a result of the hoops that I

19   had to jump through to get a photographer for Gordon Heddell's

20   retirement.

21   **Q.**    All right.  Tell me about that.  The government asked you

22   some questions about it, but you know, it sounds like you went

23   through a couple different options for photographers?

24   **A.**    Yes.  So Gordon Heddell was the IG.  He was a four star

25   equivalent and he wanted to document his retirement.  He was --

1    it was in the auditorium.  We had planned for weeks in advance

2    about his ceremony.  And I was instructed, as an initial task

3    that Matthew asked me to do was to coordinate the photographer

4    for this event.

5         So I reached out to the Pentagon, WHS, and they said that

6    they did not have a photographer available.  Let me back up, I'm

7    sorry.

8         First, I went to OCCL, and their part-time photographer

9    was not available.  So I went to WHS, they weren't available at

10   that time and date, so they recommended that I reached out to

11   the Army.

12        I reached out to the Army, they had a photographer that

13   was available but on the day of the event, the Army sent me an

14   e-mail saying, that they were not going to be able to send

15   somebody.  I could have it backwards.  It was one -- WHS was one

16   and the Army.  Either way, the one that was supposed to come and

17   be there that morning bailed on us and said they weren't going

18   to be able to come.

19        So I reached back out to the other provider, I believe it

20   was WHS, and they said, "We can accommodate."  So that morning

21   they sent me an e-mail saying, "The photographer's on the 7M --

22   7M bus from the Pentagon to the Mark Center, and will be there

23   at 9:00."  Which is the time that the event was happening.

24        So when it was all said and done, the retirement was a

25   success.  The photographer was there, took pictures, had a

1    similar camera.  And that is how I was given an award by Matthew

2    and by Mr. Wilson for the headache that I had to go through and

3    the stress of getting this photographer.  It was -- it was a

4    very involved thing with the senior staff of the IG.

5    **Q.**    And did that event lead to the purchase of that camera?

6    **A.**    So that was one of the requirements that came out when we

7    were discussing buying a camera for the Outlook pictures.  That

8    was one of the check boxes or requirements that we could use

9    that camera for was to take photos of retirements, auditorium,

10   and ISD would have their own photographer to take pictures that

11   we could put on the Internet, we could post to the Internet.

12        MR. AMOLSCH:  Thank you, Your Honor.  I have no further

13   questions.

14        THE COURT:  All right.  Thank you.  All right.  Mr. Lumho,

15   you may step down and resume your seat, sir.

16        THE WITNESS:  Thank you.

17        THE COURT:  All right.  We're done for today.  Do we need

18   a sidebar for any reason or -- at this time before we let the

19   jury go?

20        MR. BURKE:  No, sir.

21        MR. AMOLSCH:  No, sir.

22        THE COURT:  All right.  Then obviously, my predictions as

23   usual were wrong that I gave you last night about how far we

24   would get today.  But I think that we're close to getting the

25   case to you, and should after a couple of -- I'm not sure

1    how long.  I know there are a couple of short witnesses, and

2    we'll go from there, but I think that -- I'm confident that

3    you'll get the jury instructions and closing arguments tomorrow

4    in the case.

5         All right.  So real important as usual.  Enjoy the

6    evening.  Don't do any research, don't investigate the case, and

7    don't speak to anyone about the case.  And we'll see you tomorrow

8    at 9:00.  Thank you.  You're excused.

9         (Jury out at 6:00 p.m.)

10        THE COURT:  All right.  So you have the two character

11   witnesses you're going to put on that will be short, I'm sure.

12   And then the government's going to put on a rebuttal case in

13   light of the defendant's.

14        MR. BURKE:  Your Honor, we may put on a five-minute

15   rebuttal case, maybe 10.  But it will be one very short witness

16   and that's it, if -- if at all.

17        THE COURT:  Okay.  So where are we on jury instructions,

18   then?

19        MR. BURKE:  Your Honor, I think, I think the only -- well,

20   the only remaining issues that I'm aware of are, first, whether

21   or not the defendants intend to ask for a lesser included offense

22   instruction, and then the issue about --

23        THE COURT:  Willfulness.

24        MR. BURKE:  The *mens rea* standard as to -- as to false

25   claims, Your Honor.  And I have to admit I did not have much time

1    to research this over the lunch break.  I will tell, Your Honor,

2    that my view, at least as of right now, I believe that the -- I

3    believe that -- Court's indulgence -- that the case brought to

4    our attention by Mr. Sears, it predates all of the modern case

5    law from the Supreme Court from *Ratzlaf* to *Cheek*, to *Bryan* that

6    all came down in the 1990s.

7        Most recently, *Bryan versus United States* that I think are

8    the most recent pronouncements from the Supreme Court about how

9    we interpret *mens rea* in federal criminal statutes.  And in

10   particular the *Bryan* case, Your Honor, which I think is the most

11   recent pronouncement.  It's a 1998 case from the Supreme Court,

12   says that:  "Unless the statutory context provides otherwise,

13   when a criminal statute provides that acts be done knowingly,

14   there's no requirement of a proof of knowledge of the law."

