UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA

**UNITED STATES OF AMERICA**                    :
                                                :
                    **Plaintiff,**              :    Criminal Action
                                                :    No. 1:17-cr-00222-LO
          **v.**                                :
                                                :
**WILLIAM S. WILSON and**                       :
                                                :
**MATTHEW KEKOA LUMHO,**                        :    June 23, 2021
                                                :    (2:09 p.m.)
                                                :
          **Defendants.**                       :
                                                :
.............................. :

**DAY 11 – AFTERNOON SESSION**
**TRANSCRIPT OF JURY TRIAL PROCEEDINGS**
**BEFORE THE HONORABLE LIAM O'GRADY, and a JURY**
**UNITED STATES DISTRICT COURT JUDGE**

APPEARANCES:

For the United States:          **Matthew Burke, Assistant U.S.**
                                **Attorney**
                                United States Attorney's Office
                                (Alexandria)
                                2100 Jamieson Avenue
                                Alexandria, VA 22314
                                703-299-3700
                                Email: Matthew.Burke@usdoj.gov

                                **Russell L. Carlberg, Assistant U.S.**
                                **Attorney**
                                United States Attorney's Office
                                (Alexandria)
                                2100 Jamieson Avenue
                                Alexandria, VA 22314
                                703-299-3700
                                Email: Russell.L.Carlberg@usdoj.gov

```
APPEARANCES:   (Cont.)



For Defendant Wilson:        Andrew Michael Stewart, Esq.
                             Dennis Stewart & Krischer PLLC
                             2007 15th Street N
                             Suite 201
                             Arlington, VA 22201
                             703-248-0626
                             Email:
                             Andrew.m.stewart.esq@gmail.com

                             Stuart Alexander Sears, Esq.
                             Schertler Onorato Mead & Sears,
                             LLP
                             901 New York Avenue, NW
                             Suite 500 West
                             Washington, DC 20001-4432
                             202-628-4199
                             Fax: 202-628-4177
                             Email: Ssears@schertlerlaw.com

For Defendant Lumho:         Christopher Bryan Amolsch, Esq.
                             Law Office of Christopher Amolsch
                             12005 Sunrise Valley Drive
                             Suite 200
                             Reston, VA 20191
                             703-969-2214
                             Fax: 703-774-1201
                             Email: Chrisamolsch@yahoo.com

                             Frank Salvato, Esq.
                             1203 Duke Street
                             Alexandria, VA 22314
                             (703) 548-5000
                             Email: Frank@salvatolaw.com

Court Reporter:              Scott L. Wallace, RDR, RMR, CRR
                             Official Court Reporter
                             United States District Court
                             401 Courthouse Square
                             Alexandria, VA  2231-5798
                             Office: 703.549.4626
                             Cell: 202.277.3739
                             Email: Scottwallace.edva@gmail.com
```

Proceedings reported by machine shorthand, transcript produced
by computer-aided transcription.

# C O N T E N T S

**EXAMINATIONS**                                                                                     **Page**

CLOSING ARGUMENT ON BEHALF OF THE GOVERNMENT                    4

CLOSING ARGUMENT ON BEHALF OF DEFENDANT WILLIAM                47
WILSON

CLOSING ARGUMENT ON BEHALF OF DEFENDANT KEKOA LUMHO            89

FINAL CLOSING ARGUMENT ON BEHALF OF THE GOVERNMENT            139

                                                               152

## EXHIBITS

**DESCRIPTION**                                                                                     **Page**

1                <u>**AFTERNOON SESSION, JUNE 23, 2021**</u>

2 (2:09 PM.)

3      THE COURT:  All right.  Anything before we get our

4 jurors?

5      MR. AMOLSCH:  No, sir.

6      THE COURT:  Okay.  Ira, let's get the jury, please.

7      (Jury in at 2:10 p.m.)

8      THE COURT:  Please, have a seat.  All right, Mr. Burke.

9      MR. BURKE:  Thank you, Your Honor.

10           <u>**CLOSING ARGUMENT ON BEHALF OF THE GOVERNMENT**</u>

11      MR. BURKE:  How did this happen?  How did this come to

12 pass?  How did it happen that Kekoa LumHo could secretly place an

13 order for high-end camera equipment, equipment that he had

14 utterly no use for in his job at the DoD IG?  Equipment that he

15 ordered secretly using his personal Gmail account, sent directly

16 to defendant Wilson's right-hand man at MSO Tech, Barry Atwood.

17 Equipment that gets ordered through WITS, a GSA contract that is

18 supposed to be used for telephone and Internet services and

19 cannot legitimately be used to buy camera equipment.

20      An order placed nominally through a company called Level

21 3, a telecommunications company that doesn't manufacture or sell

22 camera equipment, an order that is then subcontracted, not to a

23 camera manufacturer, not to a camera store, but to Bill Wilson's

24 company, MSO Tech, a construction firm based 750 miles away in

25 Lake Butler, Florida, that has no experience or expertise in

1    selling or providing camera equipment?  Only to have

2    Bill Wilson's company arrange to ship all of this high-end camera

3    equipment, not to the DoD IG, but to the personal residence of

4    Kekoa LumHo's friend and fishing buddy, Barry Atwood.

5         And then how did it come to pass that all of this camera

6    equipment and the other electronics you've seen in the case, get

7    falsely billed to the government as part of various service

8    hours, falsely billed to the government in service hours,

9    including the service hour for 768 hours of cable installer for

10   the inflated price of $54,000, with LumHo himself directing the

11   key details from the service order be deleted before he signs it.

12   With LumHo himself authorizing and signing off on these

13   fraudulent service orders.  A service order that ensured that

14   Bill Wilson's company would profit handsomely from this

15   transaction, even though Bill Wilson's company added no value for

16   the government.  A service order that LumHo signed while Wilson

17   was also making secret payments to Timothy Donelson covered up by

18   fake invoices from a shell company called Apposite Services for

19   the supposed use of a bulldozer that Tim Donelson didn't have and

20   didn't own, a bulldozer that Bill Wilson owned himself and paid

21   for with his own money.

22        Fraudulent service orders placed by LumHo while Wilson was

23   also making secret payments to Ron Capallia, covered up by the

24   thin false pretext of a fake job for Ron Capallia's wife, and

25   while Wilson was also making bribe payments to Kekoa LumHo

1    covered up by an equally fake job for LumHo's father-in-law.

2         Was this an extraordinary, astonishing, series of

3    coincidences?  Was this Defendant Lumho working hard to satisfy

4    the legitimate needs of the IT department at the DoD IG?  Was

5    this a crisis?  Did they just have to buy this through WITS and

6    through Bill Wilson's company because of Bill Wilson's security

7    clearance?  No, ladies and gentlemen, of course not.  It was one

8    reason and one reason only for this incredible sequence of

9    events, and that was corruption.

10        Over the course of this afternoon, I'm going to walk you

11   through the evidence that you've seen in the course of this trial

12   over the last few weeks.

13        We're going to talk about the charges in the indictment.

14   What you've already seen over the last few weeks has demonstrated

15   overwhelmingly that Bill Wilson and Defendant Lumho entered into

16   a corrupt agreement, a conspiracy to engage in fraud, to pay and

17   receive bribes, to submit false claims to the government and then

18   to cover it up.

19        I'm going walk you through the evidence in each of the

20   counts.  What you're going to see from the evidence that we've

21   already presented to you, ladies and gentlemen, is that there's

22   only one verdict consistent with the evidence in this case, and

23   that is a verdict of guilty as to both defendants on all counts.

24        Now, ladies and gentlemen, the conspiracy in this case

25   starts with the corrupt relationship between Bill Wilson and

1    Timothy Donelson.  You heard a lot about that at the beginning of

2    the case.  And what you saw from the evidence, ladies and

3    gentlemen, is that from 2010 through approximately 2014,

4    construction contract after construction contract after

5    construction contract was awarded by Tim Donelson to Bill Wilson.

6        And there are several notable characteristics of those

7    construction contracts and the circumstances surrounding them,

8    ladies and gentlemen, that point to the corrupt bargain.  First

9    of all, you heard from Seana Gilliland that coming from

10   David Scotidas that from 2010 on, no one else at Level 3 awarded

11   a construction contract to Bill Wilson.  And that since

12   Tim Donelson and Ron Capallia resigned in disgrace in 2014, no

13   one at all at Level 3 has awarded a construction contract to

14   Bill Wilson or either of his companies.  And you're going to see,

15   ladies and gentlemen, from the contract themselves and the

16   summary charts -- this is 1407 -- enormous number of contracts

17   steered by Tim Donelson to Bill Wilson in ways that don't make

18   any business sense.

19       As you've seen, ladies and gentlemen, Bill Wilson's

20   company was a small company with a handful of employees based in

21   Lake Butler, Florida.  It had no offices anywhere else, and yet

22   construction contract after construction contract all over the

23   country -- or all over the East Coast I should say -- are awarded

24   by Tim Donelson and only by Tim Donelson to Bill Wilson's

25   companies, Durham; Kearneysville, West Virginia; McLean,

1   Virginia; Clarksville, Virginia; Nashville; Hanscom Air Force

2   base in Massachusetts; Philadelphia; Jacksonville; Washington,

3   D.C., on and on and on.  And what you heard, ladies and

4   gentlemen, from David Scotidas was that many of these

5   construction contracts were awarded without any meaningful

6   competition at prices that didn't make any sense to him and that

7   were so high that he immediately went and reported it once he was

8   out from under Tim Donelson's thumb.

9        And you heard how in many instances it didn't make sense

10  to involve Bill Wilson's company at all, because what

11  Bill Wilson's company would do was not actually do the project,

12  they would just subcontract the project to somebody else, a job

13  that David Scotidas himself could have done.

14       And ladies and gentlemen, you know why, now.  All the

15  while Bill Wilson was secretly making payments to a shell entity

16  called Apposite Services that Tim Donelson owned and controlled.

17  And look at the timing of the payments, ladies and gentlemen.

18  Hundreds and thousands of dollars, all from Bill Wilson to this

19  shell entity owned by Tim Donelson at the same time Tim Donelson

20  is awarding those same contracts to Bill Wilson's companies.

21       And not just payments to the shell entity, buying the

22  property immediately behind Tim Donelson's residence, doubling

23  the size of his backyard.  Paying for him to buy new trucks or at

24  least portions of the new trucks, covering it up with false

25  information in the memo line.  Buying him a custom-made dog box

1    where Bill Wilson had a matching one, and as you later heard,

2    then seeking to conceal that once they learned that they were

3    under investigation.

4        The bargain, the corrupt *quid pro quo* is obvious, ladies

5    and gentlemen.  And what makes it even more obvious is the

6    relentless efforts by Bill Wilson, and Tim Donelson to cover it

7    up with fake invoices from a company called Apposite Services.

8    Fake invoices where Bill Wilson claimed under oath in his

9    deposition were all for the rental of a bulldozer that he

10   couldn't afford to buy himself and that he had to get from

11   Tim Donelson because he just couldn't rent one, couldn't buy one

12   on his own.

13       Ladies and gentlemen, now you know that the entire time

14   that this -- these invoices, these fake invoices were being --

15   for work supposedly done, Bill Wilson owned his own bulldozer.

16   And you heard from witness after witness many of these projects

17   reflected in these invoices didn't happen or couldn't happen or

18   were done by Bill Wilson's own employees with his own equipment

19   where he never would have had any legitimate reason to pay anyone

20   else.

21       And the evidence of the corrupt bargain is even clearer,

22   ladies and gentlemen, when you look at the money.  This is

23   government's Exhibit 1404A.  And what you see, ladies and

24   gentlemen, is the revenues and the source of the revenues to

25   Bill Wilson's company.  Bill Wilson starts paying the illegal

1    kickbacks in 2011, and watch what happens.  The revenues for

2    Level 3 all pursuant to contracts awarded by Tim Donelson, go

3    through the roof, more than quintupling the money that his

4    businesses are making.

5         And then, after early 2014, when Tim Donelson and

6    Ron Capallia realize that they're under investigation and resign

7    in disgrace, the revenues fall through the floor.

8         Ladies and gentlemen, if Bill Wilson was really earning

9    these or believed that he could earn all this business on his

10   own, he wouldn't have paid the kickbacks, and if it was

11   legitimate business, the business would continue.  But it didn't

12   because it was corrupt.  These were illegal kickbacks, there was

13   a corrupt bargain between Bill Wilson and Tim Donelson, and,

14   that, that alone, ladies and gentlemen, proves defendant Wilson

15   guilty of Count 1.

16        Count 1 of the indictment is a conspiracy count that

17   charges a conspiracy to commit wire fraud.  And as you were

18   instructed by Judge O'Grady and as you're going to see from the

19   instructions when you get them in written form, is that in order

20   to be guilty of conspiracy, there doesn't have to be a written

21   agreement.  It doesn't have to be explicit, and not all members

22   of the conspiracy have to join at the same time or play the same

23   role.  But the evidence that I've just walked you through, ladies

24   and gentlemen, proves overwhelmingly that Bill Wilson is guilty

25   of that first count, conspiracy count, and here are the elements:

1    Number one, the conspiracy agreement or understanding to commit

2    wire fraud as described in the indictment was formed, reached, or

3    entered into by two or more persons; number two, at some time

4    during the existence or life of the conspiracy agreement or

5    understanding, the defendant knew the purpose of the agreement;

6    and three, with knowledge of the purpose of the conspiracy

7    agreement or understanding, the defendant then deliberately

8    joined the conspiracy, agreement, or understanding.

9         Well, ladies and gentlemen, the evidence I've just

10   described clearly demonstrates there was a corrupt bargain

11   between Bill Wilson and Tim Donelson.  But in addition, consider

12   their actions, consider all the efforts they took to cover it up.

13   If you have any doubt about whether or not -- what their intent

14   was, their behavior both in carrying out the conspiracy and

15   attempting to conceal it demonstrates that there was an

16   agreement, that of course Bill Wilson knew the purpose of the

17   agreement.  He was the ringleader.  It was all to benefit him,

18   and that of course he joined it.

19        This is an agreement between he and Tim Donelson in those

20   early stages.  That evidence alone, before we get to the bribes

21   to LumHo, before we get to the kickbacks to Capallia, before we

22   get to all the false statements that he made during his

23   deposition, during his interviews, before we get to the false

24   service orders, that alone proves defendant Wilson guilty of

25   Count 1.

1       But for this conspiracy to work as well as it did, for as

2  long as it did, and for it to be as profitable as it was for all

3  of the members of the conspiracy, Bill Wilson needed help, not

4  just from Tim Donelson, but from key people throughout this

5  series of contracts and subcontracts.  He needed help from

6  Ronald Capallia managing the day-to-day of the WITS contract

7  making sure that all these fraudulent service orders kept being

8  pushed through the WITS contract and sent down to Bill Wilson's

9  company, despite the fact that Bill Wilson's companies had no

10  experience or expertise in providing IT services, in selling

11  highly specialized computer equipment or components, or even in

12  providing office moving services.

13       He needed help from Barry Atwood to serve as a back

14  channel for communications with Kekoa LumHo for the bribe

15  requests for LumHo and to funnel the bribes back to LumHo after

16  he had received the requests.  And he needed Kekoa LumHo himself

17  on the inside within the Department of Defense's Office of the

18  Inspector General to make sure that these orders kept being

19  placed through WITS, the one procurement option that Kekoa LumHo

20  could control, the one procurement option that Kekoa LumHo and

21  Bill Wilson knew necessarily would put money in Bill Wilson's

22  pocket, the one procurement option that could not legitimately be

23  used for many of the fraudulent service orders that you've seen

24  in this case.

25       Unless, of course, Kekoa LumHo was willing to sign off on

1    fraudulent service orders and call these things something other

2    than what they truly were, to disguise them and call them,

3    "Cable Installer" or "LAN/WAN integrator" or "Master Subject

4    Matter Expert CIO."  And Wilson, Ron Capallia, and Kekoa LumHo

5    all needed each other to falsely call these service orders

6    something they were not, to ensure that the prices paid by Level

7    3 and then ultimately by the government were so dramatically

8    inflated that there would be plenty of money for Bill Wilson to

9    make an enormous profit with more than enough left over to pay

10   bribes to LumHo, kickbacks to Donelson, and kickbacks to

11   Capallia.  They needed each other.  Everyone played a role, and

12   for this conspiracy to work, they all had to act purposefully.

13        So let's look at that corrupt bargain between Bill Wilson

14   and Kekoa LumHo.  It starts with the fake job for Fidel Ramos,

15   Kekoa LumHo's father-in-law.  And, ladies and gentlemen, the

16   co-conspirators knew that this was a scam from the start.  Look

17   at this employee enrollment form nominally in the name of

18   Fidel Ramos describing Fidel Ramos as secretary assistant.  You

19   now know, ladies and gentlemen, that Fidel Ramos was illiterate.

20   He was unemployed, he couldn't work, he couldn't possibly serve

21   as a secretary.  He never heard of MSO Tech or Bill Wilson.  He

22   never knew anything about what this job was going to entail

23   except for whatever information Kekoa LumHo chose to tell him.

24        Defendant LumHo says somebody's going to call him, but no

25   one ever does.  And Fidel Ramos tells defendant LumHo that no one

1    calls.  Defendant LumHo knows this job never comes to creation.

2    He lives with his father-in-law.  Of course he knows that the job

3    never happened, and that it wasn't real.

4        And ladies and gentlemen, look closer at government's

5    Exhibit 938, at Page 1.  Page 1, is the employment enrollment

6    form, again in the name of Fidel Ramos for a job that never

7    happened, for work that was never done.

8        The evidence shows you conclusively he definitely did not

9    fill out this form, Fidel Ramos.  Because, as you've seen,

10   Fidel Ramos was illiterate.  He couldn't have filled out this

11   form.  And as you heard his testimony, Fidel Ramos doesn't know

12   who MSO Tech is, doesn't know who Bill Wilson is, doesn't know

13   anything about this job.  So the evidence proves conclusively

14   that this fraudulent form in the name of Fidel Ramos was not

15   filled out by Fidel Ramos.

16       The evidence also shows, ladies and gentlemen, who did

17   fill it out, maybe not by hand but who provided the information;

18   and that's Kekoa LumHo.  Government's Exhibit 1101 is a file that

19   Special Agent Allison Russo found in the Outlook file of

20   Defendant Lumho from his files at the DoD IG.  And what you can

21   see in this Outlook file, 1101, is all of the information that

22   Kekoa LumHo would have needed to fraudulently fill out the

23   employment enrollment form in his father-in-law's name.  He knows

24   what MSO Tech is.  Fidel Ramos does not.  He knows how to write.

25   Fidel Ramos does not.  He has all of Fidel Ramos information, his

1    name, his driver's license information, his date of birth, his

2    social security number, all of the information he would need to

3    provide that information for a fake enrollment form for a job he

4    knows never happened.

5         So you know from this evidence that from the beginning

6    Kekoa LumHo knew this was a sham because this could not have

7    happened.  This fraudulent enrollment documentation could not

8    have come into existence unless Kekoa LumHo was personally

9    involved.  He was doing it and he knew that his father-in-law

10   didn't know anything about it.

11        And not only that, ladies and gentlemen, Kekoa LumHo takes

12   his father-in-law to the bank and as you can see from this

13   enrollment form, he has all of his father-in-law's information,

14   his name, his account number, his home address, his driver's

15   license number.  This is the account that you now know was used

16   as a conduit through which to pass the bribes from Bill Wilson to

17   Kekoa LumHo.  He doesn't pick any bank, he picks a bank where

18   he's a member so he has an excuse to take his father-in-law to a

19   bank where he knows he's going to be able to control what

20   happens.  And it's not just any day that he takes his

21   father-in-law to the bank.

22        Government's Exhibit 927, FedEx records from the account

23   of Bill Wilson, MSO Tech, and what these FedEx records show you

24   is that on February 17th, 2012, Bill Wilson caused a package to

25   be delivered to Kekoa LumHo's house, a package that is in the

1    name of Fidel Ramos, but as you heard from his deposition

2    testimony, Bill Wilson claims he doesn't know who Fidel Ramos is,

3    and you know from Fidel Ramos that he's never heard or know

4    anything about Bill Wilson or MSO Tech except what Kekoa LumHo

5    tells him.

6        And the date is particularly important, February 17th,

7    2012, because it is the exact same day that Kekoa LumHo takes his

8    father-in-law to the bank.  This package from Bill Wilson mailed

9    to LumHo's home address wasn't for Fidel Ramos, and the date that

10   Kekoa LumHo took his father-in-law to the bank wasn't a

11   coincidence.  It wasn't some goal to just do something nice for

12   Fidel Ramos to help him open an account on that day.  The timing,

13   the circumstances, the surrounding events show you Kekoa LumHo

14   opened this account specifically for the purpose of using it as a

15   conduit through which to conceal the bribes.  And, in fact, he

16   controlled the account.

17       These are from the bank records from Navy Federal Credit

18   Union.  And as you can see here, a transfer, all of this money

19   coming from Bill Wilson transferred through an account nominally

20   in the name of Fidel Ramos, an account that would look to the

21   outside world like it had nothing to do with someone with the

22   last name LumHo.  But an account, nevertheless, that was used to

23   transfer money into Kekoa LumHo's own account.

24       There's a transfer on April 11th, a transfer on June 6th,

25   a transfer on June 28th.  Again, you know who didn't do those

1    transfers, Fidel Ramos, because Fidel Ramos doesn't know how to

2    use a computer, and you know who did, Kekoa LumHo, because he

3    controlled the account, he had all the log on information, he

4    went to the bank with his father-in-law that day, and every penny

5    of this money is money that originates from Bill Wilson.

6         It gets worse.  May of 2012, Kekoa LumHo is now in control

7    of the WITS contract.  He has now inserted himself into the

8    process.  He has now directed Ron Capallia:  Send all of the

9    service order requests to me.  He is the designated agency

10   representative who you know through the testimony of GSA

11   representative Tina LeBlanc, Willie Spivey, witness after

12   witness, the designated agency representative is the person at

13   the agency in question who's in charge of the WITS 3 contract.

14        Well before May of 2012, it's clear Kekoa LumHo controls

15   the WITS contract.  And in this context, Kekoa LumHo sends this

16   e-mail to Timothy Donelson, May 23rd of 2012.  By this point

17   Kekoa LumHo knows that he has the power to approve or disapprove

18   any orders submitted through WITS.  He knows it, Tim Donelson

19   knows it, Bill Wilson knows it, Barry Atwood knows it,

20   Ron Capallia knows it.  It is no secret who has the power to

21   control what happens.  And in that context he sends this e-mail

22   to Timothy Donelson complaining that the price under WITS is just

23   too high mentioning apropos of nothing.

24        Ron's whole seven day Disney cruise vacation with his

25   family, including his extended family cost less than this.  What

1    on earth does that have to do with IT services?  And then again,
2    apropos of nothing -- and I'll back up just a step, a Disney
3    cruise vacation that you now know from the testimony and from the
4    evidence and from the financial records and the invoices,
5    Bill Wilson paid for as an illegal kickback to Ron Capallia to
6    influence Ron Capallia's actions on the inside of Level 3.  And,
7    then again, apropos of nothing, Kekoa LumHo just happens to
8    mention, "I'm going to Hawaii and staying at the Hilton Hawaiian
9    Village for two weeks, staying in a two-bedroom suite, and the
10   total cost with airfare is 14,000 and that is for six adults."
11       If the message wasn't clear enough, he then goes on to
12   explain that if matters are not resolved to his satisfaction, he
13   might just have to stop ordering through WITS all together.  "My
14   customers and co-workers are quickly losing their confidence in
15   my ability to get what they need in a timely manner.  What use to
16   take a matter of weeks to get is now taking months.  Everyone is
17   just about done with me and WITS."
18       He's been receiving bribe payments through the fake
19   pretext of his father-in-law's job for several months, but you
20   can all see what's going on here, ladies and gentlemen.  He
21   doesn't need to say it out loud.  This is nothing more than a
22   veiled request for a bribe and the law requires nothing more.
23       From one of the instructions, "The *quid pro quo* need not
24   be stated in express terms, for otherwise the law's effect could
25   be frustrated by knowing winks and nods.  Rather, the intent to

1    exchange may be established by circumstantial evidence, based

2    upon the defendant's words, conduct, acts, and all the

3    surrounding circumstances disclosed by the evidence and the

4    rationale or logical inferences that may be drawn from them."

5         He doesn't have to say it out loud for all of you to

6    understand exactly what he was asking for.

7         And Bill Wilson certainly got the message, because a few

8    weeks later Bill Wilson causes the rate of pay for the

9    non-existent job for Fidel Ramos to be increased from $10 per

10   non-existent hour, to $50 per non-existent hour.  This can only

11   happen on purpose.  Nobody trips and falls down and accidentally

12   enrolls someone on their payroll.  And even if you could indulge

13   in the fantasy that someone tripped and fell down and

14   accidentally put someone on their payroll, no one trips and falls

15   down and accidentally quintuples the rate of pay for a fake job,

16   for a guy who doesn't work for you, who doesn't do anything, by

17   accident.

