IN THE UNITED STATES DISTRICT COURT FOR THE

EASTERN DISTRICT OF VIRGINIA

Alexandria Division

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | Case No. 1:17-CR-222-03 |
| | ) | |
| MATTHEW KEKOA LUMHO, | ) | Hon. Judge Liam O'Grady |
| | ) | |
| Defendant. | ) | Sentencing: October 20, 2021 |
| | ) | |

**POSITION OF THE UNITED STATES
WITH RESPECT TO SENTENCING**

The United States, by and through undersigned counsel, hereby respectfully submits this

position paper with respect to the sentencing of defendant Matthew Kekoa LumHo.

From approximately February 2012 through October 2012, the defendant abused his

position of trust within the Department of Defense-Office of Inspector General ("DODIG") by

accepting bribes from Bill Wilson in exchange for signing numerous false and inflated service

orders under the Washington Interagency Telecommunications System ("WITS 3") contract he

controlled. The defendant betrayed his oath of office and abused the trust of those who relied

upon him, from within the very office that Congress charged with rooting out waste, fraud, and

abuse in the Department of Defense. By even a conservative estimate. the defendant's criminal

actions inflicted over $1.5 million in losses on the DODIG.

Rather than accepting any responsibility, the defendant engaged in a series of obstructive

acts in an attempt to escape accountability. This included, in 2013, filing a false government

ethics form concealing the bribes, and on December 9, 2014, filing a motion to quash an

Inspector General subpoena for his banking records, in which he falsely claimed under penalty of

1

perjury that his bank accounts had no information relevant to the investigation. In fact, he well knew his bank statements would plainly show incoming substantial money transfers from his father-in-law, Fidel Ramos, who was on Bill Wilson's payroll as a ghost employee. The defendant's obstruction took place again this year, on June 22, 2021, when he took the witness stand and told multiple material lies for many hours – lies the jury swiftly and correctly disbelieved when it returned its verdict at the end of one long day of deliberation.

The defendant's consistent attempt to shift all blame for signing the false service orders to others —to Ron Capallia, to his boss, to his subordinate, to anybody but himself— is itself a very serious matter and indicative of an unrepentant and uncorrected individual. Using his father-in-law as a conduit of the bribes, then denying any contemporaneous knowledge of the pretextual job, were another appalling series of choices this defendant made. All of this was unnecessary and undoubtedly caused stress to many individuals, exposing some to potential liability.

The defendant's betrayal of his oath of office, his abuse of trust, and his shifting of blame to others all counsel for a serious sentence of incarceration to reflect the nature and circumstances of these offenses, as well as the need to promote respect for the law and provide just punishment. The defendant, a very technically skillful and highly intelligent person, thought he could con, if not this Court then the jury with the force of his personality and his blithe lies. That makes him especially a danger to offend again and also counsels a lengthy sentence to incapacitate him and to also to deter others. The government respectfully requests that this Court especially consider this willful and obstructive pattern when fashioning the defendant's custodial sentence, which should be within the applicable guidelines range.

# I.      Factual Background of the Offenses and the Pattern of Obstruction

### A.  Offense Conduct

For much of 2012, the defendant who was then employed at the Department of Defense's Office of Inspector General, accepted multiple bribes from Bill Wilson in exchange for taking official acts to benefit Wilson.  LumHo served as a Designated Agency Representative ("DAR"), meaning that he was authorized to place orders for goods and services for the DODIG through the WITS 3 contract.

Wilson bribed LumHo by funneling money to LumHo through a bank account that LumHo himself opened in the name of his father-in-law, Fidel Ramos.  And as with the fake job for Natalie Capallia, Wilson and LumHo concealed the true nature of these bribe payments by claiming falsely that Mr. Ramos worked for MSO Tech, and that the payments were Mr. Ramos's salary.  In truth, Mr. Ramos had never heard of Wilson or MSO Tech—much less worked for Wilson's company—and was unaware that the bribery payments were passing through the bank account LumHo had opened in his name until interviewed by law enforcement.

Wilson also bribed LumHo by providing him with stereo equipment and photography equipment.  LumHo concealed these bribes by hiding them in various fraudulent service orders that LumHo was placing via the WITS 3 contract.  For example, in June 2012, Wilson sent a list of electronic equipment to Capallia which included a high-end Canon EOS 60D digital camera, high end lenses, and other items.  Wilson advised, "Ron add your cost to this and send it to Kekoa."  (**GX-176**).  Capallia in turn prepared a fraudulent service order request form that falsely described these items as 768 hours of professional "cable installer" services, at a cost to the government of $54,320.64.  LumHo signed off on the fraudulent service order knowing it to be false, while Wilson arranged for these items to be delivered to LumHo.  Thus, Wilson,

3

Capallia, and LumHo jointly caused the United States to pay $54,320.64 for camera and computer equipment that Wilson used to bribe LumHo.  The true cost of this unnecessary equipment was around $11,324.28, and it was entirely fraudulent because the government had no need of it.  *See* GX-1406.

In return for these bribes, LumHo took numerous official acts to benefit Wilson and his companies.  For example, LumHo pressed for the DODIG to buy goods and services using the WITS 3 contracting vehicle, ensuring that he could control the process, rather than using any number of other contracting mechanisms available to the DODIG that he could not influence. Once the decision had been made to use the WITS 3 vehicle, LumHo pressed to use Level 3 (rather than another company) as the vendor to supply the goods or services, knowing that Level 3 (acting through Donelson and Capallia) would subcontract all of the work to Wilson, who would return part of the profits to LumHo in the form of bribes. LumHo repeatedly signed or directed his subordinate to sign false service orders that he knew to be fraudulent, knowing that in so doing, he was putting money into Wilson's pocket.

LumHo played an essential role in the conspiracy, which could not have succeeded as well as it did, or have caused as much harm as it did, without his willful participation.  LumHo and Capallia together made certain that scores of purchase orders were steered to Wilson's company even though neither Wilson nor MSO Tech had any experience or legitimate reason to be performing any of the work.  LumHo routinely reviewed and signed fraudulent service orders that passed off standard computer equipment and other products as sophisticated information technology services.  **Government Exhibit 1406** catalogs 14 official acts taken by LumHo to benefit Wilson.

Moreover, LumHo's and Capallia's manipulation of the system was critical to the success of the conspiracy.  First, by lying about what was being ordered, they ensured that those orders could be placed through the WITS 3 contracting vehicle—a vehicle that LumHo controlled, and that both men knew would benefit Wilson as the subcontractor on the project.  Without this manipulation, the co-conspirators would have lost control of the ordering process, and the government would have gone elsewhere to purchase whatever it needed through a legitimate, competitive option.

Second, by lying about what was being ordered, LumHo and Capallia gave themselves the leeway to manipulate the number of hours supplied and the price charged per hour to be whatever fiction they chose, thereby enabling them to inflate the price to whatever they wanted it to be.  And that bloated price is what enriched the co-conspirators: the margin by which they overcharged the government is the margin that Wilson had left over to line his own pockets, to pay kickbacks to Donelson and Capallia, and to bribe LumHo.  In other words, the pot of money that the co-conspirators used to enrich themselves was precisely the amount of money they were willing to overcharge the government via their corrupt agreement.