15       And so, I would say that, Your Honor, at least where we

16   stand right now, based on the preliminary research that I've

17   done, it seems to me that -- that -- that the *Maher* case, which

18   long predates all of the modern Supreme Court case law on this

19   point, I believe is not -- does not correctly state the law as to

20   287, which requires that the conduct be knowing -- be done

21   knowingly but says nothing about willfulness.  And so that --

22   that's my preliminary thought, Your Honor.  I'm more than happy

23   to look at this some more tonight and talk with Mr. Sears.  We

24   have had a pretty good dialogue in this case about jury

25   instructions, but if I have to take a position right now, Your

1   Honor, I think our position --

2       THE COURT:  No.  I think it's a good idea for you to take

3   some time when you get back to the office and then you can reach

4   out to Mr. Sears and the two of you can discuss it and let me

5   know what you think, you know, before court.

6       MR. BURKE:  We'll do so, Your Honor.  And the other thing

7   I'll make sure to do tonight is to circulate a proposed verdict

8   form whenever I know from the defense whether they intend to ask

9   for a lesser included --

10      MR. BURKE:  -- or perhaps we could do two; one with and

11  one without the lesser included.

12      THE COURT:  Okay.  A couple of other jury instruction

13  matters.  There's one that was submitted for typewritten

14  transcript of tape recorded conversations.  I would think that we

15  do not need that, right?

16      MR. BURKE:  Your Honor, I think there's been admitted 179,

17  which is the voicemail from Mr. Lumho, as well as I believe

18  it's -- there's also a voicemail from Mr. Atwood, both of which

19  have been admitted.  And I think there are transcripts marked for

20  convenience of the jurors.  Neither voicemail is particularly

21  long, so we could just leave out the transcripts and leave out

22  that instruction but --

23      THE COURT:  Yeah.  I didn't know the transcripts had been

24  admitted.

25      MR. BURKE:  They're marked as exhibits and I believe they

1  have been admitted.  The transcript of 179 is marked

2  Exhibit 179T, and the transcript for the Barry Atwood recording

3  is whatever it is plus a "T" after it.

4       THE COURT:  Well, if they're in, I can just -- I'll leave

5  the instruction in.  If they want to look at it they can look at

6  it and then they'll understand the obligation to use the actual

7  tape versus the written transcript if there's a difference.

8       There's an instruction on charts, and it references both

9  611 charts and 1006 charts having been admitted, and I don't know

10 whether the 611 charts were used or --

11      MR. BURKE:  I think it's just the --

12      THE COURT:  1006.

13      MR. BURKE:  -- 1006 charts.

14      THE COURT:  That's what I think.  Okay.  So we'll take the

15 611 charts out.

16      MR. BURKE:  I believe they're all 1006 charts.  I think

17 only the second half of that instruction applies.

18      THE COURT:  Okay.  All right.

19      There's a false exculpatory statements --

20      MR. BURKE:  Yes.  All that refers to numerous false

21 statements that the government contends that Mr. Wilson made

22 during his deposition, during his bond hearing, during his

23 various interviews with law enforcement.

24      THE COURT:  And the same for suppression and fabrication

25 of evidence.

```
1        MR. BURKE:  That's correct, Your Honor.  We would point to

2   the destruction of evidence, as well as the back-dating of the

3   false letter signed by Mr. Lumho on that point.

4        THE COURT:  All right.  And the character evidence

5   instruction is open-ended and refers to truth and veracity,

6   honesty and integrity, and being a law-abiding citizen.  And it

7   seems a little broad, and I usually -- well, truth and veracity,

8   is that what you are offering the character --

9        MR. SALVATO:  It would just be truth and veracity, Your

10  Honor.  I don't -- we don't need the law-abiding, et cetera.

11       THE COURT:  Okay.

12       MR. SALVATO:  And I would expect it would be reputation

13  and opinion.

14       THE COURT:  It reads:  "The defendant has offered evidence

15  of his good general reputation for truth and veracity.  The jury

16  should consider this evidence along with other evidence in

17  reaching its verdict."  So but it also lists honesty and

18  integrity, and being a law-abiding citizen.

19       MR. SALVATO:  Just strike law-abiding.  I think, that's

20  always awkward to --

21       THE COURT:  You want honesty and integrity?

22       MR. SALVATO:  Yes, sir.

23       THE COURT:  Okay.  All right.  All right.  I'll make that

24  change.  Okay.  That's all I have on the instructions.  So you

25  let us know where you go from there, and we'll -- if you have any
```

```
1   other last minute thoughts on them, I'm sure Mr. Sears will go

2   back and think about that tonight some more.  We'll deal with it

3   in the morning.  All right.  So we'll get the case to the jury

4   tomorrow.  All right.  Anything else before we break for tonight?

5           MR. BURKE:  No, Your Honor.

6           MR. AMOLSCH:  No, Your Honor.

7           MR. STEWART:  No, Your Honor.

8           MR. SEARS:  No, Your Honor.

9           THE COURT:  All right.  Thank you.  We're in recess.

10          (Proceedings adjourned at 6:08 p.m.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```