18        This is conclusive evidence of the corrupt bargain between

19   Bill Wilson and Kekoa LumHo that they both knew this job was

20   never a job at all, it was a pretext.  They both knew it because,

21   number one, Bill Wilson himself is the one who ordered this

22   change in payroll.  You heard through the Grand Jury testimony of

23   his mother, Reba Sue Wilson, and from numerous other MSO Tech

24   employees that at MSO Tech, Bill Wilson called the shots.  He

25   made all the decisions about hiring, firing, what people were

1    paid, how much, whether or not they got raises.

2         And ask yourself, ladies and gentlemen, just the common

3    sense question, who has their salary quintupled from one week to

4    the next?  No one.  Because this isn't salary, it's a bribe, the

5    message was received.  And Kekoa LumHo, he knew it, too.  This is

6    from the bank records from the fake account in Fidel Ramos's

7    name.  It's one of the earliest bribe payments, and you can see

8    from the check it's dated February 15th, 2012.  This is early on.

9    The check in the total amount of about $650 endorsed by

10   Kekoa LumHo.  The face of the check itself says MSO Tech.  He saw

11   it, he knew the rate at which the bribes were coming in.  And

12   then this is what happens after Kekoa LumHo sends his veiled

13   request for a bribe.  The check has increased by roughly tenfold.

14   It's unmistakable.  He knew what this was.  He knew the message

15   had been received.

16        Now, ladies and gentlemen, to prove defendant Wilson and

17   Defendant Lumho guilty of bribery, we don't have to show you that

18   they, in fact, changed their conduct.  As you can see from the

19   instructions, "In order to satisfy the elements of bribery or

20   honest services fraud, the public official need not actually

21   perform an official act or even intend to do so.  When the

22   defendant is a public official charged with receiving a bribe it

23   is sufficient if the public official agrees to perform an act,

24   official act, in exchange for a thing of value."  And then down

25   below, "You may, for example, conclude that an agreement was

1    reached if the evidence shows that the public official received a

2    thing of value knowing that it was given with the expectation

3    that the official would perform an official act in return."

4         "Likewise, when the defendant is a person who is charged

5    with paying a bribe, it is sufficient if the defendant intends or

6    solicits the public official to perform an official act in

7    exchange for a thing of value."

8         What matters is intent.  We don't have to show you that

9    they, in fact, changed their behavior, but, ladies and gentlemen,

10   we have.  You'll recall that during the course of this trial

11   there was evidence regarding something called the Bridge

12   contract.  The Bridge contract arose in October of 2011 when

13   there was a sudden need to fill the gap created by a protest from

14   some earlier contractors.  And, as you saw throughout the trial,

15   defense Counsel went to great lengths to point out that in

16   October of 2011 when the Bridge contract was awarded, neither

17   Ronald Capallia nor Kekoa LumHo were receiving anything of value

18   from Bill Wilson, and that's true.  The Bridge contract was not

19   corrupt because of what Kekoa LumHo did or what Ron Capallia did,

20   it was corrupt because of the pre-existing conspiracy between

21   Bill Wilson and Tim Donelson.  It was corrupt because

22   Tim Donelson had awarded this WITS 3 subcontract to a

23   construction firm that had no business or qualifications doing

24   any kind of work like that.  Defendant LumHo and defendant -- I'm

25   sorry, Defendant Lumho and Ron Capallia were not yet a part of

1    the conspiracy, but, ladies and gentlemen, that experience

2    necessarily showed Bill Wilson, Ron Capallia, and Kekoa LumHo

3    their ability to influence the process.  Bill Wilson undoubtedly

4    learned how valuable it would be for him to be able to influence

5    the actions of Ron Capallia and Kekoa LumHo, and, ladies and

6    gentlemen, that's exactly what happened.

7         Compare their actions with respect to the Bridge contract.

8    It was corrupt because of the prior conspiracy between

9    Bill Wilson and Tim Donelson, but at least on the face of the

10   service orders they weren't also fraudulent.  You'll recall those

11   service orders were for IT services, and by all accounts IT

12   services were provided.  But now compare that to their conduct

13   once they are receiving bribes and kickbacks from Bill Wilson.

14        This is government's Exhibit 1406.  What you're going to

15   see, ladies and gentlemen, is that for each of these

16   transactions, each one of these is fraudulent.  Each one of these

17   was based on a service order that was prepared by Ron Capallia

18   and signed off on by or at the direction of Kekoa LumHo ordering

19   all manner of things that you cannot order through WITS.

20   Significantly blowing up the price, pushing it through a contract

21   never intended to buy any of these items, never giving Verizon an

22   opportunity to compete, and then sending all of the business down

23   to Bill Wilson's company, a company that has no legitimate reason

24   to be involved and who adds no value to these transactions.

25        Consider from a business standpoint how ridiculous this

1    all is.  There are plenty of options to order things.  Washington

2    Headquarter Services already had the contract that enabled them

3    to provide moving services.  And, yet, Kekoa LumHo directs his

4    subordinate to sign off on a task order that calls what's really

5    about 350 hours from Donny Ravas for moving services, 4,171 hours

6    of cable installation services.  Moving services that are

7    provided by a guy who has zero employees and no clearance, where

8    the price goes from somewhere in the neighborhood of $30,000 with

9    Blake & Sons, who actually did the bulk of the work charged, to

10   $70,000 to ultimately $443,000.

11        Bill Wilson does not know anything about Adtran, Niksun,

12   Cisco equipment.  He's not a manufacturer or a retailer or a

13   reseller.  He doesn't know anything about what those items are,

14   how they work, what they do, why they're needed.  And yet, the

15   co-conspirators work together to ensure those items get bought

16   from him.  First, Kekoa LumHo takes a quote with sensitive

17   information about what somebody else would charge for this,

18   equipment, and he forwards it on to Ron Capallia enabling Ron and

19   ultimately Bill Wilson to run up the price.  Ron, for his part,

20   sends it to Bill Wilson, despite the fact that it makes no

21   logical sense or business sense to do so.  And here is

22   Bill Wilson's response:  "What the hell is this?"

23        Ask yourselves, ladies and gentlemen, what value was the

24   government getting by contorting itself to use a

25   telecommunications contract that doesn't allow you to buy this

1    type of equipment, to place an order with Level 3, a company that

2    doesn't sell this equipment, to have them in turn place an order

3    through Bill Wilson, a company located in Lake Butler, Florida, a

4    company and a guy who doesn't know anything about this equipment,

5    and then let's look at how it's billed.

6         Fraudulent service order, signed off on by Kekoa LumHo for

7    942 hours of application project management services, and

8    approximately 1700 hours of LAN/WAN integrator for the price of

9    $474,000 when Bill Wilson was able to buy this from a vendor for

10   266, and adds no value.

11        The co-conspirators all needed each other.  In fact, when

12   you review the transactions in government's Exhibit 1406, which

13   are the same transactions that are charged in the false count --

14   false claims count for the indictment, you'll see this same

15   absurdity throughout, where there's no logical or rational

16   explanation for what happened other than the corrupt conspiracy

17   among these defendants, Ron Capallia, and others.  Now, ladies

18   and gentlemen, they're all fraud and they're all corrupt, but

19   perhaps the worst of them is the camera equipment.

20        On June 20th, 2012, Kekoa LumHo sends this e-mail, not

21   from his DoD IG e-mail account, from his personal Gmail account.

22   He sends it directly to Barry Atwood at MSO Tech, his friend and

23   fishing buddy.  And he asks for this high-end zoom lens, two

24   black and white clear UV haze with multi-resistant coating,

25   filters, a Canon Speedlite.

1          Ladies and gentlemen, there was no legitimate reason for

2     Kekoa LumHo to buy this stuff at all.  You heard from his

3     co-workers, this has nothing to do with his job duties.  And the

4     story that he told you yesterday when he testified is not

5     plausible.  The DoD IG already had a professional photographer on

6     staff.  You saw from the record that Willie Spivey introduced,

7     there's legitimate ways to buy cameras and in fact the DoD IG had

8     already bought cameras.  He asks you to believe that this item,

9     or other items, zoom lenses, these were for an active directory

10    project or for Outlook photos, or because there's a big room

11    somewhere at the DoD IG that he needed to use government money to

12    buy this?  He claims that, well, they couldn't use the government

13    purchase card because it was just too expensive.

14         Well, why on earth would you need anything this expensive

15    at all, but let's just take the argument on its face, look at the

16    prices on government's Exhibit 803.  $1,800 plus $700, that's

17    2500 bucks, maybe a little bit more with the two filter sets.

18    That's still below the $3,000 threshold for a government purchase

19    card.  There's no reason to buy any of this stuff, there's no

20    reason to buy anything this expensive.  But even if you did, you

21    didn't need to do it through WITS.

22         And if you had any doubt, ladies and gentlemen, about his

23    intent, consider the fact that his own Amazon records give it

24    away.  One day before he sends this bribe request to Barry Atwood

25    using his personal e-mail account, he buys camera equipment of

1    the exact same size, 77 millimeters, that he has shipped to his

2    own house with his own funds.  All of this equipment was for his

3    personal use, none of it was for any legitimate government

4    business.

5            And that's the message that Bill Wilson and his

6    co-conspirators got.  After Kekoa LumHo made this request for a

7    bribe, Barry Atwood, in his role as the go-between, forwards the

8    request to Bill Wilson.  The items are purchased, not shipped to

9    the DoD IG, but shipped to Barry Atwood's residence.  And then

10   the items get fraudulently wrapped into a service order that

11   Kekoa LumHo himself signs off on with the fraudulent explanation

12   of 296 hours of cable installer, not for the $2,600, the retail

13   price of these items, but for $20,000.  Is it Mr. LumHo's

14   testimony, is it truly his contention that this was required?

15   That they just couldn't use the government purchase card, and as

16   a result they had to lie about what it was and increase the price

17   dramatically.  A transaction of course again that would ensure

18   that Bill Wilson would profit enormously, despite the fact that

19   the only thing he has done in this entire process is go on to

20   Amazon.com and ship items to his co-conspirator.

21           It gets even worse.  Government's Exhibit 828 is a quote

22   issued to MSO Tech in June of 2012.  It's a quote from the Apple

23   store.  The Apple store at Pentagon City Mall which is right down

24   the street from this courthouse, right down the street from the

25   Mark Center.  And as you'll see from this quote, the total price

1    for the items listed is $11,000.

2         You'll also see that the second item listed in this quote

3    is this camera, this EOS 60D camera used to bribe Kekoa LumHo.

4    As you'll see, the total price is $11,000, but Bill Wilson, not

5    wanting to miss an opportunity, sends these exact same list of

6    items, including this camera, EOS 60D, to Ron Capallia, the exact

7    same list of items with the instruction, "Ron, add your cost to

8    this and send it to Kekoa, please."

9         He doesn't describe the true cost, he identifies the cost

10   as $36,000.  He knows that Ron's not going to care because he's

11   paying Ron hundreds of thousands of dollars to do his bidding.

12        Ron Capallia dutiful prepares the fraudulent service

13   order, calling this, "Cable Installer," 768 hours, not for the

14   $11,000 that it truly cost and that the government undoubtedly

15   could have got it for, not even the fraudulently inflated $36,000

16   that Bill Wilson described it as, but even further inflating it

17   $54,000 of cable installer services, 768 hours that everyone in

18   the conspiracy knows will not, in fact, happen.

19        But Ron is a little bit too careless for Kekoa LumHo

20   because he's just a little bit too transparent about the fraud.

21   He lists items in the technical support section, and Kekoa LumHo

22   does not want there to be a paper trail of what their corrupt

23   bargain was, he doesn't want the fraud to be that obvious.

24        And so after receiving this service order, Kekoa LumHo

25   calls Ron Capallia, leaves the following voicemail with the

1    following instructions.

2         (Audiotape played.)

3         MR. BURKE:  Remove all the line items.  Remove the

4    details.  Nothing about Matt Steiniger told me to do it, nothing

5    about Willie Spivey told me to do it, nothing about Stephen

6    Wilson told me to do it.  Remove the details, delete the evidence

7    of our crime, and of course Ron Capallia obliged.  He revised the

8    fraudulent service order to be a little less obviously

9    fraudulent.  He revised the remarks section, still fraudulent, it

10   still says, "Technical support for Apple cable installation."

11   This isn't technical support for Apple cable installation, it's

12   bribes and other equipment.  Still fraudulently describing it as

13   cable installer normal business day, 768 hours.  Six months worth

14   of work by some trained specialist?  Still billing the government

15   fraudulently $54,000, and Kekoa LumHo signs off on it.

16        And so now Kekoa LumHo, Bill Wilson, Ron Capallia through

17   their concerted action, have succeeded in causing the United

18   States Government to pay for the bribes to Kekoa LumHo while

19   Bill Wilson makes an enormous profit.

20        This sequence of events can only happen if the members of

21   this conspiracy, if these defendants are knowingly participating

22   in the fraud and acting in concert with one another.  Bill Wilson

23   paying the bribes and kickbacks.  Tim Donelson awarding an IT

24   contract to a company that digs trenches based in Lake Butler,

25   Florida.  Ron Capallia preparing the false and fraudulent service

1    orders.  Barry Atwood helping to funnel the bribes to Kekoa LumHo

2    after he receives them at his house, and Kekoa LumHo signing off

3    on the false service orders after directing Ron Capallia to

4    delete the incriminating information.  Despite any legitimate

5    reason to order this equipment, to use WITS, to use Level 3, or

6    to use Bill Wilson's company, this cannot happen by accident.

7         So how does all that relate to the charges in the

8    indictment?  Count 10 of the indictment charges Bill Wilson with

9    bribery of a public official, and you'll see that the government

10   is required to prove three elements:  Number one,

11   defendant William Wilson directed or didn't direct offered or

12   promised to give something of value as described in the

13   indictment to Matthew Kekoa LumHo, the official alleged in the

14   indictment; number two, LumHo the official alleged in the

15   indictment was at the time an official of the United States or

16   was acting on behalf of the United States; and, number three,

17   defendant Wilson made the gift offer or promise corruptly with

18   the intent to influence an official act.

19        You'll see that the elements with respect to Count 11,

20   which charges Kekoa LumHo with receiving bribes as a public

21   official are very similar.  Element 1, defendant LumHo directly

22   or indirectly demanded, sought, received, accepted, or agreed to

23   receive or accept something of value as described in the

24   indictment; two, Mr. LumHo was at that time a public official of

25   the United States, or was acting on behalf of the United States;

1   and, three, LumHo demanded, sought, received, accepted, or agreed

2   to receive or accept the item of value corruptly.  In return for

3   being influenced in the performance of any official act.

4         Did Bill Wilson give things of value to Ron Capallia?

5   Absolutely.  Did Ron Capallia receive things of value from

6   Bill Wilson?  Absolutely.  Was LumHo a public official at the

7   time?  Yeah.  Yeah, he sure was.  He was working at the

8   Department of Defense's Office of Inspector General, an entity

9   that is supposed to be dedicated to rooting out fraud, waste, and

10  abuse.  So, yes, he was a public official.  And, third, did

11  Bill Wilson give the items with corrupt intent?  Did Kekoa LumHo

12  receive the items with corrupt intent?  Of course they did.  The

13  pretext of the fake job.  Of course.  The efforts at concealment,

14  yes.  The conduct?  Absolutely.  The timing of the payments,

15  payments being made while everyone knows that Kekoa LumHo is in

16  control of this WITS 3 contracting, the decision to steer work

17  through Level 3 despite any reason to do so.  The need to falsify

18  the service orders, to steer down to Bill Wilson's company.  All

19  of that tells you their corrupt intent.  And there's more.

20        There's Kekoa LumHo's efforts to paper over the record, to

21  make all of this look legitimate, including his decision to sign

22  off on a fraudulent back dated fictitious fair opportunity

23  letter.  He knows that this letter is not real.  He knows that

24  it's back dated.  He knows that there's nothing called the

25  Regional Contracting Office National Capital Region.  He wants

1   you to believe that he didn't know anything about the WITS 3

2   contract and that because of his absence of training, he couldn't

3   possibly have understood that what he was doing was wrong.

4         But when it came time for him to cover it up, to make it

5   look like everything was legitimate, to make it look like there

6   had been competition, to make it look like there had been some

7   form of official blessing, that these actions, that these orders

8   were in the best interest of the government, he had no

9   hesitation.  He had no hesitation to talk about the fair

10  opportunity notification letter, how the DoD IG had selected WITS

11  3 as our preferred provider for the following WITS 3 services,

12  professional services and customer premise equipment.  He had no

13  hesitation to explain, should you have any questions regarding

14  this notification, please contact Mr. Kekoa LumHo with his phone

15  number and his e-mail address. Nothing about Matthew Steiniger.

16  Nothing about Tommy Carlyle.  Don't send your questions to Steve

17  Wilson.  If you've got any issues, come to me.

18        And he didn't just sign this fraudulent back dated letter

19  seeding the record with the false appearance of legitimacy, the

20  false appearance of competition, he also decides to create this

21  fraudulent e-mail.  He doesn't copy Matthew Steiniger, he doesn't

22  copy Willie Spivey or Steve Wilson or anybody else.  When

23  Ron Capallia needs a fraudulent backdated letter he goes to

24  Kekoa LumHo, and then Kekoa LumHo sends it back fully on board

25  with the conspiracy, "Ron, attached is the fair opportunity

1  letter I thought I had sent last year.  I looked through my

2  e-mail, and, in fact, I did not send it."  All lies.  He didn't

3  think he sent it last year.  He didn't look through his e-mail

4  account.  It wasn't just "his bad."  This was not a mistake.

5  This was intentional, purposeful conduct in furtherance of the

6  conspiracy demonstrating his corrupt intent.

7       And, then, consider, ladies and gentlemen, how the conduct

8  of the co-conspirators suddenly changed the moment that

9  Kekoa LumHo realized that he was under investigation, and that

10 his conduct would be scrutinized.

11      On October 11th, 2012, Kekoa LumHo receives the e-mail you

12 see marked as government's Exhibit 240.  And in that e-mail he

13 learns for the first time that he is going to be audited.

14 There's no more hiding, there's no more obfuscation, he's going

15 to have to turn over the documents, the documents that he knows

16 are fraudulent, and that he fears will reveal his crimes.  And

17 look what happens.

18      One day before Kekoa LumHo learns that his conduct is

19 going to be scrutinized, he deposits the last of the bribery

20 checks, supposedly in the name of Fidel Ramos, his father-in-law.

21 And then look what happens after he learns of the audit.  The

22 checks keep coming, but he doesn't deposit them.  If Mr. LumHo

23 really thought this was a real job, he would have gone right on

24 cashing those checks.  If Mr. LumHo really was unaware, as he now

25 claims, that this job had nothing to do with MSO, he would have

1   gone right along cashing those checks.  He doesn't.  He stops

2   because he knows the scrutiny is on him, and his sudden change in

3   behavior tells you everything you need to know about his

4   knowledge, about his intent.  It was corruption.  He knew it.

5          Consider also how Bill Wilson behaved.  If Bill Wilson

6   really thought there was some guy named Fidel Ramos who worked

7   for him, he would have gone right on sending the checks to his

8   loyal employee.  If it was really just a mistake that somehow

9   Fidel Ramos accidentally got added to the payroll, the checks

10  would have kept on being issued, but that's not at all what

11  happens.

12         Bill Wilson learns that Kekoa LumHo has been removed from

13  control of the WITS 3 contract.  Bill Wilson now knows that

14  there's nothing in it for him.  Kekoa LumHo can't scratch his

15  back anymore, so he stops sending the checks because it was

16  corrupt.  Because these were bribes, and because they both knew

17  it.

18         And then consider the money, ladies and gentlemen, all the

19  money.  Look at what happens.  In his testimony yesterday,

20  Kekoa LumHo told you that within the information services

21  directorate everyone loved WITS.  They wanted to spend money

22  using WITS.  It was great.

23         He didn't do anything to influence this process.  He

24  didn't care.  Well, ladies and gentlemen, why is it, then, that

25  before Kekoa LumHo has control of the WITS 3 contract there's

1    very little money going to Bill Wilson.  And, then, after the

2    bribes start rolling in, the money quintuples.  And why is it,

3    ladies and gentlemen, that everyone else was really controlling

4    WITS 3, if everyone else was the one who really was deciding that

5    this was a great thing, why is it that after Kekoa LumHo is

6    pulled from control of this contract the revenue plummets

7    dramatically.  If Kekoa LumHo's story was true, the money would

8    tell a different tale.

9         And, ladies and gentlemen, if you had any doubt about

10   Bill Wilson's intent, consider his pattern of behavior.  Consider

11   how he behaved with respect to Ron Capallia, just as he did with

12   Kekoa LumHo, creating a fictitious job for Fidel Ramos as a

13   pretext through which to route bribe payments to him.

14        Bill Wilson does the exact same thing with Ron Capallia,

15   putting Ron Capallia's wife nominally on the payroll as a

16   secretary, even though MSO Tech has no office in West Virginia

17   and then paying her an obscene amount of money for work that

18   never happened.

19        It's painfully obvious what's going on here.  So that

20   brings me back to Count 1.  As I explained, the conspiracy has

21   already been proven with respect to Bill Wilson because of his

22   corrupt bargain with Tim Donelson.  But the further evidence that

23   we've shown you, ladies and gentlemen, shows that the conspiracy

24   wasn't just Bill Wilson and Tim Donelson, that all of these acts

25   demonstrate that Kekoa LumHo was a knowing and active member of

 1   the conspiracy just as well.

 2        Again, the conspiracy agreement or understanding to commit

 3   wire fraud as described in the indictment:  Is formed, reached,

 4   or entered into by two or more persons, the defendant at some

 5   point during the existence of the conspiracy, the defendant knew

 6   the purpose, and with knowledge of the purpose of the conspiracy,

 7   the defendant deliberately joined.

 8        Undoubtedly true.  The evidence proving both defendants

 9   guilty of the conspiracy is undeniable.  But the evidence that

10   I've described also shows that both defendant Wilson and

11   Defendant Lumho are guilty of Count 2.

12        Count 1, is a conspiracy count, which requires proof of an

13   agreement to engage in a scheme to defraud.

14        Count 2, in which both defendant Wilson and defendant

15   LumHo are charged is substantive wire fraud.  And what you've

16   been instructed and what you'll see when you view the jury

17   instructions is that a scheme to fraud can be proven in one of

18   two ways.  It can either be proven under what's often referred to

19   as a traditional money and property scheme, or what's often

20   referred to as an honest services scheme.

21        In the context of the of a money and property scheme, in

22   summary, and without altering anything that Judge O'Grady

23   instructed you, that generally involves lies, deception, or

24   deceit in order to obtain money.  Whereas, honest services

25   requires proof of a scheme involving kickbacks or bribes.

1        As I've already explained, the evidence proves both of

2    these types of schemes as to both defendants.  They both engaged

3    in money and property fraud because of all of their efforts,

4    working in concert with each other to submit fraudulent claims

5    that they ultimately knew would be paid by the government and

6    would benefit them.  And they also engaged in honest services

7    wire fraud.  Bill Wilson, because he paid kickbacks to

8    Tim Donelson, because he paid kickbacks to Ron Capallia, because

9    he paid bribes to Kekoa LumHo, and Kekoa LumHo because he

10   received, knowingly, bribes from Bill Wilson.

11       And you'll see further definitions of what the scheme to

12   defraud intangible right of honest services means.  It means that

13   the people involved violated their fiduciary duties.  The public

14   officials have a fiduciary duty to act in the best interest of

15   the public, and not for their personal self interest.  That

16   employees have a fiduciary duty to act in the best interest of

17   their employers, and that whether or not you owe a fiduciary

18   duty, if you take actions to try to cause somebody else to

19   violate their fiduciary duty by paying kickbacks to an employee,

20   by paying bribes to a public official, you're just as guilty of

21   that honest services wire fraud as them.

22       Now, what I've explained so far demonstrates why the proof

23   shows overwhelmingly that LumHo and Wilson are both engaged in a

24   scheme to defraud under either definition.  But as to wire fraud,

25   the substantive counts, you'll see that one of the elements that

1    we have to prove is that during or in furtherance of the scheme

2    the co-conspirators caused, sent, or caused an interstate wire

3    communication.  It's another element of the offense, and that

4    element has been satisfied by Stipulation 1212.

5        In Stipulation 1212, the parties have agreed that all of

6    the communications described in Count 2, Count 3, and Count 4 all

7    crossed state lines.  There were communications sent from the

8    Eastern District of Virginia outside of the state.  And as you'll

9    see, ladies and gentlemen, the defendant at issue does not

10   himself have to be the one who sends the wire.