Based just on the false service orders he signed (or directed his subordinate to sign), LumHo caused the DODIG to overpay for goods and services (some of which were unnecessary or were bribes to LumHo himself) by $1,567,894.33.  *See* **GX-1406**; **Sentencing Exhibit 1**; Pre-Sentence Investigation Report (Dkt. No. 344) (hereafter "PSR") ¶¶ 102, 115.

### B.  The Defendant's Obstructive Conduct

LumHo's obstruction of justice began during the offense itself and continued through the second trial.  In the middle of the scheme, LumHo signed a fake, backdated "fair opportunity letter" created by Ron Capallia to make it appear that the DODIG had performed some form of

competitive evaluation in issuing the WITS 3 orders to Level 3.  This was false: LumHo unilaterally selected Level 3—thereby funneling money to Wilson—in return for the bribes he was receiving.  *See* PSR ¶¶ 87-88.  The evidence at trial showed overwhelmingly that LumHo created and caused the creation of false tax, employment, and court records to make it appear that Fidel Ramos had been actually employed by MSO Tech, when LumHo knew that the job for Ramos was fake. *Id*. at ¶¶ 73-74.

On February 11, 2013, LumHo also digitally signed a Form OGE-450, a conflict-of-interest form, in which he willfully concealed the gifts and money from Wilson. PSR ¶ 99. The defendant did this during an audit of WITS 3. The jury convicted him of this material lie – Count 12 of the Superseding Indictment. PSR ¶ 4.

On December 9, 2014, LumHo's retained counsel filed in this Court a motion to quash an Inspector General subpoena for his banking records. *LumHo v. Dept. of Defense*, No. 1:14-mc-38-LO-JFA, Dkt. #3, (E.D. Va. Dec. 9, 2014) (trial exhibit **GX-1553**). In an attached sworn statement, LumHo claimed falsely under penalty of perjury that his bank accounts had no information relevant to the investigation.  *See* **GX-1553** at 10. As proven at trial, however, LumHo's Navy Federal Credit Union (NFCU) bank statements plainly showed substantial money transfers coming in from his father-in-law's NFCU bank account, which the defendant had opened for him.  As the defendant knew when he signed and filed his pleading, if the investigators obtained his bank records, they would discover Fidel Ramos, which would lead to the ultimate source of those funds: MSO Tech and Bill Wilson. An interview with Ramos would then reveal the no-show nature of the job. Defendant affirmatively attempted to thwart the investigators from that discovery. *See also* PSR ¶ 108.

The defendant testified at both the original trial and the retrial of the case. The government will focus on the second trial here.

The scope and depth of the defendant's lies from the witness stand on June 22, 2021, is truly remarkable. Cataloging every single lie would take dozens of pages. By category alone, the list is substantial.  For example, the defendant repeatedly testified falsely that he *physically* showed every single false service order to Matthew Steiniger (and many to Assistant Inspector General Steven Wilson), who supposedly approved and ordered him to sign them.[1] His testimony on this point was preposterous, as the undisputed evidence showed that, despite receiving every single one of the fraudulent service orders by email he never forwarded a single draft service order to Steiniger for review.  It also contradicted his own testimony that he was frequently traveling and out of the office in 2012,[2] thereby incapable of physically delivering every service order to Steiniger or Steven Wilson.

His attempt to drag Steiniger into the criminal conduct even went to the ludicrous lengths of testifying that it was Steiniger who ordered him to use WITS to buy the high-end Canon camera and telephoto lenses,[3] and that it was also Steiniger who told him to delete the camera detail from the draft false service order he worked on with Capallia as shown in **Government Exhibit 177**.[4] But the furtive voicemail LumHo left for Capallia in directing the excision of the incriminating detail (**GX-179, GX-179T**), of course, had nothing to do with Steiniger and everything to do with LumHo, Capallia and Wilson. Nor had Steiniger been copied on any of this

---

[1] Transcript of Testimony of Matthew Kekoa LumHo, June 22, 2021, (hereafter "Tr.") at 29:7-14, 45:19-46:5; *see also* Tr. 85:2-25 (in which LumHo testified that Capallia explained to both him and Steiniger that you could submit false claims because that is the way DHS supposedly did it).

[2] Tr. at 70:21, 72:19-22, 177:20.

[3] Tr. at 136:22-137:12.

[4] Tr. at 142:20-143:22.

incriminating email traffic. Thus, to attempt to escape liability for his fraud and corruption, LumHo again and again falsely implicated his boss with uncorroborated accusations.

Continuing with his perjured attempts to blame everyone else, according to LumHo it was actually Matthew Steiniger who ordered him to sign the backdated fair opportunity letter for Capallia (**GX-172**).[5] Moreover, LumHo testified implausibly that he never actually even looked at the backdated letter he signed.[6]  The absurdity of this story was revealed on cross-examination, when LumHo was walked through the entire process.[7] This included the "panicked" phone call from Capallia; the email attaching the backdated, fake letter; LumHo's clicking the icon to open the letter; his printing of the letter; his signing it; LumHo's scanning it back in; and LumHo's sending it back to Capallia with a cover email that itself contained multiple lies of LumHo's own crafting. Such lies included that LumHo must have forgotten to send it back in 2011 after looking through his emails. On cross-examination, LumHo had no option but to admit that he wrote those lies in the cover email himself. But he maintained that Steiniger ordered him to sign it and that he never really read it.

The defendant's perjurious testimony about Fidel Ramos is another example of a story that collapses under the weight of its own implausibility. The defendant's deep involvement with opening and controlling the illiterate Fidel's bank account and even depositing the physical payroll checks addressed to Fidel required too many far-fetched explanations to try to convince the jury that he had no knowledge or criminal intent. For instance, on direct examination the defendant claimed that he had been very clear with Barry Atwood that any job for Fidel could not be with MSO Tech because the defendant was supposedly concerned about a conflict of

---

[5] Tr. at 90:16-21.
[6] Tr. at 89:25-91:14 (including, "Honestly, I never even looked at the letter.")
[7] Tr. at 237:19-243:10.

interest.[8] But on cross, the defendant was impeached with his prior testimony that he had discussed with Atwood that Fidel would drive Bill Wilson around.[9] Indeed, in the first trial, his story was that he thought Fidel would be working for Wilson legitimately, but that LumHo never asked for anything of value in return. The contradiction in these two stories is evident.

The defendant repeatedly told the jury that he had never known at the time that Fidel Ramos was receiving money from MSO Tech. Despite signing a number of the payroll checks himself, LumHo claimed he never looked closely at the face of the checks, which showed the money coming from MSO Tech. Instead, he insistently claimed on the stand that all that he saw in 2012 was the big Frank Crum payroll company name on the top of the checks.