11       The government need not prove that the defendant

12   personally used a wire communication in Interstate Commerce or

13   that the defendant even intended that anything be transmitted in

14   Interstate Commerce.  The government must prove beyond a

15   reasonable doubt, however, that a transmission in Interstate

16   Commerce was, in fact, used in some manner to further the scheme.

17       We've proven that.  We've proven that in part through

18   Stipulation 1212, but you have the evidence as well.

19   Government's Exhibit 189 is the transmission, the communication

20   that's charged in Count 2.  That's the wiring.  Both LumHo and

21   Wilson are charged in Count 2.  And the wiring that completes the

22   scheme is this purchase requisition where Ron Capallia is sending

23   this information from his office in McLean to Level 3's

24   headquarters in Broomfield, Colorado.  A transmission that's

25   necessary to make sure that Bill Wilson gets paid for this work

1    that he has obtained and secured through the corrupt bargain that

2    he has with Tim Donelson, with Ron Capallia, and with

3    Kekoa LumHo.  Bill Wilson, Kekoa LumHo, both guilty of Count 2.

4         Count 3, and, Count 4, are more substantive wire fraud

5    counts that charge Bill Wilson only.  Count 3 is another e-mail

6    sent by Ron Capallia from his office in McLean to Level 3's

7    headquarters in Broomfield, Colorado, crossing state lines,

8    requesting that an invoice from Bill Wilson get paid.  So did

9    this further the scheme?  Of course it did.  The whole point of

10   the scheme was for Bill Wilson to corrupt the other parties so

11   that he could get rich and cut them off a piece.

12        Count 4 is the same thing, another e-mail sent in

13   Interstate Commerce by Ron Capallia while he's under the

14   influence of the corruption of Bill Wilson to benefit

15   Bill Wilson.

16        Now, ladies and gentlemen, in addition to the conspiracy

17   and the wire fraud, substantive wire fraud counts in the

18   indictment, Counts 5 through 9 of the indictment also charge

19   these defendants with false claims.  And the elements that the

20   government is required to prove as to Counts 5 through 9 are on

21   your screen now.  One, the defendant willfully made, presented or

22   caused to be presented to the General Services Administration a

23   claim against the United States; two, at the time that the claim

24   was presented, the General Services Administration was a

25   department or agency of the United States; three, that the claim

1    was -- the claim presented was false, fictitious or fraudulent;

2    four, the defendant knew that the claim was false fictitious or

3    fraudulent; and, five, the false fictitious or fraudulent

4    information was material.

5         So did these defendants make, present or cause to be

6    presented, claims to the General Services Administration?  Of

7    course they did.  All those fraudulent service orders that you

8    saw, I'm going walk you through them in a minute, and you're

9    going to see how the fraudulent service orders get wrapped up in

10   monthly bills that get submitted to GSA as a part of a claim for

11   payment; two, was the General Services Administration an agency

12   of the United States?  Of course it was; three, was the claim

13   false fictitious and fraudulent?  I'm going to walk you through

14   exactly how we've proven that in just a moment; four, did the

15   defendant know?  Yes.  And was it material?  Of course.  As you

16   heard from Tina LeBlanc, had they known that these items were

17   fraudulent they wouldn't have paid them.  And as you'll see,

18   ladies and gentlemen, from the transactions and from the summary

19   chart, 1406, every single one of these was fraudulent.  They call

20   it "Cable installer."  443,000 hours of cable installer.

21        But what does the government get?  300 or so hours of

22   moving services from Donny Ravas who has no employees and no

23   clearance.

24        Here's the bill charged in Count 5, sent to GSA on

25   March 1st, including that fraudulent service order that

1    Kekoa LumHo directed Tommy Carlyle to sign.  He wants to put that
2    off on Tommy Carlyle, ladies and gentlemen, but he's the one who
3    directed Tommy Carlyle to do it.
4         Count 6, yet another fraudulent service order approved,
5    signed off on by Kekoa LumHo, calling work that's really office
6    moving services about 33 hours of office moving services done by
7    Blake & Sons and then with the assistance of Donny Ravas, calling
8    that 755 hours of "Cable installer," rather than charging the
9    government for what it really got through their concerted action,
10   that caused the government to pay for 755 hours of cable
11   installer at a price of $80,000.  That's Count 6.  It gets
12   wrapped up into the monthly bill, submitted to GSA.
13        Count 7, again, the co-conspirators acting in concert with
14   one another to make sure that fraudulent service orders are sent
15   and approved by Kekoa LumHo for items you can't buy under WITS,
16   to ensure that it goes to Bill Wilson's company.  Application
17   project manager, LAN/WAN integrator, 2,666 hours, supposedly, of
18   professional services.  When, in fact, what we actually got was
19   zero hours.  We got equipment, equipment that MSO Tech bought for
20   $266,000.  But instead of getting that equipment at the real
21   price, because of their concerted action, because of their fraud,
22   they were able to charge the government an extra $200,000,
23   leaving plenty of profit left over for Bill Wilson to make money
24   and pay the kickbacks to the other members of the conspiracy,
25   including the fraudulent service order that included the Bose

1    SoundDock that you see right there, with no legitimate business

2    purpose.  Wrapped into Count 7, same thing for Count 8, order

3    after order after order after order.

4         Count 9, another fraudulent service order signed off on by

5    Kekoa LumHo acting in concert with Ron Capallia all to benefit

6    Bill Wilson, despite the absence of any legitimate economic,

7    business, or national security reason to do that.

8              THE COURT:  You're at about 75 minutes now, Mr. Burke.

9              MR. BURKE:  Your Honor, I'll --

10             THE COURT:  I'm just giving you --

11             MR. BURKE:  Thank you --

12             THE COURT:  -- a time count.

13             MR. BURKE:  Now, ladies and gentlemen, you heard in

14   Kekoa LumHo's testimony yesterday, his claim that every single

15   one of these service orders he showed and got approval from

16   Matthew Steiniger or from Willie Spivey or from Stephen Wilson,

17   that he relied on their advice.  It's not his fault, it's

18   Matthew Steiniger's fault or it's Ron Capallia's fault, or

19   perhaps it's Tommy Carlyle's fault.

20        But, ladies and gentlemen, consider the testimony of

21   Special Agent Allison Russo from this morning.  A hundred

22   thousand e-mails, searched extensively.  And in the course of all

23   those, the only e-mail found prior to the audit was one e-mail

24   where Kekoa LumHo sends a non-fraudulent service order.  A

25   non-fraudulent service order that isn't the basis for any of

1    these charges.  Consider, ladies and gentlemen, who was in charge

2    of WITS?  Matthew Steiniger wasn't a designated agency

3    representative, Kekoa LumHo was.  And consider, ladies and

4    gentlemen, the e-mails from the time period in question.

5         Here's an e-mail from back in 2012 when Kekoa LumHo was

6    still in charge, Willie Spivey saying, "Please provide a status

7    for the pending order of the 200 laptops requested through the

8    WITS contract.  Provide the order requisition number used in the

9    process as well and the order delivery information."  If he is

10   really sharing all of these orders with his co -- with his

11   co-workers, why is it that they're so desperate to get them from

12   him?  And why is it, then, that he, rather than handing over the

13   documentation, says, oh, I've cancelled the order?

14        Consider, ladies and gentlemen, this e-mail from Matthew

15   Steiniger, again, saying, "We've got the items as part of

16   installs from WITS, somebody bought them.  It seems somebody

17   either has an invoice or doesn't."  You could see his

18   frustration.  But does Kekoa LumHo say, hey, I signed that

19   fraudulent service order a couple of weeks ago.  Does he hand it

20   over?  Of course not.  He sends an e-mail to his co-conspirators

21   trying to get them to keep a lid on it.

22        So, ladies and gentlemen, the evidence that we've

23   discussed proves overwhelmingly that the defendants are guilty of

24   the conspiracy, of the substantive wire fraud count, of the false

25   claims, but what's just as damning is the cover up.  And both

1    defendants engaged in actions throughout to cover up their

2    actions.  Their efforts to coverup what they did is just as

3    powerful evidence as their intent.  The coverup of course starts

4    with LumHo.  Every year you're required to fill out a

5    confidential disclosure form, and here he is claiming that he had

6    no non-investment income, no gifts and travel reimbursements.

7    False.  And he knows that it's false, ladies and gentlemen.  You

8    can't own the bribe so he lies on his confidential disclosure

9    form, despite the fact that he knows full well that this money

10   was coming to him, despite the Canon camera equipment and the

11   Bose SoundDock, despite the fact that he himself deposited this

12   $6,500 check that he used on his trip to Hawaii that he knew was

13   from MSO Tech.

14        It's not just that, ladies and gentlemen, it's his efforts

15   in the months that followed to make it look like this job was

16   real.  This is Fidel Ramos's restricted license order.  Again,

17   you know who didn't fill this out.  It wasn't Fidel Ramos, he

18   can't read.  He doesn't know what MSO Tech is.  He doesn't know

19   what MSO Tech's office in Manassas, Virginia is.  He doesn't know

20   their phone number or their mailing address, and, as you heard,

21   ladies and gentlemen, he was very clear during his testimony in

22   the Grand Jury.  Kekoa LumHo was with me.  He was the one

23   providing the information, and of course it was him.  Who else

24   would have known?  Who else had an incentive to provide fake

25   information to make this job look real?

1          The application for employment at the Catholic Arch

2     Diocese.  You know Fidel Ramos didn't fill this out, he can't

3     write, he doesn't know any of this information, so you know where

4     the information came from.

5          And then, ladies and gentlemen, yesterday Defendant Lumho

6     claimed that he was trying to help the investigators.  But look

7     at his actions.  When he learns that the investigators are

8     getting close to his bank records, bank records that he knows

9     will reveal his crime, bank records that he doesn't want the

10    investigators or ultimately you to see, he files this motion to

11    quash, to try to prevent his conduct, his actions, his crimes

12    from coming to light.

13         And then, of course, ladies and gentlemen, there's the

14    efforts of cover up by defendant Wilson.  Count 14, is a false

15    statement count.  This is from the interview that Ed Cassin did

16    in Alexandria of defendant Wilson.  An interview where

17    defendant Wilson claimed that he had never provided

18    Timothy Donelson of anything of value besides a vehicle.  He

19    claimed that he had purchased a vehicle for Natalie Capallia to

20    enable her to survey land; that Natalie Capallia had identified

21    properties in Florida and Georgia for Wilson to purchase; that he

22    had paid for Natalie Capallia to go on a cruise in the Caribbean

23    to look for properties on his behalf.  Ladies and gentlemen, it's

24    preposterously false, and his efforts to cover it up show that he

25    knew all along that what he was doing was criminal.

1        And, then there's the statements Bill Wilson made during

2    his deposition which is marked as government's Exhibit 400.  I

3    encourage you to read it, ladies and gentlemen.

4        Under oath, over and over and over again, Bill Wilson said

5    things that are just impossible to believe; PVS used a bulldozer

6    supplied by Tim Donelson.  No, they didn't; PVS used a

7    bulldozer -- Wilson hired Natalie Capallia to perform

8    administrative work in search of real estate.  No, she didn't;

9    Wilson met with Natalie Capallia three times for hiring; that he

10   had purchased two properties that Natalie Capallia found; that he

11   purchased two vehicles for Natalie Capallia to enable her to

12   perform work on behalf of Wilson; that he never provided anything

13   of value to Ron Capallia aside from the salary and vehicles

14   provided to Natalie Capallia; that he never provided anything to

15   LumHo; and that he had never bought anything for LumHo directly

16   or indirectly.

17       And then, ladies and gentlemen, you saw all the other

18   evidence of the attempt to cover up by Bill Wilson.  You saw his

19   actions in throwing a Lenovo laptop into a fire after he learned

20   of the investigations, of smashing the hard drive in his office.

21   Upon learning of the investigation in that L.C. Simmons was being

22   brought up here to testify in the Grand Jury, saying, "The less

23   you say about Tim Donelson, the better.  You don't know anything

24   about those invoices."  Which was totally false.

25       And then worst of all, ladies and gentlemen, knowing that,

 1   of course, Ron Capallia's testimony would overwhelmingly reveal

 2   his guilt, threatening to kill Ron Capallia and his family.

 3        So, ladies and gentlemen, at the beginning of this case,

 4   my co-counsel, Mr. Carlberg, told you that this was about

 5   corruption and cover up.  We've shown you the corruption.  We've

 6   shown you the efforts at the cover up.  The efforts at a cover up

 7   these defendants sought in the hopes that this day would never

 8   arrive.  But, ladies and gentlemen, now this day has arrived, so

 9   now it's up to you.

10        The evidence proves both defendants guilty overwhelmingly

11   of every count in the indictment.  And so we ask that you return

12   the only verdict consistent with the evidence, a verdict of

13   guilty on all counts as to both defendants.

14        THE COURT:  Thank you.  All right.  Let's take a brief

15   recess.  Let's take ten minutes, and we'll come back and continue

16   with closing arguments.  All right.  You're excused.

17        (Jury out at 3:35 p.m.)

18        THE COURT:  All right.  Anything before we break?

19        MR. AMOLSCH:  No, sir.

20        THE COURT:  Who's going to go next?

21        MR. STEWART:  (Raised hand.)

22        THE COURT:  Let's take 10 minutes, we'll be in recess.

23        (Thereupon, a recess in the proceedings occurred from

24   3:36 p.m. until 3:49 p.m.)

25        THE COURT:  All right.  Ready?

1         MR. STEWART:  Yes, sir.

2         THE COURT:  Ira, please.

3         (Jury in at 3:50 p.m.)

4         THE COURT:  All right.  Please, have a seat.  All right.

5   Mr. Stewart.

6   **CLOSING ARGUMENT ON BEHALF OF DEFENDANT WILLIAM WILSON**

7         MR. STEWART:  Thank you, Your Honor.

8         Good afternoon, ladies and gentlemen.  We've been together

9   for about two and a half weeks now, I still have the compulsion

10  to introduce myself.  I'm sure you've heard my name enough over

11  the last couple of days.

12        The government asked you at the opening of their closing

13  remarks, how did we get here?  They asked that you repeatedly.

14  And I have a different answer, as you might imagine.  We got here

15  because of chaos and confusion within the DoD IG and Level 3.  No

16  one knew how these contracts worked.  I don't think -- I don't

17  think anybody truly understood how complicated this government

18  contracting can be, especially when you have this perfect storm

19  of the government going into almost a shutdown situation, they're

20  trying to move out of a building at the same time.  It was a

21  disaster, it was chaos.

22        Before I go too much further, I want to discuss where we

23  left off yesterday.  You had the opportunity to hear witnesses

24  that were called by Mr. Wilson.  You had the opportunity to

25  listen directly to Mr. LumHo, and during the trial you learned

1    through the government witnesses that Mr. Wilson had made some

2    prior statements.  Mr. Wilson's story is in the evidence, and

3    you'll have his statements at your disposal to review while

4    you're deliberating.

5         You heard from a number of witnesses who testified on

6    behalf of Mr. Wilson to confirm where the bulldozer did its work.

7    We didn't call additional witnesses to speak about his good

8    character because we felt as you already heard about Mr. Wilson's

9    generosity during this trial.

10        In addition to the statements that you already have as

11   exhibits, and you'll have the opportunity to review, you also

12   listened to testimony relating to prior statements that were made

13   by Mr. Wilson that the government contends are false.  It's

14   important to remember that, and as you watched this as witnesses

15   testified throughout this trial, people's memories can fade.

16   People can have difficulty remembering things, and you observed

17   some of the witnesses misremember, be slightly off on a date, and

18   how challenging that can be when you're facing examination from

19   an attorney.  The first set of statements that Mr. Wilson made

20   that the government contends are false occurred back in April of

21   2014, I think it was April 2nd of 2014, and this is when agents

22   interviewed Mr. Wilson.

23        Now, there was a lot of information that he shared, there

24   was some information that he didn't share.  Agent Doyle, though,

25   would agree or agreed during his testimony that Bill Wilson told

1    them, Natalie worked for MSO, Bill Wilson told them he paid her.

2    He told them how much he paid her at the time.  He acknowledged

3    buying a truck for Mr. Donelson, he acknowledged buying a car for

4    the Capallia's.  He made payments from MSO directly.  There's no

5    effort to conceal those payments for the vehicles.  And he

6    acknowledged a personal business relationship with Tim Donelson.

7    That sounds like a lot of the things we've been talking about

8    over the last couple of -- well, two and a half weeks.

9         He told her about NASCAR races, he told her about fishing

10   trips with Tim Donelson and LumHo.  He even told them that he was

11   going to meet with his partners, including Tim Donelson later

12   that day, the same day as the interview.

13        While Agent Doyle might believe that some of Bill Wilson's

14   answers weren't a hundred percent true or precise, they were

15   still -- it was still clear that he provided the agents with

16   information that allowed them to further their investigation.

17   Without that information they wouldn't have gone and subpoenaed

18   car records, without that information they would not have

19   subpoenaed bank records.  Maybe they still would have, but

20   getting that information from Mr. Wilson certainly shortened the

21   amount of time or shortened the curve -- the work curve that they

22   would have to go through.

23        The next set of statements occurred during the deposition.

24   You have this, I think the government referred to it by exhibit.

25   Again, during this deposition Mr. Wilson provided quite a bit of

1 historical information, how he met who, how he got involved with

2 different companies, things along those nature -- things along --

3 things of that nature.  I'm sorry.

4     Certain questions were confusing.  I think one of the ones

5 that came up was exchange about a car.  Did you buy Tim Donelson

6 a car?  No.  Did you buy him any vehicle?  A vehicle?  Yeah, I

7 got him a truck.  Those are the kinds of exchanges we see

8 throughout this deposition.

9     Now, Bill Wilson also made statements that related to the

10 bulldozer.  Do you remember the bulldozer?  We spent the first

11 week talking about it.  Now, specifically there was concern about

12 the bulldozer as it relates to the JEA project, and what

13 bulldozer was there, not if a bulldozer was there, but which

14 bulldozer.

15     And he told agents, or he testified during the deposition

16 that the Case bulldozer that was owned by Donelson and

17 Mr. Wilson, through CSS, that was the company that they had, the

18 partnership, that that bulldozer was at the JEA location.  We've

19 heard all kinds of testimony about that JEA business location

20 during this trial.  I think it's pretty clear that it was the

21 John Deere.

22     I just wanted to explain that obviously he was mistaken.

23 Those two bulldozers were bought and sold relatively closely in

24 time.  The business arrangement that he had with Mr. Donelson

25 remained the same, and ultimately he was making these statements,

1     at least some years after these transactions had occurred, and

2     again, sometimes memory takes refreshing.  Sometimes people just

3     misspeak or make a mistake.

4          During the rest of my closing, moving on from the

5     statements, I would like you to think about a few key points.

6     First, Bill Wilson received contracts from Level 3 before he met

7     Tim Donelson.  Second, Bill Wilson and Tim Donelson had a

8     legitimate business relationship before, during, and after the

9     2010-2014 window that encompassed the allegations in this case.

10    Third, Level 3 was independently motivated to maximize their

11    profits, regardless of the proper procedures.  That dovetails

12    with the whole chaos and no one understands how government

13    contracting works in an emergency.  Fourth, Bill Wilson had a

14    WITS 3 professional services contract before Ron Capallia became

15    a project manager for the DoD IG project.  Fifth -- there's only

16    two more -- Ron Capallia didn't have the discretion to do

17    anything for MSO, and, he didn't change his behavior after he

18    began receiving gifts.  Sixth, after Ron Capallia resigned from

19    Level 3, he continued to receive gifts.  So, again, it's been two

20    and a half weeks, and I'd like to rewind and sort of go to the

21    beginning and review some of the background of Mr. Wilson.

22         Bill Wilson has spent his entire life working, working

23    hard.  He built a business from scratch and eventually he built

24    it into something where he was competing for multi-million dollar

25    contracts.

1          His journey began in Lake Butler, Florida, population

2    2000.  He owned a landscaping company.  His long time friend,

3    Sandy Darden testified, and he told you how Bill got a contract

4    with Alltel to mow the lawns or the ground around these cell

5    towers.

6          Eventually, he developed a relationship with Troy Wilson

7    at Alltel who encouraged him to form this company PVS.  And

8    Bill Wilson worked his way up from mowing the lawn around these

9    cell towers to eventually building the cell towers.

10          He did that in part because of the relationship that he

11    built with Troy Wilson, but he also did it because he did good

12    work.  Now, Sandy Darden also testified, if Bill Wilson didn't

13    have experience building cell towers before he started building

14    cell towers, but he learned how to do it, he did it well.

15    Building cell towers was good business, and the majority of the

16    work PVS did at the time was with Alltel.  Bill's work with

17    Alltel eventually moved on to Nextel.  He followed Troy Wilson

18    there, and Bill transitioned from building cell towers to

19    building switches for cellular networks.  And, again,

20    Sandy Darden was here for all of this, and he testified and told

21    you that as with the cell towers, Bill Wilson didn't have

22    experience building switches for cellular network, but he learned

23    how to do it and he did it well.  Building switches for cell

24    tower network was good business and the majority of the work PVS

25    did at that time was for Nextel.  Now, when working with Nextel,

1    Bill formed MSO in 2000, and you heard testimony from Dean Carter

2    that 100 percent of MSO business was coming from Nextel, and they

3    were doing jobs all over the United States.  Dean Carter

4    explained how MSO would hire subcontractors to work on projects

5    that were local to the region, the subcon- -- obviously, the

6    projects were local to the region, the subcontractors were local

7    to the region.  But, during this time MSO had nothing to do with

8    Tim Donelson, had nothing to do with Level 3.  While working on a

9    job for Nextel, that's when Bill was introduced to Level 3.  And,

10   eventually he was invited to start bidding on projects laying

11   fiber optic cable for government entities all over the country.

12          And then we have an important date, December 17th, 2004.

13   Bill Wilson signs the nondisclosure agreement with Level 3.  This

14   is defense Exhibit 130 for those of you keeping track.  This

15   agreement is where they agreed to engage in discussions

16   concerning a potential business transaction.  So basically

17   they've agreed that they're going to talk about business and

18   they're not going to share it.

19          That contract was signed by Brian Farley on behalf of

20   Level 3, not Tim Donelson.  Later in 2005, MSO was awarded the

21   first contract by Level 3.  Laying fiber optic cable in

22   Oklahoma City or -- I always forget the name, Tinker's [sic] Air

23   Force Base.  Now, around this time Dean Carter, he returns to

24   MSO, and he testified and he told you that Bill Wilson didn't

25   have experience laying fiber optic cable but he learned how to do

1    it, and he did it well.  Laying fiber optic cable was good

2    business, and the majority of the work that MSO did at the time

3    was for Level 3.  Dean Carter testified that like its work at

4    Nextel, MSO was providing construction management services for

5    Level 3, and they hired subcontractors with local experience.

6    The way that these projects increased to a point where MSO was

7    actually also participating in the construction, so they were

8    doing both.

9         The work with Level 3 and various government agencies

10   required certain MSO employees to obtain security clearances in

11   order to gain access to facilities.  There's been a lot of talk

12   about security clearances and whether or not that's the only

13   consideration in awarding these contracts.  And we'll talk later

14   about the fair value process and all of the other considerations

15   that go into choosing a subcontractor.  Now, the employees that

16   obtain security clearances at the time were Bill Wilson,

17   Dean Carter, and Billy Ray Hall.  A facility clearance was also

18   required to store documents obtained my MSO, and MSO obtained

19   what they call an FCL.

20        Now, during this same timeframe we heard from Agent Cassin

21   that Bill Wilson met Tim Donelson while working on a Level 3

22   project.  They became fast friends.  They hunted together.  They

23   went to NASCAR together.  And, eventually, in 2008 they formed a

24   partnership together.

25        This company was called CSS, I mentioned it earlier.  And

1    its purpose was to pursue construction opportunities.  And then

2    in 2010 Tim Donelson formed Apposite and dissolved CSS.  This

3    brings us up to that 2010, 2014 window.  So I want to shift gears

4    a little bit and discuss Count 1, as it relates to Tim Donelson.

5    This is the conspiracy to commit honest services fraud and the

6    money and property wire fraud.

7         The government argues that Bill Wilson paid thousands of

8    dollars of kickbacks to Tim Donelson in exchange for favorable

9    treatment.  You heard testimony that Bill Wilson purchased a

10   property adjacent to Tim Donelson's residence.  However, this

11   property was never transferred to the ownership of Tim Donelson.

12   And that was confirmed by Agent Russo.

13        Bill Wilson also contributed to the purchase price of two

14   vehicles for Tim Donelson.  Tim Donelson asked Bill to do this

15   instead of submitting an invoice to him for work that had been

16   done with the bulldozer.  And this isn't the first time

17   Bill Wilson did this.  You also heard testimony from Dean Carter

18   that Bill Wilson bought him a Jeep instead of paying his salary

19   for some portion of time.

20        There were also the payments to Apposite from MSO.  During

21   the government's closing, they described this relation between

22   MSO and Apposite as Bill Wilson and Tim Donelson's effort to

23   cover up their transactions, these money changes.  It just dawns

24   on me that cash, something that wasn't creating bank records, may

25   have been a more effective cover up, but this is what they chose

1    to do, and I would submit because they had nothing to hide,

2    because it was a legitimate business arrangement.

3         Now, as I mentioned, in 2008, Bill Wilson and Tim Donelson

4    formed CSS, each of them contributed capital equipment,

5    Tim Donelson was the one who contributed the Case bulldozer.

6    Their arrangement was when the bulldozer was doing work,

7    Tim Donelson would get proceeds, and if you look at defense

8    Exhibit 113, this is a 2018 tax return prepared for CSS that

9    lists Bill Wilson and Tim Donelson as 50 percent partners, and it

10   also shows depreciation of that Case bulldozer -- what did I say?

11   2008.  Thank you.  Regardless, it's on the defense Exhibit 113,

12   but thank you very much.