The defendant's testimonial lies about Fidel Ramos and the fake job extended to his denials concerning his intent in drafting the email that was introduced in trial as **Government Exhibit 174**. This was the email to Tim Donelson the defendant sent on May 23, 2012. In that email, which LumHo wrote in the context of his review of a false draft service order form, he made a veiled reference to receiving money for his upcoming trip to Hawaii. In his email, LumHo complained about Level 3's performance under WITS, and in the next breath he referred to the cost of Capallia's Disney Cruise vacation (paid for my Wilson) and discussed how much his own upcoming Hawaiian vacation would cost. Not long after that, Fidel Ramos had his MSO Tech pay quintupled, and two large checks for over $6,500 were sent to the LumHo house in the name of Fidel Ramos. LumHo even signed the back of one of the large checks himself and caused its deposit. Again, the face of the check indicated it was pay from MSO Tech. The bank records clearly showed that LumHo used this money to fund his Hawaiian vacation.

---

[8] Tr. at 177:10-17.
[9] Tr. at 196:3-197:24.

LumHo sought to explain all of this to the jury by falsely claiming that he had no intent to ask for a bribe; indeed, testifying that he *never* took anything of value from Bill Wilson; that he had no idea Bill Wilson had paid for Capallia's vacation; that he never saw MSO Tech on the checks he signed; and that he thought Frank Crum (MSO Tech's payroll company) was simply sending Fidel back pay for a legitimate job that had nothing to do with MSO Tech (despite Barry Atwood, in LumHo's supposed explanation, having arranged the "job").[10] The jury saw these lies for exactly what they were, and returned its verdict accordingly.

## II.   Sentencing Argument

Although the Supreme Court rendered the federal Sentencing Guidelines advisory in *United States v. Booker*, 543 U.S. 220 (2005), "a sentencing court is still required to 'consult [the] Guidelines and take them into account when sentencing.'" *United States v. Clark*, 434 F.3d 684, 685 (4th Cir. 2006) (quoting *Booker*, 543 U.S. at 264).  The Supreme Court has directed district courts to "begin all sentencing proceedings by correctly calculating the applicable Guidelines range." *Gall v. United States*, 552 U.S. 38, 49 (2007).  In *Gall*, the Supreme Court instructed that the sentencing court should calculate the sentencing guideline range, permit the government and the defendant "an opportunity to argue for whatever sentence they deem appropriate," consider all of the § 3553(a) factors, and finally pronounce a sentence taking into account all of the relevant factors. *Id*. at 596-97. The *Gall* Court further instructed that, in the event that the sentencing court decides to impose a variant sentence, the court "must consider the extent of the deviation and ensure that the justification is sufficiently compelling to support the degree of the variance." *Id.* (noting that a "major departure should be supported by a more

---

[10] Tr. at 193; 198-212; 221-222, 288.

significant justification than a minor one.").  Ultimately, the sentence imposed must meet a standard of reasonableness.  *See Booker*, 543 U.S. at 260-61.

### A.    Guidelines Range

The United States has no objection to the final Pre-Sentence Report.  The total offense level is 38, the defendant is a criminal history category I, and the resulting advisory guideline range is 235-293 months (or 19.5 years to 24.4 years). The defendant has not accepted responsibility for his crimes.

### 1.  *Base Offense Level: 14*

The Presentence Investigation Report ("PSR") correctly applies § 2C1.1, as the guideline that governs this case, since the defendant was a public official convicted of accepting bribes for official acts.  *See* PSR ¶ 112.  The base offense level is, thus, 14, under § 2C1.1(a), § 2X1.1(a) *Id*. at ¶ 113.

### 2.  *More Than One Bribe: +2*

The Probation Officer is correct that the offense involved more than one bribe, earning LuumHo a two-level enhancement under § 2C1.1(b)(1). PSR ¶ 114. Indeed, the jury convicted the defendant of Count 11 of the Superseding Indictment, which charged the defendant with accepting the following series of bribes:

- approximately $23,595.12 in multiple payroll checks for the Fidel Ramos no-show job

- electronics and camera equipment, including two Bose Sounddocks, a Canon digital camera, two Canon telephoto and zoom lenses, a Canon flash lighting accessory, and other camera accessories worth thousands of dollars

Dkt. No. 40.  The evidence at trial, captured in a summary chart of LumHo's bribes as

**Government Exhibit 1402**, proved beyond a reasonable doubt all of these bribes in their various forms.

11

Count 11 also detailed numerous officials acts that the defendant performed in exchange for these many bribes, including:

- Knowingly singing multiple false service orders under WITS 3

- Using WITS 3 rather than other available contract options to benefit Wilson

- Steering work to Level 3 and MSO Tech through WITS 3 by not obtaining competing quotes

- Directing his subordinate to sign several false WITS 3 service orders

*Id.*  The evidence proven at trial was overwhelming that LumHo took many official acts as alleged in Count 11. Indeed, **Government Exhibit 1406** is a list of the multiple false service orders LumHo or his subordinate signed at LumHo's direction, and it amounts to over a dozen. And Counts 5-9 of the Superseding Indictment are four sperate substantive false claims that the jury convicted LumHo of submitting to the government, Dkt. No. 40, each one also being an official act he took as the DODIG's DAR at the same time he was accepting bribes from Wilson.

The Second Circuit has identified a three-factor test for determining whether more than one bribe occurred under § 2C1.1(b)(1). *United States v. Arshad*, 239 F.3d 276 (2d Cir. 2001); *see also United States v. Roussel*, 705 F.3d 184 (5th Cir. 2013) (applying *Arshad* factors); *United States v. Weaver*, 175 F. App'x 506 (3d Cir. 2006) (same). The first *Arshad* factor is whether "the payments were made to influence 'a single action.'" *Id.* at 280 (citation omitted).  Here, as is evident from the jury verdict and the evidence adduced at trial, especially all of the false service orders and the summary of them at **GX-1406**, LumHo clearly took many official acts to benefit Wilson and his co-conspirators.

The second *Arshad* factor is "whether the pattern and amount of payments bear the hallmarks of installment payments, such as a regular schedule of payments over a finite period of time toward a fixed final sum, rather than a series of intermittent and varied bribes." *Arshad*, 239

F.3d at 281. Like WITS 3 itself, the Fidel Ramos ghost "job" may have been a bribe of "indefinite duration and indefinite quantity" in order to assure periodic and continued official acts from LumHo to benefit Wilson. In any event, the fact that LumHo via email to Tim Donelson indirectly solicited a quintupling of Ramos's pay for two pay periods to coincide with payment for LumHo's Hawaiian vacation (*see* **GX-174** and two associated $6,580 checks) shows that the payroll payments were not simply equal installment payments designed to reach some fixed amount. Moreover, the false service orders associated with the high-end camera equipment and telephoto lenses also clearly account for additional and separate bribes. Thus, third and finally, the defendant did not receive his bribes "in the same form and in the same means," *Arshad*, 239 F.3d at 282, as he accepted not only varied amounts in terms of the payroll checks, but a high-end Canon camera, telephoto and zoom lenses, digital camera flash, and stereo equipment from Wilson, at the same time that he was signing significantly inflated and false WITS 3 service order forms that benefitted Wilson.