13        On March 12th of 2019, if you look at government's

14   Exhibit 1,000, and, again, I'm not pulling these up.  If you want

15   to keep track, that's fine.  MSO purchased a John Deere 450J

16   bulldozer from Stribling Equipment in the amount of $58,000.

17   This bulldozer, as we see in government's Exhibit 972, was

18   immediately put in service, and it began depreciating it on the

19   PVS tax returns through 2015.

20        I point all this out just to reiterate the bulldozers were

21   real.  In September of 2009, following a project that used the

22   Case bulldozer, the CSS bulldozer, Bill Wilson sold it to

23   Guy Hollingsworth.  He came and testified.

24        And he testified that he purchased it for $17,000.

25   There's no evidence that the proceeds or any portion of those

1    $17,000 was ever transferred back to Tim Donelson.  It stayed

2    with MSO.

3         So in 2010, again, Tim Donelson forms Apposite, or,

4    however it's pronounced, and CSS is dissolved, but the

5    arrangement between Bill Wilson and Tim Donelson is consistent.

6    If the bulldozer's working he's getting a portion of the

7    proceeds.

8         From 2010 until 2014, MSO or PVS made approximately six

9    payments to -- well, not approximately, six payments there, up

10   there, to Apposite.  The Apposite invoices appear in government's

11   Exhibit 702 and 703 and here we have the cancelled checks

12   displayed.  They're combined from government's Exhibits 1000 and

13   1004.  These payments were made from MSO to Apposite, they were

14   done in real time as the work was being performed.  The memo line

15   on the checks match, for the most part, what appears on the

16   invoices, and we know that the descriptions that appear on the

17   memo lines were added when the check was written because these

18   are copies of the cancelled checks from the TD Bank records.

19   This income was also reflected on the Apposite tax records, this

20   is government's Exhibits 1006 through 1009.

21        And, then, finally, we have this additional split just to

22   sort of breakdown how the split worked between MSO and Apposite.

23   And this is for the F&W invoices where the bulldozer was used

24   to -- here we go.  So this is government's Exhibit 922, Page 5,

25   where we have 3,590 as one charge, and then government's

1    Exhibit 923 on Page 4 we have $1,075.  The total for that is

2    $4,665, and that corresponds with the Apposite invoice

3    government's Exhibit 407, Page 3, Line 1, for $2,335 or half.

4         And in relation to these work sites you heard from

5    Garry Moore, this is the JEA representative.  He testified that

6    many of the companies have equipment subsidiaries to lease

7    equipment for tax purposes.  So this arrangement between PVS, or

8    not PVS, between MSO -- or PVS and Apposite, is not out of the

9    ordinary.

10        When you look at the contract for this JEA project -- this

11   is government's Exhibit 986, Page 8, the Bid Specification -- it

12   states that it was the contractor's responsibility to access

13   these roads.  These were shown to you with -- we have photos of

14   the roads, and I believe they were also introduced.  I don't have

15   the cite right now, though, but that bid specification stated

16   that it was the contractor's responsibility to access the sites

17   and JEA was not responsible for the additional costs to do so.

18        Then, if you look at government's Exhibit 987, the

19   technical specifications on Page 8, indicates that the contractor

20   would also need to use rights of way and contemplated that there

21   might be damage that requires repair.

22        So even though it appears as though the cause of the

23   documents that contracted this project with JEA to go out and do

24   these tower repairs, even though it appears that they

25   contemplated having to repair the roads, Mr. Moore was adamant

1    that no repairs would ever be necessary.

2          Then we heard from Dean Carter who testified that he

3    actually went to the JEA site on occasion.  He wasn't there all

4    the time.  They needed to make a place to store boats.  He didn't

5    actually see work being done, but he observed that the roads

6    needed to be repaired, and he also testified that he witnessed

7    Tim Donelson deliver the bulldozer to an FBI project in 2015, and

8    that corresponds with government's Exhibit 702, Page 12.  So we

9    have additional bulldozer sightings being present on projects and

10   then ultimately being invoiced.

11         L.C. Simmons testified that, looking at, again,

12   government's Exhibit 702, referencing the fire prevention and

13   other MSO hunting line items.  He testified that, yes, a

14   bulldozer was used to plow a fire row, and that a bulldozer could

15   be used to do work for the MSO hunting.

16         He also confirmed that he actually did the work on the

17   Hamilton Plantation.  That included land clearing, tree removal,

18   road building.  He also confirmed that he did work along with

19   Bill on the Oden property that's also known as the

20   Philips Pasture, not to be confused with the Oden property.  That

21   work was done for free.

22         He also confirmed work that he did work on the Rayonier

23   project, again, with the bulldozer.

24         David Allen Lane, he was the bulldozer driver.  He

25   testified during Mr. Wilson's case, that he did work on the JEA

1   project with the bulldozer.  He also did work at the Sweet Water

2   Hunting Club.

3        Kevin Griffith, he was the fence builder who assisted on

4   the Oden, Phillip's Pasture property testified that the bulldozer

5   was there.  It was on the other side of the property working its

6   way around.  The bottom line is this:  Before 2010, the Case

7   bulldozer was used to perform work during the CSS partnership.

8   Bill Wilson and Tim Donelson split those proceeds 50/50.  After

9   2010, the John Deere bulldozer was put in place, used to perform

10  work.  Tim Donelson invoiced Bill Wilson for the work.  You heard

11  from the people that actually got their hands dirty doing the

12  work.  You heard what kind of work they did.  You heard where the

13  work was done.  And you heard when the work was done.

14       Now, even after Tim Donelson left Level 3 in February of

15  2014, Bill Wilson continued to pay Apposite for bulldozer work,

16  and you can see that in government's Exhibit 702.  There are four

17  additional invoices after he leaves Level 3, owing $28,000.

18       Now, MSO already had a long standing relationship with

19  Level 3 before Tim Donelson arrived and came into the picture.

20  In 2004 MSO, as I mentioned, signed the nondisclosure agreement.

21  Beginning in 2005, they were awarded a series of contracts, and

22  if you recall -- well, you probably don't recall the exact

23  exhibit number, but defense Exhibit 147.  This is an example of

24  one of the contracts that was signed in 2008 by Ed Morche,

25  M-O-R-C-H-E, not Tim Donelson.

1    When the government makes a point about whether the work

2    on the invoice lines are a hundred percent accurate or match up

3    exactly with what work was actually done, you have to keep in

4    mind -- or I would ask you to keep in mind, this is a handshake

5    agreement between two friends.  A lot of men who testified about

6    the work that was being done, they're coming back to the office

7    and relaying verbally what they did.

8    Suffice it to say, specificity and detail wasn't

9    necessarily their priority.  They didn't realize that ten years

10   later these records would be reviewed as closely as they are.

11   Generally, though, those descriptions on the invoices are

12   pretty accurate.

13   These payments were made for -- these payments relating to

14   the bulldozer were made for legitimate business purposes and the

15   government failed to prove to the contrary.

16   At most, Tim Donelson had a conflict of interest while he

17   was working for Level 3 and maintaining this side business

18   relationship with Bill Wilson.  But that's not sufficient to

19   prove honest services fraud.

20   I'd like to move on to Matthew Kekoa LumHo and discuss him

21   for a little bit again.  Within Count 1, this is the conspiracy

22   to commit honest services fraud, and the money and property wire

23   fraud.

24   Now, the government argues that Bill Wilson paid thousands

25   of dollars and gave equipment to Kekoa LumHo with the intent to

1    influence him in the performance of his official acts that would

2    benefit Bill Wilson.  And that LumHo accepted this money and

3    equipment in return for being influenced in the performance of

4    these official acts.  That's a lot.  Suffice it to say, that

5    Bill Wilson never provided money and equipment to Kekoa LumHo

6    with the intent to influence the performance of any official act.

7         Let's start with these payroll deposits or payments to

8    Fidel Ramos.  If you look at government's Exhibit 938, I believe

9    this is the FrankCrum records that the government probably had

10   them up.  On February 9th, 2012, Fidel Ramos is placed on the MSO

11   payroll, he stayed on the payroll until November 7th of 2012.  He

12   received a total of $23,595 after taxes.  There's no evidence

13   that Bill Wilson was ever informed that Ramos was hired.  There's

14   no evidence that Bill Wilson was ever informed or knew that there

15   was any relationship between Bill Wil- -- not Bill, between

16   Kekoa LumHo and Fidel Ramos.  This is supported by the fact that

17   there's no employment file in evidence; unlike Natalie Capallia,

18   that the government has argued was also receiving similar

19   payments, she's got an employment file.

20        Moving on to the Bose SoundDock.  This is government's

21   Exhibit 906.  It shows the March 31st, 2012 Apple receipt.  This

22   is the transaction.  We had a little confusion that we were

23   missing a page and I had questions about which transactions

24   corresponded with Mr. Atwood.  I think we agreed that this

25   transaction was conducted under Barry Atwood's card and then

1    shipped to Barry Atwood's house.  It came out of Mr. Wilson's

2    credit card account, but the actual purchase was conducted by

3    Barry Atwood,

4         Then we move on to the camera equipment.  MSO received

5    these requests between June 25th and June 26th of 2012 and filled

6    them.  That's what Bill Wilson did.  He sent them a request, he's

7    going to fill it, and send it back to you.  If you look at

8    government's Exhibit 803.  This shows LumHo e-mailing Atwood the

9    list and then government Exhibit 828, Page 16, shows Atwood then

10   e-mailing Tyler Dalton and Bill Wilson is cc'd, and he's asking

11   him to purchase this equipment and put it on the portal 6099.

12   Tyler Dalton goes and purchases the equipment and sends it off or

13   has it shipped.  Bill Wilson didn't even know what this equipment

14   was going to be used for.  That wasn't his responsibility.  His

15   responsibility was to buy it and provide it.  It's the same thing

16   Ron Capallia told you, the project manager from Level 3.  He

17   didn't know what any of this equipment was going to be used for.

18   He's creating a purchase order, making sure that it arrives, we

19   hope, and then invoicing.

20        Now, in their opening, the government suggests that

21   somehow Barry Atwood was going to be a back channel between

22   Kekoa LumHo and Bill Wilson, and just with this one camera

23   transaction.  Look at all the e-mails that ended up getting sent

24   back and forth.  Add the camera into it and look at how many

25   e-mails are getting sent back and forth.  Barry Atwood wasn't a

1    back channel.

2         Bill Wilson didn't knowingly provide any money or

3    equipment to LumHo.  However, even if you believe that he did,

4    then the most Bill Wilson can be found guilty of is providing a

5    gratuity, not honest services fraud, because LumHo was never

6    influenced in the performance of an official act.  Any benefit

7    that he would have received, occurred -- any benefit that he

8    would have received would have occurred after any action that he

9    had taken, or any imminent action to be taken.

10        So turning back to November 8th of 2007, this is when

11   Level 3 was awarded the WITS 3 contract by GSA.  At the time

12   Bill Wilson was performing various contracts for Level 3.  On

13   November 18th of 2010, MSO entered into a master subcontract

14   service agreement with Level 3.  This is -- this puts them into a

15   special pool of subcontractors.  I think that's probably an

16   oversimplification, but that's basically the gist of it.

17        That contract -- the purpose of that contract was to

18   provide professional services to the GSA.  That process wasn't

19   just something that Tim Donelson would sign off on.  You heard

20   testimony that it required additional vetting.  Part of that

21   vetting process was corporate looking into finances so they're

22   not just letting anyone on to this list of the master

23   subcontractor agreements.

24        Now, in January of 2011 -- in January of 2011, Mr. Wilson

25   was approached by Level 3 that a very small professional services

1    contract for him to take over, maybe one or two people at WHS.

2    We have the -- in evidence you'll have the FrankCrum records for

3    this person.  Debra Gardner.  And, this isn't something that

4    Bill Wilson had done before -- here we go.  This isn't something

5    that Bill Wilson had done before, but as most of his professional

6    career, he learns how to do things and he does it well.

7         So he takes this job on with a few subcontractors.  It

8    also made sense because it was generally related to telecom.

9         Now, in 2011, Level 3 took over the month-to-month

10   contracts used for IT support related to the move to the

11   Mark Center.  So, again, small contract, they approach

12   Bill Wilson, they had staff already in the facility, they had

13   someone in place who already had a managerial role, Barry Atwood,

14   so they asked Bill Wilson, is this something that you want to

15   take over.  It's slightly bigger than what he was currently

16   working on.  There may be three or four employees, but he takes

17   it over.  It wasn't necessarily in his area of expertise, being

18   IT, but he had someone on site who could basically be a project

19   manager.

20        Now, this occurs before the Bridge contract and before the

21   last phases of the BRAC move.  And we heard Mr. Steiniger testify

22   that MSO -- the MSO subcontractors did a good job on this

23   project.

24        Now, throughout the trial we heard a lot of testimony

25   about the contract dispute between EES or ESS and Phacil, Facil

1   (phonetic.)  I can't remember how to pronounce it, and this
2   resulted in a Bridge contract being awarded to Level 3.  That
3   happened on October 20th of 2011.  Now, there's some controversy
4   about how the contract was awarded to Level 3.  Defendant's
5   Exhibit 7 shows, however, that LumHo informs Steiniger and a
6   number of others about this -- about his communication with Level
7   3, GSA legal, and there were discussions about how GSA legal
8   wanted to make sure that they didn't use certain contractors,
9   Phacil or InquisIT.  It also explained how Level 3 was already in
10  conversations with a potential subcontractor to take over the
11  project, and this occurred before LumHo ever sent Ron Capallia
12  any of the bid information.

13       We also heard testimony from Pamela Munford, this is the
14  24 year old Verizon veteran who testified about the fair
15  opportunity process.  And, I would encourage to you look at
16  government's Exhibit 302.  This is the actual Verizon WITS 3
17  appointment letter, and it specifies that letter is for or that
18  contract, that appointment is for voice and data services, not
19  professional services, and not for equipment that would have been
20  required for the Bridge contract.

21       So as we're moving through this progression, you hear
22  testimony from Willie Spivey, Spivey, about how there's 91
23  existing positions that has to be culled down to 31 positions
24  that they're going to retain.  They're trying to decide who was
25  going to be able to take this over.  Well, MSO is already on the

1  contract.  They're on site providing -- no, this is the Bridge

2  contract.  So MSO is already on site, okay.

3          They're already providing professional services.

4  According to Steiniger, they were doing a good job.  Also, MSO

5  had the master subcontract agreement with Level 3, and, so a lot

6  of the fair -- a lot of the best value factors are already in

7  place for Level 3 -- or for MSO.

8          So the Bridge contract was ultimately awarded to Level 3

9  and MSO took over.  Barry Atwood was able to manage the project.

10 They had to hire additional subcontractors.  Through all this

11 process, Spivey testified that they didn't receive any complaints

12 about the MSO employees' performance on the Bridge contract and

13 this is, at least in the beginning, they were dealing on

14 one-third staff.

15         Now, three months later we have the issue with the BRAC

16 move.  That all comes to a head.  MSO is already on site with

17 this month-to-month service agreement.  They have their three or

18 four, maybe more employees, they're starting to grow because

19 they're also handling the Bridge contract, so there's a series of

20 three portal orders that are associated with this move out.

21 January 31st, 2012; April 3rd, 2012; and July 24th of 2012.

22         And, again, MSO is already on site, they're doing a good

23 job with the Bridge contract, Atwood is there to manage.  It

24 makes sense that they're there.  They're not just being thrown

25 into this situation.

1        Ultimately, Atwood in consultation with Mr. LumHo decided

2   that they're going to use Donnie Ravas to provide the technical

3   moving services, and you heard Mr. Ravas's testimony about how

4   challenging that process was.  He ended up having to do

5   walk-throughs.  There were meetings associated with it.  He

6   staged an overflow warehouse.  He assisted with the move itself.

7   He was supervising the movers that he had hired.

8        He also testified that he completed the work that appeared

9   in the statements of work, and they did a good job.  Steiniger

10  testified that the MSO subcontractors provided an appropriate

11  level of support and that there weren't any complaints.

12       Now, this version of the move out process stands in stark

13  contrast to the testimony you heard from Mr. Jenks.  This is the

14  individual who testified when they're confronted with a number of

15  e-mails, just denied that they were ever written.

16       It's obviously your prerogative, if you want to credit his

17  testimony over Mr. Ravas's, but I would submit to you that

18  Mr. Ravas's version of how this move occurred and the quality of

19  service is inherently more accurate.

20       Now, when we look at -- if we could -- Now, Ravas

21  testified also that Atwood participated in the planning and

22  moving of this process -- in the planning and moving process.

23  Atwood was basically the project manager for these various

24  professional services.  He was also supervising Ravas and his

25  crew, and on at least one occasion he had to go track down IT and

1    help desk people to help assist with the move.  Based on those

2    job titles, I would suspect that they're MSO subcontractors, but

3    I don't know that for certain.  The point is that you'll remember

4    government's Exhibit 1406.  This is what shows the number of

5    hours that Ravas's subcontractor movers put in, 332 or whatever,

6    he billed $70,000 to MSO, and then you slide over and you see

7    what Level 3 billed the government.  And that's just not an

8    accurate description of how those -- how the $440,000 that MSO --

9    or that Level 3 came up with and billed the government was

10   calculated.  A little bit later I'll go into the play by play

11   of -- or how that number gets that high, but at least at this

12   point I wanted to point that out.

13        Now, during this same timeframe there's a total of ten

14   additional portal orders -- so in addition to the move, there's

15   portal orders.  The portal orders are for equipment.  So you have

16   three portal orders that for moving related service, ten portal

17   orders that are related to equipment.  And these are all

18   different equipment and installation services that would be

19   required for the BRAC.  MSO was able to provide this equipment

20   and services.  They already had infrastructure in the building on

21   site.  It made sense for them to handle it, and they also already

22   had the contract for it.

23        The total invoice for these services that was submitted to

24   MSO or submitted by MSO to Level 3 ended up being $2 million, 2,

25   million 5,000 and $37.  Do we have that?

1          The total amount that Level 3 ended up billing to the GSA

2     was $3,088,883.  It basically corresponds to a 54 percent markup

3     for all -- I guess all 13 of those portal orders.

4          So, I point all of these dates out to explain how it is

5     that Bill Wilson ended up working on all of these contracts.  The

6     most important thing to remember about the WITS 3 contract you

7     heard on the very first day from Tina LeBlanc, and that is that

8     after the contract is awarded to Level 3, the government doesn't

9     have any say in who the subcontractor is.  So they might -- the

10    government may not like that Level 3 is subcontracting whatever

11    service, whatever contractor they got, but they don't have any

12    control over it.

13         The DoD IG also wouldn't have had any authority to

14    influence whether or not -- well, they wouldn't have the ability

15    to influence whether a contractor was used or who was actually

16    awarded the contract.

17         And this means that LumHo also didn't have the authority

18    to influence the subcontracting decisions that were made by

19    Level 3.  And, notwithstanding the lack of oversight that the

20    DoD IG had over the selection of MSO as the subcontractor on

21    these projects, Level 3's decision to use MSO was completely

22    justified.  When the GSA decided to re-compete this contract, he

23    actually had the opportunity to steer what in essence was a

24    $30 million contract to MSO, but he ended up not doing it.

25         So turning to Ron Capallia, again we're talking about the

1    conspiracy, Count 1, to commit honest services fraud, the money

2    and property wire fraud.

3        So in relation to Ron Capallia, the government's arguing

4    that Bill Wilson paid thousands of dollars in kickbacks to

5    Ron Capallia in exchange for favorable treatment.  However,

6    Bill Wilson didn't need favorable treatment from Ron Capallia,

7    and, in fact, Ron Capallia couldn't give Bill Wilson favorable

8    treatment even if he wanted to.

9        As I mentioned in the beginning, Level 3 was -- well, the

10   project -- the federal project management office at Level 3 acted

11   with a common purpose, to maximize their own profit without

12   regard to the process.  And specifically what I mean by that is

13   that Level 3 was responsible for making sure that the DAR or

14   Mr. LumHo actually had their training, and if he didn't then they

15   weren't allowed to submit portal orders with untrained DAR.  He

16   basically disregarded both of these responsibilities in the

17   interest of maximizing their profits, especially during the BRAC

18   move out and the Bridge contract.

19       The individuals who worked within the federal project

20   management office of Level 3, the primary players are listed

21   here, as you've listened to the testimony, clearly you've heard

22   more names than those, but these individuals all profited through

23   raises, bonuses, and they received raises and bonuses when

24   profits were maximized, and they accomplished this by adding 30

25   to 35 percent markups on the equipment or the services that were

1  subcontracted and then invoicing the government.  This process

2  was not dependent upon on any single person.  It functioned

3  without -- it functioned in the absence of any one of the major

4  players, it functioned in the absences of anyone.

5      They were collectively in the pursuit of profit, and any

6  of the gifts that Bill Wilson gave to Ron Capallia didn't affect

7  that process.

8      So Ron Capallia went to work for Level 3 in 2009 as a

9  project manager.  He was supervised by Mr. Hoeymans, and then

10  above that Tim Donelson, the leader of PMO.

11      Now, at this time Bill Wilson had already been

12  subcontracting for Level 3 since about 2005.  Ron Capallia met

13  Bill Wilson on a project in Durham, North Carolina, and again

14  they got along well, and eventually in 2011 Ron Capallia was put

15  in charge of this DoD IG project.

16      Now, Bill Wilson was already on the project.  He already

17  had employees on the project.  He already had a master

18  subcontractor agreement, and, as I said, he already had the

19  professional services contracts in place.

20      Now, Ron Capallia was ignorant of all of this when

21  Tim Donelson told him, "We're going to use MSO."  And I think you

22  heard Mr. Capallia's testimony that he didn't understand why they

23  were going to use MSO.  And in essence it's because Ron Capallia

24  was brand-new to this program.  He also didn't participate in the

25  subcontractor selection process.  Again, MSO already had in place

1   all of the best value factors, or not all of them, but a

2   significant number of them, that made them suitable for this

3   contract.

4        You heard testimony from a number of witnesses about, you

5   know, this best value selection process, so in addition to the

6   MSA, already being on the location, having the resources, having

7   a relationship, they wanted to make sure that you accepted all of

8   the additional requirements of the contract, a number of

9   different requirements.

10       In October of 2011, when discussions began about the

11  Bridge contract, and MSO was earmarked for the project, it's

12  because they were qualified.  It had nothing to do with any

13  behind the scenes selection or favoritism.

14       Now, there's been testimony that there should have been a

15  fair opportunity process with their contract.  The government

16  called -- we already mentioned her, Pamela Munford from Verizon

17  to testify about the fair opportunity process.  You heard about

18  how Verizon went back through their e-mail and they had people

19  looking over their shoulder combing their records for one of

20  these fair opportunity letters.

21       Now, this criticism ignores two important facts.  First,

22  Verizon didn't have the appointment that covered professional

23  services and equipment.  They only had an appointment to this for

24  voice and data.  Second, it ignored the terms of the actual WITS

25  contract itself.

1          The government's Exhibit 301, on Page 225, specifically

2    carves out exceptions to the fair opportunity process.  If you

3    look at the top, we have highlighted some of these exceptions.

4    You see one of the exceptions on the left lists:  "Unusual

5    urgency that will lead to unacceptable delays," and to the right

6    you see an example of that would be:  "Immediate short term need

7    arising on short notice."

8          This would explain why no one in the senior GSA or DoD IG

9    seemed at all concerned about the fair opportunity process.  It

10   would explain why Ron Capallia and Kekoa LumHo all of a sudden

11   panicked because they didn't have a form in a file somewhere.

12   They had no idea what was even in the contract.

13         If you look down below on the left-hand side, it talks

14   about another type of exception where you have a contract that

15   could potentially be extended.  And if you then look on the

16   right-hand side it specifically lists that there's an agency move

17   going on.

18         Now, again, government contracts are confusing, I didn't

19   want to speculate about what type of contract was already in

20   place and whether or not that qualified for that left-hand

21   column, but certainly moving services seems to fit into one of

22   those exceptions.  But certainly these sort of last minute

23   situations do.

24         So the Bridge contract resulting from the process --

25   protest required that all these existing contractors leave, and

1   that certainly fits the description in this exception list.  This

2   is also another justification for why MSO would receive this

3   subcontract.  It was warranted, and it had nothing to do with

4   Ron Capallia.

5        Now, early in 2012, you have the last phases of the BRAC

6   move.  It began with -- the BRAC began to ramp up the moving

7   services were kicking in again.  On January 31st of 2012, this is

8   when you have the first in the series of portal orders that we've

9   already talked about.

10        These orders were issued with CLINs, and you heard

11   probably for the last four days, maybe longer, about how the

12   CLINs don't match the services that were provided.

13        So MSO had previously been awarded this contract prior --

14   again prior, to Ron Capallia's involvement on the contracts, so

15   the iPad that Bill Wilson purchased on that same day, January

16   31st, 2012, the first item of value that Ron Capallia received,

17   had nothing to do with this portal order.  The portal order

18   process goes on between the government and Level 3.  You heard

19   testimony that MSO isn't trained, they're not supposed to be

20   trained on this portal order process; Seana Gilliland told us

21   that.