  3. *The Loss Enhancement is Correctly Calculated at Over $1.5 million: + 16.*

   The Probation Officer has correctly applied a sixteen-level enhancement for loss under § 2C1.1(b)(2). See PSR ¶¶ 102, 115. Indeed, this is a conservative figure that only captures the measurable loss (in the form of inflated over-payments) associated with the false service orders that LumHo himself directly signed or ordered his subordinate to sign. The government would be within the law to seek a higher amount but believes that this methodology is the most compelling.[11]

---

[11] Application of § 2C1.1(b)(2) must be determined on the basis of all "relevant conduct" as defined by U.S.S.G. § 1B1.3. Thus, "in the case of a jointly undertaken criminal activity (a criminal plan, scheme, endeavor, or enterprise undertaken by the defendant in concert with others, whether or not charged as a conspiracy)," relevant conduct includes "all reasonably foreseeable acts and omission of others in furtherance or the jointly undertaken criminal activity." § 1B1.3(a)(1)(B).

Section 2C1.1(b)(2) provides that in a bribery case a defendant's base offense level must be enhanced commensurate with "whichever is greatest" of four amounts: (i) "the value of the payment"; (ii) "the benefit received or to be received in return for the payment"; (iii) "the value of anything obtained or to be obtained by a public official or others acting with a public official"; or (iv) "the loss to the government from the offense." The first and third amounts reflect the value of the agreed upon bribes or extorted property, or *quid*, and the second amount reflects the value of the official action sought, or *quo*. The fourth amount reflects any loss to the government caused by the offense. If the greater of the four amounts exceeds $5,000, the base offense level is enhanced by the number of levels set forth in U.S.S.G. § 2B1.1(b)(1)'s table for calculating loss and gain for fraud offenses.

As with calculation of loss under § 2B1.1, calculation of the applicable and comparative values in § 2C1.1(b)(2) need only be "a reasonable estimate . . . , given the available information," and a "district court's estimation . . . need not be determined with precision." *United States v. Quinn*, 359 F.3d 666, 680 (4th Cir. 2004) (internal quotation omitted). Indeed, it is not necessary to make a specific estimate at all; all that the Guidelines require is that the district court determine the applicable range from § 2B1.1(b)(1)'s table. In sum, the question for the Court is simple: did the PSR correctly conclude that the trial evidence showed it is more likely than not that the greater of the value of the bribes or official action reasonably foreseeable to the defendant in this case exceeded $1.5 million? As explained briefly below, the answer is yes.

**Government Exhibit 1406**, admitted at trial, is a summary chart that FBI Forensic Accountant Rachael Bingham prepared concerning the specific fraudulent WITS 3 service orders that LumHo authorized or directed to be authorized. For sentencing, Ms. Bingham then prepared

another chart that calculates the difference between the out-of-pocket cost to MSO from acquiring the goods or services actually provided to the amount billed to the government under the fraudulent service orders.  That calculation is attached here as **Sentencing Exhibit 1**.  It clearly shows that LumHo caused losses of at least **$1,567,894.33** during the conspiracy from these transactions alone.  As noted above, the true amount may well be higher, but this is a sound calculation that sufficiently captures the loss the defendant caused. As a result, a 16-level enhancement is correctly applied under §§ 2C1.1(b)(2) and 2B1.1(b)(1)(I) because the loss attributable to LumHo was greater than $1,500,000 but not greater than $3,500,000.

4. *The Defendant Was a High-Level Decision-Maker or in a Sensitive Position: +4*

The Probation Officer correctly applied a four-level enhancement under § 2C1.1(b)(3) because the offense involved "any public official in a high-level decision-making *or* sensitive position." U.S.S.G. § 2C1.1(b)(3) (emphasis added).  *See* PSR ¶¶ 29, 30, 116. The commentary goes on to explain that "(e)xamples of a public official who holds a sensitive position include a juror, a law enforcement officer, an election official, and any other similarly situated individual." § 2C1.1 cmt. n.4(B).  LumHo was both a high-level decision-maker **and** in a sensitive position.

Courts have affirmed the enhancement for government contracting officers, program managers, and those who exert control or influence over purchases or disposition of property – positions of far less responsibility or power than LumHo exercised as the DAR under WITS 3. The Fourth Circuit recently affirmed that the enhancement applied to a mid-level government employee who lacked authority to sign contracts or purchase orders, but whose advice was critical in the final decision. *United States v. Conrad*, 760 F. App'x 199, 210 (4th Cir. 2019) (although "appellant did not have independent authority to award the contract, the record reflects that as the official leading the data migration project, Appellant's recommendation of who

should win the contract was given substantial deference.").

Likewise, in *United States v. Matzkin*, 14 F.3d 1014 (4th Cir. 1994), a defendant had bribed a supervisory engineer at the Navy who had responsibility for the technical aspects of major procurements. *Id*. at 1016. In return, the engineer passed non-public information to the bribe payer, recommended to a contract review panel that the bribe payer's clients win contracts, and sought to ensure that certain contracts were awarded without competition. *Id*. at 1016-17. The Fourth Circuit held that the engineer's ability to pass on non-public information and to make *recommendations* to the Navy about who should be awarded the contracts meant that the enhancement applied. *Id*. at 1021. Other circuits have reached similar results. For example, in *United States v. Johnson*, the Seventh Circuit upheld the enhancement on a city official with substantial influence over a city-run land bank program, reasoning that despite being outranked by many others,

> [w]hile Walton did not have a high rank or title within the City, he drafted resolutions recommending transfers of Land Bank properties to specific buyers for specific prices at specific times. Walton did not have overt influence over his superiors, but his resolutions were scarcely scrutinized, giving him de facto control over how and to whom Land Bank Properties were sold. The record supports that Walton's position was sensitive …

*Johnson*, 874 F.3d 990, 1002-03 (7th Cir. 2017). And in *United States v. Smith*, the Eleventh Circuit affirmed the enhancement applied to a civilian army program manager who exercised substantial influence over government contracting.  429 Fed. Appx. 840, 845 (11th Cir. 2011).[12]

LumHo exercised far more control over the WITS 3 ordering process than the officials in *Conrad*, *Matzkin* and *Johnson*.  Here, not only did defendant LumHo hold a national security

---

[12] Courts also routinely apply this enhancement to prison security guards and other officials with far less discretionary and supervisory authority than LumHo. *See United States v. Dodd*, 770 F.3d 306, 312 (4th Cir. 2014) (private correctional officer in low security facility); *United States v. Zamora*, 982 F.3d 1080, 1084 (7th Cir. 2020) (federal prison guard).

clearance, but he was the DAR for the DODIG in 2011 - 2012. As the DAR, he had almost exclusive control over the WITS 3 contract vehicle servicing the Department of Defense's law enforcement arm.  He could arrange the service orders directly with Capallia, then sign the orders, and essentially verify that the goods or services ordered were actually received. The defendant had nearly unfettered authority to sign service orders (many of them false), resulting in obligating the government to pay up to hundreds of thousands of dollars on any one order alone, and, in aggregate, many millions of dollars.  This clearly satisfies the guideline, as the commentary notes that "high level decision making or sensitive position means a position characterized by a direct authority to make decisions for, or on behalf of, a government department, agency, or other government entity, or by a substantial influence over the decision-making process."  U.S.S.G. § 2C1.1 cmt. n.4(A).