22        The CLIN codes don't appear on the purchase orders.  They

23   were issued to MSO.  These CLIN codes don't appear on the

24   invoices that go back to the government.  The purchase

25   requisition or the portal orders and the purchase requisitions

1    that go on back and forth between the government and Level 3,

2    copies of those aren't provided to MSO, certainly none of it was

3    recovered in any of their project files.  The government argued

4    in their op- -- closing that somehow Bill Wilson, Kekoa LumHo,

5    and Ron Capallia all needed each other in this process.  That's

6    absolutely not the case.  Kekoa LumHo and Ron Capallia or any of

7    the other program managers within Level 3 are who was needed for

8    this process, but certainly Ron Capallia was superfluous.

9         Now, the first portal order is portal order 5631.  This

10   occurs, like I said January 31st.  This uses the CLIN code, cable

11   installer.  So we'll put up the -- so here are the -- yep, that

12   was right.  All right.  So portal order, and if we look at the

13   description, all right, obviously it said, "Cable Installer,"

14   right.  If we're looking at the document on its face, we're not

15   just looking at this little square where it says description.

16   We're looking at the document, and on the document I see, "Order

17   file attachment."  And it lists, "Network removal at 400 Army

18   Navy Drive."  And then you look up, "Purchase order file

19   attachment," same thing.  It's listed in two places.  So then if

20   we go to the purchase orders, this lists the project as Bryce --

21   or Project Bryce, who knows what that is, maybe it's a nickname,

22   but look at MSO.  This -- so the portal ord- -- the purchase

23   order, this is what's prepared by Ron Capallia, okay.  It doesn't

24   even match what's on the description in the purchase order, but

25   look what MSO does.  For DIG move out, so even though the

1    purchase order that they get has Project Bryce, MSO is still

2    invoicing for the work that they did.

3          After they send the invoice to Level 3, and MSO is out of

4    the process.  So let's go to the next portal order.  This is

5    5890.  This is April 3rd, 2012.  Again, the CLIN is, cable

6    installer, we're looking at this document on its face, so we're

7    not just looking where it says description.  You look up and in

8    the middle of the page it says, "Building clean out," and then

9    you look in the upper left-hand corner under PON and it actually

10   has in the order summary, "Move out, phase two."

11         That matches the description that appears on the service

12   order request.  So then we go to the purchase order.

13   Ron Capallia, "Project move out phase two."  You got it right.

14   Then we look at the two invoices that are associated with this,

15   "Project" move out phase two," "Project move out phase two."

16         Purchase order 5901.  We're looking at the description,

17   "Application Project Manager," and then the file attachment,

18   "Niksun."  You go over to their service order request -- the

19   service order request -- I can't read that, "Professional

20   Services, After Hours Installation."  Go to the purchase order,

21   look at the -- so here we have the PO order, "Niksun phase two,"

22   up above that, "Niksun phase one," invoices from MSO, they match

23   the portal orders, and the requestor is Ron Capallia.  If we can

24   go to the next one, "Cable Installer," is in the description.

25   Under the PON in the upper left hand corner it says, "Tech

1    Support."  If we go to the purchase order, it says,

2    "Ron Capallia, Apple Server and Samsung install" is what it reads

3    on the purchase order, and that corresponds with the invoice.

4         So as we scroll through these, we see that the invoice

5    that's being generated by MSO matches the purchase order.

6    After -- well, before MSO is involved, it doesn't necessarily

7    match.  After MSO is involved, between the purchase order and the

8    invoice, it matches.  Where are we?  Go ahead.  All right.  Go

9    ahead.  One more.  All right.  Go ahead, one more.

10        So this is an example, 6099, again, "Cable Installer,"

11   "Apple Lenovo Brackets."  In the middle, doesn't match the

12   service order request form.  Go to the purchase order.  Purchase

13   order is what's sent to MSO.  Apple 2, that matches the invoice

14   that's prepared by MSO, and the interesting thing about this

15   portal order is that it's -- we'll go back one.  The interesting

16   thing about this purchase order is that it is delivered to Leroy

17   Firnell.  So Ron Capallia, not signing this one, yet someone else

18   in the process continues.

19        So I mentioned that earlier that the government

20   Exhibit 1406 is a little bit misleading.  If we could bring up

21   the chart that we have.

22        Okay.  So this is what I was talking about.  If you look

23   at portal order number 5631, we see the amount billed to the

24   government.  That's 44 thousand -- $442,501.  The amount that was

25   billed to Level 3 from MSO was $295,000.  What appeared on

1    government's Exhibit 1406 was $70,000.  That's what Ravas billed

2    MSO.

3          Included in that chart is also a description of the work

4    that was done.  The only description that appears in that chart

5    is 332 hours and change of moving services.  Obviously, it

6    doesn't take into account the additional work that Ravas did.

7    Obviously it doesn't take into account any of the additional work

8    that MSO employees did, or Barry Atwood did, or Dean Carter did

9    who testified that he also assisted with that project -- or at

10   least with the planning for that project.

11         So looking at this we can see that Level 3 is not the

12   victim in this case.  They subcontracted work to Level 3.  They

13   put almost a 50 percent markup on it, and then billed it back to

14   the government.  And there was almost zero risk of any sort of

15   loss, and they stood to make a small fortune.

16         Now, looking at the portal orders on their face, the

17   description in that small box as we went through a couple of

18   them, is incorrect.  It doesn't describe what was actually being

19   provided.

20         It's important, though, as we looked at some of the

21   examples, that those descriptions appear in other places, and

22   while these portal orders may be inconsistent, that doesn't

23   necessarily make them false or fraudulent.  It just doesn't make

24   sense that Ron Capallia or any of the people who are generating

25   these portal orders would intentionally be submitting these false

1    orders and including all these attachments that describe what was

2    actually being done, and then putting the title in other places

3    on these purchase orders.  It just doesn't make any sense.

4         It does highlight, though, that even when another project

5    manager is making an entry in this system, they're doing it

6    exactly the same way as Ron Capallia.  It doesn't matter who's

7    doing it because they're interchangeable, and again, this

8    suggests that Ron Capallia isn't necessarily new to this process.

9         THE COURT:  Mr. Stewart you're at about 75 minutes just so

10   you know.

11        MR. STEWART:  Okay.  Thank you.

12        Mr. Capallia, Ron Capallia testified that he had a

13   conversation with Bill Wilson about the way that he was filling

14   these documents out, the inconsistent CLINs but that's all they

15   are, they're inconsistent, they're not false, and there's no

16   reason to expect that that would have raised any kind of alarm

17   bell with Bill Wilson, again, because he hasn't been trained.

18   And when he replied he always included an accurate description.

19        Now, Ron Capallia didn't have any role in pushing these

20   orders through to MSO either.  If he didn't do it, someone else

21   would do it.  And we know that through various e-mails with the

22   DoD IG where they're actively trying to get these different

23   equipment purchased.  So in regard to the construction proce- --

24   the construction projects, this is -- in addition to the

25   professional services, we see how Ron Capallia also is not

1    steering construction work to MSO.  There's e-mails where

2    they're -- there's one project where they're asking, who -- would

3    you like Woodlawn on the D.C. project.  And it's, well, here we

4    go -- there's -- I like Woodlawn, MSO, Highlander over Woodland,

5    so they throw MSO in there but that's definitely not a ringing

6    recommendation.

7         We also hear -- we also heard testimony from Capallia that

8    all of these projects were going to MSO and we have these PMO

9    slides that show some of the contracts that he was actually

10   working on.  If you look at the bottom left corner were Woodlawn,

11   so we know that all of the contracts that he was receiving

12   weren't MSO.

13        The other -- we also had the subcontractor tracking sheet.

14   This gives us a good understanding of what the ratio of contracts

15   were between some of these different contractors.  So at the top

16   we can see on the right-hand side, there's notations that say,

17   "Do not use these particular contractors for professional

18   services."  In the middle we have MSO with eight contracts.  At

19   the bottom we have Woodlawn with 16 contracts.  And you can go

20   look at this defense Exhibit 137A for yourself and review it.

21   It's multiple pages, but of the total of 92 subcontractors,

22   they're -- Woodlawn has more than MSO.  So that stands in

23   contrast to the testimony that both Scotidas and Capallia gave

24   you about the funnel of contracts going directly to MSO and

25   nowhere else.

1        So this just highlights the fact that Bill Wilson was

2   getting contracts before Ron Capallia was assigned to the DoD IG,

3   he was getting contracts while he was assigned there.  And even

4   though he didn't have any authority to steer these contracts to

5   MSO, we did hear testimony about how he tried to take Bill Wilson

6   to this NASA facility and then had the qualm anyway to submit a

7   contract but just never got around to it.

8        So in relation to this whole process of bidding contracts

9   for -- to MSO -- or funneling them to MSO, we heard from

10  Dean Carter.  He talked about how he was involved in actually

11  submitting some of these contracts or bids to Level 3.  He

12  testified about how the bids that they prepared, contrary to what

13  Scotidas testified to, they tried to provide competitive bids.

14  They did use the flat fee pricing.  They did that because they

15  needed to build in contingencies and he also testified that that

16  was the industry standard.

17       He testified, as well, that they didn't receive contracts

18  that they didn't bid.  He also testified that they didn't receive

19  contracts for all the bids that they submitted.

20       So clearly these gifts that Ron Capallia was receiving

21  didn't affect the way that he conducted himself in work.

22       It was also clear that Bill Wilson's intent wasn't to

23  receive favorable treatment from Ron Capallia.  He considered him

24  a friend.  And we know that Bill takes care of his friends.  We

25  heard testimony about that.  We heard about donations to the

1    Camp Landing Museum for $30,000.  $5,000 to the families whose

2    children had passed away.  There's the Thanksgiving turkey,

3    barbecue.  He gave Sandy Darden a smoker.  He gave Dean Carter a

4    Jeep.  He's loaned his equipment to neighbors.  He did work for

5    free for Barton Odon (phonetic.)  And he also helped with

6    maintaining the roads for these different hunting clubs.

7           The payments to Natalie Capallia continued over a year

8    after Ron Capallia resigned from Level 3.  He resigned on

9    February 21st of 2004, and the payments continued into June or

10   July of 2015.

11          The day that Ron Capallia resigned, Bill Wilson flew him

12   down to Orlando, he drove from Jacksonville to Orlando, picked

13   him up, brought him to Daytona.

14          He gave him a job.  He put Ron's kids on his healthcare.

15   He gave him a place to stay and they started the company

16   together.

17          Now, the one thing I have trouble squaring are -- My

18   recollection is that relatively early on in this process is when

19   the threat allegedly happened, when Bill Wilson threaten

20   Ron Capallia and his family.  It doesn't make sense to me that

21   they're still receiving money from Bill Wilson, and they didn't

22   leave.  I just don't understand that.

23          Before Bill -- before Ron Capallia resigned, though, if he

24   asked Bill for something, Bill would give it to him.  If he

25   needed something, he got it.  He started with the iPad for work,

1      there was the car when he was going to lose his work car.  His

2      family needed a computer.  That turned into a computer and iPads

3      for the kids.  He was -- iPads for the nieces.  He was going to

4      take a -- Ron was stressed out from work so that turned into a

5      vacation.  He did all of this for someone who couldn't do

6      anything for him in exchange, because he didn't have any

7      authority to do anything.

8          Ron Capallia couldn't provide favorable treatment to him

9      because he didn't have any favorable treatment to provide.  And

10     despite all of that, Bill Wilson kept on paying for him to live

11     with him and support him for an additional year.

12         So I just wanted to briefly touch on some of the

13     additional charges, other than -- or beyond the conspiracy

14     charge.

15         The honest services fraud in relation to the government, I

16     just wanted to reiterate that there weren't any bribes to LumHo.

17     And in addition to taking any action -- there weren't any bribes

18     to LumHo and that was in addition to not taking any action in

19     favor of MSO.  In fact, he took action against their interests.

20     He complained about prices, he got prices reversed.  Most

21     importantly, though, when it came right down to it, there was the

22     AIS-MSO bid to take over where the Bridge contract was going to

23     leave off, and he didn't get it.  What all of this sounds like is

24     if you believe that -- it's really just hard to make any sense

25     out of it.

1        The only thing that really makes any sense is the

2    relationship between Tim Donelson and Bill Wilson.  That was a

3    contract, 50/50, you could understand it.  It made sense, and it

4    went forward in time.

5        The relationship between LumHo and Bill Wilson just

6    doesn't make sense.  There's -- all of the benefits that could

7    have been given to Bill Wilson, he already had them by the time

8    that anything was being provided to LumHo.  By the time his dad

9    was on the -- by the time his dad was on the payroll, he already

10   had the Bridge contract, he already had the month-to-month

11   contract.  Everything was in the pipeline for him.  The only

12   explanation for -- the only potential explanation, is that he was

13   receiving a gratuity, that Bill Wilson was giving LumHo a

14   gratuity.

15       Now, in that same logic, the payments that were going to

16   Capallia, Capallia couldn't give him any more.  And so even after

17   he left he continued paying.  The only thing that makes sense is

18   that Bill Wilson was giving the Capallia's a gratuity for things

19   that had already happened.  Now, the gratuity instruction only

20   applies to LumHo, but the logic applies the same, to Capallia.

21   But it's not sufficient to find him guilty of the honest services

22   fraud.

23       THE COURT:  And the gratuity applies to Mr. Wilson, you

24   meant to say, right?

25       MR. STEWART:  Right.

```
 1          THE COURT:  Right.  Okay.

 2          MR. STEWART:  The same logic applies to -- the same logic

 3     applies to Mr. Donelson.  You have these payments that are going

 4     on, you have began -- before the 2010-2014 window, they continue

 5     after, maybe there's a conflict of interest, maybe there's a

 6     gratuity, but regardless it's not sufficient to find him guilty.

 7          So with that, ladies and gentlemen, I would just ask that

 8     you return a verdict of not guilty for Mr. Wilson.  Thank you.

 9          THE COURT:  All right.  Thank you, Mr. Stewart.

10          All right.  Let's take another ten minutes, and then we'll

11     come back and hear closing arguments on behalf of Mr. LumHo.  All

12     right.  You're excused.  Thank you.

13          (Jury out at 5:18 p.m.)

14          THE COURT:  Yes, sir.

15          MR. SALVATO:  Sorry, Your Honor.  Just wondering about

16     timing.

17          THE COURT:  We're going to finish up tonight.

18          MR. SALVATO:  That's what I figured.

19          THE COURT:  Yeah.

20          MR. SALVATO:  The jury's okay.  We're going to push timing

21     but if we're going to finish up tonight with everybody that's

22     good with us.  We obviously don't want it broken up between.

23          THE COURT:  No problem.  No, we'll finish, and you're

24     going to keep your rebuttal short and sweet.

25          MR. BURKE:  I'll try.  I'll try to keep it short, Your
```

1    Honor.

2         THE COURT:  All right.  I know Mr. Amolsch is going to

3    keep his closing.

4         MR. AMOLSCH:  I'm going to speak so fast.  That he won't

5    have a chance to keep up with Wallace until he jumps out of that

6    chair.

7         THE COURT:  He may.  We have one other issue.  I'll get an

8    update on it, but our soccer referee, of course, has an event in

9    New Jersey that he did mention in the voir dire.  He's made some

10   noise about wanting to be excused in lieu of the other alternate

11   that we have.  I don't have a position on that, and I certainly

12   will require him to remain here, but I wanted to let you know,

13   and he hasn't said anything in the last half a day, but he had

14   mentioned it a couple of times.

15        MR. SALVATO:  He seems a little checked out to me, just in

16   his body language.  I wouldn't have any problem with the

17   alternate coming in.  He's spinning his chair and looking at the

18   wall and we can take that a couple of different ways, but -- I

19   don't want the guy sitting here when he's completely

20   disinterested.

21        THE COURT:  Well, talk about it and let me know your

22   position, and I'll get an update on whether he's still making any

23   noise.

24        MR. SALVATO:  And Your Honor, just for future planning,

25   this isn't going to affect anything at all.  But I have two

1   matters in Loudoun Circuit Court tomorrow that I definitely need

2   to be there, one's a bond revocation that came up suddenly,

3   another one, a Judge gave me a nice extension that I need.  So

4   one of us will be here, no matter what, but don't hold up any

5   questions or verdict or anything like that if both of us are not

6   here.

7           THE COURT:  All right.  All right.  Thank you for letting

8   me know.  All right.  We're in recess.

9           (Thereupon, a recess in the proceedings occurred from

10  5:20 p.m. until 5:34 p.m.)

11          THE COURT:  Do you want to keep the -- Mr. Strasberg.

12          MR. BURKE:  I think so. Yes.  We are taking an unnecessary

13  risk by excusing a juror when we still have a ways to go.

14  Absolutely we should keep him.

15          THE COURT:  Okay.  We have unanimity, there's always a

16  risk, so we'll leave things as the way they are.  He hasn't

17  mentioned it in the last day, so maybe he's given up, so ready

18  for the jury?

19          MR. AMOLSCH:  Yes, sir.

20          THE COURT:  Mr. Burke, depending on how long Mr. Amolsch

21  goes we may go right into rebuttal without another break.

22          MR. BURKE:  Okay.  I will do my absolute best to keep it

23  short.

24          THE COURT:  All right.  I just wanted to let you know in

25  case you were expecting a break.

1        MR. BURKE:  I want to get done as soon as everyone else as

2    well.  As soon as possible.

3        (Jury in at 5:36 p.m.)

4        THE COURT:  All right.  Please, have a seat.  Mr. Amolsch.

5    **CLOSING ARGUMENT ON BEHALF OF DEFENDANT KEKOA LUMHO**

6        MR. AMOLSCH:  Yes, sir.  May it please the Court, ladies

7    and gentlemen, it has been a long two and a half weeks.  I asked

8    you at the beginning to please take notes and pay attention, and

9    I thank you for doing that.  We could not be doing this without

10   you.  It's been a grind on all of us, and so I thank you.

11       This is the last time that I get to talk to you.  This

12   will be it for me.  And so I want to use this time to just talk

13   directly to you like a normal person, like not a lawyer, and just

14   try to distill down the last two and a half weeks of trial

15   testimony into about the hour and a half or so that I have here,

16   and this is not an easy task as you might imagine, especially

17   with all the jargons and abbreviations you've heard over the last

18   two weeks.  So by DoD, and OIG, and GSA, and DCIS, and WITS, it

19   is enough, I would think to make someone mental trying to keep

20   all that stuff in their head.  I've been working on this case a

21   long time and I still don't always know what those things stand

22   for, so I'm going to try to do my best to break it down the way I

23   see it without using any abbreviations I don't have to so I know

24   that we're all talking about the same thing.  And I'm also going

25   to show you a few slides, but I'm going to do it with as few

1   slides as possible.

2        The first thing we all need to recognize and remember is

3   that the government's theory in this case is the result of their

4   efforts to try to piece together events that happened almost ten

5   years ago.  This started, just for reference sake, during I think

6   the first Obama Administration, that's how long ago this

7   happened.  When for a brief period of time Kekoa LumHo, an IT

8   professional by training, was asked by his boss to work with a

9   contract called WITS.

10       He didn't ask for this responsibility.  He didn't want

11  this responsibility.  He didn't particularly want the job on top

12  of all of his other jobs.  But his colleague Tommy was out on

13  medical leave it had been Tommy's responsibility so Kekoa stepped

14  up and said, "Yes, I'll help," and this was in March of 2011.

15       But according to the government, after Kekoa reluctantly

16  agreed to work with WITS while Tommy was out he saw an

17  opportunity, an opportunity to seize control over the WITS

18  contract so he could, on his own with no oversight, show

19  especially favorable treatment to Bill Wilson by secretly

20  submitting orders to a company called Level 3 so that Level 3

21  could then send those order to Bill Wilson.  And what is the

22  government's theory about why Kekoa went through all this work

23  and all this effort to seize control, to be secret so that Level

24  3 could send them to Bill Wilson, because, according to the

25  government, Kekoa was being bribed by Bill.  And the bribes were

1  as follows for all his work:  A $3,500 camera and lens, a $350

2  Bose SoundDock, and about $14,600 paid to Kekoa from -- went to

3  Kekoa from his father-in-law Fidel Ramos's account over about a

4  month period.

5      He did all that for that.  That in a nutshell as best I

6  can tell is what this case is about for Kekoa.

7      Now, based on this somewhat tortured theory of events that

8  happened a decade ago, the government has indicted Kekoa on 11

9  counts, one count of conspiracy, three counts of wire fraud, five

10  counts of false claims, one count of accepting a bribe, and one

11  count of making a false statement on his financial disclosure

12  form.

13      Felony charges which are all based on the government's

14  theory that it can prove to you beyond a reasonable doubt that

15  Kekoa was not acting by mistake or by misimpression, that he was

16  not acting in good faith, but rather was acting with criminal

17  intent to defraud the government willfully with the knowledge

18  that his actions were illegal.

19      That Kekoa while in his official capacity as a government

20  employee actively betrayed the public trust because he was being

21  bribed, because he was on the take, because he was really taking

22  bribes to show Bill Wilson favorable treatment.

23      Now, if they can't show that to you, if they can't prove

24  that to you beyond a reasonable doubt that he was taking bribes

25  to show favorable treatment to Bill Wilson, then the rest of it

1    all crumbles because it's all based on that premise, all based on

2    that idea.

3         Now, before we get into the actual charges against Kekoa

4    and what the government has to prove in more detail, I want you

5    to think about what I just said, that at bottom, is what the

6    government has to prove to you, not for an innocent reason like a

7    mistake, not for an innocent reason like bad judgment, but he was

8    actively working for Bill Wilson when he should have been working

9    for the American people because he was being bribed to do so.

10   And if they can't prove that, everything falls apart.

11        So this question:  Why did Kekoa take the actions he did?

12   Was Kekoa acting in good faith or was he acting with the intent

13   to deceive?  It defines the government's entire theory of

14   prosecution.  Because this case has never been about whether the

15   government acquired moving services with a cabling invoice.

16   That's easy.  You didn't need to sit here for two and a half

17   weeks for that.  This case is now, and has always been about, why

18   did the government require moving services with a cabling

19   invoice.  That's why.  The why in this case is everything.

20        Because as his Honor Judge O'Grady has instructed you, it

21   is not enough for the government to prove that Kekoa submitted

22   invoices that are internally inconsistent or were inaccurate.

23   The only question that matters is whether the government has

24   proven to you by beyond a reasonable doubt that those invoices

25   were returned to Level 3 not for an innocent reason, not for

1   mistake, because Kekoa intended to defraud the government because

2   his loyalty had been purchased by Bill Wilson.

3           So let's talk a little bit about, "Proof beyond a

4   reasonable doubt."  This is a phrase you've seen and heard

5   probably a thousand times in your life, TV, movies radio, you've

6   heard it so often I'm wondering if it's possible the meaning has

7   become lost on everyone, that it's become just another phrase

8   that gets thrown around in crime shows.  It is not a throw away

9   phrase.  You can't let it become something that you just say and

10  hear.

11          Proof beyond a reasonable doubt, is a bedrock principle

12  upon which our entire criminal justice system functions.  It

13  means you cannot -- you may not convict, it means you may convict

14  only when there is no longer any reasonable doubt that Kekoa is

15  guilty.  It is in a very real sense one of two ideas that inform

16  how you need to understand everything else that's going on.

17          Now, it would be nice if I could just tell you what beyond

18  a reasonable doubt is, but I can't define it for you in the sense

19  that I can't tell you what is or is not proof beyond a reasonable

20  doubt.  That's something you need to define for yourself, so

21  while I can't tell you what it is, I can tell you a little bit

22  about it.

23          But to really understand beyond a reasonable doubt, you

24  first need to understand the other bedrock principle upon which

25  our entire system rests, which is the presumption of innocence.

1          The presumption of innocence as His Honor instructed is

2    Kekoa's by right.  The presumption of innocence is the benefit of

3    the doubt given to anyone who has been charged with a crime.  The

4    presumption of he's innocent unless and until you decide

5    otherwise.

6          The presumption of innocence is such a powerful thing that

7    the law allows you to find Kekoa guilty -- not guilty based

8    solely on that presumption alone, with nothing more.  And the

9    presumption of an innocence means you must presume from the start

10   that what you're seeing and what you're hearing about Kekoa

11   are -- reflect innocent actions taken by an innocent man.  That

12   is the presumption of innocence.

13         And that presumption changes only when the government can

14   overcome this presumption by proving it to you by proof beyond a

15   reasonable doubt.  That Kekoa's actions were not innocent but

16   that rather -- innocent man acting for reasons but a guilty man

17   acting for guilty reasons.  This switching of the equation from

18   innocent to guilt, the overcoming of the presumption by proof

19   beyond a reasonable doubt is their burden.  It's their burden

20   alone.  Kekoa as he sits in that chair is an innocent man.  Kekoa

21   has no obligation in this case.  He doesn't have to prove that he

22   isn't guilty, he doesn't have to prove that he's innocent, he

23   doesn't have to prove he acted in good faith, he has no

24   obligation to prove anything to anybody.

25         These are the government's accusations, and it's up to the

1   government to overcome the presumption of innocence by proving to

2   all of you, every one of you, that he's guilty beyond a

3   reasonable doubt.