The defendant, as the head of the Unified Communications Division of the Information Systems Directorate of the DODIG, was responsible for leading and supervising others in a law enforcement body – the DODIG. Both his directorate chief (Matthew Steiniger) and his subordinates (Tommy Carlyle, for example) looked to him as the DAR and as the IT expert in ordering items under WITS 3 to support the DODIG's law enforcement mission. Occupying this position, LumHo was sophisticated enough to understand the weaknesses in the system – from how WITS 3 operated with little supervision, to how goods and services were delivered and accounted for by the employees in the property management office.  For these reasons, he also occupied a sensitive position apart from his discretionary decision-making role. Accordingly, the four-level enhancement is properly applied for both reasons.

17

*5.   The Defendant Obstructed Justice: +2*

The Pre-Sentence Report correctly applied a two-level obstruction of justice enhancement under U.S.S.G. § 3C1.1 based on defendant's obstructive behavior during the federal investigation as well as defendant's false testimony under oath during the trial. PSR ¶¶ 108, 109, 119. Section 3C1.1 provides for a two-level enhancement where:

> (1) The defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice with respect to the investigation, prosecution, or sentencing of the instant offense of conviction, and (2) the obstructive conduct related to (A) the defendant's offense of conviction and any relevant conduct; or (B) a closely related offense.

U.S.S.G. § 3C1.1. Defendant earns this enhancement both for his perjurious testimony on June 22, 2021, and for his obstructive acts during the investigation of the matter.

### a.   The Defendant Perjured Himself on June 22, 2021

The defendant willfully obstructed the administration of justice by taking the stand and committing perjury as to material matters in the instant trial. In *United States v. Dunnigan*, 507 U.S. 87, 113 S. Ct. 1111 (1993), the Supreme Court concluded that this enhancement may apply where, as here, a defendant willfully gives false testimony concerning a material matter related to the case. *Id*. at 94, 1116 ("[A] defendant's right to testify does not include a right to commit perjury."). To support its application, the Supreme Court stated that it was preferable for a district court to address "each element of the alleged perjury in a separate and clear finding." *Id*. at 95, 1117.

Applying *Dunnigan*, the Fourth Circuit has concluded that there are three elements necessary to impose a two-level enhancement for obstruction of justice based on the defendant's perjurious testimony: "the sentencing court must find that the defendant: '(1) gave false testimony; (2) concerning a material matter; (3) with willful intent to deceive.'" *United States v.*

*Perez*, 661 F.3d 189, 192-94 (4th Cir. 2011) (*quoting United States v. Jones*, 308 F.3d 425, 428 n.2 (4th Cir. 2002); *United States v. Sun*, 278 F.3d 302, 314 (4th Cir. 2002) (*citing United States v. Smith*, 62 F.3d 641, 646 (4th Cir. 1995)). Moreover, the Fourth Circuit has stated that the district court must provide a finding that "clearly establishes" each of the three elements. *Id*. (noting that with respect to willfulness, it would be enough for the court to say, "[t]he defendant knew that his testimony was false when he gave it.").  In *Jones*, the Fourth Circuit held that "[t]he sentencing court also must specifically identify the perjurious statements and make a finding either as to each element of perjury or " 'that encompasses all of the factual predicates for a finding of perjury.' " 308 F.3d at 428 n.2 (*citing United States v. Akinkoye*, 185 F.3d 192, 205 (4th Cir.1999) (*quoting Dunnigan*, 507 U.S. at 95).

Applying these parameters, the Fourth Circuit regularly upholds the application of the obstruction of justice enhancement where defendants take the stand in their defense and commit perjury as to material matters. For example, in *United States v. Perez*, No. 12-6303, 2012 WL 3642849, *2 (4th Cir. 2012), the Fourth Circuit affirmed the application of the enhancement where: [t]he court found that Perez falsely testified when he denied under oath that he was involved in cocaine trafficking, which directly contradicted Government witness testimony which the jury found more credible. Second, the court found that Perez's false testimony concerned a material matter, namely his guilt or innocence. Finally, the court found that Perez acted willfully with the intent to deceive ... by testifying in direct contradiction to witnesses whose testimony the jury found more credible....  *Id*.; *see also United States v. Ecklin*, 528 Fed.Appx. 357, 365-66, 2013 WL 2679080, *6 (4th Cir. June 14, 2013) (affirming application of enhancement after defendant's perjurious trial testimony); *United States v. Cartrette*, 502 Fed.Appx. 311, 319, 2012 WL 6734788, *7-*8 (4th Cir. 2012) (affirming application of

enhancement where defendant perjured himself at trial); *United States v. Quinn*, 359 F.3d 666, 681 (4th Cir. 2004) (affirming application of enhancement where defendant's false testimony was material because it concerned the essential facts of the crime charged.). Based on this standard, the United States submits that the trial record establishes by a preponderance of the evidence each element of the obstruction enhancement.

Like the defendant in *Perez*, the defendant took the stand at trial and: (1) gave false testimony; (2) concerning material matters, specifically, his guilt or innocence of the crimes charged; (3) with a willful intent to deceive the members of the jury regarding his commission of these crimes. First, the defendant gave testimony that was false and completely inconsistent with testimony of government witnesses and documentary evidence. As to the bribery charges, LumHo repeatedly denied engaging in illicit *quid pro quo* relationships with Wilson and his other co-conspirators. He denied ever taking anything from Wilson or MSO Tech.

During his testimony, LumHo did not simply deny the allegations; instead, he developed and articulated highly creative and fanciful explanations for some of the government's most critical evidence. As a result, the best examples of perjury are the absurd explanations that LumHo deliberately concocted to undercut the direct evidence of bribes and associated false claims in this case, including (transcript quotations are in the factual background section, above):

- Falsely inculpating Matthew Steiniger in approving each and every false claim, testifying that LumHo physically (not via email) showed each and every draft false service order to Steiniger, who ordered him to sign them.

- Falsely testifying it was Steiniger who ordered him to use WITS 3 to buy the Canon DSLR camera and high-end telephoto lenses. Again, Steiniger flatly contradicted him on this point, testifying there was no need for such high-end equipment.

- Falsely testifying that Steiniger ordered him to remove the camera detail from the draft false service order, which is why he called Capallia and left the furtive voicemail to take out that incriminating detail.