4        And what is reasonable doubt?  Well, it's the highest

5   legal standard we have.  It's the highest legal standard maybe in

6   any society, it's the most difficult burden of proof we have in

7   this country.  Maybe any country, and that is the way it is

8   supposed to be because in criminal cases, the stakes are the

9   highest.

10       Kekoa is not on trial here for his money.  He is not being

11  sued for causing a car accident or something like that.  If that

12  were the case the burden of proof would be different.

13  Preponderance of the evidence, slightly more than 50 percent.

14       But Kekoa is not on trial for a car accident.  He is -- no

15  one is trying to take his money, the stakes are far higher than

16  that.  Kekoa is on trial for 11 felonies, which if convicted will

17  follow him around for the rest of his life with ramifications

18  that would be life altering, loss of Civil Rights.

19       MR. BURKE:  Objection.

20       THE COURT:  Sustained.

21       MR. AMOLSCH:  You remember Ron Capallia.  You heard his

22  testimony and how he is trying to deal with the fact that he

23  pleaded guilty to felonies.

24       So this is serious business, the most serious legal

25  business there is, and I ask that you treat it that way.  You are

1    the guardians in this case, the checks against the government's

2    enormous power in felony cases.  You're the only ones in the

3    position to hold them to their burden of overcoming Kekoa's

4    innocence by proof beyond a reasonable doubt.  The highest burden

5    we have.

6         Which brings us back to the essential question, and the

7    only question that matters; Kekoa's intent.  And the question for

8    each of you is whether the government has done their job.  Or is

9    it possible, after you consider all the alternate testimony and

10   all the documents in this case, that there are other

11   possibilities, that Kekoa submitted those invoices not because

12   he's being bribed by Bill Wilson, but that he did it in good

13   faith for an innocent reason, like because his bosses, or their

14   bosses all told him it was okay, because he was it was a crazy

15   time, everyone was desperate and everyone was just scrambling to

16   get by, because he relied on WITS, WITS expert at Level 3,

17   Ron Capallia, to keep him straight.  Because he relied on Matthew

18   Steiniger and Tommy Carlyle to keep him on track.  Because he

19   didn't really understand how important it was to be precise,

20   because he was an untrained IT tech working with a 5,000 page

21   government contract for the first time.

22        Could all of those reasons have been why Kekoa submitted

23   the invoices?  Could any of those reasons have been why he

24   submitted the invoices?  Of course.  Because Kekoa could have

25   submitted those invoices for any one of those innocent reasons,

1    because he could have been acting in good faith.  The only

2    possible conclusion is that the government hasn't met its burden,

3    not by proof beyond a reasonable doubt.  And there's only one

4    possible verdict because of that, and that's not guilty.

5         So as you think about Kekoa's intent, there's something

6    else that I ask you to think about.  Now, in these kinds of cases

7    not everyone is treated -- the system doesn't view everybody

8    equally.  There are those witnesses for the government, there are

9    those on the outside.  And when you're on the outside, and the

10   government machine gets fixed on you, well, that's about the

11   worst thing that can happen to anybody.

12        Let's first talk about Level 3.  Now, Level 3 is firmly on

13   the inside of the government contracting world.  They're cemented

14   in place making a lot of money every year selling goods and

15   services to government.

16        And because Level 3 is on the inside of the government

17   contracting world and has been for so long, they are able to spot

18   weaknesses in the system, and in WITS they found the perfect

19   spot.

20        Now, for just a second, set aside CLINs and all those

21   other -- that technical jargon you've heard about over the last

22   two weeks, and think about what you've learned about the

23   craziness of the WITS contract in 2011 and 2012.

24        As you heard, WITS is a billion dollar plus contract, and

25   Level 3 got itself appointed as one of only two vendors able to

1    get access to that WITS money.  Verizon was also on the WITS

2    contract, but as you heard Ms. Watkins tell you, they weren't

3    really able to provide the services that the Inspector General

4    needed in 2011 and 2012, so Level 3 had the field pretty much to

5    itself.

6        Now, whoever wrote the WITS contract also designed it so

7    that only one person could actually place the orders needed to

8    get the WITS money, the DAR, the designated area representative,

9    and GSA, sorry about the jargon, GSA the government agency

10   overseeing the contract did make WITS training mandatory so DARs

11   like Kekoa would actually know what they're doing.  But after GSA

12   made the training mandatory, did GSA do anything else?  Nope.

13   They checked out.

14       You remember Tina Lane.  She was the very first witness

15   called by the government, LeBlanc, sorry.

16       THE COURT:  Mr. Lane?

17       MR. AMOLSCH:  The GSA official overseeing the WITS

18   contract, Tina LeBlanc, the very first witness called by the

19   government.  She was called to explain to you how it all worked,

20   and she couldn't tell you about the WITS training other than it

21   was supposed to happen.  She had no idea what the training was,

22   what was covered, if GSA even kept records on the training.

23       She told you GSA only really randomly and periodically

24   reviewed the WITS invoices that came in any way, and they just

25   paid them, even when the inconsistencies or inaccuracies were

1   obvious on the face of the documents like in this case.

2        The only conclusion to draw, GSA didn't really care about

3   the training.  GSA didn't even provide the training.  GSA

4   outsourced the WITS training to Level 3, the company which exists

5   to sell things and to sell things to the government.

6        So if you're Level 3, and you have Kekoa, an IT guy with

7   no contract experience at all, and no WITS training period,

8   working for the first time with any kind of government contract.

9   You've got a government agency in a jam with countless needs, no

10  formal budget because they are on a continuing resolution but

11  with access to WITS money.  You've got Tim Donelson, who by all

12  accounts seems to be a bully, a very difficult man, Level 3's

13  head of government contracting group, who as Ron Capallia told

14  you, whose guiding corporate principle seems to be taking WITS

15  money is just a matter of passing the red tape test.  And you've

16  got Ron Capallia, Donelson's underling, and Kekoa's trusted

17  contact on the WITS contract.  Ron's livelihood depends on WITS,

18  and Ron up charges the government at every opportunity because

19  Ron is greedy.

20       So really, are any of us really shocked that Level 3,

21  Tim Donelson and Ron Capallia somehow never managed to get Kekoa

22  trained on WITS?  Despite their obligation to do so they never

23  managed to get him trained on the importance of giving Verizon a

24  fair opportunity.  Never managed to get Kekoa trained on how the

25  contract actually worked.  There's no chance they simply

1    overlooked this.  There's no chance this happened by accident.

2    They liked it that way, and they kept it that way, and as long as

3    Kekoa didn't really know what he was doing, and as long as

4    Ron Capallia could keep the hook in, the WITS money would keep

5    rolling in.

6          And as you saw from those e-mails, Ron Capallia made sure

7    that his bosses at Level 3 knew exactly how much WITS money was

8    coming in.  With all of their corporate infrastructure and

9    expense accounts and yearly bonuses, do you think they had no

10   idea what was going on with WITS?  Of course they knew.  They

11   probably saw the numbers and loved it.

12         And Ron Capallia, again, made sure everybody knew exactly

13   how much money he was making off WITS.  You remember the invoice,

14   the e-mail, two exclamation points from Ron Capallia after

15   another WITS order.

16         Now, sure, Ron Capallia and Tim Donelson were charged and

17   Ron pleaded guilty, but you heard how that happened.  Level 3

18   left with their big, firm lawyers in D.C. saw the writing on

19   the wall --

20         MR. BURKE:  Objection.

21         THE COURT:  Sustained.  That's not in evidence.

22         MR. AMOLSCH:  It is in evidence.

23         THE COURT:  Not the way you've characterized it it's not

24   in evidence.  Let's move on.

25         MR. AMOLSCH:   Tim Donelson --

1          THE COURT:  Take that down, okay.

2          MR. AMOLSCH:   Tim Donelson and Ron Capallia were in a

3     room, and Tim Donelson came out and said, "We're screwed."  And

4     after that, they're the ones who get prosecuted.

5          As you think about Kekoa's intent in using the WITS

6     contract, remember Ron Capallia.  He was Kekoa's contact and

7     advisor with Level 3.  He's the one who pleaded guilty in 2018.

8          Ron's answer to every question as he told you to whether

9     it was okay to use WITS, no matter what the question, it was

10     always, yes.  And Ron was very clear with you about how those

11     WITS orders were processed.  Ron filled out the service orders

12     himself ahead of time for Kekoa or Tommy Carlyle.  Ron picked the

13     price, Ron picked the CLIN, Ron wrote the remarks.  And when

14     asked about the inconsistent information in the orders by Kekoa,

15     he told him the only thing that mattered was whether the

16     government got what it was expecting.

17          Ron Capallia was also very clear with you that he did

18     exactly what Tim Donelson told him to do.  Tim Donelson as you

19     will remember was Capallia's boss, and Donelson told Ron, as far

20     as WITS went, every order went to Bill Wilson.  No exceptions, no

21     questions asked, no matter what.  And this was the system in

22     place long before Kekoa submitted the invoice for the move, which

23     is the first move -- which is the first invoice in the

24     indictment.

25          Capallia also told you that Donelson signed his

1   performance evaluations, determined his salary, determined his

2   bonuses.  He had complete control over Ron's career at Level 3.

3          And, as I said, Ron -- as Ron told you, and maybe Scotidas

4   did -- Scotidas did too, Donelson was a bully and a difficult

5   man.  So Ron did exactly what Donelson told him to do every time

6   Kekoa returned an invoice, every time Tommy Carlyle returned an

7   invoice, Capallia sent it to Bill Wilson.  No exceptions, no

8   questions asked.

9          This reality of the situation makes it clear that Kekoa

10  had no influence at all in Bill Wilson receiving the WITS orders

11  from Level 3.  That was a decision made at Level 3 by

12  Tim Donelson.  And, in fact, Kekoa could not have had any

13  influence on that process.

14         Now, the government also argued that Kekoa never gave

15  Verizon a fair opportunity to bid on the orders that went to

16  Level 3.  That is, Verizon was never given a chance to submit on

17  the work.

18         Now, as you heard, Ms. Watkins said they didn't even think

19  they could provide that work.

20         MR. BURKE:  Objection.  Misstates the testimony.  There's

21  no testimony on this.

22         THE COURT:  All right.

23         MR. AMOLSCH:  This might be meaningful if Kekoa had been

24  trained on the duties of fair opportunity.  If he understood he

25  was supposed to give Verizon a fair opportunity.  And the WITS

1    contract itself actually has exceptions written into the fair

2    opportunity rule that apply in this case.

3         So if I could ask you Sandvig to bring up government's

4    Exhibit 301, and go to Page 226, this is the WITS contract

5    that's been admitted into evidence.

6         You go all the way down to Page 226.  Okay.  This says,

7    "Exceptions to fair opportunity."  This is written into the WITS

8    contract which is in evidence.  Exceptions provided for:

9    "Unusual urgency that would lead to unacceptable delays,

10   immediate short term needs arising on short notice, only one

11   capable contractor, economy and efficiency, orders placed to

12   augment and maintain engineering, orders associated with any

13   moves, additions, changes or similar needs."

14        The fair opportunity WITS contract itself contains

15   fair -- exceptions to the fair opportunity process built into

16   the contract, and anyone one of the invoices Kekoa submitted,

17   it's our position, could have arguably fit into any one of those

18   positions.

19        Exceptions.  And this again this brings me to that letter

20   that Kekoa wrote to Ron Capallia, the fair opportunity letter

21   that you heard so much about and the government told you about

22   in its opening and closing.  Ron Capallia -- Kekoa told you that

23   Ron Capallia sounded panicked and scared when he called Kekoa

24   asking him for this letter because it had been demanded by

25   Tim Donelson.  As it turns out, they didn't even need that

1    letter.  If they had just looked at the contract, they would

2    have seen that they could have made an argument that this was

3    outside of the fair opportunity rules in any event.

4        And, again, as you think about whether the government has

5    proven to you that Kekoa actively intended to defraud the

6    government, remember the testimony of everyone from the Office

7    of the Inspector General who testified for the government and

8    still work for the government, Willie Spivey, Matthew Steiniger,

9    and Tony Jenks.

10       So let's first talk about Willie Spivey.  Willie Spivey

11   as you will remember was the head of the contract shop at the

12   Office of the Inspector General, the one with the contract

13   training.  His testimony was without question the definitive

14   testimony on Kekoa's true intentions and the definitive proof of

15   Kekoa's loyalty to the government.

16       As you will remember in March of 2012, a month after

17   Kekoa's father, Fidel Ramos, was put on the MSO payroll,

18   Mr. Wilson and MSO submitted a contract bid along with another

19   company to the government in pursuit of a contract worth in

20   excess of $31 million.  Mr. Wilson's bid was one of five other

21   companies that submitted bids.  As Mr. Spivey told you any of

22   those five companies had the equal opportunity to win the

23   contract.

24       Now, to sort through those five bids, Mr. Spivey put

25   together a technical review board to determine which of the five

1  bids would deliver the best overall value for the government.

2  Kekoa was on that review board.  Kekoa reviewed the bids, and

3  Kekoa cast his vote for a company called Phacil, a company in

4  direct competition with Bill Wilson.  In a vote that contributed

5  to Bill Wilson and his company losing out on a $31 million

6  government contract.

7       That fact alone, standing alone, should be, I would

8  think, the beginning and end of any discussion about whether

9  Kekoa was working for Bill Wilson or whether -- and whether

10 Kekoa was accepting bribes from Bill Wilson for favorable

11 treatment, about whether Kekoa's loyalty was to Bill Wilson or

12 to a government.

13      There is simply no other way to look at what happened.

14 Kekoa directly voted against Bill Wilson and the $31,000,000

15 contract bid and when it happened a month after his father --

16 father-in-law, Fidel, went on the MSO payroll and reach any

17 conclusion, other than Kekoa was a servant of the people, not of

18 Bill Wilson.  This fact alone, should raise doubt in your mind

19 requiring you to find Kekoa not guilty.

20      Now, you heard the government's opening and they talked

21 about Kekoa for almost an hour and a half.  And never once

22 talked to you about this.  They talked to you about that camera,

23 and how many times did you hear about that camera, and what was

24 it was used for.  But they didn't talk to you about this because

25 they are hoping that you don't really appreciate the

1    significance of what that means because this really does

2    undercut their entire theory.  Kekoa, when given the

3    opportunity, chose the best interest of the government over any

4    interest he might have had in Bill Wilson.

5         Now, Willie Spivey was able to tell you all of this

6    because back in 2012 he wrote a memo about what happened in that

7    technical review meeting.  And when I showed him that report

8    from almost ten years ago, Willie Spivey told it to you

9    straight.  He could have said he didn't remember the report or

10   not sure or he didn't write it or someone made it up, but he

11   didn't.  He told you the report was accurate.  He told you about

12   the technical review board meeting in March of 2012, and he told

13   you how Kekoa behaved.  Willie Spivey testified with honor and

14   integrity and for that, he deserves respect.

15        But the government is now trying to downplay that by

16   pointing out that Bill Wilson partnered with another company on

17   this bid and that Mr. Spivey's report did not precisely reveal

18   how much Bill Wilson lost out on.  But I don't see how that

19   matters.  If it was 50 percent, it was 16 million, if it was

20   10 percent, it was 3.2 million, if it was 5 percent, it was

21   1.8 million.  But does the percentage make any difference?  All

22   of those figures dwarf the amount of money the government says

23   Bill Wilson gave to Kekoa for favorable treatment.

24        Now, money is money.  And how is it possible, again -- I

25   still don't know, how is it possible that at this point the

1    government still doesn't know how much Bill Wilson lost as a

2    result of Kekoa's choice of Phacil?

3         Then the government switched gears and seems to be saying

4    that Kekoa should not even have been on that technical review

5    board to begin with.  That he snuck on to the review board only

6    because he hid the fact that he had a conflict of interest.

7    Now, I'm not really sure what to make of that.  I'm not sure if

8    the government was arguing that Kekoa purposely didn't disclose

9    the conflict of interest so he could then vote against

10   Bill Wilson from the inside, like, I don't know what that's

11   supposed to mean.  I don't know what to make of that.  So just

12   focus on what happened and given an opportunity to put

13   Bill Wilson's interest ahead of the government's, Kekoa LumHo

14   chose the government.

15        The reality of that, I think, is clear.  No matter how

16   you look at it, this evidence undermines and undercuts the

17   government's really entire theory on the bribery.  And I ask you

18   just to imagine how bad this is for the government, but just

19   imagine if Kekoa had voted for Bill Wilson instead of against

20   him.  Just imagine if that's how it came out, the government

21   called Willie Spivey and asked him about the vote and they say

22   yep, there's Kekoa voting for Bill Wilson a month after --

23        MR. BURKE:  Objection.  Counsel's inviting the jury to

24   speculate about what testimony might be in a hypothetical trial.

25        MR. SALVATO:  This is closing argument.  He's got to be-

1        THE COURT:  -- you can't use hypotheticals, though.  You

2    can use the evidence in the record.  Go ahead.

3        MR. AMOLSCH:  What we do know, and this is not

4    hypothetical, is that Kekoa didn't vote for Bill Wilson he voted

5    against him.  And this is proof positive that Kekoa was not

6    accepting bribes from Bill for any kind of favorable treatment.

7        Mr. Spivey also told you that his contract department

8    should have been managing with the WITS contract from the

9    beginning, but Matthew Steiniger and Stephen Wilson fought him

10   at every turn.  Now, my memory of the government's opening was

11   that they told you they had proof Kekoa was the one who stood in

12   Spivey's way, but that's not what happened either.

13   Willie Spivey told you it was Steiniger and Wilson who insisted

14   they keep control of the WITS contract, not Kekoa.  And that

15   makes sense because Steiniger and Wilson needed control of WITS

16   in order to get the things that they need when they needed them.

17       Lastly, Willie Spivey told you about the purchase of some

18   laptop computers, the ones called Lenovos.  The ones that

19   Level 3 billed the government for and kept the money even after

20   the order was cancelled.  That was at least until Kekoa made

21   Capallia refund the money to the government.  Mr. Spivey told

22   you that Kekoa had ordered these laptops with WITS that he did

23   so in secret without Mr. Spivey's knowledge only to cancel the

24   order when Mr. Spivey questioned him about it.  And none of that

25   is actually true.  Mr. Spivey's own e-mails shows he was aware

1    of the purchase that he green lighted the purchase that Kekoa

2    cancelled the laptops, not because Mr. Spivey questioned him,

3    but because Lenovo couldn't deliver what they needed.

4         And I don't think Mr. Spivey got it right, but I don't

5    think he was lying to you either.  All this happened ten years

6    ago, and I think it's just hard to keep track of stuff that

7    happens in your head ten years ago.

8         So I will think that in that case that Willie Spivey was

9    mistaken, but not that he was lying to you.  But I do not think

10   the same thing about Matthew Steiniger and Tony Jenks.

11        Matthew Steiniger, as you will remember, was Kekoa's

12   direct supervisor.  Matthew Steiniger actually had WITS

13   training, Matthew Steiniger had other substantial government

14   training, training in government contracts.  He is the one who

15   asked Kekoa to work with the WITS contract, and the one who, in

16   his own words, encouraged Kekoa to use it.

17        In my -- the way I look at the evidence, Mr. Steiniger is

18   the government's key witness against Kekoa, the one brought in

19   to tell you that Kekoa was acting on his own without supervision

20   placing orders with WITS that Steiniger never would have

21   approved if he had just known what was going on.

22        But you know Steiniger approved them.  Of course he

23   approved them.  You saw for yourself that Steiniger approved the

24   orders for the move to the Mark Center.  You saw Steiniger tell

25   Kekoa that using WITS for the restack was obviously the right

1   way to go.  You saw Steiniger tell Kekoa that his boss,

2   Stephen Wilson, was 100 percent on board of using WITS to buy

3   equipment.

4        And you saw how many times Steiniger just didn't want to

5   answer my questions.  When asked a question he didn't like it

6   was:  I don't know; I can't remember; I'm not sure; possibly;

7   well, I may have said, yes, I really meant, no; sure, we needed

8   the equipment, but I'm pretty sure we got all of it, but that's

9   not my department; I don't know if we even got it.  On and on

10  and on and on.  None of that makes any sense, and none of it

11  rings true.  Would any supervisor ask an untrained person to

12  work with a contract the size of WITS and then pay absolutely no

13  attention to what that person was doing?  Is there any chance

14  Matthew Steiniger asked Kekoa to work on a contract the size of

15  WITS and then paid absolutely no attention to what Kekoa was

16  doing?

17       You heard from multiple people in the government.  There

18  are meetings about meetings, layer upon layer of review.

19  Steiniger knew exactly what was going on.  He would have had to.

20  And it's just not believable to think otherwise.

21       And while you're thinking about whether you can trust

22  Matthew Steiniger when he told you that he'd -- he never would

23  have approved these invoices and he never saw them until the

24  end.  Remember that he looked you all right in the eye and told

25  you, "I always wanted Mr. Spivey to take over WITS.  I always

1    wanted him there.  I always felt uncomfortable with it."
2    Mr. Spivey, of course, told you the exact opposite.  He told you
3    Steiniger -- he went to Steiniger and his boss Stephen Wilson
4    multiple times about transferring WITS's to his contract job,
5    and each time he was met with stiff resistance.  Each time he
6    asked, Steiniger and Stephen Wilson said, no.  Those two, until
7    the very end, held on to the WITS contract as long as they
8    could, and only gave it up at the very end.
9         The only conclusion about that is that Mr. Steiniger is
10   simply not telling the truth.
11        Now how you view his testimony is particularly crucial
12   because again he's really the witness against Kekoa.  His
13   credibility is everything in this.  Was Kekoa a lone wolf or
14   were all his orders approved?  And if you can't completely
15   believe what Steiniger told you about Kekoa's secretly working
16   behind the scenes, if you have any lingering doubts about
17   whether Mr. Steiniger was telling you the whole truth about
18   whether he reviewed Kekoa's orders before he placed them, then
19   Kekoa is not guilty.  It doesn't get anymore simple than that.
20        But the reality that Mr. Steiniger is still with the
21   government he doesn't have many options.  He's boxed in.  He
22   approved those orders, and now he has to say he didn't, and he
23   doesn't have anybody to really give up for himself except Kekoa.
24   So he's trying to give him up to you in exchange for himself.
25   You just can't let that happen.

1        Tony Jenks.  Now his part in all of this was limited to

2   testifying about using WITS for something called the "restack."

3   The restack was when the government rearranged and reorganized

4   the interior layout of the Office of the Inspector General.  And

5   Tony Jenks was in charge of that process.  He told you that.  As

6   you'll remember, Mr. Steiniger is the one who e-mailed both

7   Kekoa and Tony Jenks at the very beginning telling them both

8   that obviously OIG would be using WITS for the restack.

9   Obviously.

10       And, yet, Tony Jenks sat right there in that chair, took

11   the oath and told you that WITS was never part of the restack.

12   He never met Donny Ravas, never planned the restack, never

13   e-mailed Donny Ravas about the restack, never met Donny Ravas

14   until the day of the restack, that Donny did a terrible job

15   showing up with not enough guys and only one cart.

16       He's another one with no idea about anything going on

17   with WITS and another OIG employee who apparently is completely

18   in the dark about how things got done.

19       And then I showed him some of his own e-mails

20   demonstrating that WITS actually was part of the restack from

21   the very beginning, that he did, in fact, know Donny Ravas.

22   That he met face the face with Donny Ravas many times before the

23   restack, and he e-mailed and communicated with Donny Ravas about

24   the restack, demonstrating, in short, that he was a complete

25   liar.

1      But Jenks didn't really do the same things Steiniger did,

2   he didn't go with:  I don't know or maybe or who knows or

3   possibly.  He took the more direct approach of just all out

4   lying directly to your face.  Telling you those e-mails were

5   false, that they'd been manufactured out of thin air that he was

6   being set up.

7      Special Agent Russo talked about those e-mails this

8   morning, and she said they all came from the Office of the

9   Inspector General, and she has no reason to believe any of those

10  are false.  So then Tony Jenks basically lied about lying.  It

11  was a remarkable performance, and it would almost be funny if

12  the stakes weren't so high.  But make no mistake, Tony Jenks is

13  a liar who came to this courtroom as a witness for the

14  government, sworn an oath to tell the truth, and when he was

15  confronted with his own words he lied again.  How did that

16  happen?

17     The reality is, it would have been much easier for him to

18  admit what was just obviously true; they were openly using WITS.

19  Everyone knew they were using WITS, but the only difference

20  between Mr. Jenks and Mr. Steiniger, is that Mr. Jenks was just

21  more brazen in his approach.

22     And then we have Donny Ravas.  Donny Ravas is a good guy,

23  a hardworking guy, blue collar guy.  Donny came into this

24  courtroom thinking he was doing the right thing.  Only, it

25  didn't work out for Donny because he didn't really say what the

1    government wanted him to say.

2         MR. BURKE:  Object.

3         MR. AMOLSCH:  Self-employed Donny came in here and told

4    you the truth.  He worked hard, he worked long hours, it was

5    chaos, that he met Tony Jenks many times; that the government

6    was up against a deadline to be out of the building; that he

7    worked as hard as he could to make sure that the government met

8    that deadline; that he did all he could to make sure the

9    government wasn't on the hook for $1 million a day; and that he

10   really worked himself hard to make sure that got done.