20

- Falsely testifying that Steiniger ordered him to sign the back-dated fair opportunity letter.

- Falsely testifying that he never really read or looked at the backdated, falsified fair opportunity letter that he signed, despite all the evidence to the contrary, including his cover email sending it back to Capallia in which he embellished the lie.

- Telling scores of lies about Fidel Ramos, for instance, that despite signing some of the payroll checks from MSO Tech and depositing them into Ramos's NFCU account, he never saw MSO Tech on the face of the checks or knew that the money was from MSO Tech, even though he had supposedly arranged the "job" with Barry Atwood.

- Lying about **Government Exhibit 174**, his email to Tim Donelson in which he made a veiled request for a bribe to pay for his Hawaiian vacation. LumHo claimed that he had no idea Wilson had paid for Capallia's Disney Cruise, and that the two large payroll checks that came to his residence after his email, each for over $6,5000 and one of which LumHo signed himself, had nothing to do with his email or his trip to Hawaii.

Second, defendant's false testimony concerned material matters as it went to the heart of his guilt or innocence to the criminal charges. Defendant's perjurious testimony concerned the core of the government's case: his demand and acceptance of things of value from Wilson in exchange for his signing materially false and inflated WITS 3 service order forms. Defendant lied about soliciting and accepting things of value, lied about supposed supervisory approval for signing the false claims, and lied about any knowledge of Fidel Ramos receiving money from MSO Tech – because it appears that he calculated that even admitting knowledge would result in a conviction on at least one felony (Count 12 – 18 U.S.C. § 1001-- the false OGE-450 form), if not many more.

Under these circumstances, the Court can easily conclude that LumHo took the stand on January 22, 2021 with the willful intent to deceive the jury and lie his way out of jail.  To put it simply, LumHo believed that he could smooth-talk and charm his way into a "not guilty" verdict,

but the jury saw through his act and convicted LumHo of nine felony counts. The United States has carried its burden of proving by a preponderance of the evidence that the two-level enhancement for obstruction of justice is highly justified in this case.

### b.  The defendant undertook other acts to obstruct justice

An alternative (and additional) basis for the application of this enhancement is that the defendant willfully impeded the federal investigation into his crimes. For instance, on December 7, 2014 the defendant signed a sworn statement to accompany his motion to quash an Inspector General subpoena for his bank records, which his retained counsel filed on December 9, 2014, in the Eastern District of Virginia. *See* **GX-1553**. The defendant affirmed under penalty of perjury that there was nothing relevant to investigators in his personal bank records. That was a rank lie designed to prevent the discovery of the Fidel Ramos no-show job with Bill Wilson. As adduced at trial, LumHo's bank statements clearly showed significant transfers of funds coming in from Fidel Ramos. *See, e.g.*, **GX-962**.  Investigators would have seen these transfers, then followed the money to the Ramos bank account (**GX-961**), which would have shown the payroll checks coming in from MSO Tech, as well as LumHo's actions in opening the account for his father-in-law. LumHo acted to prevent this discovery, despite later falsely testifying that he was helpful to the investigators. *See also* PSR ¶ 108.

Also, the defendant, even earlier, on February 11, 2013, had filed a false OGE-450 conflict-of-interest form. *See* **GX-1102**. The defendant signed it in the midst of an audit of WITS 3. In this disclosure form, he affirmed that he had no financial conflicts of interest with anybody doing business with the government. But as Keith Williams, the ethics officer for the DODIG, testified at trial, information concerning employment by family members is highly relevant to rooting out conflicts of interest, as are gifts (such as expensive cameras) received

22

from government contractors. As noted above, the jury convicted LumHo of this lie under Court 12 of the Superseding Indictment. As such, it, too, forms an independent basis to apply the obstruction enhancement for obstructing the WITS 3 audit and the investigation of the matter.

**B.    Section 3553(a) Factors**

Pursuant to the factors set forth in 18 U.S.C. § 3553(a), the government recommends a custodial sentence within the guidelines range as sufficient, but not greater than necessary, to achieve the goals of federal sentencing.

**1.    The Nature and Circumstances of the Offense.**

The Guidelines calculation conducted by U.S. Probation of an offense level 38 with a resulting range of 235-293 months' imprisonment in this case reflects "the seriousness of the offense." 18 U.S.C. § 3553(a)(2)(A); *United States v. Goff*, 501 F.3d 250, 257 (3d Cir. 2007) ("[T]he Guidelines reflect a carefully considered assessment of the seriousness of federal crimes").

Crimes committed by public officials are particularly insidious because they destroy the community's faith in its own governmental institutions. *See United States v. Spano*, 411 F. Supp. 2d 923, 940 (N.D. Ill), aff'd 447 F.3d 517 (7th Cir. 2006) ("Public corruption demoralizes and unfairly stigmatizes the dedicated work of honest public servants. It undermines the essential confidence in our democracy and must be deterred if our country and district is ever to achieve the point where the rule of law applies to all—not only to the average citizen, but to all elected and appointed officials").  As the Eleventh Circuit held:

> Bribery cannot properly be seen as a victimless crime, for in a sense it threatens the foundation of democratic government. Putting aside the financial havoc it can cause, bribery tears at the general belief of the citizenry that government officials will carry out their duties honestly, if not always competently. And that harm, though it may at times appear intangible, is real.

*United States v. Hayes*, 762 F.3d 1300, 1309 (11th Cir. 2014). The same is true here. That is because LumHo not only perverted WITS 3 to benefit his co-conspirators and himself, wreaking financial chaos on the DODIG, but he undermined the mission of the Inspector General – to fight waste, fraud, and abuse – from within the organization. He created distrust and undermined morale. It is hard to believe his actions would not also undermine public trust in the integrity of many Offices of Inspector General and the government more broadly.

Perjury is an equally serious criminal act, and it is something the defendant did in this Court to try to avoid accountability for his crimes. By impeding the ability to obtain the truth and undermining the integrity of judgments, LumHo's perjured testimony attacked the very core of our judicial system, which protects the essential freedoms of all citizens. *See United States v. Alvarez*, 567 U.S. 709, 720-21 (2012). That LumHo lied so extensively on June 22, 2021, warrants special condemnation.