11        And he told you the same thing about the restack; three

12   days, hard work, where he and his guys sweated and humped that

13   material where it needed to be, while Tony Jenks sat around,

14   according to Donny Ravas, observing the work that Donny was

15   actually doing.

16        And then the government wanted to ask him about his

17   security clearances.  Did he have one, when did he get it, how

18   did he get it.  Donny told you truthfully, he thought he had

19   one, which seems fair.  I mean we heard all the testimony about

20   how secure the Mark Center is.  I mean how did he even get in

21   there without a security clearance?  How did that even happen?

22        But setting the question of the security clearances

23   aside, Donny Ravas has nothing to gain in this case.  He's not

24   working for the government.  He's on his own, he's a private

25   citizen.  He came in here and told you the truth, and he has

1    nothing to gain by lying.  And he told you definitively that

2    Tony Jenks is a liar and that what he -- and the only conclusion

3    you can draw about that, is that when he lied about Donny Ravas,

4    he lied about Mr. LumHo, too.

5         Now, Kekoa LumHo is here in court, and I sat here for two

6    weeks, and I began to think is name was actually

7    defendant LumHo.  We heard everybody else called by their first

8    name; Ms. Sandvig, Mr. Amolsch, Judge O'Grady, Mr. Salvato,

9    always their first name.  That is Matthew Kekoa LumHo.  And the

10   government talked about him for almost an hour and a half today

11   in its closing.  He took the stand, told you about himself, who

12   he is in the world, the church he attends, the charity he

13   contributes, the volunteering he provides.

14        Kekoa has a wife and kids who are sitting right there in

15   the courtroom who's friend love and -- and friends who love him

16   enough to come to this courtroom and tell you how they view him.

17   Tom Fields, Colonel Tom Fields, who went to West Point,

18   graduated from West Point, colonel in the Army, came to this

19   courthouse to testify for Kekoa in a government contracts fraud

20   case.  Colonel Tom Fields told you that there's no greater trust

21   than the trust acquired to put your children in the hand of

22   somebody else and that he trusted Kekoa completely with his

23   children.

24        Reverend Zacharoli and Tom Fields have known Kekoa for a

25   long time.  They have spent years with him, they have seen him,

1    his character up close, in person, at his house, in church, with

2    their children.  This is how you get to know someone, who they

3    really are.

4         And if you were to put Tom Fields and Reverend Zacharoli

5    on a trust meter comparing those two with Matthew Steiniger and

6    Anthony Jenks, there is no comparison between those people and

7    how they view the world.

8         This is important because the judge, as His Honor

9    instructed you, "Evidence of a defendant's reputation, if it's

10   inconsistent with those traits of character ordinarily involved

11   in the commissions of crimes, may give rise to a reasonable

12   doubt, since you may think it improbable or unlikely that a

13   person of good character for truth and veracity and honesty and

14   integrity would commit such crimes."

15        And that's what they testified to, that Kekoa is a man of

16   honesty, integrity, and veracity, and that that is how his

17   family and the community view him.

18        Kekoa also told you he did his best to keep everyone in

19   the loop.  Again, there were meetings about meetings and how

20   everyone who mattered knew what he was doing, when he was doing

21   it as he was doing it, how they supported it, and authorized

22   that.  And, again, compare the testimony of Kekoa with the

23   testimony of Matthew Steiniger versus the testimony of

24   Tom Fields and the reverend.

25        Matthew Kekoa LumHo is an actual person.  He is not just

1    defendant LumHo, he is not a nonperson, but he -- I don't want

2    to you think of him that way.  You can't just peg him as

3    Defendant Lumho.  Now, is he a defendant in this case, sure.

4    But he is more accurately, in my opinion, an accused.  The

5    government has accused him of something, that's all.  And as

6    His Honor Judge O'Grady told you, an accusation is nothing more,

7    it's just an accusation.  He is Matthew Kekoa LumHo.

8        But it's the twists of the things that I think are the

9    kind of issues that are going to get you distracted.  Like when

10   Agent Russo was telling you about Fidel Ramos, Kekoa's

11   father-in-law, listing Rondelay Lane on his banking application,

12   because Rondelay Lane is where Kekoa lives.  Then you heard on

13   cross-examination, where actually Fidel lived on Rondelay Lane,

14   too, that he's lived there for ten years that he was living

15   there when he filled out the application, and, in fact, he's

16   only ever lived at Rondelay Lane.  So is Rondelay Lane Kekoa's

17   address, sure, but it's also Fidel's address.

18       And they know this.  Or when the government was asking

19   Keith Williams questions, Keith Williams was the gentleman

20   ethics lawyer who told you about Kekoa's financial disclosure

21   forms.  Mr. Williams told you that gifts and non-investment

22   income need to be reported on financial disclosure forms and it

23   was a violation not to do so.

24       But there is more to those instructions.  The

25   instructions that told Kekoa to specifically include -- exclude

1    gifts from his family like the gifts and contributions Fidel

2    made to his family expenses.  That's what I'm talking about, you

3    have to pay attention to the whole thing.

4         Now, when I spoke to you at the very beginning of the

5    trial, I made certain predictions to you about what I thought

6    the evidence would show in this case.  All of which would

7    demonstrate that Kekoa had no intention to defraud the

8    government.  And the first promise I made, the prediction is the

9    evidence would show that Kekoa had never at any time received

10   any training on how to use WITS.  Despite the fact that the

11   training is mandatory, despite the fact that Level 3 is the

12   entity responsible for doing it.

13        You've heard so many witnesses; all, most, some of which,

14   talked about how much training they had in their professional

15   jobs.  Kekoa may have been the only person to not receive

16   training in this area, and, again, I submit to you that wasn't

17   an accident.

18        Second, that a WITS order never started with Kekoa.

19   Someone always came to him with a request, and that everyone who

20   mattered, Stephen Wilson, Matthew Steiniger knew what he was

21   ordering and how he was doing it.  Again, there can't be any

22   doubt about this.

23        Third, I promised you proof that Kekoa was always acting

24   in the government's best interest.  I told you again how he

25   voted to give a $31 million contract to Bill Wilson's competitor

1    because it was in the best interest of the government to do so.

2    In June of 2012, Kekoa saved the government approximately

3    $130,000 in travel costs associated with the Windows 7 roll out

4    because it was in the best interest of the government to do so.

5    $130,000 is more than four times what Fidel received from MSO

6    and Mr. Wilson.

7       And how in August of 2012, he hounded Level 3 into

8    returning the $438,000 they paid for computers and then didn't

9    deliver.  Money that almost certainly came from -- was recouped

10   from Bill Wilson, and he did that because it was in the best

11   interest of the government to do so.  And none of this was

12   secret.  It is all there in the documents.

13       Fifth, I told you the evidence would show that the

14   camera, the lens, and the Bose sound track, bribes theoretically

15   paid to Kekoa for his personal use of benefit never left the

16   Office of the Inspector General, were never seen in his

17   possession outside of the Office of the Inspector General, or

18   stored at OIG headquarters, used by the Office of the Inspector

19   General, purchased at the request of Stephen Wilson and that the

20   Office of the Inspector General has those items right now in

21   their possession.  And that's exactly what the evidence showed.

22   Terry Peck told you about how he located the items at the Mark

23   Center.

24       And I think what the government -- I'm not sure, but it's

25   like the government is telling you that they want to you believe

1   that Kekoa knew he was under investigation and then returned the

2   bribes to the Office of the Inspector General to be put in the

3   property room so that they would have them in time of their

4   investigation.  It's like he was turning in proof of his own

5   guilt.  Who does that?

6       If the government's theory is true that these were really

7   personal gifts for Mr. LumHo to use in his personal capacity,

8   why didn't he just sell them?  Why didn't he just drop them in

9   the sea?  Why didn't he burn them?  Why didn't he do anything

10  other than bring them back to the Office of the Inspector

11  General so they could be used against him in any upcoming

12  investigation?  That doesn't make any sense.

13      And, finally, there's Fidel Ramos, Kekoa's father-in-law.

14  I told you I hadn't seen him in two years and I expected to see

15  a somewhat confused and possibly scared guy trying to remember

16  what happened to him, and I think by and large that's what you

17  saw.

18      But I learned something from his testimony that I didn't

19  know.  I didn't know his relationship with his lawyers was so

20  bad until he told us about it.  How they went to the U.S.

21  Attorney's Office with him and they yelled at him repeatedly,

22  and this happened right before Fidel was taken downstairs to the

23  basement to testify by himself in front of the Grand Jury to

24  questions asked by the government, only the government.

25      Now, sure, Fidel's lawyers were on the outside of the

1    room.  The same lawyers who had just been yelling at him in

2    these rooms upstairs.  So is it any wonder that even if Fidel

3    could -- did know that he could go out and ask his lawyers

4    questions, that he didn't stop and ask for help?  Is it any

5    wonder he stayed in the Grand Jury by himself and tried to do

6    his best?

7          Now, you could tell, I think, by looking at Fidel testify

8    that the Grand Jury was a miserable experience for him that he

9    didn't want to answer the government's questions, they just

10   wanted him to answer the government's questions and get out of

11   there are soon as he could.  So that's what he did.  The only

12   problem for Fidel is that he got locked into a story that just

13   isn't true.

14         In the Grand Jury, Fidel said he never saw any of the

15   checks that were deposited into his account.  But you saw for

16   yourself how many of them he signed.  So he clearly saw them.

17   You also heard about Fidel's DWI.  And saw that he paid his

18   court costs out of his own money from his own Navy Federal

19   Credit Union account.  So you knew -- so he knew he had money.

20         Fidel was aware of the checks and he was aware that they

21   were going into his account, but that's not what he told the

22   Grand Jury.  And Fidel, to this day, is still trying to figure

23   out how to solve that problem.  How does he reconcile the fact

24   that what he said in the Grand Jury just isn't true given the

25   physical evidence that you've seen here today -- or in this

1    trial.

2         I told you that you would see that Fidel was hired when

3    Kekoa was in Korea on business, and that Fidel when he came back

4    Fidel had job, Fidel took the job fully expecting to perform

5    work.

6         Now, maybe Fidel thought he was being paid just for being

7    on call, I don't know, who knows what Fidel was thinking.  Now,

8    Fidel did testify that he mentioned early on that MSO hadn't yet

9    called him, but at this point I'm not sure even Fidel knows if

10   he actually said that or if he did when he said it.  In this

11   regard he's like Willie Spivey he's trying to put together

12   events that happened ten years ago.

13        But even if you decide to believe that Kekoa -- he told

14   Kekoa once early on that he was waiting for MSO to call, it is

15   overwhelmingly clear that Fidel kept the reality of the

16   situation to himself and there's just no credible evidence that

17   he ever brought up the topic again.

18        Now, the government did show Mr. LumHo when he testified,

19   a check.  And there is the smallest piece of evidence that Kekoa

20   knew or should have known that Fidel was working at MSO, but you

21   read and saw all those checks the huge FrankCrum written in big

22   letters.  You saw the W2 form Kekoa submitted for Fidel listing

23   Frank, Fidel's employer, as FrankCrum.

24        So was there MSO Tech like in small print as part of the

25   address?  Yes, there was.  But how can any of you be even

 1   remotely sure that Kekoa ever even knew that, saw it, or had any

 2   impact on what he was doing?

 3          And you will remember that Kekoa is the one who got Fidel

 4   to file his taxes.  When Fidel came to visit Kekoa, he hadn't

 5   filed his taxes for five, four, three, five years, and Kekoa

 6   went back and made sure Fidel paid his taxes that he did what he

 7   was supposed to do including the taxes he was supposed to pay on

 8   the money he earned while he was working.

 9          So the government on the one hand wants to tell you that

10   Kekoa went out of his way to conceal the fact that he was

11   receiving bribes by not disclosing it on his financial

12   disclosure form, while at the same time Kekoa is taking that

13   money and reporting it to the IRS.  So Kekoa, maybe he should

14   have paid attention and maybe he should have noticed that

15   detail.

16          And the government also talks to you about how the checks

17   stopped coming in. According to the government, if you deposit

18   the check you're guilty, but as soon as you stop depositing the

19   checks you're guilty.  Kekoa isn't guilty of any of it.  If it

20   wasn't a bribe from Bill Wilson to provide him with favorable

21   treatment, and again, the evidence all shows Kekoa never

22   provided Bill Wilson favorable treatment.

23          Which bring me to what else is missing and I mean, is

24   there any evidence Bill Wilson knew Fidel was being paid by MSO?

25   At all ever?  Unlike Natalie Capallia, there's not a single

1    e-mail that we've seen mentioning Fidel from anyone, not from

2    Tim Donelson, not from Ron Capallia, not from Bill Wilson.  They

3    scoured Kekoa's e-mail account both his -- nothing on his OIG

4    account, nothing on his personal account.  There's simply

5    nothing out there showing that Bill Wilson had the slightest

6    idea MSO was even paying Fidel Ramos, had even heard his name,

7    much less knew who Fidel Ramos was, or that Fidel Ramos was even

8    related to Kekoa LumHo.

9         There's a file in evidence on Natalie Capallia the

10   employment file that came from MSO, and I don't think there's an

11   employment file in there about Fidel.

12        The evidence is clear that whatever was going on with

13   Fidel and MSO, Bill Wilson was not using Fidel to bribe Kekoa.

14        And the government keeps trying to lump Fidel together

15   with Natalie Capallia, and the reality is that they are utterly

16   different in almost every respect.  The length of time Fidel was

17   paid by MSO versus Natalie Capallia, months versus years.  The

18   amount he was paid by MSO, $30,000 in change versus over

19   $1 million.  The amount that was shared, 14,000 of that money --

20   14,600 went to Kekoa and his family for expenses and credit

21   cards.  Natalie and Ron shared all of it, cars the money, all of

22   it.  And the government wants you to think of them as being the

23   same, but they are not the same.

24        You saw Natalie Capallia.  She's motivated by money.  She

25   received close to a million dollars, received an immunity order

1    and has no obligation to pay that money back, not her.  And she

2    has not paid back a single dime.  And she somehow still managed

3    to qualify for a court appointed lawyer.  How did that happen?

4         Fidel wanted a job because he had self-respect.  Fidel

5    got $25,000, paid for a lawyer no immunity order and a subpoena

6    to testify against his son-in-law.  Fidel is illiterate and

7    uneducated, that is the difference between Natalie Capallia and

8    Fidel Ramos.

9         I also ask you to pay particular attention to certain

10   dates, with regard to the Bridge contract, I didn't know they

11   were going to talk about.  But I ask you to take special note of

12   October 5th, the day the contract protest happened, and October

13   12th, the day that Kekoa e-mailed Ron Capallia, and October

14   26th, the end of the 24-hour period in which GSA took to award

15   its multimillion dollar contract to Level 3.

16        And, again, the evidence on what happened is

17   overwhelmingly clear by October 7th, two days after the protest.

18   The powers that be had decided that Level 3 would fill the gap

19   and would use WITS to pay for it.  Willie Spivey found the

20   contract award to be fair and reasonable and in the best

21   interest of the government.  You saw his signed statement.  And

22   the 24-hour fair opportunity period GSA gave Verizon to submit a

23   bid for a contract worth over $2 million, that's not real.  That

24   was a formality given to cover a decision that had been made

25   weeks earlier.  You heard Mr. Spivey.  You heard them all say,

1    "GSA does not award contracts in 24 hours, and they do not award

2    multimillion dollar contracts in 24 hours."  The 24-hour fair

3    opportunity period given by GSA was cover for a decision that

4    had been made long before that bid ever went out.

5         On October 7th, two days after the protest, you saw the

6    e-mails it had been decided Level 3 was getting the contract and

7    WITS was being used to pay for it.  Kekoa had left them nothing

8    to do with the actual award of the Bridge contract.  He didn't

9    have anything to do with the costs.  You heard what was told.

10   The costs were entirely determined upon the positions that

11   Matthew Steiniger wanted filled.  He did nothing to give Level 3

12   a competitive advantage.  The decisions had been made earlier

13   and the costs and the e-mail are not even the same costs

14   associated with the contract.  But there is that single e-mail

15   on October 12th, with pricing information that could not have

16   mattered less.

17        You need to understand and focus that that's what they're

18   trying to do with this case.  They're trying to take things like

19   that and make them into bigger items than they really are.

20        The second series of dates involves the 13 invoices the

21   government insists are fraudulent.  Special Agent Russo talked

22   about how they searched the e-mail databases to see if these --

23   you know, their e-mails e-mailing around from Kekoa, e-mailing

24   around the service orders.  Well, one, she said she didn't check

25   Matthew Steiniger's e-mail account because she wasn't able to,

1    but also you saw, I think, without exception every one of those

2    services orders had been printed out and signed by hand.  It

3    wasn't electronically signed.  So Kekoa had printed them up,

4    taken them around and shown them to people, signed them, and

5    then e-mailed them back to Ron Capallia.  So there wouldn't have

6    been any e-mails from Kekoa, e-mailing the service orders to

7    Matthew Steiniger because that's not how it was done.  You heard

8    how it was done.  He printed up the invoice, he took it to the

9    comptroller, he took it to Matthew Steiniger, he signed it, they

10   approved it, and they sent it back.  And were there exceptions

11   to that rule or were there occasions when that didn't happen?

12   Yes, but that is the overwhelming majority of the way these

13   things happened.

14        And you saw on August 2nd, that Kekoa was part of a

15   discussion when they were talking about how they were going to

16   pay for moving the servers from 400 Army Navy Drive over to the

17   Mark Center.  And they would be paid for with cable abatement.

18   Then you saw the e-mails in January where Mr. Steiniger is

19   making sure Kekoa has submitted the paperwork to Level 3 for

20   this must-have move, and Kekoa forwarding Mr. Steiniger the

21   order he got from Ron Capallia, the one that listed as cabling.

22   Steiniger reviewing it, sending it to Jennifer Paper in the

23   comptroller's office explaining to her why the price had gone

24   up, clearly indicating that he had reviewed it.  Jennifer Paper

25   getting the order and approving it.  Tommy Carlyle signing it

1   and returning it.  Yet, according to the government Kekoa did

2   all this in the dark, in secret, hiding in plain sight.

3       It's preposterous.  How many different people reviewed

4   that service order alone?  Cabling for moving, and they approved

5   it.

6       Yet, according to Mr. Steiniger he had no idea what was

7   going on.  It is simply not possible to believe that that is

8   true, and it is simply not possible to believe that

9   Matthew Steiniger is telling you the truth when he says that.

10       As for the rest, the government showed you an e-mail

11  where Mr. Steiniger is complaining about the Samsung TVs bought

12  with WITS.  You saw an e-mail from Matthew Steiniger to

13  Mr. Kekoa LumHo asking about the smart boards being bought from

14  MSO with WITS.  You saw the e-mail -- to -- to Mr. Steiniger and

15  Kekoa about how much MSO would be charging to send IT

16  contractors to the field office.  Contractors that were paid for

17  with WITS.

18       You saw how Mr. Steiniger told Kekoa that Stephen -- that

19  Mr. Wilson was 100 percent on board with buying equipment with

20  WITS so that OI- -- the Office of the Inspector General could

21  back up its data at an off-site location.

22       You saw an e-mail from Mr. Steiniger telling Kekoa and

23  Jenks that obviously WITS could be used for restacks, and on and

24  on and on.

25       All these e-mails and Mr. Steiniger had no idea what was

1   going on?  That's not possible.

2        October 12th, this is the day of the audit.  When the

3   financial gurus began the process of reviewing the work orders

4   that were part of -- that were a part of this accusation against

5   Kekoa.  As you saw and heard, Kekoa gave the invoices to

6   Mr. Steiniger at least twice.  Once at 9:00, 9:30 and once at

7   midnight.  That in-between that time he and Mr. Steiniger

8   discussed the invoices and discussed approving -- discussed

9   sending them to the auditors.

10       He told you that he and Mr. Steiniger asked -- talked

11  about it and that every question was answered.  You heard there

12  was a conference call with the financial gurus the next day to

13  review these invoices.  You heard that Mr. Steiniger and Kekoa

14  talked afterwards and that afterwards Mr. LumHo felt like

15  everything looked good.

16       You also saw that Kekoa stayed employed at the Office of

17  the Inspector General for another two years before taking a

18  promotion to the Department of Justice.  So what does that tell

19  you about whether there was any concern about these invoices?

20  Not back in 2012, there wasn't.

21       November 2nd, that's the date roughly three weeks after

22  the invoice reviewed that Matthew Steiniger submitted his annual

23  review for Kekoa.  Declaring him to be in his own words, an

24  excellent employee.  And is there any chance Matthew Steiniger

25  never spoke to anyone about those invoices during the audit or

1   in the immediate days after or indeed at any time before writing

2   that review?  Do you think he was in the dark about how the

3   auditors viewed those WITS 3 invoices?  There's not a chance in

4   the world, and he gave Kekoa a sparkling, sterling, excellent

5   review.

6         The inescapable conclusion of all of this is that

7   everybody who mattered knew what was going on when it was

8   happening.  You heard about the items that were purchased and

9   the reasons they were purchased:  We needed equipment now, we

10  needed HP backup tapes, we needed a SMARTnet maintenance

11  programs so that we could have phone and Internet service, we

12  need to be able to provide Internet security so that our

13  Internet wouldn't get cut off.  Now, were there other orders

14  that didn't fit into that category?  Absolutely, but when

15  Stephen Wilson asks you to buy something you do it.

16        So who knew?  Stephen Wilson, Assistant Inspector General

17  and Matthew Steiniger's boss; Willie Spivey, head of the

18  contracts office; Tommy Carlyle, who worked with Kekoa and

19  actually had WITS training, returned both the order for the

20  restack which lists the CLIN or the work as being some sort of

21  services unrelated to moving.  And Tommy Carlyle is the one who

22  sent back the order for the original move from 400 Army Navy

23  Drive.

24        You saw an e-mail where Mr. LumHo sent -- at least one of

25  those invoices to Ms. Paper in the office.  You saw the e-mails

1    from Ms. Paper about the equipment being used with WITS and how

2    she was tracking it.  And it wasn't until ten years later in

3    this trial that now suddenly nobody has any idea what was going

4    on and nobody knows anything.

5         So with all that as background, let's finally take a look

6    at the charges themselves.  Always keeping in mind Kekoa's

7    presumption of innocence, the government's burden of proof

8    beyond a reasonable doubt, the fact that it appears everyone who

9    mattered knew what was going on when he was doing it and as it

10   was happening, and the fact that Kekoa voted against Mr. Wilson

11   receiving a $31 million contract when given the opportunity to

12   show Bill Wilson favorable treatment.

13        His Honor told you that the mere existence of an

14   undisclosed conflict of interest or undis- -- is, without more,

15   can't serve as the basis for finding Mr. LumHo agreed to commit

16   honest services fraud.  So even if you think that he did have an

17   undisclosed conflict of interests because he should have told

18   somebody that his father-in-law was working for MSO, even if you

19   come to that conclusion, that is not enough to support a claim

20   for honest services fraud.  That may be an ethics violation, but

21   it is not a crime.

22        The Court also instructed you that the first nine counts

23   in this indictment are various acts of fraud.  And that in order

24   to prove that the government has to prove by proof beyond a

25   reasonable doubt that Kekoa acted with the conscious decision to

1  deceive, with the intent to be untruthful and deceptive, that

2  his conduct was willful, deliberate, and not by mistake.

3        And the Court also read you an instruction, the Good

4  Faith instruction.  That says Kekoa, "Cannot be guilty of any of

5  those counts if he submitted those orders in good faith."  That

6  is he cannot be guilty of the first nine counts if he submitted

7  those invoices because of an honest mistake in judgment or an

8  error in management.

9        This means he cannot be guilty simply because he

10 submitted invoices that were internally inaccurate or internally

11 inconsistent.  Mistakes in judgment or mistakes in management

12 are simply inconsistent with the unlawful intent to commit

13 fraud.

14       Instead, the laws governing the crimes for which Kekoa is

15 charged in Counts 1, 2, 5, 6, 7, 8, 9, are written to subject

16 criminal punishment only to those who act knowingly and

17 willfully, willfully being with- --

18       MR. BURKE:  Objection, misstates the law.

19       THE COURT:  Yeah.

20       MR. AMOLSCH:  Willfully --

21       THE COURT:  Ladies and gentlemen, there are specific

22 instructions on each of the different counts, and they carry

23 different elements, each one.  The intent is different in some

24 counts versus other counts, and Counsel is speaking generally

25 about the different counts and kind of mixing and not matching

1       them.  So the -- your job is to look carefully at the

2       instructions that I've given you and make sure that you

3       understand the elements that are necessary in each of the various

4       offenses, and let's try not to --

5              MR. AMOLSCH:  Yes, Your Honor.

6              THE COURT:  -- compile them together and not identify them

7       specifically.  You have the instructions before you if you want

8       to use them, please do.