The Court also must give meaningful weight to the Guidelines range, which "represent[s] the collective determination of three governmental bodies—Congress, the Judiciary, and the Sentencing Commission—as to the appropriate punishments for a wide range of criminal conduct." *United States v. Cooper*, 437 F.3d 324, 331 n.10 (3d Cir. 2006) (quotation omitted); *accord Rita v. United States*, 551 U.S. 338, 346-47 (2007) (noting that an appellate presumption of reasonableness of a guidelines sentence is permissible, and that many sentences that fall within the guidelines wil be reasonable, although sentencing court must reach independent determination).  Likewise, "[t]he fact that § 3553(a][(4)] explicitly directs sentencing courts to consider the Guidelines supports the premise that district courts must begin their analysis with the Guidelines and remain cognizant of them throughout the sentencing process." *United States v. Langford*, 516 F.3d 205, 211-12 (3d Cir. 2008) (quotation omitted). Moreover, "the authors of

the Guidelines, no less than district courts, have been tasked with ensuring that criminal sentences meet the goals of sentencing set forth in § 3553(a)," *United States v. Merced*, 603 F.3d 203, 221-22 (3d Cir. 2010), and have prepared "Guidelines that seek to embody the § 3553(a) considerations," *Rita,* 551 U.S. at 347-50. 28 U.S.C. §§ 991(b)(1)(A), 994(f). In general, then, "a within-guidelines range sentence is more likely to be reasonable than one that lies outside the advisory guidelines range[.]" *Goff*, 501 F.3d at 257 (quotation omitted). Consequently, a guidelines sentence of imprisonment for LumHo's corruption, fraud, false claims and false statement convictions, and his associated obstructive conduct, such as perjuring himself at trial, is eminently reasonable. The sentencing court, however, "may not presume that the Guidelines range is reasonable." *Nelson v. United States*, 555 U.S. 350, 352 (2009). The "Guidelines should be the starting point and the initial benchmark," but the sentencing court must also "consider all of the § 3553(a) factors" in determining the appropriate sentence. *Id.; see also Clark*, 434 F.3d at 685.

The sophistication of this scheme and the built-in opaqueness of government procurement processes all created opportunities for obfuscation and misdirection by LumHo and his co-conspirators. These factors made the crime more difficult to unravel, and thereby deserving of greater punishment than an ordinary fraud. *See, e.g.*, *United States v. Hefferman*, 43 F.3d 1144, 1149 (7th Cir. 1994) ("Considerations of (general) deterrence argue for punishing more heavily those offenses that either are lucrative or are difficult to detect and punish, since both attributes go to increase the expected benefits of a crime and hence the punishment required to deter it.").

## 2.   Promote Just Punishment,  Respect for the Rule of Law and Provide General Deterrence to Others

The defendant's intentional, calculated conduct calls for a significant term of incarceration to deter others from making similar decisions. *See United States v. Shortt*, 485 F.3d 243, 251-52 (4th Cir. 2007) ("As a practical matter, extensive efforts to conceal demand greater punishment, because they make it less likely that authorities will detect the scheme."); *see also United States v. Martin*, 455 F.3d 1227, 1240 (11th Cir. 2006) (finding that crimes that are "rational, cool, and calculated" rather than "crimes of passion or opportunity" are "prime candidates for general deterrence") (citation omitted).

With respect to public corruption schemes of this level of complexity, especially in light of the difficulty of detection and the potentially enormous financial windfall from pulling them off, imprisonment most effectively promotes general deterrence, especially when confronted with a defendant who took so many willfully obstructive acts and remains so defiant. *See e.g. United States v. Hayes*, 762 F.3d 1300, 1311 (11th Cir. 2014) (recognizing that a sentence of probation may be ineffective in deterring corruption). "General deterrence comes from a probability of conviction and significant consequences. If either is eliminated or minimized, the deterrent effect is proportionately minimized." *United States v. Morgan*, 635 F. App'x 423, 450 (10th Cir. 2015).

Absent a meaningful term of imprisonment, general deterrence —"the effort to discourage similar wrongdoing by others through a reminder that the law's warnings are real and that the grim consequence of imprisonment is likely to follow"—will not be achieved. *United States v. Bergman*, 416 F. Supp. 496, 499 (S.D.N.Y. 1976); *see also United States v. Anderson*, 517 F.3d 953, 966 (7th Cir. 2008) (affirming sentence where the "judge stressed the corrosive effect that corruption has on the public trust and expressed his belief that the scandals will not

26

end unless they are treated 'appropriately hard' "). Accordingly, a within-guidelines sentence of imprisonment will serve as adequate deterrence in this case.

Further, the defendant's false accusations against many —chief among them Matthew Steiniger, but others at the DODIG— and his manipulation of his illiterate father-in-law, certainly victimized these individuals above and beyond any harm to the government and the public generally. The Fourth Circuit recognizes that harm caused to secondary victims is something the Court is entitled to consider in sentencing a defendant. *See United States v. Jinwright*, 683 F.3d 471, 488 (4th Cir. 2012) (in case where the government is pecuniary victim, "[w]e have recognized, however, that the offense of conviction may harm secondary victims as well") (citing *United States v. Akinkoye*, 185 F.3d 192, 204 (4th Cir.1999); *United States v. Turner*, 102 F.3d 1350, 1360 (4th Cir.1996); *United States v. Bhagavan*, 116 F.3d 189, 193 (7th Cir.1997)). Certainly, the defendant's false accusations against Steiniger, his betrayal and manipulation of his colleagues, and his callous use of his father-in-law in the scheme and through both trials, these are all forms of secondary victimization that should be considered in punishing the defendant and deterring him from future complex crimes.

There are other secondary victims as well, such as Verizon —the other contractor under WITS 3. By perverting the Fair Opportunity process under WITS 3 and steering all work to Level 3 and MSO Tech, rather than seeking a quote from Verizon, LumHo denied Verizon any chance to do business with the DODIG. That is another reason why his false and backdated fair opportunity letter (**GX-172**) was much more significant than he tried to make it appear at trial, when he testified that he was simply helping Capallia stay out trouble with Tim Donelson. Presumably, had Verizon been given a chance, its program managers would have obtained three quotes at fair prices for allowable goods and services to be provided, rather than steering the

27

work to Bill Wilson at inflated prices. And in some cases, Verizon would have honestly said that WITS 3 could not be used at all for certain purchases, for instance to hire people like Donny Ravas for routine moving services or to purchase Canon camera equipment to be shipped to Barry Atwood's residence. By perverting the Fair Opportunity process, LumHo entirely eliminated competition, rigging these service orders, building in inflated prices, and concealing the likely detection of the crime. He harmed other government contractors, other businesses, and he contributed to the cynicism that many people in the business world and the public have in their government when they say that the system is rigged or unfair. In other words, this was not just some abstract exercise in overbilling the government with no real harm to individuals or other businesses. Because of that, too, the defendant deserves lengthy jail time.

A light sentence or one that could be perceived as a mere "slap on the wrist" would send precisely the wrong message to the public and the thousands of public officials in this community who are watching. That the defendant occupied a high position within the DODIG and betrayed not only the organization, but also the personal trust of many of his colleagues, means that he is especially deserving of real carceral punishment, and by that same token, his colleagues, the DODIG, and the larger community deserve to see that real justice is done here. Not only did LumHo bring disrepute on the DODIG by his actions, but he harmed many of his colleagues in the process.