9              MR. AMOLSCH:  Thank you, Your Honor.

10             And finally, the burden of proving good faith is not

11      Kekoa's because Kekoa doesn't have an obligation to prove

12      anything in this case.  He doesn't have to prove he acted in good

13      faith.  The presumption is that Kekoa submitted these invoices in

14      good faith.  It is the government's burden to overcome that

15      presumption.  Proof beyond a reasonable doubt that Kekoa acted

16      with criminal intent.

17             And that is why I said at the very beginning that Kekoa's

18      intent in this case is everything, that the presumption of

19      innocence standing alone is sufficient for an acquittal.  So the

20      question is, has he proven -- has the government proven to you

21      beyond a reasonable doubt what Kekoa's intent actually was,

22      beyond a reasonable doubt, the highest legal hurdle we have.

23      Have they proved to you that this wasn't a mistake in judgment,

24      that this wasn't a mistake in management?  That this was

25      criminal.

1          The government's theory is that these are criminal because

2     he was being bribed.  And on this, again, the evidence is

3     overwhelming.  It is entirely reasonable to conclude that Kekoa

4     acted in good faith because his boss told him it was okay,

5     because Mr. Wilson told him it was okay -- Stephen Wilson,

6     because he was trying his best because it was chaos, and everyone

7     was just trying to get through the next day, still having phones

8     that work and a connection to the Internet, not because he was

9     being bribed.

10          Mr. LumHo is also charged with acceptance of bribes by a

11    public official meaning he accepted a bribe from Mr. Wilson,

12    which, as I said, it's the heart of the government's case.  The

13    center of gravity, in my opinion, of the entire indictment.

14          Now, according to the government, these invoices don't get

15    sent to Level 3, didn't get sent to Level 3 because Kekoa made a

16    mistake in judgment.  They happened because Kekoa was taking a

17    bribe.  And everything depends on that.

18          Now, there have been many instructions on bribery and you

19    need to pay attention to all of them, but at bottom, there has to

20    be some evidence of a thing of value flowing to a public official

21    in exchange for favorable treatment.  This is the *quid pro quo*.

22    There has to be a "you give me this, and I give you that."

23          And where in all of this is there any evidence of Kekoa

24    taking an official action favorable to Bill Wilson in exchange

25    for a bribe?  Where in all of this is there evidence of Kekoa

1    taking an official action in favor of Bill Wilson at all?  All

2    the evidence supports the opposite conclusion.  Kekoa

3    consistently put the government's best interest at the top of any

4    decision tree he had.  It is simply not possible to square

5    Bill Wilson paying Fidel Ramos as a bribe to Kekoa, and at the

6    same time Kekoa voting to award a $31 million contract to

7    Bill Wilson's competitor.  I don't see how those two ideas can

8    exist together.

9           THE COURT:  You're at 75 minutes.

10          MR. AMOLSCH:  Yes, sir.  I'm about done.

11          THE COURT:  All right.

12          MR. AMOLSCH:  Yes, sir.

13          In your head at the same time, and we know he voted

14   against Bill Wilson, which means Bill Wilson could not have been

15   bribing Kekoa LumHo for favorable treatment.

16          This, by itself, this unexplained act of putting the

17   government's interest first has to create a reasonable doubt in

18   your mind about what Kekoa was doing.

19          The last charge is involving his financial disclosure

20   form.  The government must prove beyond a reasonable doubt that

21   Kekoa made a false statement knowing it was false, rather than

22   out of ignorance, mistake, or accident.

23          Now, in -- you know, normal speak that means the

24   government has to show you Kekoa knowingly lied on the financial

25   disclosure form when he didn't disclose the bribes the government

1    says were paid to him through Fidel.  Once more, the government

2    hasn't proved beyond a reasonable doubt that Kekoa was receiving

3    bribes in exchange for favorable treatment.  There wasn't a

4    bribe, and this false statement accusation doesn't stand.

5         The law also requires the government to prove Kekoa didn't

6    simply make a mistake when he filled out this form, or simply

7    didn't understand that it was a deliberate decision to be

8    untruthful.

9         Now, you heard Mr. LumHo's testimony about how he's

10   familiar with this form, how he learned all about the form and

11   its requirements when he was caring for his father in the last

12   days of his cancer.  And Keith Williams, the government witness,

13   told you Kekoa does not have to disclose money given to him by

14   relatives, like gifts given to him by relatives, like money Fidel

15   passed on to his family in contributions to the living expenses,

16   the money Fidel contributed to the family vacation that Fidel was

17   on, those don't have to be reported, so Kekoa didn't report it.

18   He didn't report it because he wasn't supposed to and he wasn't

19   required to.  Again, it all comes back to the bribe.

20        So what is the conclusion of all of this?  You look at the

21   e-mails back and forth between Kekoa and Matthew and the rest of

22   his colleagues, you look at the awards Kekoa received, you look

23   at the review Mr. Steiniger gave him after the audits of the

24   invoices was complete.  You saw how Kekoa acted in the best

25   interest of the government, even at the expense of Bill Wilson.

1   You listened to the testimony and you observed the people who

2   gave that testimony.  Tom Fields, the reverend, Anthony Jenks,

3   Matthew Steiniger, you review that testimony, and you decide who

4   to credit and there's only one possible conclusion:  Kekoa wasn't

5   taking a bribe from anybody in exchange for anything.  He was

6   doing exactly what he thought he was supposed to do, everything

7   that he thought his bosses told him it was okay to do, and he was

8   doing it in good faith, not committing fraud on the government.

9   Kekoa was not materially misleading anybody about what was being

10  purchased or how it was being purchased.  And remember, again,

11  there is no way to explain that $31 billion contract award in the

12  context of a bribe from Mr. Wilson.  There is no fraud here,

13  there is no material misrepresentation, there's no bribery,

14  there's no *quid quo pro*, there are no favorable actions, there's

15  nothing but a good guy trying his best in incredibly difficult

16  times.

17         And, lastly, I will leave with you this and then I'm

18  finished.  This is a complicated case.  We've been here for three

19  weeks, and there's a lot of information to absorb.  So, if any of

20  you are still confused about what actually happened, if after

21  two-and-a-half weeks you still have questions about what WITS

22  means or who the players are or what GSA does, the government

23  hasn't made that clear to you, then you must find Kekoa not

24  guilty.

25         Please don't throw up your hand and say guilty because you

1    don't understand, hoping some court down the road will straighten

2    this all out.  If any of you still don't understand what really

3    happened, you cannot blame Kekoa for that.  These are the

4    government's allegations, they have an obligation to you to make

5    it clear so that you understand what really happened.  It is up

6    to them to explain it to you, not Kekoa.  And on this, and all of

7    it as Your Honor told you, your verdict is your own.  You're, of

8    course, to consult with each other, to listen and work with each

9    other to exchange ideas, but at the end of the day, your verdict

10   is your verdict.  It belongs to you.

11        It is your duty to make sure that you are satisfied by

12   proof beyond a reasonable doubt that Kekoa is just not being

13   sacrificed, so that Mr. Steiniger and Mr. Jenks can continue to

14   go on with their lives.  You cannot let it happen on this

15   evidence, not on the words of these people.  As I told you at the

16   beginning, this is a serious matter for serious people.  You are

17   the guardians of the government's burden of proof.  Twelve people

18   drawn at random from the community charged with holding them to

19   their burden.  We have been with Mr. LumHo for four years now and

20   I have been fighting this fight with him for that long.

21   Mr. Salvato and I have been by him every step of the way, but we

22   are now done.  I am now turning him over to you.  Mr. LumHo is

23   not guilty.  I ask that you find him not guilty on all charges,

24   and that you return him to his family.

25        Thank you.

```
1          THE COURT:  All right.  Thank you, Mr. Amolsch.  I'd like

2    to move forward with the rebuttal of the government, unless you

3    need a short break.

4          MR. BURKE:  No.

5          THE COURT:  All right.  Let's do our rebuttal at this

6    time.

7          I'm sorry, you need a short bathroom break, comfort break?

8          MR. AMOLSCH:  No.

9          THE COURT:  Then we're going to finish up tonight.

10         FINAL CLOSING ARGUMENT ON BEHALF OF THE GOVERNMENT

11         MR. BURKE:  Nonsense.  Nonsense.  Nonsense about the facts

12   and nonsense about the law.  Ladies and gentlemen, you are the

13   deciders of the facts.  Your memory controls, not what Mr.

14   Amolsch says the testimony was.  Judge O'Grady gives you the law.

15   That's the law you're required to follow, not what Mr. Amolsch

16   says that it was.

17         Now, ladies and gentlemen, the core of Mr. Amolsch's

18   argument here this evening is based on an obfuscation.  Kekoa

19   Lumho is not indicted and is not standing trial because he used

20   WITS.  He was indicted and he is standing trial because he lied

21   while using WITS.  He's not indicted because he misread footnote

22   483 in a 300-page contract.  He's indicted because he

23   deliberately and purposefully lied on service orders.

24         Mr. Amolsch talks about how everyone knew, but, ladies and

25   gentlemen, what did they know?  They knew what Kekoa Lumho chose
```

1    to tell them, and the fraud, ladies and gentlemen, in this case

2    required you to have two pieces of information.

3         Number one, you have to know exactly what the service

4    orders say, and then, number 2, you have to know what we're

5    really getting.  So, yes, of course people at the DoD OIG knew

6    that he was using WITS.  They trusted him.  He was the designated

7    agency representative, but where in this, ladies and gentlemen,

8    is there any information where he said, Hey, I'm lying on these

9    services orders; hey, these hours, they're made up; hey, the

10   work, none of that actually happened?  There's no evidence of

11   that, ladies and gentlemen.  So when Mr. Amolsch tells you

12   everyone knew, what he's doing is he's cashing in on the

13   deliberate obfuscation that his client perpetrated during the

14   crime.

15        He's asking you, in essence -- he blew it past them then,

16   so you can't convict now.  The crime is not some complex

17   government contracting regulation.  It's not something that you

18   need any training, specialized or otherwise, to know.  Don't lie

19   on a bill.  Don't take bribes.  What specialized training do you

20   need to know in order to know that?  None, ladies and gentlemen.

21   None.

22        And there's not a shred of evidence anywhere that Kekoa

23   Lumho shared the critical information that would have disclosed

24   his fraud with anyone until he was forced to do so as a part of

25   the audit.

1       And then look, look, look what he did the moment after he

2  learns of the audit.  He immediately stops taking the bribes.

3  And consider, ladies and gentlemen, the inconsistency of the

4  arguments that Mr. Amolsch raises for you and the hypocrisy of

5  Mr. Lumho's position.  He didn't know anything at all about GSA,

6  this contract.  Everyone else is to blame:  Matthew Steiniger,

7  Willie Spivey, Ron Capallia, GSA, Level 3, Tim Donelson.  They're

8  all to blame, but he wants you to see him as the hero when he's

9  the one who saved money on those GSA telephone contracts, when he

10 so studiously was aware of the penalties for moving out of Army

11 Navy Drive, when he was aware of the leases and the lease

12 agreements at GSA properties, and how he devised a perfect

13 solution, how he's this brilliant IT guy, but he can't read a

14 one-page form for a bill that's 400, 500, $600,000?

15      We're not talking about somebody who accidentally wrote

16 the wrong thing on a voucher for a baggage fee.  Of course he

17 looked at these, ladies and gentlemen.  Of course he knew the

18 fraud.  The crime is not using WITS, the crime is lying on bills,

19 and the lies matter, ladies and gentlemen.  They matter because

20 they were essential to the corrupt conspiracy.  By lying about

21 what it was, he made sure that he could keep these orders under

22 WITS, because if he told the truth, they wouldn't have been able

23 to use that contract, and he wouldn't have been able to control

24 it.

25      If he told the truth, they would have used any one of the

1    other number of options that Willie Spivey told you about.  Of

2    course the government has lots of options for buying stuff.  The

3    Army contracting command, GSA's IT 70 Schedule, the various

4    catalogs that Mr. Spivey told you about, the government purchase

5    card, the Defense Information Systems Act.  He controls none of

6    those options.

7         Every single one of them could have been used to buy all

8    of this stuff, but it would have required him, number one, to

9    tell the truth, and then, number 2, he would have lost control,

10   and that would have meant no money in Bill Wilson's pocket.  This

11   did not happen by mistake.

12        And when you're considering, ladies and gentlemen, this

13   argument that everyone knew, did everyone know he was on the

14   take?  Did everyone know he was secretly receiving money from

15   Bill Wilson?  Do you think they might have scrutinized his

16   actions just a little bit differently?

17        Ladies and gentlemen, defense counsel pointed out how the

18   character witnesses came in and told you how they trusted Kekoa

19   Lumho.  You know who else trusted Kekoa Lumho?  Matthew

20   Steiniger, Steven Wilson, Willie Spivey.  The United States

21   government placed its trust in Kekoa Lumho, and he abused that

22   trust.

23        You know who else placed his trust in Kekoa Lumho?  Fidel

24   Ramos placed his trust in Kekoa Lumho.  Defense counsel wants to

25   say that Fidel Ramos, he's lying because he obviously saw these

1   checks from MSO Tech, but he also wants you to say, well, but

2   Kekoa Lumho couldn't possibly have known what those checks were

3   about.  Well, one of these two men is illiterate, and one of

4   these two men is a highly sophisticated IT professional.  So

5   which one of these men really knew what was going on?  Defendant

6   Lumho, of course.

7         So, of course Fidel Ramos doesn't recognize that there are

8   checks coming in from MSO, because those checks aren't intended

9   for him, and he can't read.  And so it does appear that he signed

10  some of them, ladies and gentlemen, but how does he know what

11  these checks are unless Kekoa Lumho tells him?  That is how Kekoa

12  Lumho used the trust that people placed in him.  He used it to

13  commit the crimes charged in the indictment.

14        Now, ladies and gentlemen, Mr. Wilson's lawyer, for his

15  argument, pointed out that there were several things that were

16  said, maybe they were just the product of mistake in memory, but

17  I would encourage you, ladies and gentlemen, to go back, read the

18  transcript of Mr. Wilson's testimony.  When he goes on and on

19  about Natalie Capallia's job, is that a mistake?  When he talks

20  at length about how he couldn't possibly afford a bulldozer and

21  that's why he had to pay Tim Donelson, is that a mistake?  Of

22  course not, ladies and gentlemen.  Those are deliberate,

23  purposeful false statements that he knew.

24        Mr. Amolsch also says that, ah-ha, ah-ha, AIS.  Well,

25  ladies and gentlemen, he's misstated the facts, and he's

1   misstated the law.  First of all, ladies and gentlemen, this

2   technical evaluation board was in March of 2012, prior to most of

3   the bribes being paid to Kekoa Lumho.  There's no information

4   anywhere in this form that Bill Wilson's company has a stake in

5   this vote.  There's no information anywhere in this form telling

6   Kekoa Lumho how much, if anything, Bill Wilson would receive

7   based on his vote.  But if, if, in fact, he did know, then that

8   proves conclusively that he's also lying.

9        Ms. Sandvig, can you pull up Government's Exhibit 234 at

10   page 3.  Blow that up.

11        He's required to disclose whether he or anyone in his

12   family have an employment interest in any of the companies

13   competing.  So either he doesn't know that MSO's involved, in

14   which case his actions don't tell you anything about his intent,

15   or he does know that MSO's involved and he's concealing it from

16   everyone, which tells you everything about his intent.

17        And, ladies and gentlemen, look what happens after this

18   technical evaluation board.  Ms. Sandvig, Government's

19   Exhibit 961, page 45.  Blow up the check, please.  From Bill

20   Wilson's perspective, if at first you don't succeed, try, try

21   again.  After the technical evaluation board, Bill Wilson

22   continues to bribe Kekoa Lumho and to increase the amount he's

23   paying to Kekoa Lumho.

24        And, ladies and gentlemen, you'll also be instructed or

25   you have been instructed that in order to satisfy the elements of

1    bribery, the public official need not actually perform an

2    official act or even intend to do so.  So, whether or not Kekoa

3    Lumho took the action in the AIS instance or not doesn't

4    determine his guilt; rather, ladies and gentlemen, you may, for

5    example, conclude that an agreement was reached if the evidence

6    shows that the public official received a thing of value knowing

7    that it was given with the expectation that the official would

8    perform an official act in return.  Kekoa Lumho knows exactly why

9    Bill Wilson is sending this money, and he knows why, after that

10   vote, he increased the money.  And then, ladies and gentlemen,

11   let's see what happens after Bill Wilson increases the bribes to

12   Kekoa Lumho.  He continues to award or to place service orders

13   that he knows are fraudulent benefitting Bill Wilson's company.

14        And, ladies and gentlemen, then you heard about his

15   efforts to try to stave off this disconnection when the DoD IG

16   was talking about removing the business from MSO Tech, and you

17   heard about that, ladies and gentlemen, through a voicemail left

18   by Barry Atwood.

19        Ms. Sandvig, could you please play Government's

20   Exhibit 194.

21        (Audiotape played.)

22        MR. BURKE:  The voicemail was left on July 25th, 2012.

23   "Kekoa's going to fix it."  He's trying to stave off the

24   disconnect and do everything in his power to keep money flowing

25   into the pockets of Bill Wilson.

1      Ladies and gentlemen, the evidence put before you in this

2  case is overwhelming.  Now, there was one point that Mr. Amolsch

3  said in his closing with which I completely agree.  You are the

4  ones who must hold the government to its burden, and you should,

5  ladies and gentlemen.  We embrace that burden.  It's our burden

6  to prove the defendants guilty beyond a reasonable doubt.  The

7  evidence that we've shown you in this case overwhelmingly

8  satisfies that burden.  You are also the only people who can hold

9  these defendants to account for their crimes.  No one else but

10  you, because the evidence shows overwhelmingly that both

11  defendants are guilty of every single count in the indictment.

12  We ask that you return a verdict of guilty as to both defendants

13  on all counts.

14      THE COURT:  All right.  Thank you.

15      MR. SALVATO:  Your Honor, can we approach real briefly?

16      THE COURT:  Yes, sir.

17      (Following sidebar had on the record:)

18      MR. SALVATO:  Thank you, Your Honor.  I don't think it was

19  appropriate for Mr. Burke to just put up that one document about

20  the connection between AIS and MSO in Defense Exhibit Number 12.

21  They're clearly connected.  I think that was misleading to the

22  jury, and I think that we should be able to at least refer the

23  jury to Defense Exhibit Number 12 as well.  They're connected.

24  You can't just put up one document when they're obviously

25  connected and portray it to the jury that way.  I wasn't going to

1    object.

2         MR. AMOLSCH:  For the Court's edification, Mr. Spivey

3    testified that he wrote the draft memo, circulated it.  That's

4    why I asked him about -- that's what Mr. Burke put up.  Based on

5    that memo, he then completed this official report for GSA, which

6    they based it on, and so that was admitted afterwards based on

7    the draft memo where AIS is not mentioned -- where MSO is not

8    mentioned, but the official report to GSA is.  So that report

9    makes it clear that AIS and MSO are in this together.

10        MR. BURKE:  Your Honor, first of all, I'm not sure that

11   Mr. Lumho was ever shown that second document.  Second of all,

12   nothing that I said in closing was incorrect.  And third, I mean,

13   are we going to get into the business of me now having an

14   opportunity to introduce documents to correct the dozens of

15   things in Mr. Amolsch's closing that I think are improper?  I

16   think the jury should be instructed that they decide the facts.

17   Argument of counsel is argument of counsel, but they decide the

18   facts, but singling out this one thing is, to me, improper.

19        MR. SALVATO:  That was a critical part of the whole case,

20   the $31 million in terms of intent.  I just think it was

21   misleading to point to one document but not the other document

22   that clearly shows an affiliation between the two.

23        THE COURT:  It's a document that was used during the

24   trial --

25        MR. SALVATO:  -- and it's in evidence --

```
1        THE COURT:  -- and it's in evidence, and it was referenced

2   by you in your -- in your examination.

3        MR. AMOLSCH:  Yes, sir.  It was Mr. -- it was Mr. Spivey,

4   not through Mr. Lumho, but Mr. Spivey who testified about it,

5   Mr. Spivey who wrote about it.  I think -- I don't want to speak

6   for Mr. Salvato.  I think he was just saying that you should just

7   refer them to that exhibit as well because they are connected

8   like half -- like two sides of the same coin.

9        MR. CARLBERG:  May I offer one thing on this?  The Barry

10  Atwood voicemail shows that he later -- or at least at some point

11  knew it was MSO, so it's not misleading, and that's in front of

12  the jury, the Barry Atwood --

13       THE COURT:  I'm not going to highlight this.  Your

14  exception is noted.  There were lots of representations about

15  what exhibits did or didn't say or what people testified to or

16  what they didn't testify to, and that was the subject of

17  examination of at least Mr. Spivey, if not more, and the jury's

18  heard it all, and they've been taking notes, and so I'm not going

19  to do that.  Your exception is noted.

20       I'm sorry.  Stay here.  So, the other alternates we had,

21  Galindo and Hohman, are the two alternates.  We're going to keep

22  Galindo -- he's the first one in -- and let Hohman go.  And I'll

23  tell them that they're -- they can go for tonight, that the

24  evidence will be there for them when they begin their

25  deliberations tomorrow when they come back, and so we need to
```

1   make sure -- you haven't done the exhibits review.  That will

2   take --

3       MR. BURKE:  We've done some of it, but not all, but we

4   will do that this evening.

5       THE COURT:  In the evening or first thing in the morning,

6   but whatever -- whichever one you want to do.  Thank you.

7       (Sidebar discussion concluded.)

8       THE COURT:  I haven't tested everybody's patience.  That

9   concludes the final argument, and the case is now yours.  A

10  couple of things.  Unfortunately, only 12 can deliberate.  We've

11  got 13 here, and the last alternate selected was Mr. Hohman, so

12  Mr. Hohman, I'm going to have to ask that you not participate in

13  the jury deliberations, and I'm sorry for that.  It's really

14  unfortunate, but the Constitution requires 12 and doesn't allow

15  for anymore.

16      I would like you not to do anything that would disqualify

17  you from coming back and possibly participating in the jury

18  deliberations if something -- if there's another emergency, for

19  instance, with another juror.  And so, if you'll not do any

20  research or investigation or not talk to anybody about the case

21  until you get word that the jury has reached its verdict, I very

22  much would appreciate that, sir.

23      The evidence will be brought to you -- to your jury room

24  in the morning.  I'm not going to call you down here before we

25  begin in the morning.  I would ask you to start at 9:00 tomorrow

1    morning.  You need to make sure you do not begin any

2    deliberations until all jurors are present, and if somebody

3    leaves, you know, to go out and, you know, put money in the meter

4    or for whatever purpose, stop deliberations until they come back.

5    So only deliberate when all of you are present.

6          As I said, the evidence will be there for you to look at.

7    I've got six copies of the instructions that's going to go to you

8    so you will have the ability to pass those around and look at

9    them carefully.  We won't disturb you while you're deliberating.

10   If you have a question, put it in writing.  Mr. Jones will send

11   it to me and we'll respond accordingly.  Don't stop deliberating

12   just because you have a question about a certain matter.

13   Continue on, because it may take time before I can get back to

14   you with an answer, and you can take lunch whenever you want to

15   take lunch.  Again, don't deliberate unless all of you are

16   present.  We'll have lunch brought in-between, and we'll let you

17   do your jobs now.  And thank you very much for your patience, and

18   you're excused at this time.  Thank you.

19         (Jury out at 7:14 p.m.)

20         THE COURT:  All right.  Anything else we need to talk

21   about, Mr. Sears?

22         MR. SEARS:  I don't know that it's something we need to

23   talk about.  I was just curious how the jurors are deliberating.

24   Are they in a normal room or are they in a larger room?

25         THE COURT:  They're in a larger room.

1          MR. SEARS:  Like a courtroom.

2          THE COURT:  They're in a very large conference room about

3    50 by 30 that we have available here, and so they have room to

4    spread out and for the exhibits.

5          MR. SEARS:  Okay.  I was just curious.  My understanding

6    from what the Court just instructed the jury, we do not need to

7    come to the courtroom tomorrow morning, however we need to be

8    within ten minutes of the courthouse.  We'll probably be across

9    the street, and we'll wait for any messages from the Court.

10         THE COURT:  That's fine.  That's fine.

11         MR. SEARS:  Thank you, Your Honor.

12         THE COURT:  And you'll be here.

13         MR. AMOLSCH:  That was going to be my question, Your

14    Honor.  Do you want us to first report here or just head right

15    over?

16         THE COURT:  No, just let us -- just be available -- we'll

17    get the phone numbers for you -- and just make sure you're

18    available.  And, of course, that goes for Mr. Lumho as well.  All

19    right.

20         So you're going to look at the evidence now before it goes

21    back, and, as I said, we've got six copies of the jury

22    instructions, but did we get that number 58 right on the -- who's

23    responsible for which counts and that -- okay.  All right.  All

24    right.  Then we're in recess.  Thank you, all.

25         (Proceedings adjourned at 7:16 p.m.)

1

2                         **C E R T I F I C A T E**

3              I, Scott L. Wallace, RDR-CRR, certify that the
   foregoing is a correct transcript from the record of proceedings
4  in the above-entitled matter.

5            /s/ Scott Wallace              6/31/21
          ---------------------------    -------------
6         **Scott L. Wallace, RDR, CRR        Date**
          **Official Court Reporter**

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25