### 3. Specific Deterrence – the Need to Incapacitate a Capable and Unrepentant Defendant

LumHo has not exhibited one ounce of acceptance of responsibility or remorse. He is a prime example of an individual who requires specific deterrence. He took advantage of his official position and corrupted it. He put his own interests first at the expense of the DODIG. He repeatedly lied under oath. He defiantly has refused to accept responsibility despite his

overwhelming guilt. He has not given a single indication that under similar circumstances he would change his behavior. He has shown himself to be cold, calculating, and willing to blame everybody else to save himself: his own father-in-law, the boss who hired and promoted him and gave him sterling reviews, his subordinates, and many others.  It is well-settled that "lack of remorse is a fact that a district court can consider in its evaluation of the § 3553(a) factors." *United States v. Sweat*, 573 F. App'x 292, 298 (4th Cir. 2014); *see also United States v. Keskes*, 703 F.3d 1078, 1090–91 (7th Cir. 2013) ("A lack of remorse is a proper sentencing consideration 'because it speaks to traditional penological interests such as rehabilitation (an indifferent criminal isn't ready to reform) and deterrence (a remorseful criminal is less likely to return to his old ways).'" (citation omitted)); *United States v. Mitchell*, 681 F.3d 867, 884–85 (6th Cir. 2012) (bribery case; distinguishing lack of remorse, where defendant persisted in denying his involvement following jury verdict, from exercise of trial right); *United States v. Cruzado-Laureano*, 527 F.3d 231, 236–37 (1st Cir. 2008) (rejecting argument that including lack of remorse in section 3553 analysis was unfair "double counting" where court also denied downward offense level adjustment for acceptance of responsibility); *United States v. Smith*, 424 F.3d 992, 1016–17 (9th Cir. 2005) (approving district court's above-Guidelines sentence in a tax protestor fraud case based in part on defendant's lack of remorse).

Make no mistake – defendant LumHo is extremely technically savvy. He engaged in the crimes of conviction without any apparent financial need to do so. His current net worth alone, even after years of being on unpaid leave, shows that he had no real economic need to commit these crimes. Rather, it appears he engaged in the crimes, at least in part, for more complex reasons, such as ego, arrogance, or some need to put one over on his colleagues. A light sentence would not deter him from finding employment again in short order, especially in some of the

more nebulous worlds that technical savvy offers. The government respectfully urges this Court to keep this in mind when sentencing the defendant – that his happy betrayals and his eager obstruction bode ill for any real change in his behavior.

The Court is also in the position to have observed the defendant's demeanor at trial, on the witness stand, at counsel table, and at sidebar. This was not a person who reflected on the nature of his own conduct and showed any remorse or concern for others; rather, this was a person who believed he could talk his way out of all the evidence by lying readily and earnestly. The defendant remains perfectly capable of charming people, building trust, and then exploiting those relationships to commit serious crimes whenever he completes his sentence in this case.

### 4.    Avoid Unwarranted Sentencing Disparities

Any argument that the sentence of Ron Capallia should form some basis for LumHo to profit under Section 3553(a) completely misses the mark: Capallia undid much of the harm he engaged in by accepting responsibility early and fully cooperating. Capallia also expressed remorse both on the witness stand and to this Court.  LumHo did exactly the opposite: he obstructed justice, falsely implicated others, and arrogantly and coldly used and manipulated others. For those reasons, he is not deserving of a substantial downward variance.

Nor does the defendant's prior public service or his charitable work, much of it apparently undertaken after his indictment in this case, merit a substantial downward variance. Indeed, good works are ordinarily not a proper basis for a lower sentence. One reason is that it would provide an unfair advantage for white-collar defendants. As the Fourth Circuit has recognized:

> [T]o allow any affluent offender to point to the good his money has performed and to receive a downward departure from the calculated offense level on that basis is to make a mockery of the Guidelines. Such accommodation suggests that a successful criminal defendant need only write out a few checks to charities and

> then indignantly demand that his sentence be reduced. The very idea of such
> purchases of lower sentences is unsavory, and suggests that society can always be
> bought off, even by those whose criminal misconduct has shown contempt for its
> well-being.

*United States v. McHan*, 920 F.2d 244, 248 (4th Cir. 1990); *see also United States v. Peppel*, 707

F.3d 627, 640-41 (6th Cir. 2013) (reversing overly lenient sentence for prominent businessman

who pled guilty to securities fraud and money laundering: "[T]here is nothing to indicate that the

support provided by Peppel to his family, friends, business associates, and community is in any

way unique or more substantial than any other defendant who faces a custodial sentence. Further,

Peppel's status in the community and chosen profession cannot alone be the basis for

such a conclusion."); *United States v. Morken*, 133 F.3d 628, 630 (8th Cir. 1998) (downward

departure reversed for businessman who performed substantial community service and raised

money for charity, on grounds that it was "neither exceptional nor out of the ordinary for

someone of his income and preeminence"). *See also United States v. Vrdolyak*, 593 F.3d 676,

682 (7th Cir. 2010) (reversing trial court's imposition of probationary sentence for public official

because trial court gave undue weight to letters urging leniency for the defendant and ignored the

fact that "[p]oliticians are in the business of dispensing favors; and while gratitude like charity is

a virtue, expressions of gratitude by beneficiaries of politician's largesse should not weigh in

sentencing").

     Finally, the best way to avoid an unwarranted sentencing disparity with respect to

LumHo, given all the factors discussed above specific to him and to his role in this case, is to

sentence him within the advisory guideline range. That is because, as the Seventh Circuit has

noted, "[s]entencing disparities are at their ebb when the Guidelines are followed, for the ranges

are themselves designed to treat similar offenders similarly." *United States v. Boscarino*, 437

F.3d 634, 638 (7th Cir. 2006) (noting light sentence for cooperating defendant was appropriate

and lengthy sentence for defendant who did not was appropriate, and was not a disparity, but a justifiable difference); *see also United States v. Matthews*, 701 F.3d 1199, 1205 (7th Cir. 2012) (*quoting United States v. Smith*, 510 F.3d 603, 610 (6th Cir.2010)) ("To find an unwarranted disparity in this case would allow defendants to bind district courts according to the most lenient sentence that another court had imposed for a similar crime.")."

## III.   Conclusion

Based on the foregoing, the government respectfully recommends that the Court impose a period of imprisonment within the advisory guideline range, a meaningful criminal fine, forfeiture in the amount of $41,159.33, and a term of supervised release.

Respectfully submitted,

Jessica D. Aber
United States Attorney

By:         /s
Matthew Burke
Russell L. Carlberg
Assistant United States Attorneys
Eastern District of Virginia
Counsel for the United States of America
United States Attorney's Office
2100 Jamieson Avenue
Alexandria, VA 22314
Tel.: (703) 299-3700
Fax:  (703) 299-3981

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that on the 13th day of October, 2021, I electronically filed the foregoing

document with the Clerk of Court using the CM/ECF system, which will send a notification of

such filing (NEF) to all counsel of record.

A copy also will be sent via email to:

Kelly M. Smihal
Senior United States Probation Officer
Kelly_Smihal@vaep.uscourts.gov


Russell L. Carlberg
Assistant United States Attorney